UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TABERNA CAPITAL MANAGEMENT, LLC, | : District Court Case No.: 08 CV 1817 [JSR] |
| Plaintiff, | : |
| - against - | : |
| SIDNEY B. DUNMORE, MICHAEL A. KANE, and DHI DEVELOPMENT f/k/a DUNMORE HOMES, LLC, | : |
| Defendants. | : |
| | : |
| | : |

**REQUEST FOR JUDICIAL IN SUPPORT OF SIDNEY B. DUNMORE'S MOTION TO (1) DISMISS FOR LACK OF PERSONAL JURISDICTION; OR IN THE ALTERNATIVE, (2) TO DISMISS OR TRANSFER FOR IMPROPER VENUE; OR IN THE ALTERNATIVE, (3) TO TRANSFER FOR CONVENIENCE TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA, <u>SACRAMENTO DIVISION</u>**

Pursuant to Federal Rule of Evidence 201, defendant Sidney B. Dunmore ("Dunmore"), by and through his undersigned attorneys, files this Request for Judicial Notice of the following pleadings of record and other documents set forth below on the grounds that they constitute records capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, in support of Dunmore's Motion To (1) Dismiss For Lack Of Personal Jurisdiction; Or In The Alternative, (2) To Dismiss Or Transfer For Improper Venue; Or In The Alternative, (3) To Transfer For Convenience, To The United States District Court For The Eastern District Of California, Sacramento Division:

1.        Published Memorandum Opinion And Order Granting Motion For Transfer of Venue To The Eastern District of California, Sacramento Division  rendered by the Honorable, United States Bankruptcy Court Judge, Martin Glenn dated January 14, 2008 , a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated herein by this reference and made a part hereof;

2.        Notice to Federal Court of Removal of Civil Action From State Court , a true and correct copy of which is attached hereto as Exhibit "B" and is incorporated herein by this reference and made a part hereof;

3.        California Secretary of State Records of DHI Development dated February 29, 2008, a true and correct copy of which is attached hereto as Exhibit "C" and is incorporated herein by this reference and made a part hereof; and

/ / /

/ / /

/ / /

4.        Delaware Secretary of State Records of Taberna Capital Management, LLC dated March 5, 2008, a true and correct copy of which is attached hereto as Exhibit "D" and is incorporated herein by this reference and made a part hereof.

Dated: March 10, 2008        LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

By: _____/s/ David L. Neale_____

David L. Neale (DN 1948/CA State Bar No. 141225)
Beth Ann R. Young (CA State Bar No. 143945) (Pro Hac Pending)
Michelle Sharoni Grimberg (CA State Bar No. 217327) (Pro Hac Pending)

10250 Constellation Boulevard, Suite 1700
Los Angeles, California  90067
Telephone:    (310) 229-1234
Facsimile:    (310) 229-1244

Attorneys for Defendant Sidney B. Dunmore

# <u>Exhibit A</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                           :
In re:                    :
                       :     Case No.: 07- 13533 (MG)
       DUNMORE HOMES, INC.,    :     Chapter 11
                       :
                 Debtor    :
-------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR TRANSFER OF VENUE TO THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

**A P P E A R A N C E S :**

PACHUSKI STANG ZIEHL & JONES LLP
*Counsel for the Debtor and Debtor in Possession*
780 Third Avenue, 36th Floor
New York, NY 10017-2024
By:    Richard M. Pachulski
        Debra Grassgreen
        Maria A. Bove

DIANA G. ADAMS
*Office of the United States Trustee*
33 Whitehall Street
21st Floor
New York, NY 10004
By:    Richard C. Morrissey

LOWENSTEIN SANDLER, PC
*Counsel for Weyerhaeuser Realty Investors, Inc., et al:.*
1251 Avenue of the Americas
New York, NY 10020
By:    Bruce Buechler

ORRICK, HERRINGTON & SUTCLIFFE, LLP
*Counsel for IndyMac Bank:*
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
By:    Frederick D. Holden, Jr. (Telephonic Appearance)

1

PILLSBURY, WINTHROP, SHAW & PITTMAN, LLP
*Counsel for Guaranty Bank:*
1540 Broadway
New York, NY 10036
By:    Rick B. Antonoff

SEWARD & KISSEL, LLP
*Counsel for Guaranty Bank:*
One Battery Park Plaza
New York, NY 10004
By:    John R. Ashmead

KAYE SCHOLER
*Counsel for Key Bank National*:
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA 90067
By:    Marc Cohen

DOWNEY BRAND
*Counsel for Teichert Construction and Cal Sierra Construction:*
555 Capitol Mall
10th Floor
Sacramento, CA 95814
By:    R. Dale Ginter (Telephonic Appearance)

HEFNER, STARK & MAROIS, LLP
*Counsel for Hemington Landscape Services:*
2150 River Plaza Drive
Suite 450
Sacramento, CA 95833
By:    Howard S. Nevins (Telephonic Appearance)

PARKINSON PHINNEY
*Counsel for SGN Construction, Inc.:*
400 Capitol Mall
11th Floor
Sacramento, CA 95814
By:    Donna T. Parkinson (Telephonic Appearance)

LAW OFFICE OF WILLIAM WEBB-FARRER
*Counsel for Mackay & Somps Civil Engineers:*
300 Montgomery Street, Suite 600
San Francisco, CA 94104
By:    Don Raub (Telephonic Appearance)

2

FRANDZEL, ROBINS, BLOOM & CSATO, L.C.
*Counsel for Affinity Bank*
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, CA 90048
By:     Craig A. Welin (Telephonic Appearance)

MORRISON & FOERSTER, LLP
*Counsel for the Official Committee of Unsecured Creditors:*
425 Market Street
San Francisco, CA 94105-2482
By:     Adam A. Lewis
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
By:     Alexandra Steinberg Barrage

SEWARD & KISSEL, LLP
*Counsel for Bank of New York:*
One Battery Park Plaza
New York, NY 10004
By:     John R. Ashmead

JENNINGS, HAUG & CUNNINGHAM
*Counsel for Travelers Bond:*
2800 North Central Avenue
Suite Eighteen Hundred
Phoenix, AZ 85004-1049
By:     Chad L. Schexnayder (Telephonic Appearance)

SHEPPARD MULLIN RICHTER & HAMPTON
*Counsel for Comerica Bank:*
Seventeenth Floor
Four Embarcadero Center
San Francisco, CA 94111
By:     Geraldine A. Freeman (Telephonic Appearance)

LANG, RICHERT & PATCH
*Counsel for PML Landscape:*
5200 North Palm Avenue, 4th Floor
Fresno, CA 43755
By:     Matthew W. Quall (Telephonic Appearance)

**MARTIN GLENN**
United States Bankruptcy Judge

Pending before this court is a motion by creditors seeking an order transferring venue of this chapter 11 case pursuant to 28 U.S.C. § 1412 to the Eastern District of California, Sacramento Division. (ECF Doc. # 54.) The original moving parties were Cal Sierra Construction Inc., Pacific Paving Co., Inc., and Valley Utility Services, Inc. (*Id.*) The motion was joined by other creditors[1] of Dunmore Homes, Inc. (hereinafter "Debtor"), or its non-Debtor affiliates. The transfer venue motion has been opposed by the Debtor and two creditors, Bank of New York Trust Company, N.A. ("Bank of New York") and KeyBank National Association ("KeyBank"). (ECF Doc. # 104, 114, 117.) For the reasons provided below, the motion to transfer venue is granted.

## BACKGROUND

The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Southern District of New York on November 8, 2007 ("Petition Date"). Prior to its filing, the predecessor to the Debtor, Dunmore Homes, a California corporation ("Dunmore California") performed entitlement and land development work, prepared sites for homebuilding, and built single-family residential housing throughout Northern and Central California. (ECF Doc. # 2.) Beginning in September 2005, Dunmore California experienced declining home absorption and pricing levels and deteriorating financial performance. In response, Dunmore California and its subsidiaries halted nearly all home construction, land development operations and sales on August 1, 2007. (*Id.* at ¶ 14.) Additionally, beginning in August 2007, Dunmore

---

[1]      These other moving parties are Teichert Construction, Inc., Aleco Corp., Granite Construction Co., DeSilva Gates Construction, L.P., Travelers Bond, Weyerhaeuser Realty Investors, Inc., Hemington Landscape Services, Inc., SGN Construction, Inc. and the Official Unsecured Creditors Committee. (ECF Doc. # 66, 84, 99, 107, 109, 110, 130.)

4

California and the subsidiaries experienced a series of technical and non-technical defaults under many of its existing secured debt agreements.

On September 10, 2007, Dunmore California sold all of its assets to the Debtor, Dunmore Homes, Inc., a New York corporation ("Dunmore New York"), wholly owned by Michael Kane. (*Id.* at ¶ 9.) Mr. Kane resides in California. Dunmore California is wholly owned by Sidney B. Dunmore. (*Id.* at ¶¶ 9, 10.) Mr. Dunmore resides in California. Dunmore California's assets were sold for $500.00 and the assumption of all of the company's debts and liabilities by Dunmore New York. At the time of the sale transaction, Mr. Dunmore owed Dunmore California approximately $11.2 million. This obligation was unsecured. As part of the sale transaction, Mr. Dunmore signed a promissory note secured by a pledge of an anticipated personal tax refund he hopes to receive as a result of the loss upon the sale of Dunmore California to Dunmore New York.[2] Contemporaneously with the sale, Dunmore California changed its name to DHI Development, Inc., a California corporation. On November 8, 2007, fifty-nine days after the purchase of Dunmore California, the Debtor filed its chapter 11 petition in New York. As of the Petition Date, the Debtor employed approximately 37 people, down from approximately 132 during the same time last year.[3] The Debtor has no office, employees, or bank accounts in New York. Its only presence in New York is its recent incorporation in this state.

The Debtor and its non-debtor affiliates (the "Dunmore Companies") are developing 26 communities, organized into fourteen limited liability companies and one limited partnership

---

[2]     It seems clear that the sale was designed so that Mr. Dunmore could obtain a tax refund, use it to reduce his debt to the company, and enable the company to pay down some of the debt on which Mr. Dunmore is a guarantor. Dunmore New York benefited from the transaction to the extent that the previously unsecured obligation from Mr. Dunmore became at least partially secured.

[3]     During the January 11, 2008 omnibus motion hearing, the Debtor disclosed that only seventeen employees and two independent contractors remain.

5

(collectively, the "Subsidiaries"), all owned (in whole or in substantial part) by the Debtor.[4] (*Id.* at ¶ 12.) The Dunmore Companies financed fifteen subsidiaries, representing twenty-five communities, with secured debt at the subsidiary level. The financing has been provided by nine different lenders (or lending groups). Many of the loans to the Subsidiaries are guaranteed by the Debtor (or the Debtor is a co-borrower). [5] The Subsidiaries are not currently debtors but are engaged in out of court restructuring.[6] (*Id.* at ¶ 12.)

As of September 30, 2007, the book value of the Debtor's consolidated assets was $280,592,251 and the book value of consolidated liabilities was $250,285,447. (*Id.* at ¶ 17.) As of the Petition Date, the Debtor's principal assets included: (a) its interests in the Subsidiaries; (b) cash on hand of approximately $119,000, (c) an option to purchase 19.8 acres of property in Northern California with an estimated value in excess of the option exercise price of $815,000, (d) the Debtor's interest in the Executive Non Qualified Excess Plan valued at approximately $1,700,000, (e) the promissory note from Mr. Dunmore, in the amount of approximately $11.2 million as of the Petition Date, secured by Mr. Dunmore's anticipated 2007 Federal tax refund, (f) 161 acres of mitigation property in Northern California, encumbered by a first lien in favor of

---

[4]     The Subsidiaries are: Dunmore Canterbury LLC; Dunmore Country Vilas, LLC; Dunmore Fullerton Ranch, LLC; Dunmore Highland, LLC; Dunmore Laguna Reserve, LLC; Dunmore Orchard LLC; Dunmore-Providence LLC; Dunmore Stone Creek, LLC; Fahrens Park LP; Dunmore Viscaya LLC; Dunmore Diamond Ridge LLC; Dunmore Croftwood LLC; Dunmore Westport, LLC; Dunmore Sycamore Ranch LLC; and Dunmore Montecito LLC. The Debtor wholly owns all of the Subsidiaries except Dunmore Croftwood, LLC, Dunmore Diamond Ridge, LLC, Dunmore Highlands, LLC and Dunmore Viscaya, LLC, all of which are operated as joint ventures with Weyerhauser Realty Investors. The Debtor also has an interest in the following inactive subsidiaries: Dunmore Brown Estates, LLC; Dunmore Reflections II, LLC; Dunmore Wildhawk, LLC; Fairways, LLC; Dunmore Sierra, LLC; Dunore Delano, LLC; Dunmore Wildhawk North LP; and the Dunmore Homes Statutory Trust 1.

[5]     All of Dunmore California's guarantees or obligations as co-obligor with the Subsidiaries were assumed by Dunmore New York as part of the sale.

[6]     Foreclosure proceedings are ongoing in California against several of the Subsidiaries' properties, with the earliest foreclosure possibly occurring in January 2008. Debtor's counsel represented to the Court that the Debtor has no present intention to file additional chapter 11 cases for Subsidiaries facing imminent foreclosure, but counsel also did not completely rule out that possibility.

Sacramento Valley Farm Credit ("Stone Mitigation Property"). (*Id.* at ¶ 18.) The Court approved the sale of the Stone Mitigation Property for $4,360,000 on December 14, 2007. (ECF Doc. # 176.) The sale closed before year-end and the proceeds were paid first to the first lien holder, Sacramento Valley Farm Credit, and then to pay down the debtor-in-possession financing. (*Id.*)

The Debtor's direct liabilities consist of approximately $2 million in debt, secured by a second lien on the assets of Dunmore Fullerton Ranch, LLC, Dunmore Highland, LLC, and Dunmore Montecito LLC, and $20 million of junior subordinated notes that mature in 2035. (*Id.* at ¶ 19.) Bank of New York is the indenture trustee for the subordinated notes. The Debtor also has significant indirect liabilities resulting from its obligations as guarantor or co-borrower of secured debts of various Subsidiaries held by RBC Builder Finance; Indymac Bank F.S.B.; Guaranty Bank; KeyBank; Wachovia Bank, N.A. ("Wachovia"); Affinity Bank; Comerica Bank; Franklin Bank; and United Commercial Bank. The total amount of secured debt to Subsidiaries for which the Debtor is a guarantor or co-borrower was approximately $195 million as of the Petition Date. In the first instance, the security for this debt is California real property owned at the subsidiary level.

In addition to the above debt, Travelers Casualty and Surety Company of America ("Travelers") issued payment and performance bonds ("Bonds") in favor of certain of the Subsidiaries. Dunmore California and Mr. Dunmore each executed a General Agreement of Indemnity in favor of Travelers for any loss incurred in connection with the Bonds. The Debtor assured Dunmore California's obligations to Travelers in connection with the indemnity agreement. Travelers asserts a security interest in Dunmore California's property to secure the indemnification obligation.

7

Pursuant to the Debtor's Amended List of Creditors Holding Thirty Largest Unsecured Claims, the indirect institutional creditors listed above are geographically dispersed in California, Texas, North Carolina,[7] and Ohio.[8] (ECF Doc. # 115, 116.) Bank of New York, the indenture trustee of the $20 million of subordinated notes, is the only one of the top 30 creditors in New York. (ECF Doc. # 115.) There is no indication about who owns the subordinated notes and where the noteholders are located. The majority of the creditors comprising the remainder of the top thirty creditors are trade creditors located in California. (*Id.*) Of the thirty largest creditors shown on the Amended List, seven have joined the venue transfer motion, representing approximately $23,578,998.46 of debt, and two have opposed the motion representing $56,700,000 in debt. (*Id.*) In terms of the number of creditors, twenty-four of the top thirty are located in California. (*Id.*) It appears undisputed that the vast majority of creditors below the top thirty are trade creditors located in California.

The Moving Parties filed the change of venue motion pursuant to 28 U.S.C. § 1412 on November 26, 2007. (ECF Doc. # 54.) The motion was not based on allegations that the Southern District of New York was an improper venue pursuant to 28 U.S.C. § 1408[9]; rather, the motion claimed that venue should be changed based on consideration of the interests of justice and the convenience of parties.

The Moving Parties alleged that they were listed in the Debtor's schedule of top twenty unsecured creditors and that they were representative of most of the creditor classes that are California-based businesses. (*Id.*) The motion argues that the smaller creditors will suffer

---

[7] Wachovia is headquartered in North Carolina but the Debtor's loans are administered by Wachovia's Philadelphia, Pennsylvania office. (ECF Doc. # 115 at ¶ 13.)

[8] KeyBank is headquartered in Ohio, but the Debtor's loans are administered in Bellevue, Washington. (ECF Doc. # 117 at ¶ 6.)

[9] In the motion and at oral argument, the Moving Parties recognized that the incorporation of the Debtor, Dunmore New York, in New York provides a sufficient nexus to the state to confer venue. (ECF Doc. # 54 at ¶ 23 n.2.)

8

substantial burden and expense participating in this case in New York whereas the large
institutional creditors located outside of California would incur no additional expense if the
proceedings were transferred. The motion alleges that the Debtor has no other domestic business
activity or presence outside of California. (*Id.*) The Debtor's assets, employees, and pending
litigations, among other things, are located in California. Dunmore New York was recently
incorporated in New York to facilitate the purchase of Dunmore California for nominal
consideration. As already mentioned, Dunmore New York has no office, employees, assets or
bank accounts in New York. The motion alleges that the Debtor's initial decision to file in New
York was an attempt at forum shopping as a means to limit certain creditors access to the
proceedings. Importantly, the Unsecured Creditors Committee supports the motion to transfer
venue to the Eastern District of California.

The Debtor's opposition relies on the weight given to the Debtor's choice of venue, the
percentage of the dollar amount of debt held by creditors located outside California, the
familiarity of this Court with the facts versus the time and expense in familiarizing a new court
with the case, and the focus of the restructuring on securing financing rather than operational
issues. The Debtor argues that the largest creditors who are the most likely to be very active in
the case are large national banks with headquarters outside of California and that the smaller
creditors, like the trade creditors, would still be able to participate telephonically and through the
electronic filing of motions. (ECF Doc. # 114.) The Debtor argues that its direct debts are not
principally held by California entities. (*See id.*) The Debtor also argues that this case is
principally about finding funding for a sale or orderly wind-down of Debtor's business and, as
such, the chapter 11 case is not going to directly impact many of the trade creditors, who are not
direct creditors of the Debtor but of the Subsidiaries. The Subsidiaries, who are not currently in

9

bankruptcy, are still available for the creditors to proceed against in California. (*Id.*) Two large creditors, KeyBank and Bank of New York, have joined the Debtors' opposition to the transfer venue motion. (*See* ECF Doc. # 104, 117.) Bank of New York alleges that it is the only creditor whose claim is against the Debtor alone with no recourse to the Subsidiaries. (ECF Doc. # 104.) KeyBank holds the debt of several Subsidiaries, for which the Debtor was a guarantor or co-borrower. (ECF Doc. # 117.) KeyBank contends that it holds the largest amount of debt owed by the Subsidiaries. As a result, both argue that they represent the most significant creditor interests and prefer New York as the venue for this case.

## DISCUSSION

### A. Proper Venue under 28 U.S.C. §1408

28 U.S.C. §1408 states that a chapter 11 case may be commenced in the district court for the district in which "the domicile, residence, principal place of business in the United States, or principal assets in the United States . . . have been located for a hundred and eighty days immediately preceding such commencement . . . ." The statute is written in the disjunctive making venue proper in any of the listed locations. *In re Segno Commc'n, Inc.*, 264 B.R. 501, 505 (Bankr. N.D. Ill. 2001) (finding any of the four is jurisdictionally sufficient). A corporation's domicile is generally held to be its state of incorporation. *In re B.L. of Miami, Inc.*, 294 B.R. 325, 328 (Bankr. D. Nev. 2003) (finding venue in Nevada proper because it was the state of incorporation); 1 COLLIER ON BANKRUPTCY ¶ 4.01[2][b] (15th ed. rev. 2007). In this case, the Debtor, Dunmore New York, was incorporated in New York and would be considered domiciled here. Therefore, the venue selected by the Debtor is proper under § 1408.

### B. Change of Venue Pursuant to § 1412

Finding venue proper under § 1408, consideration of the transfer venue motion must then turn to the discretionary power granted courts pursuant to 28 U.S.C. § 1412. After a case or

10

proceeding has commenced in a proper district, it can be transferred to another district court if the court finds the transfer would be in the interest of justice or for the convenience of parties. 28 U.S.C. § 1412; *In re B.L. of Miami,* 294 B.R. at 328. Section 1412 is worded in the disjunctive allowing a case to be transferred under *either* the interest of justice rationale or the convenience of parties rationale. *Enron Corp. v. Arora (In re Enron Corp.),* 317 B.R. 629, 637 (Bankr. S.D.N.Y. 2004). The decision to transfer venue is within the discretion of the court, as evidenced by the use of the permissive "may" in § 1412. *Id.* at 638 n.8. A court should base its analysis on the facts underlying each particular case. *See id.* at 638; *Gulf States Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.),* 896 F.2d 1384, 1391 (2d Cir. 1990) (review should be on individualized basis). However, "the power to transfer a case [or proceeding] should be exercised cautiously." *In re Enron,* 317 B.R. at 638 (citing *In re Toxic Control Technologies, Inc.,* 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988)). A debtor's selection of a proper venue is "entitled to great weight" in the consideration of change of venue motions. *In re Enron Corp.,* 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002). As a result, "a heavy burden of proof rests on the moving party to demonstrate that the balance of convenience clearly weighs in his favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.),* 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982) (deciding motion to transfer an adversary proceeding from the district in which the main bankruptcy case was filed). "The party moving for change of venue bears the burden of proof and that burden must be carried by a preponderance of the evidence." *Manville,* 896 F.2d at 1390 (affirming bankruptcy court's refusal to transfer an adversary proceeding); *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc. (Matter of Commonwealth Oil Refining Co., Inc.),* 596 F.2d 1239, 1241 (5th Cir. 1979) (*"CORCO"*). In considering change of venue motions, courts often look to the criteria established in two circuit

11

court decisions to evaluate the interests of justice and convenience of parties – *In re Manville Forest Prod. Corp.*, 896 F.2d 1384 and *CORCO*, 596 F.2d 1239.

In *CORCO*, the court affirmed the bankruptcy court's denial of a transfer motion seeking to transfer the chapter 11 cases of an oil refining company debtor and eleven of its subsidiaries from Texas to Puerto Rico. CORCO's principal office and management were located in Texas; most of its assets and creditors were located in Puerto Rico. The parties seeking the transfer to Puerto Rico argued that Puerto Rico had the greatest interest in the case because CORCO was a major supplier of petroleum products to Puerto Rico, its operations were located in Puerto Rico, and many of its creditors were located there. The Fifth Circuit rejected the argument, concluding that the bankruptcy court did not abuse its discretion in deciding to retain the case in Texas. The court concluded that the venue was proper in Texas for several reasons, including that management of all aspects of the debtor's business were handled in Texas, the debtor's problems were financial rather than operational and the people who would work to solve those financial problems or would appear in court were based in Texas. *CORCO*, 596 F.2d at 1241-48.

In *Manville*, the Second Circuit considered the benefits of the current court's familiarity with the case and facts and the lag time of the receiving court's learning curve. *In re Enron*, 274 B.R. 327, 349-50 (Bankr. S.D.N.Y. 2002) (citing *Manville*, 896 F.2d at 1391). In *Manville*, the moving party sought to transfer the venue of an adversary proceeding involving Louisiana law from New York, the district handling the main bankruptcy case, to Louisiana. *Manville*, 896 F.2d at 1387-88. The bankruptcy court that originally denied the motion found that while the convenience of the parties and witnesses favored transferring venue, the economic and efficient administration of the case weighed in favor of retaining venue of the adversary proceeding. The court held that it was inappropriate to shift the burden of the case to another court because the

12

bankruptcy court had already developed a substantial learning curve. *Id.* at 1391. The court also found the change of venue motion untimely. *Id.* On appeal, the Second Circuit held that the lower court had struck the appropriate balance between the economic and efficient administration of the case and the convenience of the parties. *Id.*

The interests of justice prong has been characterized as a broad and flexible standard. *In re Enron*, 274 B.R. at 343 (citing *Manville*, 896 F.2d at 1391). The court considers whether (i) transfer would promote the economic and efficient administration of the bankruptcy estate; (ii) the interests of judicial economy would be served by the transfer; (iii) the parties would be able to receive a fair trial in each of the possible venues; (iv) either forum has an interest in having the controversy decided within its borders; (v) the enforceability of any judgment would be affected by the transfer; and (vi) the plaintiff's original choice of forum should be disturbed. *In re Enron*, 317 B.R. at 638-39.

The convenience of parties prong has six factors: (i) proximity of creditors of every kind to the court; (ii) proximity of the debtor; (iii) proximity of witnesses necessary to the administration of the estate; (iv) location of the assets; (v) economic administration of the estate; and (vi) necessity for ancillary administration if liquidation should result. *In re B.L. of Miami*, 294 B.R. 325, 329 (citing *CORCO*, 596 F.2d at 1247; *In re Consol. Equity Prop., Inc.*, 136 B.R. 261, 266 (D. Nev. 1991)). The consideration given the most weight is the economic and efficient administration of the estate. *Enron*, 274 B.R. at 343. Most cases do not consider liquidation because it is illogical to focus on liquidation contingencies when the goal of the bankruptcy is reorganization. *CORCO*, 596 F.2d at 1248; *In re Enron*, 274 B.R. at 349; *In re B.L. of Miami*, 294 B.R. at 333.

13

Each prong identified above and its impact on the case will be discussed in turn below.

The court concludes that the Moving Parties have met their burden under both the interests of

justice and convenience of parties standards.

### 1. Interest of Justice

Courts evaluating the interests of justice have considered the following factors:

(1) whether transfer would promote the economic and efficient administration of the
bankruptcy estate;

(2) whether the interests of judicial economy would be served by the transfer;

(3) whether the parties would be able to receive a fair trial in each of the possible venues;
(4) whether either forum has an interest in having the controversy decided within its
borders;

(5) whether the enforceability of any judgment would be affected by the transfer; and

(6) whether the plaintiff's original choice of forum should be disturbed.

*In re Enron Corp.*, 317 B.R. at 638-639. Courts also consider the impact of the learning curve if

the case is transferred. *In re Enron*, 274 B.R. at 349. In addition, courts consider the ability of

interested parties to participate in the proceedings and the additional costs that might be incurred

to do so. *In re B.L. of Miami*, 294 B.R. at 334.

Courts evaluating the economic and efficient administration of the case have looked at

"the need to obtain post petition financing, the need to obtain financing to fund reorganization,

and the location of the sources of such financing and the management personnel in charge of

obtaining it." *In re Enron*, 274 B.R. at 348 (citing *In re Int'l Filter Corp.*, 33 B.R. 952, 956

(Bankr. S.D.N.Y. 1983)); *CORCO*, 596 F.2d at 1247. In this case, these factors support the

transfer of venue. Post petition financing has already been obtained from Mr. Dunmore, a

California resident. (ECF Doc. # 48, 192.) Further financing for a purchase of assets or a wind

down of the business is just as likely to come from California as New York since the Debtor's

main assets are the California real estate owned by its Subsidiaries. (ECF Doc. # 114 at ¶ 24)

(stating that of the six term sheets submitted, two are from New York, three from California, and

14

one from Connecticut). Anyone purchasing or financing the business in all likelihood is going to have to conduct most of the necessary due diligence in California. Debtor's only offices, management and employees are located in California. Debtor's sole shareholder resides in California. Debtor's counsel, while having a New York office, is based in California, and the two lead partners from the firm in this case are based in California. Debtor's financial advisor, Alvarez & Marsal North America, LLC, and its investment banker, Alvarez & Marsal Securities, LLC, are based in California and Arizona, respectively. (ECF Doc. # 11 at Exhibits A & B.) The location of the financial professionals retained in this case is further evidence of the ability to secure funding or a purchaser for this company when based in a location other than New York. Based on the above, the sources of funding are likely in California and the location of the professionals and management personnel in charge of obtaining this funding are in California or Arizona. As a result, the efficient administration of this case weighs heavily in favor of transfer to California.

The Debtor in opposition relies on the *Enron* and *CORCO* courts' ultimate decisions to retain venue based on the location of the financial restructuring of the debtors in those cases rather than the physical location of their assets. However, the Debtor's reliance on these cases is misplaced because the assets and business models in *Enron* and *CORCO* were fundamentally different than those involved in this case. The majority of the Debtor's significant assets consist of real property in residential developments in the state of California. As stated in *Enron*, "where a debtor's assets consist solely of real property cases have held that transfer of venue is proper because matters concerning real property have always been of local concern and traditionally are decided at the situs of the property." *In re Enron*, 284 B.R. 376, 392 (Bankr. S.D.N.Y. 2002) (abrogated on other grounds) (citing *In re Baltimore Food Sys., Inc.*, 71 B.R.

15

795, 803 (Bankr. D.S.C. 1986) ("[S]pecial consideration to administration at the situs of the assets where those assets consist of real property.")); *see also In re Old Delmar Corp.*, 45 B.R. 883, 884 (S.D.N.Y. 1985) (finding that venue of real property was the most capable in handling emergencies and keeping close contact with the property). In *Enron*, the court faced the reorganization of a complex global energy conglomerate, and the sophistication of the financial markets was an essential factor in the successful financing and reorganization of the company. *See In re Enron*, 284 B.R. at 390 -91. In *CORCO*, the court faced reorganization or sale of an oil refining company conducting business in Puerto Rico, while its executive management was primarily in Texas. The expertise of its management and greater availability of financing in Texas were more important than the location of the physical assets or the largest number of its creditors. *CORCO*, 596 F.2d at 1247-48. Both *CORCO* and *Enron* emphasized that venue was most appropriate where the people who would handle the bankruptcy were located. In this case, all of the Debtor's employees and the majority of its professionals are located in California. In addition, Dunmore is distinguishable from *Enron* and *CORCO* because Dunmore lacks any ties to New York, other than its recent incorporation in the state and its efforts to secure financing here. Dunmore New York has no offices or employees here, unlike *Enron*, which had an operating subsidiary in New York, and *CORCO*, which had its executive offices and management in Texas. The Debtor currently has no ongoing operations in any state, but its predecessor in interest, Dunmore California, was a long-time California home builder with no projects or other connections with New York. Dunmore New York's only other "connection" to New York is that the headquarters of Bank of New York, the indenture trustee of the Debtor's subordinated notes, is located here.

The next prongs to consider in the interests of justice – judicial economy and the ability to receive a fair trial in either the Southern District of New York or the Eastern District of California – are closely balanced, but judicial economy tilts slightly in favor of transfer to California. Both courts have the capacity to handle this case and provide a fair proceeding. However, because cases are already pending in California state courts against some of Debtor's Subsidiaries (but stayed as to the Debtor), and many issues in this case are likely to be governed by California law, judicial economy would be better served if all cases were pending in California.

In *Manville*, in affirming the denial of a transfer of an adversary proceeding, the court relied on the bankruptcy court's substantial "learning curve" and the likelihood that a transferee court would have delayed the final resolution of the bankruptcy case. *Manville*, 896 F.2d at 1391. The court recognized the inefficiency that can result where the main case is administered in one district by a judge who has gained familiarity with the case, but an adversary proceeding is transferred to another district to be handled by a different judge. The transfer motion in this case has been made early in the case. While this Court has gained some familiarity with the issues in this case by considering and ruling on First Day Motions and the motion to approve the sale of the Stone Mitigation Property, these are not likely to be the kinds of issues that require the most court time in the future. Accepting the Debtor's argument would effectively mean that anytime a court has ruled on first day motions it should deny a subsequent transfer motion (necessarily filed after the first day) because of the learning curve a new court would have to get up to speed. This result would eviscerate the transfer venue statute, 28 U.S.C. § 1412. Given the Debtor's stated objective to sell all or parts of the company or its assets in an orderly wind down, the familiarity and knowledge gained by this Court is not as pivotal to the progress of the case as

17

it might be in more complex reorganizations such as Enron. Therefore, the learning curve is not a substantial deterrent to transferring the case.

In *CORCO*, the court emphasized the interest of the receiving venue in the outcome of the case. *CORCO*, 596 F.2d at 1248. In this case, California clearly has a greater interest in the outcome of this case for both the Debtor and the creditors. The Debtor's assets and business are in residential home building properties within California, giving California a strong interest in the impact of the disposition of those assets to the areas and communities in which they are located. California also has a greater interest than New York because the majority of the trade creditors in this case are local California businesses. In addition, several of those creditors have commenced proceedings against the Debtor or its Subsidiaries in California state courts based on California law. In *CORCO*, the court was ultimately not persuaded by Puerto Rico's interest in the outcome of the bankruptcy because the court found that the retention of the case in Texas ultimately served the interests of Puerto Rico by maintaining the bankruptcy in close proximity to the company's management that were working to provide the Debtor with needed access to capital markets and potential buyers for the underlying company. *Id.* In this case, while New York is a financial capital and could provide the funding for the Debtor's wind down, given the local nature of the assets and operations of the Debtor and the current interest expressed while the case was proceeding in New York, retaining the case in New York does not provide the same benefits relied on in *CORCO*. The potential financial investors who have expressed sufficient interest in the Debtor's properties to submit a term sheet are geographically dispersed. (*See* ECF Doc. # 114 at ¶ 21) (one company from Connecticut, two companies from New York, and three companies from California have submitted term sheets).

In *In re B.L. of Miami,* a case granting the transfer motion, the court identified the need for creditors to obtain local counsel to participate in the case as an additional difficulty and expense that would be incurred by parties if venue was not transferred. *In re B.L. of Miami,* 294 B.R. at 334. In this case, the Southern District Bankruptcy Court has a permissive *pro hace vice* admission rule, permitting any lawyer admitted to practice in any state or federal court to be admitted *pro hace vice* without requiring local counsel. *See* Southern District Bankruptcy Court Local Rules 2090-1 effective August 2, 2004 www.nysb.uscourts.gov. This rule has substantially eased the burden and expense for out-of-state parties and counsel to appear and participate in cases in this court. Additionally, the Court has already approved telephone participation in hearings in this case by counsel who do not maintain their offices in New York City. *See* Pretrial Order # 1, ¶ 3 (ECF Doc. # 44). However, even with the availability of alternative appearances by telephone, many creditors will still want counsel to be physically present at hearings either because they are the moving parties for motions under consideration or for the more general benefits that come from attending hearings in person such as the ability to observe the court, witnesses and other parties in interest. As a result, despite technological advances there are limitations on the quality of participation for a large number of creditors located exclusively in California if they do not incur the additional expense of New York counsel or have their California counsel travel to New York for hearings.

In considering the remaining factors under the interest of justice prong, while the Debtor's selection of venue is accorded great weight it does not appear that the Debtor's interests will be harmed or that the estate will suffer a diminution in value if venue is transferred to the Eastern District of California. In this case, the Debtor's employees, including management that would be needed to testify, assets, and the Subsidiaries are located in California. Debtor's

professionals (lawyers, financial advisors and investment bankers) are also located in California

or Arizona. The Creditors Committee supports transfer of the case to California, and the

Creditors Committee's counsel, Morrison & Foerster, LLP, has offices in New York and

California. In addition, considering the jurisdictional issues of potential judgments and

subpoenas in this case, all parties would be subject to the jurisdiction of California courts by

virtue of either their domicile in the case of the trade creditors or sufficient contacts in the case of

the institutional investors that conduct business there on a regular basis. As a result, while the

Debtor's selection is valid under § 1408 and accorded great weight, the overall circumstances of

the case show by a preponderance of the evidence that transfer of venue is in the interest of

justice in this case. Indeed, the thin nexus of the Debtor to the Southern District of New York,

and the overwhelming contacts between the Debtor and Eastern District of California, combined

with no overriding factors making it substantially more likely that the Debtor's prospects for a

successful reorganization would be enhanced if this Court were to retain jurisdiction, raise

serious questions whether the Court would abuse its discretion if it denied the motion to transfer

venue in the interests of justice.

## 2. Convenience of the Parties

Under the prong "convenience of the parties," the six factors most commonly analyzed

by bankruptcy courts under § 1412 are:

1. proximity of creditors of every kind to the court;
2. proximity of the debtor;
3. proximity of witnesses necessary to the administration of the estate;
4. location of the assets;
5. economic administration of the estate; and
6. necessity for ancillary administration if liquidation should result.

*In re B.L. of Miami,* 294 B.R. at 329 (citing *Consol. Equity Prop., Inc. v. Southmark, Corp.* (*In re*

*Consol. Equity Prop., Inc.*), 136 B.R. 261, 266 (D. Nev. 1991); *CORCO,* 596 F.2d at 1247). The

most weight is given to the promotion of the economic and efficient administration of the estate. This factor has already been discussed in connection with the interests of justice prong. *See In re Enron*, 274 B.R. at 343 n.10.

Consideration of the proximity and convenience of creditors must include the number of creditors as well as the amounts owed. *Id.* at 345. In this case the Debtor is a co-borrower or guarantor of loans from approximately ten large institutional national lenders representing over $200 million in debt. The remaining creditors in the Debtor's top thirty creditors list, save one, are located in California and represent over $12 million in debt. (ECF Doc. # 116.) Considering the number of creditors and the amounts owed, this factor does not favor changing venue unless consideration is given to the quality of participation available to the creditors. The largest bank creditors in this case are often participants in California cases and only Bank of New York, the indenture trustee, is headquartered in New York. (ECF Doc. # 114 at Exhibit 1) (showing majority of dollar amount of debt is based in Texas). A California venue would not be more inconvenient to these creditors as most would have to travel to appear in New York or California. However, the majority of trade creditors would not have to travel very far if venue was transferred to California. While the court has already provided for telephone participation at hearings, for parties who cannot travel to New York, or for whom travel is financially burdensome, the ability to advocate for them is impaired.

In *Enron*, the court also stressed the statutory role that the Creditors Committee fills as a fiduciary to creditors and as a representative body of the unsecured creditors. *In re Enron*, 274 B.R. at 345. In *Enron*, the Creditors Committee opposed the transfer of venue whereas in this case the Creditors Committee supports the transfer of venue. *Id.*; ECF Doc. # 130.

While the Debtor is incorporated in New York, all of its remaining employees, sole shareholder, and the majority of its professionals are located in California. While the number of hearings at which its employees may be required to testify – either called as witnesses by the Debtor or by creditors – is uncertain, it will certainly be more convenient for them to appear in Sacramento and compulsory process can also issue to require their appearance.[10]

While the *Enron* court characterized the physical location of the assets as one of the least important factors in that case, *In re Enron*, 274 B.R. at 347-48, other courts have relied on it more heavily. *In re B.L. of Miami*, 294 B.R. at 332. In *B.L. of Miami*, the court found that the debtor, a nightclub in Florida, was better served if the court hearing the case was more likely to have an "active familiarity with the community and the milieu in which the nightclub operated." *In re B.L. of Miami*, 294 B.R. at 332. *Enron* was largely a "financial" case, where the physical assets were divided amongst various locations and their location was therefore less important to the restructuring than the center of the financial markets. *In re Enron*, 274 B.R. at 347-48. In analyzing *Enron* and *In re B.L. of Miami*, it is apparent that the nature of the underlying businesses was a major consideration in the venue decisions. Here, despite Debtor's efforts to fit this case in *Enron's* "financial" box, the Debtor's real estate assets and the local or regional business climate in which the Debtor and its Subsidiaries operated are the driving considerations in this case. The Debtor's business did not operate on a global scale, as did Enron, and Debtor's assets are not located in various locations but instead are mostly centralized in California.

The Court has already discussed the economic administration of the estate. *See In re Enron*, 274 B.R. at 348; *see supra* at 14-15. In addition to those considerations, another factor pointing to California venue is that the Debtor is already in the process of liquidating. (ECF

---

[10]    The importance of the availability of compulsory process cannot be underestimated in light of the Debtor's substantial reduction in the number of employees. Former employees who worked for the Debtor or its Subsidiaries in California are more likely to be subject to compulsory process if the case is pending in Sacramento.

Doc. # 150 at ¶ 8.) Marketing and selling its California real estate assets can best be overseen by a California bankruptcy court with greater familiarity with the market.

As a result of the above and the totality of the circumstances in this case, the Court concludes that the Moving Parties have met their burden for transfer of the case under the convenience of the parties prong as well.

## CONCLUSION

The Moving Parties have shown by a preponderance of the evidence that the Court should order the transfer of venue of this case to the Eastern District of California in the interests of justice and for the convenience of the parties. For the reasons stated, the motion is GRANTED. The Clerk of the Court is directed to transfer this case to the United States District Court for the Eastern District of California, Sacramento Division.

## IT IS SO ORDERED.

DATED:    January 14, 2008
         New York, New York


                    /s/Martin Glenn
                    MARTIN GLENN
                    United States Bankruptcy Judge

# Exhibit B

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
DAVID L. NEALE (DN 1948/CA State Bar No. 141225)
BETH ANN R. YOUNG (CA State Bar No. 143945)
MICHELLE S. GRIMBERG (CA State Bar No. 217327)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California  90067
Telephone:   (310) 229-1234
Facsimile:   (310) 229-1244

Attorneys for Defendant Sidney B. Dunmore


DIEPENBROCK HARRISON
KRISTA J. DUNZWEILER (State Bar No. 227384)
400 Capitol Mall, Suite 1800
Sacramento, California  95814
Telephone:  (916) 492-5000
Facsimile:  (916) 446-4535

Attorneys for Defendant Michael A. Kane





UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TABERNA CAPITAL MANAGEMENT, LLC, | : 08 CV **08 CV 1817** |
| Plaintiff, | : **NOTICE TO FEDERAL COURT OF REMOVAL OF CIVIL ACTION FROM STATE COURT** |
| - against - | : [28 U.S.C. §§ 1332, 1441 and 1446; Local Civil Rule 81.1] |
| SIDNEY B. DUNMORE, MICHAEL A. KANE, and DHI DEVELOPMENT f/k/a DUNMORE HOMES, LLC, | : [Supreme Court of New York, County of New York Index No. 08/600155] |
| Defendants. | : [No Hearing Required] |


**TO THE JUDGES FOR THE UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF NEW YORK:**

Defendants Sidney B. Dunmore ("Dunmore") and Michael A. Kane ("Kane")

(collectively, "Defendants") respectfully represent as follows:

1.    On or about January 17, 2008, plaintiff Taberna Capital Management, LLC ("Plaintiff") filed a Complaint against Defendants (the "Complaint"). The Complaint was served on Dunmore, via substituted service, on January 24, 2008. True and correct copies of the Proof of Service of the summons and Complaint on Dunmore and the summons and Complaint are attached hereto as Exhibit "A".

2.    Defendants are informed and believe, and therefore allege, that DHI Development f/k/a Dunmore Homes, LLC ("Dunmore Homes") was served with the Complaint, via substituted service, on January 24, 2008. A true and correct of the Proof of Service of the summons and Complaint on Dunmore Homes is attached hereto as Exhibit "B".

3.    Kane was served with the Complaint, via substituted service, on January 24, 2008. A true and correct copy of the Proof of Service of the summons and Complaint on Kane is attached hereto as Exhibit "C".

4.    No further pleadings or proceedings have been had herein.

5.    The above-described action is a civil action of which this Court has original jurisdiction under the provisions of 28 U.S.C § 1332, and is one that may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. §§ 1441 and 1446(b), in that it is a civil action other than one specified in 28 U.S.C. § 1445, brought in the Supreme Court of the State of New York, County of New York, wherein the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states.

6.    Upon information and belief, defendant Dunmore Homes is a California corporation with its principal place of business at 8781 Sierra College Blvd., Suite 100, Granite Bay, California 95746 both when the state action at issue was filed and upon the filing of this Notice of Removal.

7.      Defendant Dunmore is and was a citizen of the State of California residing at 9220 Royal Crest Court, Granite Bay, California 95746 both at the time the state action at issue was filed and at the time of the filing of this Notice of Removal.

8.      Defendant Kane is and was a citizen of the State of California residing at 11563 Sutters Mill Circle, Gold River, California 95670 both at the time the state action at issue was filed and at the time of the filing of this Notice of Removal.

9.      Upon information and belief, Plaintiff Taberna Capital Management, LLC, is a Delaware LLC which is a wholly owned subsidiary of RAIT Financial Trust, a publicly traded real estate investment trust incorporated in the State of Maryland with its principal place of business at 2929 Arch Street, 17th floor, Philadelphia, Pennsylvania 19104.

10.     Defendants concurrently filed the proper notice of removal in the Supreme Court of the State of New York. Attached hereto as Exhibit "D" is the Notice to State Court of Removal (without exhibits).

11.     Defendants concurrently served plaintiff's counsel with this Notice of Removal and Notice to State Court of Removal of Civil Action to Federal Court.

12.     The removal is timely pursuant to 28 U.S.C. § 1446(b).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

3

WHEREFORE, Defendants request that the above action now pending against them in the Supreme Court of the State of New York, County of New York, be removed therefrom to this Court.

Respectfully submitted,

Dated: February 21, 2008

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

By: _____

David L. Neale
Beth Ann R. Young
Michelle Sharoni Grimberg
Attorneys for Defendant Sidney B. Dunmore

Dated: February 21, 2008

DIEPENBROCK HARRISON

By: _____
Krista J. Dunzweiler
Attorneys for Defendant Michael A. Kane

* * *

DHI Development f/k/a Dunmore Homes, LLC, hereby consents to the removal of the complaint by Taberna Capital Management, LLC, to the United States District Court for the Southern District of New York.

Dated: February ___, 2008

By: _____
Sidney B. Dunmore, President

4

WHEREFORE, Defendants request that the above action now pending against them in the Supreme Court of the State of New York, County of New York, be removed therefrom to this Court.

Respectfully submitted,

Dated: February ___, 2008          LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.


By: _____
          David L. Neale
          Beth Ann R. Young
          Michelle Sharoni Grimberg
          Attorneys for Defendant Sidney B. Dunmore

Dated: February ___, 2008          DIEPENBROCK HARRISON


By: _____
          Krista J. Dunzweiler
          Attorneys for Defendant Michael A. Kane

* * *

DHI Development f/k/a Dunmore Homes, LLC, hereby consents to the removal of the complaint by Taberna Capital Management, LLC, to the United States District Court for the Southern District of New York.

Dated: February ___, 2008          By: _____
                                          Sidney B. Dunmore, President

# <u>Exhibit A</u>

JAN.28.2008 11:32 212-941-0255    DLS INC



**Demovsky Lawyer Service**
Premier Nationwide Document Retrieval
and Process Service Company

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------X
TABERNA CAPITAL MANAGEMENT, LLC,

                    Plaintiff,                          Index No. 08/600155

          -against-                                     AFFIDAVIT OF SERVICE

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

                    Defendants.
---------------------------------------------------------------X
STATE OF CALIFORNIA          )
                             ) S.S.
COUNTY OF SACRAMENTO         )

          JENICE ROSSNER , being duly sworn, deposes and says that he/she is

over eighteen years of age, is an agent of the attorney service, DLS, INC., and is not party to this action.

          That on the 24th day of January, 2008, at approximately the time of 12:15 PM, deponent

served a true copy of the SUMMONS AND COMPLAINT upon SIDNEY B. DUNMORE at 8781 Sierra

College Boulevard, Granite Bay, CA, by personally delivering and leaving the same with Office

Manager, PAM McMANN, a person of suitable age and discretion at that address, the actual

place of business. At the time of service, deponent asked whether SIDNEY B. DUNMORE is in

active military service for the United States of America or for the State in any capacity whatever

or dependent upon a person in active military service and received a negative reply.

          PAM McMANN is a white female, approximately 37 years of age, stands approximately 5

feet 5 inches tall, weighs approximately 140 pounds with brown hair.

_Jenice Ross_
PROCESS SERVER

State of California: County of Sacramento
Subscribed and Sworn to (or affirmed) before me on
this 5th day of January, 2008 By
~~JENICE ROSSNER~~ , personally
known to me or proved to me on the basis of
satisfactory evidence to be the person(s) who
appeared before me.

_____
NOTARY PUBLIC

L.S., Inc.
4 Broadway
s 510
, NY 10013
2-925-1220
ww.dlsny.com



ELLIOTT BENNER
COMM. # 1777865
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES NOV. 4, 2011

NEW YORK
COUNTY CLERK'S OFFICE

FEB 08 2008

NOT COMPARED
WITH COPY FILE

 

**Demovsky Lawyer Service**
Premier Nationwide Document Retrieval
and Process Service Company

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------X

TABERNA CAPITAL MANAGEMENT, LLC,

        Plaintiff,

        -against-

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

        Defendants.

------------------------------------------------------X

STATE OF NEW YORK  )
                S.S.
COUNTY OF NEW YORK  )

Index No. 08/600155

AFFIDAVIT OF MAILING

NEW YORK
COUNTY CLERKS OFFICE

FEB 08 2008

NOT COMPARED

HOWARD D. GOLDMAN, being duly sworn, deposes and says that he is over the age of

eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

    That on the 29th day of January, 2008, deponent served a true copy of the SUMMONS

AND COMPLAINT upon SIDNEY B. DUNMORE by first class mail, by enclosing a true copy thereof

in a securely sealed and postpaid wrapper with the words "PERSONAL AND CONFIDENTIAL" written

on the same envelope, and not indicating on the outside that it is from an attorney or concerns an action

against the person to be served, and depositing the same into an official depository maintained by the

Government of the United States, City and State of New York, addressed as follows:

SIDNEY B. DUNMORE
8781 Sierra College Boulevard
Granite Bay, CA 95746

HOWARD D. GOLDMAN
#932192

Sworn to before me this
29th day of January, 2008

NOTARY PUBLIC

D.L.S., Inc.
401 Broadway
Ste 510
NY, NY 10013
212-925-1220
www.dlsny.com

JONATHAN T. RIPPS
Notary Public, State of New York
NO. 01RI6109718
Qualified in Rockland County
Certificate Filed in New York County
Commission Expires May 17, 20 08

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

TABERNA CAPITAL MANAGEMENT, LLC,

                Plaintiff,

        - against -

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

             Defendants.

------------------------------------------------------------------x

      Index No.
      Date Purchased:

      **SUMMONS**

      Plaintiff designates New York
      County as the place of trial. The
      basis of venue is plaintiff's offices
      at 450 Park Avenue, New York,
      New York.

      08600155

**YOU ARE HEREBY SUMMONED** to answer the annexed complaint in this action and
to serve a copy of your answer on the plaintiff's attorneys within 20 days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: New York, New York
      January 17, 2008

                    WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP

                    By: _____
                        Kenneth G. Roberts
                        James L. Simpson
                    Attorneys for Plaintiff
                    250 Park Avenue
                    New York, New York 10177
                    (212) 986-1116

TO:    SIDNEY B. DUNMORE
        MICHAEL A. KANE
        DHI DEVELOPMENT f/k/a DUNMORE HOMES, LLC
        8781 Sierra College Boulevard
        Granite Bay, CA 95746

*FILED*
*JAN 17 2008*
*COUNTY NEW YORK*
*CLERK'S OFFICE*

NYC:754643.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
                                                    :
TABERNA CAPITAL MANAGEMENT, LLC,
                                                    :       Index No.
                        Plaintiff,
                                                    :
            - against -                                     **COMPLAINT**
                                                    :
SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE          :     **FILED**          08600155
HOMES, LLC,
                                                    :       JAN 17 2008
                        Defendants.
                                                        NEW YORK
                                                COUNTY CLERK'S OFFICE
-------------------------------------------------------------x

Plaintiff Taberna Capital Management, LLC, by its attorneys, Wolf, Block, Schorr and

Solis-Cohen LLP, for its complaint, alleges:

1.      This is an action for (a) breach of the Junior Subordinated Indenture, dated as of

June 28, 2005 (the "Indenture") (Exhibit A hereto), by and between Dunmore Homes, LLC and

JPMorgan Chase Bank, N.A. as Trustee; (b) tortious interference and fraud by defendants Sidney

B. Dunmore and Michael A. Kane; and (c) breach of fiduciary duty, unjust enrichment, and alter

ego liability against defendant Sidney B. Dunmore.

## THE PARTIES

2.      Plaintiff Taberna Capital Management, LLC is a limited liability company with

offices at 450 Park Avenue, New York, New York 10286. Plaintiff is the Collateral Manager of

the holder of the securities issued pursuant to the Indenture (the "Holder") and sues herein on

behalf of the Holder.

NYC:750579.6

3.      Upon information and belief, defendant Sidney B. Dunmore ("Sidney Dunmore") is an individual who transacted business in the State of New York in connection with the causes of action herein and committed a tort within the State of New York, as alleged below.

4.      Upon information and belief, defendant Michael A. Kane ("Kane") is an individual who transacted business in the State of New York in connection with the causes of action herein and committed a tort within the State of New York, as alleged below.

5.      Upon information and belief, defendant DHI Development f/k/a Dunmore Homes, LLC ("Dunmore Homes") is a corporation which consented in the Indenture to the jurisdiction and venue of the Courts of the State of New York.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Indenture)

6.      Pursuant to the Indenture, on or about June 28, 2005, Dunmore Homes issued a $20,619,000 note (the "Note") (Exhibit B hereto), pursuant to which it owed an interest payment in the amount of $430,000 on October 30, 2007, with interest continuing to accrue thereafter.

7.      Dunmore Homes defaulted on the interest payment due on October 30, 2007 and has remained in default for over thirty days.

8.      Pursuant to Section 10.9 of the Indenture, Dunmore Homes covenanted, *inter alia*, that: (a) the Net Worth of Dunmore Homes and its affiliates shall at all times equal or exceed the Minimum Net Worth; (b) the Debt-to-Equity Ratio of Dunmore Homes and its affiliates shall not exceed 3 to 1; and (c) Dunmore Homes would maintain cash and cash equivalents equal to or greater than $5 million.

9.      Upon information and belief, prior to September 10, 2007 Dunmore Homes defaulted on one or more of the covenants contained in Section 10.9 of the Indenture.

Supreme Court Records OnLine Library - page 3 of 9

10. Pursuant to Section 5.1(e) of the Indenture, the taking of certain actions by Dunmore Homes in connection with its potential insolvency or bankruptcy would constitute a default.

11. Upon information and belief, prior to September 10, 2007, Dunmore Homes took actions which constituted a default under Section 5.1(e) of the Indenture.

12. Section 8.1 of the Indenture prohibits Dunmore Homes from transferring substantially all its properties and assets except on certain conditions.

13. Upon information and belief, on or about September 10, 2007, Dunmore Homes transferred all its properties and assets in violation of Section 8.1 of the Indenture.

14. Pursuant to the Indenture, Dunmore Homes owes interest in the amount of $726,222.36 through December 31, 2007, plus interest at the rate of $4,777.78 per diem thereafter, plus such other and further amounts that are or shall become due under the Indenture, together with costs, expenses, attorneys' fees and statutory interest.

15. Pursuant to Section 5.2 of the Indenture, due to the foregoing defaults of Dunmore Homes, the entire $20,619,000 principal amount of the Note has been declared due and payable immediately.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Tortious Interference)

16. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

17. Upon information and belief, Sidney Dunmore and Kane entered into a conspiracy to defeat, injure, and impede the Holder's rights under the Indenture and its business relations and prospects in relation thereto. In furtherance of the conspiracy, among other things,

Supreme Court Records OnLine Library - page 4 of 9

Sidney Dunmore and Kane formed a New York corporation to which they caused Dunmore Homes to transfer all its assets in violation of the Indenture.

18.     Sidney Dunmore and Kane knew of the Indenture, and knowingly, intentionally, and wrongfully interfered with the Holder's rights under the Indenture and its business relations and prospects in relation thereto, without justification and with malice.

19.     Sidney Dunmore and Kane intentionally, knowingly and wrongfully caused Dunmore Homes to breach the Indenture. Their conduct did in fact defeat, injure, and impede the Holder's rights under the Indenture and its business relations and prospects in relation thereto.

20.     By virtue of the foregoing, the Holder has sustained damages in an amount in excess of $20,619,000.00.

21.     Sidney Dunmore's and Kane's conduct was willful, malicious, egregious, involved a high degree of moral turpitude, and was part of a pattern of conduct directed at the public generally. Therefore, the Holder is entitled to punitive damages in an amount in excess of $103,095,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

22.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

23.     Sidney Dunmore is the Administrative Trustee under a certain Amended and Restated Trust Agreement dated as of June 25, 2005 (the "Trust Agreement") (Exhibit C hereto), pursuant to which Sidney Dunmore owes fiduciary duties to the Holder.

24.     In addition, Sidney Kane owed fiduciary duties to the Holder because, upon information and belief, at all relevant times, Sidney Dunmore was the sole owner, chief

NYC:750579.6                                   - 4 -

Supreme Court Records OnLine Library - page 5 of 9

executive officer and a director of Dunmore Homes and, as such, owed creditors of Dunmore Homes, fiduciary duties to preserve the assets of Dunmore Homes when it became insolvent in or before August 2007.

25.    Sidney Dunmore violated his fiduciary duties owing to the Holder in September 2007 by, among other things, transferring the assets of Dunmore Homes in violation of the Indenture, wrongfully obtaining personal benefits in excess of $11 million as a result of causing Dunmore Homes' breaches of the Indenture, and by hiding and failing to disclose his conduct to the Holder.

26.    By virtue of the foregoing, the Holder has sustained damages in an amount in excess of $20,619,000.00.

27.    Plaintiff is entitled to compensatory damages and disgorgement by Sidney Dunmore of all personal benefits he obtained by virtue of his wrongful transfer of Dunmore Homes' assets in violation of the Indenture and his wrongfully obtained personal benefits in excess of $11 million from Dunmore Homes' breaches of the Indenture.

28.    Sidney Dunmore's conduct was willful, malicious, egregious, involved a high degree of moral turpitude, and was part of a pattern of conduct directed at the public generally. Therefore, the Holder is entitled to punitive damages in an amount in excess of $103,095,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraudulent Conveyance)

29.    Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

30.    Sidney Dunmore and Kane, through the foregoing conduct, intentionally and wrongfully hindered and delayed the Holder's rights as a creditor of Dunmore Homes.

Supreme Court Records OnLine Library - page 6 of 9

31. By virtue of the foregoing, the Holder has sustained damages in an amount in excess of $20,619,000.00.

32. Sidney Dunmore's and Kane's conduct was willful, malicious, egregious, involved a high degree of moral turpitude, and was part of a pattern of conduct directed at the public generally. Therefore, the Holder is entitled to punitive damages in an amount in excess of $103,095,000.00.

### AS AND FOR A FIFTH CAUSE OF ACTION
#### (Alter Ego)

33. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

34. Upon information and belief, at all relevant times, Sidney Dunmore has been the sole owner of Dunmore Homes and its alter ego. He has exercised complete domination and control of Dunmore Homes for his personal gain and to the detriment of the Holder with respect to the Indenture, the breaches of the Indenture, and the transfer of all of Dunmore Homes' assets in violation of the Indenture.

35. Sidney Dunmore used his domination and control of Dunmore Homes to commit wrongs in contravention of the Holder's rights under the Indenture. Among other wrongs, Sidney Dunmore used his control of Dunmore Homes to cause it to breach the Indenture, and to wrongfully hinder and delay the Holder's rights as a creditor.

36. Sidney Dunmore's domination and control of Dunmore Homes and the wrongs perpetrated thereby caused the Holder damages in an amount in excess of $20,619,000.00.

37. Sidney Dunmore's conduct was willful, malicious, egregious, involved a high degree of moral turpitude, and was part of a pattern of conduct directed at the public generally. Therefore, the Holder is entitled to punitive damages in an amount in excess of $103,095,000.00.

NYC:750579.6                                  - 6 -

Supreme Court Records OnLine Library - page 7 of 9

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

38.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

39.     By virtue of the foregoing, Sidney Dunmore and Kane have been unjustly enriched.

40.     Plaintiff is entitled to disgorgement by Sidney Dunmore and Kane of all personal benefits obtained by virtue of Dunmore Homes' breaches of the Indenture, including, but not limited to, personal benefits in excess of $11 million derived from wrongfully transferring Dunmore Homes' assets in violation of the Indenture.

**WHEREFORE**, plaintiff demands judgment:

(a)     On the First Cause of Action, awarding damages against defendant Dunmore Homes in the amount of $20,619,000 principal, plus $726,222.36 interest through December 31, 2007, plus interest at the rate of $4,777.78 per diem on and after January 1, 2008, plus such other and further amounts that are or shall become due under the Indenture, together with costs, expenses, attorneys' fees and statutory interest;

(b)     On the Second and Fourth Causes of Action, awarding against defendants Sidney Dunmore and Kane, jointly and severally, compensatory damages in an amount in excess of $20,619,000.00, and punitive damages in an amount in excess of $103,095,000.00;

(c)     On the Third and Fifth Causes of Action, awarding against defendant Sidney Dunmore compensatory damages in an amount in excess of $20,619,000.00, and punitive damages in an amount in excess of $103,095,000.00;

(d)     On the Sixth Cause of Action, directing defendants Sidney Dunmore and Kane to disgorge all personal benefits obtained by virtue of Dunmore Homes' breaches of the

Supreme Court Records OnLine Library - page 8 of 9

Indenture, including, but not limited to, personal benefits in excess of $11 million derived from

wrongfully transferring Dunmore Homes' assets in violation of the Indenture; and

   (e) Granting such other and further relief as the Court deems just and proper,

together with interest, costs, expenses and attorneys' fees.

Dated New York, New York
   January 17, 2008

         WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP

         By: _____
           Kenneth G. Roberts
           James L. Simpson
         Attorneys for Plaintiff
         250 Park Avenue
         New York, NY 10177
         212-986-1116

Supreme Court Records OnLine Library - page 9 of 9

# JUNIOR SUBORDINATED INDENTURE

between

## DUNMORE HOMES, LLC

and

## JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
*as Trustee*

Dated as of June 28, 2005

# TABLE OF CONTENTS

Page

## ARTICLE I
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 1.1.     Definitions ........................................................................... 1

Section 1.2.     Compliance Certificate and Opinions ................................ 9

Section 1.3.     Forms of Documents Delivered to Trustee ....................... 9

Section 1.4.     Acts of Holders .................................................................. 10

Section 1.5.     Notices, Etc. to Trustee and Company ............................. 12

Section 1.6.     Notice to Holders; Waiver ................................................. 12

Section 1.7.     Effect of Headings and Table of Contents ....................... 12

Section 1.8.     Successors and Assigns ..................................................... 13

Section 1.9.     Separability Clause ............................................................ 13

Section 1.10.    Benefits of Indenture ......................................................... 13

Section 1.11.    Governing Law ................................................................... 13

Section 1.12.    Submission to Jurisdiction ................................................ 13

Section 1.13.    Non-Business Days ............................................................ 13

## ARTICLE II
### SECURITY FORMS

Section 2.1.     Form of Security ................................................................ 14

Section 2.2.     Restricted Legend .............................................................. 18

Section 2.3.     Form of Trustee's Certificate of Authentication .............. 20

Section 2.4.     Temporary Securities ........................................................ 20

Section 2.5.     Definitive Securities .......................................................... 20

## ARTICLE III
### THE SECURITIES

Section 3.1.     Payment of Principal and Interest ..................................... 21

Section 3.2.     Denominations ................................................................... 22

Section 3.3.     Execution, Authentication, Delivery and Dating .............. 23

Section 3.4.     Global Securities ............................................................... 24

Section 3.5.     Registration, Transfer and Exchange Generally ............... 26

Section 3.6.     Mutilated, Destroyed, Lost and Stolen Securities ............ 27

Section 3.7.     Persons Deemed Owners ................................................... 28

**TABLE OF CONTENTS**
(continued)

Page

Section 3.8.      Cancellation .................................................................................. 28

Section 3.9.      Reserved ...................................................................................... 28

Section 3.10.     Reserved ...................................................................................... 28

Section 3.11.     Agreed Tax Treatment ................................................................ 28

Section 3.12.     CUSIP Numbers ......................................................................... 28

**ARTICLE IV**
**SATISFACTION AND DISCHARGE**

Section 4.1.      Satisfaction and Discharge of Indenture .................................. 29

Section 4.2.      Application of Trust Money ........................................................ 30

**ARTICLE V**
**REMEDIES**

Section 5.1.      Events of Default ........................................................................ 30

Section 5.2.      Acceleration of Maturity; Rescission and Annulment .............. 31

Section 5.3.      Collection of Indebtedness and Suits for Enforcement by Trustee .... 32

Section 5.4.      Trustee May File Proofs of Claim .............................................. 33

Section 5.5.      Trustee May Enforce Claim Without Possession of Securities ...... 33

Section 5.6.      Application of Money Collected ................................................ 33

Section 5.7.      Limitation on Suits ..................................................................... 34

Section 5.8.      Unconditional Right of Holders to Receive Principal, Premium, if any,
                  and Interest; Direct Action by Holders of Preferred Securities ...... 34

Section 5.9.      Restoration of Rights and Remedies .......................................... 35

Section 5.10.     Rights and Remedies Cumulative ............................................. 35

Section 5.11.     Delay or Omission Not Waiver ................................................. 35

Section 5.12.     Control by Holders ..................................................................... 35

Section 5.13.     Waiver of Past Defaults .............................................................. 36

Section 5.14.     Undertaking for Costs ................................................................ 36

Section 5.15.     Waiver of Usury, Stay or Extension Laws ................................. 37

**ARTICLE VI**
**THE TRUSTEE**

Section 6.1.      Corporate Trustee Required ....................................................... 37

Section 6.2.      Certain Duties and Responsibilities .......................................... 37

**TABLE OF CONTENTS**
(continued)

Page

| Section 6.3. | Notice of Defaults | 39 |
|---|---|---|
| Section 6.4. | Certain Rights of Trustee | 39 |
| Section 6.5. | Parties May Hold Securities | 41 |
| Section 6.6. | Compensation; Reimbursement; Indemnity | 41 |
| Section 6.7. | Resignation and Removal; Appointment of Successor | 42 |
| Section 6.8. | Acceptance of Appointment by Successor | 43 |
| Section 6.9. | Merger, Conversion, Consolidation or Succession to Business | 43 |
| Section 6.10. | Not Responsible for Recitals or Issuance of Securities | 44 |
| Section 6.11. | Appointment of Authenticating Agent | 44 |

**ARTICLE VII**
**HOLDER'S LISTS AND REPORTS BY COMPANY**

| Section 7.1. | Company to Furnish Trustee Names and Addresses of Holders | 45 |
|---|---|---|
| Section 7.2. | Preservation of Information, Communications to Holders | 46 |
| Section 7.3. | Reports by Company | 46 |

**ARTICLE VIII**
**CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE**

| Section 8.1. | Company May Consolidate, Etc., Only on Certain Terms | 47 |
|---|---|---|
| Section 8.2. | Successor Company Substituted | 48 |

**ARTICLE IX**
**SUPPLEMENTAL INDENTURES**

| Section 9.1. | Supplemental Indentures without Consent of Holders | 48 |
|---|---|---|
| Section 9.2. | Supplemental Indentures with Consent of Holders | 49 |
| Section 9.3. | Execution of Supplemental Indentures | 50 |
| Section 9.4. | Effect of Supplemental Indentures | 50 |
| Section 9.5. | Reference in Securities to Supplemental Indentures | 50 |

**ARTICLE X**
**COVENANTS**

| Section 10.1. | Payment of Principal, Premium, if any, and Interest | 50 |
|---|---|---|
| Section 10.2. | Money for Security Payments to be Held in Trust | 50 |
| Section 10.3. | Statement as to Compliance | 52 |
| Section 10.4. | Calculation Agent | 52 |

TABLE OF CONTENTS
(continued)

Page

Section 10.5.     Additional Tax Sums ................................................................. 53

Section 10.6.     Additional Covenants ............................................................... 53

Section 10.7.     Waiver of Covenants ............................................................... 54

Section 10.8.     Treatment of Securities ........................................................... 54

Section 10.9      Financial Covenants ................................................................. 54

ARTICLE XI
REDEMPTION OF SECURITIES

Section 11.1.     Optional Redemption ............................................................... 54

Section 11.2.     Special Event Redemption ....................................................... 55

Section 11.3.     Election to Redeem; Notice to Trustee .................................... 55

Section 11.4.     Selection of Securities to be Redeemed ................................... 55

Section 11.5.     Notice of Redemption .............................................................. 56

Section 11.6.     Deposit of Redemption Price ................................................... 56

Section 11.7.     Payment of Securities Called for Redemption ......................... 57

ARTICLE XII
SUBORDINATION OF SECURITIES

Section 12.1.     Securities Subordinate to Senior Debt ..................................... 57

Section 12.2.     No Payment When Senior Debt in Default; Payment Over of Proceeds
                  Upon Dissolution, Etc. ............................................................ 57

Section 12.3.     Payment Permitted If No Default ............................................. 59

Section 12.4.     Subrogation to Rights of Holders of Senior Debt ..................... 59

Section 12.5.     Provisions Solely to Define Relative Rights ............................. 60

Section 12.6.     Trustee to Effectuate Subordination ....................................... 60

Section 12.7.     No Waiver of Subordination Provisions ................................... 60

Section 12.8.     Notice to Trustee .................................................................... 61

Section 12.9.     Reliance on Judicial Order or Certificate of Liquidating Agent .... 61

Section 12.10.    Trustee Not Fiduciary for Holders of Senior Debt .................... 61

Section 12.11.    Rights of Trustee as Holder of Senior Debt; Preservation of Trustee's
                  Rights ..................................................................................... 62

Section 12.12.    Article Applicable to Paying Agents ......................................... 62

# TABLE OF CONTENTS

Page

**SCHEDULES**

Schedule A    –    Determination of LIBOR

Exhibit A    –    Form of Officer's Financial Certificate

JUNIOR SUBORDINATED INDENTURE, dated as of June 28, 2005, between Dunmore Homes, LLC, a limited liability company (the "*Company*"), and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, a national banking association, as Trustee (in such capacity, the "*Trustee*").

### RECITALS OF THE COMPANY

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance of its unsecured junior subordinated notes (the "*Securities*") issued to evidence loans made to the Company of the proceeds from the issuance by Dunmore Homes Statutory Trust I, a Delaware statutory trust (the "*Trust*"), of undivided preferred beneficial interests in the assets of the Trust (the "*Preferred Securities*") and undivided common beneficial interests in the assets of the Trust (the "*Common Securities*" and, collectively with the Preferred Securities, the "*Trust Securities*"), and to provide the terms and conditions upon which the Securities are to be authenticated, issued and delivered; and

WHEREAS, all things necessary to make this Indenture a valid agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, this Indenture Witnesseth:

For and in consideration of the premises and the purchase of the Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Securities, as follows:

### ARTICLE I

### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.1. *Definitions.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)  the terms defined in this Article I have the meanings assigned to them in this Article I;

(b)  the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(c)  all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(d)  unless the context otherwise requires, any reference to an "Article" or a "Section" refers to an Article or a Section, as the case may be, of this Indenture;

(e)  the words "hereby", "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)  a reference to the singular includes the plural and vice versa; and

(g)  the masculine, feminine or neuter genders used herein shall include the masculine, feminine and neuter genders.

"*Act*" when used with respect to any Holder, has the meaning specified in Section 1.4.

"*Administrative Trustee*" means, with respect to the Trust, each Person identified as an "Administrative Trustee" in the Trust Agreement, solely in its capacity as Administrative Trustee of the Trust under the Trust Agreement and not in its individual capacity, or its successor in interest in such capacity, or any successor Administrative Trustee appointed as therein provided.

"*Additional Interest*" means the interest, if any, that shall accrue on any amounts payable on the Securities, the payment of which has not been made on the applicable Interest Payment Date and which shall accrue at the rate per annum specified or determined as specified in such Security, in each case to the extent legally enforceable.

"*Additional Tax Sums*" has the meaning specified in Section 10.5.

"*Additional Taxes*" means taxes, duties or other governmental charges imposed on the Trust as a result of a Tax Event (which, for the sake of clarity, does not include amounts required to be deducted or withheld by the Trust from payments made by the Trust to or for the benefit of the Holder of, or any Person that acquires a beneficial interest in, the Securities).

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Applicable Depositary Procedures*" means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

"*Authenticating Agent*" means any Person authorized by the Trustee pursuant to Section 6.11 to act on behalf of the Trustee to authenticate the Securities.

"*Bankruptcy Code*" means Title 11 of the United States Code or any successor statute(s) thereto, or any similar federal or state law for the relief of debtors, in each case as amended from time to time.

"*Business Day*" means any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in the City of New York are authorized or required by law or executive order to remain closed or (iii) a day on which the Corporate Trust Office of the Trustee is closed for business.

"*Calculation Agent*" has the meaning specified in Section 10.4.

"*Common Securities*" has the meaning specified in the first recital of this Indenture.

"*Company*" means the Person named as the "*Company*" in the first paragraph of this Indenture until a successor corporation shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "*Company*" shall mean such successor corporation.

"*Company Request*" and "*Company Order*" mean, respectively, the written request or order signed in the name of the Company by its Managing member or, if elected, its Chief Executive Officer, President or a Vice President, and by its Chief Financial Officer, its Treasurer, an Assistant Treasurer, its Secretary or an Assistant Secretary, and delivered to the Trustee.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of this Indenture is located at 600 Travis, 50th Floor, Houston, Texas 77002 Attn: Institutional Trust Services—Dunmore Homes Statutory Trust I.

"*Debt*" means, with respect to any Person, whether recourse is to all or a portion of the assets of such Person, whether currently existing or hereafter incurred and whether or not contingent and without duplication, (i) every obligation of such Person for money borrowed; (ii) every obligation of such Person evidenced by bonds, debentures, notes or other similar instruments, including obligations incurred in connection with the acquisition of property, assets or businesses; (iii) every reimbursement obligation of such Person with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of such Person; (iv) every obligation of such Person issued or assumed as the deferred purchase price of property or services (but excluding trade accounts payable or other accrued liabilities arising in the ordinary course of business); (v) every capital lease obligation of such Person; (vi) all indebtedness of such Person, whether incurred on or prior to the date of this Indenture or thereafter incurred, for claims in respect of derivative products, including interest rate, foreign exchange rate and commodity forward contracts, options and swaps and similar arrangements; (vii) every obligation of the type referred to in clauses (i) through (vi) of another Person and all dividends of another Person the payment of which, in either case, such Person has guaranteed or is responsible or liable for, directly or indirectly, as obligor or otherwise; and (viii) any renewals, extensions, refundings, amendments or modifications of any obligation of the type referred to in clauses (i) through (vii).

"*Debt-to-Equity Ratio*" has the meaning set forth in Section 10.9.

"*Defaulted Interest*" has the meaning specified in Section 3.1.

"*Delaware Trustee*" means, with respect to the Trust, the Person identified as the "Delaware Trustee" in the Trust Agreement, solely in its capacity as Delaware Trustee of the Trust under the Trust Agreement and not in its individual capacity, or its successor in interest in such capacity, or any successor Delaware Trustee appointed as therein provided.

"*Depositary*" means an organization registered as a clearing agency under the Exchange Act that is designated as Depositary by the Company or any successor thereto. DTC will be the initial Depositary.

"*Depositary Participant*" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Depositary effects book-entry transfers and pledges of securities deposited with the Depositary.

"*Distributions*" means amounts payable in respect of the Trust Securities as provided in the Trust Agreement and referred to therein as "Distributions."

"*Dollar*" or "*$*" means the currency of the United States of America that, as at the time of payment, is legal tender for the payment of public and private debts.

"*DTC*" means The Depository Trust Company, a New York corporation, or any successor thereto.

"*Earnings from Operations*" means net earnings before taxes of the Combined Companies based on income, excluding (i) gains and losses on sales of investments, (i) gains or losses on early extinguishment of debt, and (iii) extraordinary items.

"*Event of Default*" has the meaning specified in Section 5.1.

"*Exchange Act*" means the Securities Exchange Act of 1934 or any statute successor thereto, in each case as amended from time to time.

"*Expiration Date*" has the meaning specified in Section 1.4.

"*GAAP*" means United States generally accepted accounting principles, consistently applied, from time to time in effect.

"*Global Security*" means a Security that evidences all or part of the Securities, the ownership and transfers of which shall be made through book entries by a Depositary.

"*Government Obligation*" means (a) any security that is (i) a direct obligation of the United States of America of which the full faith and credit of the United States of America is pledged or (ii) an obligation of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, or the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case (i) or (ii), is not callable or redeemable at the option of the issuer thereof, and (b) any depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any Government Obligation that is specified in clause (a) above and held by such bank for the account of the holder of such depositary receipt, or with respect to any specific payment of principal of or interest on any Government Obligation that is so specified and held, *provided*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the Government Obligation or the specific payment of principal or interest evidenced by such depositary receipt.

"*Holder*" means a Person in whose name a Security is registered in the Securities Register.

"*Indenture*" means this instrument as originally executed or as it may from time to time be amended or supplemented by one or more amendments or indentures supplemental hereto entered into pursuant to the applicable provisions hereof.

"*Interest Payment Date*" means January 30, April 30, July 30, and October 30 of each year, commencing on October 30, 2005, during the term of this Indenture.

"*Investment Company Act*" means the Investment Company Act of 1940 or any successor statute thereto, in each case as amended from time to time.

"*Investment Company Event*" means the receipt by the Company of an Opinion of Counsel experienced in such matters to the effect that, as a result of the occurrence of a change in law or regulation (including any announced prospective change) or a written change in interpretation or application of law or regulation by any legislative body, court, governmental agency or regulatory authority, there is more than an insubstantial risk that the Trust is or, within ninety (90) days of the date of such opinion will be, considered an "investment company" that is required to be registered under the Investment Company Act, which change or prospective change becomes effective or would become effective, as the case may be, on or after the date of the issuance of the Securities.

"*LIBOR*" has the meaning specified in Schedule A.

"*LIBOR Business Day*" has the meaning specified in Schedule A.

"*LIBOR Determination Date*" has the meaning specified in Schedule A.

"*Liquidation Amount*" has the meaning specified in the Trust Agreement.

"*Maturity*," when used with respect to any Security, means the date on which the principal of such Security or any installment of principal becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration, call for redemption or otherwise.

"*Minimum Net Worth*" shall have the meaning set forth in Section 10.9(a).

"*Net Worth*" means "tangible net worth" as defined by GAAP, except that in computing Net Worth (a) intangible assets (e.g., goodwill) shall be excluded, (b) affiliate receivables shall be included, and (c) related party payables shall be included.

"*Notice of Default*" means a written notice of the kind specified in Section 5.1(c).

"*Officers' Certificate*" means a certificate signed by the Managing member or, if elected, the Chief Executive Officer, the President or a Vice President, and by the Chief Financial Officer, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary, of the Company and delivered to the Trustee.

"*Operative Documents*" means the Trust Agreement, the Indenture, the Purchase Agreement and the Securities.

"*Opinion of Counsel*" means a written opinion of counsel, who may be counsel for or an employee of the Company or any Affiliate of the Company.

"*Optional Redemption Price*" has the meaning set forth in Section 11.1.

"*Original Issue Date*" means the date of original issuance of each Security.

"*Outstanding*" means, when used in reference to any Securities, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(i) Securities theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

(ii) Securities for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such Securities; *provided*, that, if such Securities are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

(iii) Securities that have been paid or in substitution for or in lieu of which other Securities have been authenticated and delivered pursuant to the provisions of this Indenture, unless proof satisfactory to the Trustee is presented that any such Securities are held by Holders in whose hands such Securities are valid, binding and legal obligations of the Company;

*provided*, that in determining whether the Holders of the requisite principal amount of Outstanding Securities have given any request, demand, authorization, direction, notice, consent, or waiver hereunder, Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Securities that a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded. Securities so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Securities and that the pledgee is not the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor. Notwithstanding anything herein to the contrary, Securities initially issued to the Trust that are owned by the Trust shall be deemed to be Outstanding notwithstanding the ownership by the Company or an Affiliate of any beneficial interest in the Trust.

"*Paying Agent*" means the Trustee or any Person authorized by the Company to pay the principal of or any premium or interest on, or other amounts in respect of, any Securities on behalf of the Company.

"*Person*" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint stock company, limited liability company, trust, unincorporated

association, government or any agency or political subdivision thereof, or any other entity of whatever nature.

"*Place of Payment*" means, with respect to the Securities, the Corporate Trust Office of the Trustee.

"*Preferred Securities*" has the meaning specified in the first recital of this Indenture.

"*Predecessor Security*" of any particular Security means every previous Security evidencing all or a portion of the same debt as that evidenced by such particular Security. For the purposes of this definition, any security authenticated and delivered under Section 3.6 in lieu of a mutilated, destroyed, lost or stolen Security shall be deemed to evidence the same debt as the mutilated, destroyed, lost or stolen Security.

"*Proceeding*" has the meaning specified in Section 12.2.

"*Property Trustee*" means the Person identified as the "Property Trustee" in the Trust Agreement, solely in its capacity as Property Trustee of the Trust under the Trust Agreement and not in its individual capacity, or its successor in interest in such capacity, or any successor Property Trustee appointed as therein provided.

"*Purchase Agreement*" means the agreement, dated as of the date hereof, between the Company and the Trust and Purchaser named therein.

"*Redemption Date*" means, when used with respect to any Security to be redeemed, the date fixed for such redemption by or pursuant to this Indenture.

"*Redemption Price*" means, when used with respect to any Security to be redeemed, in whole or in part, the Special Redemption Price or the Optional Redemption Price, as applicable, at which such Security or portion thereof is to be redeemed as fixed by or pursuant to this Indenture.

"*Reference Banks*" has the meaning specified in Schedule A.

"*Regular Record Date*" for the interest payable on any Interest Payment Date with respect to the Securities means the date that is fifteen (15) days preceding such Interest Payment Date (whether or not a Business Day).

"*Responsible Officer*" means, when used with respect to the Trustee, the officer in the Institutional Trust Services department of the Trustee having direct responsibility for the administration of this Indenture.

"*Securities*" or "*Security*" means any debt securities or debt security, as the case may be, authenticated and delivered under this Indenture.

"*Securities Act*" means the Securities Act of 1933 or any successor statute thereto, in each case as amended from time to time.

"*Securities Register*" and "*Securities Registrar*" have the respective meanings specified in Section 3.5.

"*Senior Debt*" means the principal of and any premium and interest on (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company, whether or not such claim for post-petition interest is allowed in such proceeding) all Debt of the Company, whether incurred on or prior to the date of this Indenture or thereafter incurred, unless it is provided in the instrument creating or evidencing the same or pursuant to which the same is outstanding, that such obligations are not superior in right of payment to the Securities issued under this Indenture; *provided*, that Senior Debt shall not be deemed to include (i) any debt obligation incurred to acquire non-real estate related assets, including, but not limited to, the obligation with U.S. Bancorp Equipment Finance, Inc. pertaining to the "Aircraft" as defined therein and in the Aircraft Security Agreement, in the original amount of $13,428,000.00 ("Non-Real Estate Debt"), and (ii) any other debt securities (and guarantees, if any), in respect of such debt securities issued to any trust other than the Trust (or a trustee of any such trust), partnership or other entity affiliated with the Company that is a financing vehicle of the Company (a "financing entity") in connection with the issuance by such financing entity of equity securities or other securities guaranteed by the Company pursuant to an instrument that ranks *pari passu* with or junior in right of payment to this Indenture.

"*Special Event*" means the occurrence of an Investment Company Event or a Tax Event.

"*Special Record Date*" for the payment of any Defaulted Interest means a date fixed by the Trustee pursuant to Section 3.1.

"*Special Redemption Price*" has the meaning set forth in Section 11.2.

"*Stated Maturity*" means July 30, 2035.

"*Subsidiary*" means a Person more than fifty percent (50%) of the outstanding voting stock or other voting interests of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries.

"*Tax Event*" means the receipt by the Company of an Opinion of Counsel experienced in such matters to the effect that, as a result of (a) any amendment to or change (including any announced prospective change) in the laws or any regulations thereunder of the United States or any political subdivision or taxing authority thereof or therein or (b) any judicial decision or any official administrative pronouncement (including any private letter ruling, technical advice memorandum or field service advice) or regulatory procedure, including any notice or announcement of intent to adopt any such pronouncement or procedure (an "*Administrative Action*"), regardless of whether such judicial decision or Administrative Action is issued to or in connection with a proceeding involving the Company or the Trust and whether or not subject to review or appeal, which amendment, change, judicial decision or Administrative Action is enacted, promulgated or announced, in each case, on or after the date of issuance of the Securities, there is more than an insubstantial risk that (i) the Trust is, or will be within ninety (90) days of the date of such opinion, subject to United States federal income tax with respect to income received or accrued on the Securities, (ii) interest payable by the Company on the Securities is not, or within ninety (90) days of the date of such opinion, will not be, deductible by

the Company, in whole or in part, for United States federal income tax purposes, or (iii) the Trust is, or will be within ninety (90) days of the date of such opinion, subject to more than a *de minimis* amount of other taxes, duties or other governmental charges.

"*Trust*" has the meaning specified in the first recital of this Indenture.

"*Trust Agreement*" means the Amended and Restated Trust Agreement executed and delivered by the Company, the Property Trustee, the Delaware Trustee and the Administrative Trustees named therein, contemporaneously with the execution and delivery of this Indenture, for the benefit of the holders of the Trust Securities, as amended or supplemented from time to time.

"*Trustee*" means the Person named as the "*Trustee*" in the first paragraph of this instrument, solely in its capacity as such and not in its individual capacity, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "*Trustee*" shall mean or include each Person who is then a Trustee hereunder.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended and as in effect on the date as of this Indenture.

"*Trust Securities*" has the meaning specified in the first recital of this Indenture.

SECTION 1.2. *Compliance Certificate and Opinions.*

(a)     Upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee an Officers' Certificate stating that all conditions precedent (including covenants compliance with which constitutes a condition precedent), if any, provided for in this Indenture relating to the proposed action have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent (including covenants compliance with which constitutes a condition precedent), if any, have been complied with.

(b)     Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than the certificate provided pursuant to Section 10.3) shall include:

        (i) a statement by each individual signing such certificate or opinion that such individual has read such covenant or condition and the definitions herein relating thereto;

        (ii) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions of such individual contained in such certificate or opinion are based;

        (iii) a statement that, in the opinion of such individual, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

        (iv) a statement as to whether, in the opinion of such individual, such condition or covenant has been complied with.

# **<u>Exhibit A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                 :

In re:                              :

                              :      Case No.: 07- 13533 (MG)

        DUNMORE HOMES, INC.,    :      Chapter 11

                              :

                Debtor      :

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR TRANSFER OF VENUE TO THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

**A P P E A R A N C E S:**

PACHUSKI STANG ZIEHL & JONES LLP
*Counsel for the Debtor and Debtor in Possession*
780 Third Avenue, 36th Floor
New York, NY 10017-2024
By:    Richard M. Pachulski
        Debra Grassgreen
        Maria A. Bove

DIANA G. ADAMS
*Office of the United States Trustee*
33 Whitehall Street
21st Floor
New York, NY 10004
By:    Richard C. Morrissey

LOWENSTEIN SANDLER, PC
*Counsel for Weyerhaeuser Realty Investors, Inc., et al:.*
1251 Avenue of the Americas
New York, NY 10020
By:    Bruce Buechler

ORRICK, HERRINGTON & SUTCLIFFE, LLP
*Counsel for IndyMac Bank:*
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, CA 94111
By:    Frederick D. Holden, Jr. (Telephonic Appearance)

PILLSBURY, WINTHROP, SHAW & PITTMAN, LLP
*Counsel for Guaranty Bank:*
1540 Broadway
New York, NY 10036
By:      Rick B. Antonoff

SEWARD & KISSEL, LLP
*Counsel for Guaranty Bank:*
One Battery Park Plaza
New York, NY 10004
By:      John R. Ashmead

KAYE SCHOLER
*Counsel for Key Bank National*:
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA 90067
By:      Marc Cohen

DOWNEY BRAND
*Counsel for Teichert Construction and Cal Sierra Construction:*
555 Capitol Mall
10th Floor
Sacramento, CA 95814
By:      R. Dale Ginter (Telephonic Appearance)

HEFNER, STARK & MAROIS, LLP
*Counsel for Hemington Landscape Services:*
2150 River Plaza Drive
Suite 450
Sacramento, CA 95833
By:      Howard S. Nevins (Telephonic Appearance)

PARKINSON PHINNEY
*Counsel for SGN Construction, Inc.:*
400 Capitol Mall
11th Floor
Sacramento, CA 95814
By:      Donna T. Parkinson (Telephonic Appearance)

LAW OFFICE OF WILLIAM WEBB-FARRER
*Counsel for Mackay & Somps Civil Engineers:*
300 Montgomery Street, Suite 600
San Francisco, CA 94104
By:      Don Raub (Telephonic Appearance)

2

FRANDZEL, ROBINS, BLOOM & CSATO, L.C.
*Counsel for Affinity Bank*
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, CA 90048
By:    Craig A. Welin (Telephonic Appearance)

MORRISON & FOERSTER, LLP
*Counsel for the Official Committee of Unsecured Creditors:*
425 Market Street
San Francisco, CA 94105-2482
By:    Adam A. Lewis
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
By:    Alexandra Steinberg Barrage

SEWARD & KISSEL, LLP
*Counsel for Bank of New York:*
One Battery Park Plaza
New York, NY 10004
By:    John R. Ashmead

JENNINGS, HAUG & CUNNINGHAM
*Counsel for Travelers Bond:*
2800 North Central Avenue
Suite Eighteen Hundred
Phoenix, AZ 85004-1049
By:    Chad L. Schexnayder (Telephonic Appearance)

SHEPPARD MULLIN RICHTER & HAMPTON
*Counsel for Comerica Bank:*
Seventeenth Floor
Four Embarcadero Center
San Francisco, CA 94111
By:    Geraldine A. Freeman (Telephonic Appearance)

LANG, RICHERT & PATCH
*Counsel for PML Landscape:*
5200 North Palm Avenue, 4th Floor
Fresno, CA 43755
By:    Matthew W. Quall (Telephonic Appearance)

**MARTIN GLENN**
United States Bankruptcy Judge

Pending before this court is a motion by creditors seeking an order transferring venue of this chapter 11 case pursuant to 28 U.S.C. § 1412 to the Eastern District of California, Sacramento Division. (ECF Doc. # 54.) The original moving parties were Cal Sierra Construction Inc., Pacific Paving Co., Inc., and Valley Utility Services, Inc. (*Id.*) The motion was joined by other creditors[1] of Dunmore Homes, Inc. (hereinafter "Debtor"), or its non-Debtor affiliates. The transfer venue motion has been opposed by the Debtor and two creditors, Bank of New York Trust Company, N.A. ("Bank of New York") and KeyBank National Association ("KeyBank"). (ECF Doc. # 104, 114, 117.) For the reasons provided below, the motion to transfer venue is granted.

## BACKGROUND

The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Southern District of New York on November 8, 2007 ("Petition Date"). Prior to its filing, the predecessor to the Debtor, Dunmore Homes, a California corporation ("Dunmore California") performed entitlement and land development work, prepared sites for homebuilding, and built single-family residential housing throughout Northern and Central California. (ECF Doc. # 2.) Beginning in September 2005, Dunmore California experienced declining home absorption and pricing levels and deteriorating financial performance. In response, Dunmore California and its subsidiaries halted nearly all home construction, land development operations and sales on August 1, 2007. (*Id.* at ¶ 14.) Additionally, beginning in August 2007, Dunmore

---

[1]     These other moving parties are Teichert Construction, Inc., Aleco Corp., Granite Construction Co., DeSilva Gates Construction, L.P., Travelers Bond, Weyerhaeuser Realty Investors, Inc., Hemington Landscape Services, Inc., SGN Construction, Inc. and the Official Unsecured Creditors Committee. (ECF Doc. # 66, 84, 99, 107, 109, 110, 130.)

4

California and the subsidiaries experienced a series of technical and non-technical defaults under many of its existing secured debt agreements.

On September 10, 2007, Dunmore California sold all of its assets to the Debtor, Dunmore Homes, Inc., a New York corporation ("Dunmore New York"), wholly owned by Michael Kane. (*Id.* at ¶ 9.) Mr. Kane resides in California. Dunmore California is wholly owned by Sidney B. Dunmore. (*Id.* at ¶¶ 9, 10.) Mr. Dunmore resides in California. Dunmore California's assets were sold for $500.00 and the assumption of all of the company's debts and liabilities by Dunmore New York. At the time of the sale transaction, Mr. Dunmore owed Dunmore California approximately $11.2 million. This obligation was unsecured. As part of the sale transaction, Mr. Dunmore signed a promissory note secured by a pledge of an anticipated personal tax refund he hopes to receive as a result of the loss upon the sale of Dunmore California to Dunmore New York.[2] Contemporaneously with the sale, Dunmore California changed its name to DHI Development, Inc., a California corporation. On November 8, 2007, fifty-nine days after the purchase of Dunmore California, the Debtor filed its chapter 11 petition in New York. As of the Petition Date, the Debtor employed approximately 37 people, down from approximately 132 during the same time last year.[3] The Debtor has no office, employees, or bank accounts in New York. Its only presence in New York is its recent incorporation in this state.

The Debtor and its non-debtor affiliates (the "Dunmore Companies") are developing 26 communities, organized into fourteen limited liability companies and one limited partnership

---

[2]     It seems clear that the sale was designed so that Mr. Dunmore could obtain a tax refund, use it to reduce his debt to the company, and enable the company to pay down some of the debt on which Mr. Dunmore is a guarantor. Dunmore New York benefited from the transaction to the extent that the previously unsecured obligation from Mr. Dunmore became at least partially secured.

[3]     During the January 11, 2008 omnibus motion hearing, the Debtor disclosed that only seventeen employees and two independent contractors remain.

5

(collectively, the "Subsidiaries"), all owned (in whole or in substantial part) by the Debtor.[4] (*Id.* at ¶ 12.) The Dunmore Companies financed fifteen subsidiaries, representing twenty-five communities, with secured debt at the subsidiary level. The financing has been provided by nine different lenders (or lending groups). Many of the loans to the Subsidiaries are guaranteed by the Debtor (or the Debtor is a co-borrower).[5] The Subsidiaries are not currently debtors but are engaged in out of court restructuring.[6] (*Id.* at ¶ 12.)

As of September 30, 2007, the book value of the Debtor's consolidated assets was $280,592,251 and the book value of consolidated liabilities was $250,285,447. (*Id.* at ¶ 17.) As of the Petition Date, the Debtor's principal assets included: (a) its interests in the Subsidiaries; (b) cash on hand of approximately $119,000, (c) an option to purchase 19.8 acres of property in Northern California with an estimated value in excess of the option exercise price of $815,000, (d) the Debtor's interest in the Executive Non Qualified Excess Plan valued at approximately $1,700,000, (e) the promissory note from Mr. Dunmore, in the amount of approximately $11.2 million as of the Petition Date, secured by Mr. Dunmore's anticipated 2007 Federal tax refund, (f) 161 acres of mitigation property in Northern California, encumbered by a first lien in favor of

---

[4]    The Subsidiaries are: Dunmore Canterbury LLC; Dunmore Country Vilas, LLC; Dunmore Fullerton Ranch, LLC; Dunmore Highland, LLC; Dunmore Laguna Reserve, LLC; Dunmore Orchard LLC; Dunmore-Providence LLC; Dunmore Stone Creek, LLC; Fahrens Park LP; Dunmore Viscaya LLC; Dunmore Diamond Ridge LLC; Dunmore Croftwood LLC; Dunmore Westport, LLC; Dunmore Sycamore Ranch LLC; and Dunmore Montecito LLC. The Debtor wholly owns all of the Subsidiaries except Dunmore Croftwood, LLC, Dunmore Diamond Ridge, LLC, Dunmore Highlands, LLC and Dunmore Viscaya, LLC, all of which are operated as joint ventures with Weyerhauser Realty Investors. The Debtor also has an interest in the following inactive subsidiaries: Dunmore Brown Estates, LLC; Dunmore Reflections II, LLC; Dunmore Wildhawk, LLC; Fairways, LLC; Dunmore Sierra, LLC; Dunore Delano, LLC; Dunmore Wildhawk North LP; and the Dunmore Homes Statutory Trust 1.

[5]    All of Dunmore California's guarantees or obligations as co-obligor with the Subsidiaries were assumed by Dunmore New York as part of the sale.

[6]    Foreclosure proceedings are ongoing in California against several of the Subsidiaries' properties, with the earliest foreclosure possibly occurring in January 2008. Debtor's counsel represented to the Court that the Debtor has no present intention to file additional chapter 11 cases for Subsidiaries facing imminent foreclosure, but counsel also did not completely rule out that possibility.

6

Sacramento Valley Farm Credit ("Stone Mitigation Property"). (*Id.* at ¶ 18.) The Court approved the sale of the Stone Mitigation Property for $4,360,000 on December 14, 2007. (ECF Doc. # 176.) The sale closed before year-end and the proceeds were paid first to the first lien holder, Sacramento Valley Farm Credit, and then to pay down the debtor-in-possession financing. (*Id.*)

The Debtor's direct liabilities consist of approximately $2 million in debt, secured by a second lien on the assets of Dunmore Fullerton Ranch, LLC, Dunmore Highland, LLC, and Dunmore Montecito LLC, and $20 million of junior subordinated notes that mature in 2035. (*Id.* at ¶ 19.) Bank of New York is the indenture trustee for the subordinated notes. The Debtor also has significant indirect liabilities resulting from its obligations as guarantor or co-borrower of secured debts of various Subsidiaries held by RBC Builder Finance; Indymac Bank F.S.B.; Guaranty Bank; KeyBank; Wachovia Bank, N.A. ("Wachovia"); Affinity Bank; Comerica Bank; Franklin Bank; and United Commercial Bank. The total amount of secured debt to Subsidiaries for which the Debtor is a guarantor or co-borrower was approximately $195 million as of the Petition Date. In the first instance, the security for this debt is California real property owned at the subsidiary level.

In addition to the above debt, Travelers Casualty and Surety Company of America ("Travelers") issued payment and performance bonds ("Bonds") in favor of certain of the Subsidiaries. Dunmore California and Mr. Dunmore each executed a General Agreement of Indemnity in favor of Travelers for any loss incurred in connection with the Bonds. The Debtor assured Dunmore California's obligations to Travelers in connection with the indemnity agreement. Travelers asserts a security interest in Dunmore California's property to secure the indemnification obligation.

7

Pursuant to the Debtor's Amended List of Creditors Holding Thirty Largest Unsecured Claims, the indirect institutional creditors listed above are geographically dispersed in California, Texas, North Carolina,[7] and Ohio.[8]  (ECF Doc. # 115, 116.)  Bank of New York, the indenture trustee of the $20 million of subordinated notes, is the only one of the top 30 creditors in New York. (ECF Doc. # 115.)  There is no indication about who owns the subordinated notes and where the noteholders are located. The majority of the creditors comprising the remainder of the top thirty creditors are trade creditors located in California. (*Id.*) Of the thirty largest creditors shown on the Amended List, seven have joined the venue transfer motion, representing approximately $23,578,998.46 of debt, and two have opposed the motion representing $56,700,000 in debt. (*Id.*) In terms of the number of creditors, twenty-four of the top thirty are located in California. (*Id.*) It appears undisputed that the vast majority of creditors below the top thirty are trade creditors located in California.

The Moving Parties filed the change of venue motion pursuant to 28 U.S.C. § 1412 on November 26, 2007. (ECF Doc. # 54.) The motion was not based on allegations that the Southern District of New York was an improper venue pursuant to 28 U.S.C. § 1408[9]; rather, the motion claimed that venue should be changed based on consideration of the interests of justice and the convenience of parties.

The Moving Parties alleged that they were listed in the Debtor's schedule of top twenty unsecured creditors and that they were representative of most of the creditor classes that are California-based businesses. (*Id.*) The motion argues that the smaller creditors will suffer

---

[7] Wachovia is headquartered in North Carolina but the Debtor's loans are administered by Wachovia's Philadelphia, Pennsylvania office. (ECF Doc. # 115 at ¶ 13.)

[8] KeyBank is headquartered in Ohio, but the Debtor's loans are administered in Bellevue, Washington. (ECF Doc. # 117 at ¶ 6.)

[9] In the motion and at oral argument, the Moving Parties recognized that the incorporation of the Debtor, Dunmore New York, in New York provides a sufficient nexus to the state to confer venue. (ECF Doc. # 54 at ¶ 23 n.2.)

8

substantial burden and expense participating in this case in New York whereas the large
institutional creditors located outside of California would incur no additional expense if the
proceedings were transferred. The motion alleges that the Debtor has no other domestic business
activity or presence outside of California. (*Id.*) The Debtor's assets, employees, and pending
litigations, among other things, are located in California. Dunmore New York was recently
incorporated in New York to facilitate the purchase of Dunmore California for nominal
consideration. As already mentioned, Dunmore New York has no office, employees, assets or
bank accounts in New York. The motion alleges that the Debtor's initial decision to file in New
York was an attempt at forum shopping as a means to limit certain creditors access to the
proceedings. Importantly, the Unsecured Creditors Committee supports the motion to transfer
venue to the Eastern District of California.

The Debtor's opposition relies on the weight given to the Debtor's choice of venue, the
percentage of the dollar amount of debt held by creditors located outside California, the
familiarity of this Court with the facts versus the time and expense in familiarizing a new court
with the case, and the focus of the restructuring on securing financing rather than operational
issues. The Debtor argues that the largest creditors who are the most likely to be very active in
the case are large national banks with headquarters outside of California and that the smaller
creditors, like the trade creditors, would still be able to participate telephonically and through the
electronic filing of motions. (ECF Doc. # 114.) The Debtor argues that its direct debts are not
principally held by California entities. (*See id.*) The Debtor also argues that this case is
principally about finding funding for a sale or orderly wind-down of Debtor's business and, as
such, the chapter 11 case is not going to directly impact many of the trade creditors, who are not
direct creditors of the Debtor but of the Subsidiaries. The Subsidiaries, who are not currently in

9

bankruptcy, are still available for the creditors to proceed against in California. (*Id.*) Two large creditors, KeyBank and Bank of New York, have joined the Debtors' opposition to the transfer venue motion. (*See* ECF Doc. # 104, 117.) Bank of New York alleges that it is the only creditor whose claim is against the Debtor alone with no recourse to the Subsidiaries. (ECF Doc. # 104.) KeyBank holds the debt of several Subsidiaries, for which the Debtor was a guarantor or co-borrower. (ECF Doc. # 117.) KeyBank contends that it holds the largest amount of debt owed by the Subsidiaries. As a result, both argue that they represent the most significant creditor interests and prefer New York as the venue for this case.

## DISCUSSION

### A. Proper Venue under 28 U.S.C. §1408

28 U.S.C. §1408 states that a chapter 11 case may be commenced in the district court for the district in which "the domicile, residence, principal place of business in the United States, or principal assets in the United States . . . have been located for a hundred and eighty days immediately preceding such commencement . . . ." The statute is written in the disjunctive making venue proper in any of the listed locations. *In re Segno Commc'n, Inc.*, 264 B.R. 501, 505 (Bankr. N.D. Ill. 2001) (finding any of the four is jurisdictionally sufficient). A corporation's domicile is generally held to be its state of incorporation. *In re B.L. of Miami, Inc.*, 294 B.R. 325, 328 (Bankr. D. Nev. 2003) (finding venue in Nevada proper because it was the state of incorporation); 1 COLLIER ON BANKRUPTCY ¶ 4.01[2][b] (15th ed. rev. 2007). In this case, the Debtor, Dunmore New York, was incorporated in New York and would be considered domiciled here. Therefore, the venue selected by the Debtor is proper under § 1408.

### B. Change of Venue Pursuant to § 1412

Finding venue proper under § 1408, consideration of the transfer venue motion must then turn to the discretionary power granted courts pursuant to 28 U.S.C. § 1412. After a case or

10

proceeding has commenced in a proper district, it can be transferred to another district court if the court finds the transfer would be in the interest of justice or for the convenience of parties. 28 U.S.C. § 1412; *In re B.L. of Miami*, 294 B.R. at 328. Section 1412 is worded in the disjunctive allowing a case to be transferred under *either* the interest of justice rationale or the convenience of parties rationale. *Enron Corp. v. Arora (In re Enron Corp.)*, 317 B.R. 629, 637 (Bankr. S.D.N.Y. 2004). The decision to transfer venue is within the discretion of the court, as evidenced by the use of the permissive "may" in § 1412. *Id.* at 638 n.8. A court should base its analysis on the facts underlying each particular case. *See id.* at 638; *Gulf States Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990) (review should be on individualized basis). However, "the power to transfer a case [or proceeding] should be exercised cautiously." *In re Enron*, 317 B.R. at 638 (citing *In re Toxic Control Technologies, Inc.*, 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988)). A debtor's selection of a proper venue is "entitled to great weight" in the consideration of change of venue motions. *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002). As a result, "a heavy burden of proof rests on the moving party to demonstrate that the balance of convenience clearly weighs in his favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982) (deciding motion to transfer an adversary proceeding from the district in which the main bankruptcy case was filed). "The party moving for change of venue bears the burden of proof and that burden must be carried by a preponderance of the evidence." *Manville*, 896 F.2d at 1390 (affirming bankruptcy court's refusal to transfer an adversary proceeding); *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc. (Matter of Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979) (*"CORCO"*). In considering change of venue motions, courts often look to the criteria established in two circuit

11

court decisions to evaluate the interests of justice and convenience of parties – *In re Manville Forest Prod. Corp.*, 896 F.2d 1384 and *CORCO*, 596 F.2d 1239.

In *CORCO*, the court affirmed the bankruptcy court's denial of a transfer motion seeking to transfer the chapter 11 cases of an oil refining company debtor and eleven of its subsidiaries from Texas to Puerto Rico. CORCO's principal office and management were located in Texas; most of its assets and creditors were located in Puerto Rico. The parties seeking the transfer to Puerto Rico argued that Puerto Rico had the greatest interest in the case because CORCO was a major supplier of petroleum products to Puerto Rico, its operations were located in Puerto Rico, and many of its creditors were located there. The Fifth Circuit rejected the argument, concluding that the bankruptcy court did not abuse its discretion in deciding to retain the case in Texas. The court concluded that the venue was proper in Texas for several reasons, including that management of all aspects of the debtor's business were handled in Texas, the debtor's problems were financial rather than operational and the people who would work to solve those financial problems or would appear in court were based in Texas. *CORCO*, 596 F.2d at 1241-48.

In *Manville*, the Second Circuit considered the benefits of the current court's familiarity with the case and facts and the lag time of the receiving court's learning curve. *In re Enron*, 274 B.R. 327, 349-50 (Bankr. S.D.N.Y. 2002) (citing *Manville*, 896 F.2d at 1391). In *Manville*, the moving party sought to transfer the venue of an adversary proceeding involving Louisiana law from New York, the district handling the main bankruptcy case, to Louisiana. *Manville*, 896 F.2d at 1387-88. The bankruptcy court that originally denied the motion found that while the convenience of the parties and witnesses favored transferring venue, the economic and efficient administration of the case weighed in favor of retaining venue of the adversary proceeding. The court held that it was inappropriate to shift the burden of the case to another court because the

12

bankruptcy court had already developed a substantial learning curve. *Id.* at 1391. The court also found the change of venue motion untimely. *Id.* On appeal, the Second Circuit held that the lower court had struck the appropriate balance between the economic and efficient administration of the case and the convenience of the parties. *Id.*

The interests of justice prong has been characterized as a broad and flexible standard. *In re Enron*, 274 B.R. at 343 (citing *Manville*, 896 F.2d at 1391). The court considers whether (i) transfer would promote the economic and efficient administration of the bankruptcy estate; (ii) the interests of judicial economy would be served by the transfer; (iii) the parties would be able to receive a fair trial in each of the possible venues; (iv) either forum has an interest in having the controversy decided within its borders; (v) the enforceability of any judgment would be affected by the transfer; and (vi) the plaintiff's original choice of forum should be disturbed. *In re Enron*, 317 B.R. at 638-39.

The convenience of parties prong has six factors: (i) proximity of creditors of every kind to the court; (ii) proximity of the debtor; (iii) proximity of witnesses necessary to the administration of the estate; (iv) location of the assets; (v) economic administration of the estate; and (vi) necessity for ancillary administration if liquidation should result. *In re B.L. of Miami*, 294 B.R. 325, 329 (citing *CORCO*, 596 F.2d at 1247; *In re Consol. Equity Prop., Inc.*, 136 B.R. 261, 266 (D. Nev. 1991)). The consideration given the most weight is the economic and efficient administration of the estate. *Enron*, 274 B.R. at 343. Most cases do not consider liquidation because it is illogical to focus on liquidation contingencies when the goal of the bankruptcy is reorganization. *CORCO*, 596 F.2d at 1248; *In re Enron*, 274 B.R. at 349; *In re B.L. of Miami*, 294 B.R. at 333.

13

Each prong identified above and its impact on the case will be discussed in turn below.

The court concludes that the Moving Parties have met their burden under both the interests of

justice and convenience of parties standards.

### 1. Interest of Justice

Courts evaluating the interests of justice have considered the following factors:

(1) whether transfer would promote the economic and efficient administration of the
bankruptcy estate;

(2) whether the interests of judicial economy would be served by the transfer;

(3) whether the parties would be able to receive a fair trial in each of the possible venues;
(4) whether either forum has an interest in having the controversy decided within its
borders;

(5) whether the enforceability of any judgment would be affected by the transfer; and
(6) whether the plaintiff's original choice of forum should be disturbed.

*In re Enron Corp.*, 317 B.R. at 638-639. Courts also consider the impact of the learning curve if

the case is transferred. *In re Enron*, 274 B.R. at 349. In addition, courts consider the ability of

interested parties to participate in the proceedings and the additional costs that might be incurred

to do so. *In re B.L. of Miami*, 294 B.R. at 334.

Courts evaluating the economic and efficient administration of the case have looked at

"the need to obtain post petition financing, the need to obtain financing to fund reorganization,

and the location of the sources of such financing and the management personnel in charge of

obtaining it." *In re Enron*, 274 B.R. at 348 (citing *In re Int'l Filter Corp.*, 33 B.R. 952, 956

(Bankr. S.D.N.Y. 1983)); *CORCO*, 596 F.2d at 1247. In this case, these factors support the

transfer of venue. Post petition financing has already been obtained from Mr. Dunmore, a

California resident. (ECF Doc. # 48, 192.) Further financing for a purchase of assets or a wind

down of the business is just as likely to come from California as New York since the Debtor's

main assets are the California real estate owned by its Subsidiaries. (ECF Doc. # 114 at ¶ 24)

(stating that of the six term sheets submitted, two are from New York, three from California, and

14

one from Connecticut). Anyone purchasing or financing the business in all likelihood is going to have to conduct most of the necessary due diligence in California. Debtor's only offices, management and employees are located in California. Debtor's sole shareholder resides in California. Debtor's counsel, while having a New York office, is based in California, and the two lead partners from the firm in this case are based in California. Debtor's financial advisor, Alvarez & Marsal North America, LLC, and its investment banker, Alvarez & Marsal Securities, LLC, are based in California and Arizona, respectively. (ECF Doc. # 11 at Exhibits A & B.) The location of the financial professionals retained in this case is further evidence of the ability to secure funding or a purchaser for this company when based in a location other than New York. Based on the above, the sources of funding are likely in California and the location of the professionals and management personnel in charge of obtaining this funding are in California or Arizona. As a result, the efficient administration of this case weighs heavily in favor of transfer to California.

The Debtor in opposition relies on the *Enron* and *CORCO* courts' ultimate decisions to retain venue based on the location of the financial restructuring of the debtors in those cases rather than the physical location of their assets. However, the Debtor's reliance on these cases is misplaced because the assets and business models in *Enron* and *CORCO* were fundamentally different than those involved in this case. The majority of the Debtor's significant assets consist of real property in residential developments in the state of California. As stated in *Enron*, "where a debtor's assets consist solely of real property cases have held that transfer of venue is proper because matters concerning real property have always been of local concern and traditionally are decided at the situs of the property." *In re Enron*, 284 B.R. 376, 392 (Bankr. S.D.N.Y. 2002) (abrogated on other grounds) (citing *In re Baltimore Food Sys., Inc.*, 71 B.R.

795, 803 (Bankr. D.S.C. 1986) ("[S]pecial consideration to administration at the situs of the assets where those assets consist of real property.")); *see also In re Old Delmar Corp.*, 45 B.R. 883, 884 (S.D.N.Y. 1985) (finding that venue of real property was the most capable in handling emergencies and keeping close contact with the property). In *Enron*, the court faced the reorganization of a complex global energy conglomerate, and the sophistication of the financial markets was an essential factor in the successful financing and reorganization of the company. *See In re Enron*, 284 B.R. at 390 -91. In *CORCO*, the court faced reorganization or sale of an oil refining company conducting business in Puerto Rico, while its executive management was primarily in Texas. The expertise of its management and greater availability of financing in Texas were more important than the location of the physical assets or the largest number of its creditors. *CORCO*, 596 F.2d at 1247-48. Both *CORCO* and *Enron* emphasized that venue was most appropriate where the people who would handle the bankruptcy were located. In this case, all of the Debtor's employees and the majority of its professionals are located in California. In addition, Dunmore is distinguishable from *Enron* and *CORCO* because Dunmore lacks any ties to New York, other than its recent incorporation in the state and its efforts to secure financing here. Dunmore New York has no offices or employees here, unlike *Enron*, which had an operating subsidiary in New York, and *CORCO*, which had its executive offices and management in Texas. The Debtor currently has no ongoing operations in any state, but its predecessor in interest, Dunmore California, was a long-time California home builder with no projects or other connections with New York. Dunmore New York's only other "connection" to New York is that the headquarters of Bank of New York, the indenture trustee of the Debtor's subordinated notes, is located here.

16

The next prongs to consider in the interests of justice – judicial economy and the ability to receive a fair trial in either the Southern District of New York or the Eastern District of California – are closely balanced, but judicial economy tilts slightly in favor of transfer to California. Both courts have the capacity to handle this case and provide a fair proceeding. However, because cases are already pending in California state courts against some of Debtor's Subsidiaries (but stayed as to the Debtor), and many issues in this case are likely to be governed by California law, judicial economy would be better served if all cases were pending in California.

In *Manville*, in affirming the denial of a transfer of an adversary proceeding, the court relied on the bankruptcy court's substantial "learning curve" and the likelihood that a transferee court would have delayed the final resolution of the bankruptcy case. *Manville*, 896 F.2d at 1391. The court recognized the inefficiency that can result where the main case is administered in one district by a judge who has gained familiarity with the case, but an adversary proceeding is transferred to another district to be handled by a different judge. The transfer motion in this case has been made early in the case. While this Court has gained some familiarity with the issues in this case by considering and ruling on First Day Motions and the motion to approve the sale of the Stone Mitigation Property, these are not likely to be the kinds of issues that require the most court time in the future. Accepting the Debtor's argument would effectively mean that anytime a court has ruled on first day motions it should deny a subsequent transfer motion (necessarily filed after the first day) because of the learning curve a new court would have to get up to speed. This result would eviscerate the transfer venue statute, 28 U.S.C. § 1412. Given the Debtor's stated objective to sell all or parts of the company or its assets in an orderly wind down, the familiarity and knowledge gained by this Court is not as pivotal to the progress of the case as

17

it might be in more complex reorganizations such as Enron. Therefore, the learning curve is not a substantial deterrent to transferring the case.

In *CORCO*, the court emphasized the interest of the receiving venue in the outcome of the case. *CORCO*, 596 F.2d at 1248. In this case, California clearly has a greater interest in the outcome of this case for both the Debtor and the creditors. The Debtor's assets and business are in residential home building properties within California, giving California a strong interest in the impact of the disposition of those assets to the areas and communities in which they are located. California also has a greater interest than New York because the majority of the trade creditors in this case are local California businesses. In addition, several of those creditors have commenced proceedings against the Debtor or its Subsidiaries in California state courts based on California law. In *CORCO*, the court was ultimately not persuaded by Puerto Rico's interest in the outcome of the bankruptcy because the court found that the retention of the case in Texas ultimately served the interests of Puerto Rico by maintaining the bankruptcy in close proximity to the company's management that were working to provide the Debtor with needed access to capital markets and potential buyers for the underlying company. *Id.* In this case, while New York is a financial capital and could provide the funding for the Debtor's wind down, given the local nature of the assets and operations of the Debtor and the current interest expressed while the case was proceeding in New York, retaining the case in New York does not provide the same benefits relied on in *CORCO*. The potential financial investors who have expressed sufficient interest in the Debtor's properties to submit a term sheet are geographically dispersed. (*See* ECF Doc. # 114 at ¶ 21) (one company from Connecticut, two companies from New York, and three companies from California have submitted term sheets).

18

In *In re B.L. of Miami,* a case granting the transfer motion, the court identified the need for creditors to obtain local counsel to participate in the case as an additional difficulty and expense that would be incurred by parties if venue was not transferred. *In re B.L. of Miami,* 294 B.R. at 334. In this case, the Southern District Bankruptcy Court has a permissive *pro hace vice* admission rule, permitting any lawyer admitted to practice in any state or federal court to be admitted *pro hace vice* without requiring local counsel. *See* Southern District Bankruptcy Court Local Rules 2090-1 effective August 2, 2004 www.nysb.uscourts.gov. This rule has substantially eased the burden and expense for out-of-state parties and counsel to appear and participate in cases in this court. Additionally, the Court has already approved telephone participation in hearings in this case by counsel who do not maintain their offices in New York City. *See* Pretrial Order # 1, ¶ 3 (ECF Doc. # 44). However, even with the availability of alternative appearances by telephone, many creditors will still want counsel to be physically present at hearings either because they are the moving parties for motions under consideration or for the more general benefits that come from attending hearings in person such as the ability to observe the court, witnesses and other parties in interest. As a result, despite technological advances there are limitations on the quality of participation for a large number of creditors located exclusively in California if they do not incur the additional expense of New York counsel or have their California counsel travel to New York for hearings.

In considering the remaining factors under the interest of justice prong, while the Debtor's selection of venue is accorded great weight it does not appear that the Debtor's interests will be harmed or that the estate will suffer a diminution in value if venue is transferred to the Eastern District of California. In this case, the Debtor's employees, including management that would be needed to testify, assets, and the Subsidiaries are located in California. Debtor's

19

professionals (lawyers, financial advisors and investment bankers) are also located in California
or Arizona. The Creditors Committee supports transfer of the case to California, and the
Creditors Committee's counsel, Morrison & Foerster, LLP, has offices in New York and
California. In addition, considering the jurisdictional issues of potential judgments and
subpoenas in this case, all parties would be subject to the jurisdiction of California courts by
virtue of either their domicile in the case of the trade creditors or sufficient contacts in the case of
the institutional investors that conduct business there on a regular basis. As a result, while the
Debtor's selection is valid under § 1408 and accorded great weight, the overall circumstances of
the case show by a preponderance of the evidence that transfer of venue is in the interest of
justice in this case. Indeed, the thin nexus of the Debtor to the Southern District of New York,
and the overwhelming contacts between the Debtor and Eastern District of California, combined
with no overriding factors making it substantially more likely that the Debtor's prospects for a
successful reorganization would be enhanced if this Court were to retain jurisdiction, raise
serious questions whether the Court would abuse its discretion if it denied the motion to transfer
venue in the interests of justice.

### 2. Convenience of the Parties

Under the prong "convenience of the parties," the six factors most commonly analyzed
by bankruptcy courts under § 1412 are:

1. proximity of creditors of every kind to the court;
2. proximity of the debtor;
3. proximity of witnesses necessary to the administration of the estate;
4. location of the assets;
5. economic administration of the estate; and
6. necessity for ancillary administration if liquidation should result.

*In re B.L. of Miami,* 294 B.R. at 329 (citing *Consol. Equity Prop., Inc. v. Southmark, Corp. (In re
Consol. Equity Prop., Inc.),* 136 B.R. 261, 266 (D. Nev. 1991); *CORCO,* 596 F.2d at 1247). The

20

most weight is given to the promotion of the economic and efficient administration of the estate. This factor has already been discussed in connection with the interests of justice prong. *See In re Enron*, 274 B.R. at 343 n.10.

Consideration of the proximity and convenience of creditors must include the number of creditors as well as the amounts owed. *Id.* at 345. In this case the Debtor is a co-borrower or guarantor of loans from approximately ten large institutional national lenders representing over \$200 million in debt. The remaining creditors in the Debtor's top thirty creditors list, save one, are located in California and represent over \$12 million in debt. (ECF Doc. # 116.) Considering the number of creditors and the amounts owed, this factor does not favor changing venue unless consideration is given to the quality of participation available to the creditors. The largest bank creditors in this case are often participants in California cases and only Bank of New York, the indenture trustee, is headquartered in New York. (ECF Doc. # 114 at Exhibit 1) (showing majority of dollar amount of debt is based in Texas). A California venue would not be more inconvenient to these creditors as most would have to travel to appear in New York or California. However, the majority of trade creditors would not have to travel very far if venue was transferred to California. While the court has already provided for telephone participation at hearings, for parties who cannot travel to New York, or for whom travel is financially burdensome, the ability to advocate for them is impaired.

In *Enron*, the court also stressed the statutory role that the Creditors Committee fills as a fiduciary to creditors and as a representative body of the unsecured creditors. *In re Enron,* 274 B.R. at 345. In *Enron*, the Creditors Committee opposed the transfer of venue whereas in this case the Creditors Committee supports the transfer of venue. *Id.*; ECF Doc. # 130.

21

While the Debtor is incorporated in New York, all of its remaining employees, sole

shareholder, and the majority of its professionals are located in California. While the number of

hearings at which its employees may be required to testify – either called as witnesses by the

Debtor or by creditors – is uncertain, it will certainly be more convenient for them to appear in

Sacramento and compulsory process can also issue to require their appearance.[10]

While the *Enron* court characterized the physical location of the assets as one of the least

important factors in that case, *In re Enron*, 274 B.R. at 347-48, other courts have relied on it

more heavily. *In re B.L. of Miami*, 294 B.R. at 332. In *B.L. of Miami*, the court found that the

debtor, a nightclub in Florida, was better served if the court hearing the case was more likely to

have an "active familiarity with the community and the milieu in which the nightclub operated."

*In re B.L. of Miami*, 294 B.R. at 332. *Enron* was largely a "financial" case, where the physical

assets were divided amongst various locations and their location was therefore less important to

the restructuring than the center of the financial markets. *In re Enron*, 274 B.R. at 347-48. In

analyzing *Enron* and *In re B.L. of Miami*, it is apparent that the nature of the underlying

businesses was a major consideration in the venue decisions. Here, despite Debtor's efforts to fit

this case in *Enron's* "financial" box, the Debtor's real estate assets and the local or regional

business climate in which the Debtor and its Subsidiaries operated are the driving considerations

in this case. The Debtor's business did not operate on a global scale, as did Enron, and Debtor's

assets are not located in various locations but instead are mostly centralized in California.

The Court has already discussed the economic administration of the estate. *See In re*

*Enron*, 274 B.R. at 348; *see supra* at 14-15. In addition to those considerations, another factor

pointing to California venue is that the Debtor is already in the process of liquidating. (ECF

---

[10]     The importance of the availability of compulsory process cannot be underestimated in light of the Debtor's
substantial reduction in the number of employees. Former employees who worked for the Debtor or its Subsidiaries
in California are more likely to be subject to compulsory process if the case is pending in Sacramento.

22

Doc. # 150 at ¶ 8.) Marketing and selling its California real estate assets can best be overseen by a California bankruptcy court with greater familiarity with the market.

As a result of the above and the totality of the circumstances in this case, the Court concludes that the Moving Parties have met their burden for transfer of the case under the convenience of the parties prong as well.

## CONCLUSION

The Moving Parties have shown by a preponderance of the evidence that the Court should order the transfer of venue of this case to the Eastern District of California in the interests of justice and for the convenience of the parties. For the reasons stated, the motion is GRANTED. The Clerk of the Court is directed to transfer this case to the United States District Court for the Eastern District of California, Sacramento Division.

## IT IS SO ORDERED.

DATED:      January 14, 2008
            New York, New York


            **/s/Martin Glenn**
            MARTIN GLENN
            United States Bankruptcy Judge

23

SECTION 1.3. *Forms of Documents Delivered to Trustee.*

(a)     In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b)     Any certificate or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or after reasonable inquiry should know, that the certificate or opinion or representations with respect to matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or after reasonable inquiry should know, that the certificate or opinion or representations with respect to such matters are erroneous.

(c)     Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

(d)     Whenever, subsequent to the receipt by the Trustee of any Board Resolution, Officers' Certificate, Opinion of Counsel or other document or instrument, a clerical, typographical or other inadvertent or unintentional error or omission shall be discovered therein, a new document or instrument may be substituted therefor in corrected form with the same force and effect as if originally received in the corrected form and, irrespective of the date or dates of the actual execution and/or delivery thereof, such substitute document or instrument shall be deemed to have been executed and/or delivered as of the date or dates required with respect to the document or instrument for which it is substituted. Without limiting the generality of the foregoing, any Securities issued under the authority of such defective document or instrument shall nevertheless be the valid obligations of the Company entitled to the benefits of this Indenture equally and ratably with all other Outstanding Securities.

SECTION 1.4. *Acts of Holders.*

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given to or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent thereof duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments (including any appointment of an agent) is or are delivered to the Trustee, and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "*Act*" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section 1.4.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him or her the execution thereof. Where such execution is by a Person acting in other than his or her individual capacity, such certificate or affidavit shall also constitute sufficient proof of his or her authority. The fact and date of the execution by any Person of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient and in accordance with such reasonable rules as the Trustee may determine.

(c)     The ownership of Securities shall be proved by the Securities Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Security shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(e)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Security may do so with regard to all or any part of the principal amount of such Security or by one or more duly appointed agents each of which may do so pursuant to such appointment with regard to all or any part of such principal amount.

(f)     Except as set forth in paragraph (g) of this Section 1.4, the Company may set any day as a record date for the purpose of determining the Holders of Outstanding Securities entitled to give, make or take any request, demand, authorization, direction, notice, consent, waiver or other action provided or permitted by this Indenture to be given, made or taken by Holders of Securities. If any record date is set pursuant to this paragraph, the Holders of Outstanding Securities on such record date, and no other Holders, shall be entitled to take the relevant action, whether or not such Holders remain Holders after such record date; provided, that no such action shall be effective hereunder unless taken on or prior to the applicable Expiration Date (as defined in Section 1.4(h)) by Holders of the requisite principal amount of Outstanding Securities on such record date. Nothing in this paragraph shall be construed to prevent the Company from setting a new record date for any action for which a record date has previously been set pursuant to this paragraph (whereupon the record date previously set shall automatically and with no action by any Person be canceled and of no effect). Promptly after any record date is set pursuant to this paragraph, the Company, at its own expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Trustee in writing and to each Holder of Securities in the manner set forth in Section 1.6.

(g)     The Trustee may set any day as a record date for the purpose of determining the Holders of Outstanding Securities entitled to join in the giving or making of (i) any Notice of Default, (ii) any declaration of acceleration or rescission or annulment thereof referred to in Section 5.2, (iii) any request to institute proceedings referred to in Section 5.7(b) or (iv) any direction referred to in Section 5.12. If any record date is set pursuant to this paragraph, the Holders of Outstanding Securities on such record date, and no other Holders, shall be entitled to join in such notice, declaration, request or direction, whether or not such Holders remain Holders after such record date; provided, that no such action shall be effective hereunder unless taken on

or prior to the applicable Expiration Date by Holders of the requisite principal amount of Outstanding Securities on such record date. Nothing in this paragraph shall be construed to prevent the Trustee from setting a new record date for any action for which a record date has previously been set pursuant to this paragraph (whereupon the record date previously set shall automatically and with no action by any Person be canceled and of no effect). Promptly after any record date is set pursuant to this paragraph, the Trustee, at the Company's expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Company in writing and to each Holder of Securities in the manner set forth in Section 1.6.

(h)    With respect to any record date set pursuant to paragraph (f) or (g) of this Section 1.4, the party hereto that sets such record date may designate any day as the "*Expiration Date*" and from time to time may change the Expiration Date to any earlier or later day; *provided*, that no such change shall be effective unless notice of the proposed new Expiration Date is given to the other party hereto in writing, and to each Holder of Securities in the manner set forth in Section 1.6, on or prior to the existing Expiration Date. If an Expiration Date is not designated with respect to any record date set pursuant to this Section 1.4, the party hereto that set such record date shall be deemed to have initially designated the ninetieth (90th) day after such record date as the Expiration Date with respect thereto, subject to its right to change the Expiration Date as provided in this paragraph. Notwithstanding the foregoing, no Expiration Date shall be later than the one hundred eightieth (180th) day after the applicable record date.

SECTION 1.5. *Notices, Etc. to Trustee and Company.*

Any request, demand, authorization, direction, notice, consent, waiver, Act of Holders, or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee by any Holder, any holder of Preferred Securities or the Company shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with and received by the Trustee at its Corporate Trust Office, or

(b)    the Company by the Trustee, any Holder or any holder of Preferred Securities shall be sufficient for every purpose hereunder if in writing and mailed, first class, postage prepaid, to the Company addressed to it at 2150 Professional Drive, Suite 150, Roseville, California 95661 or at any other address previously furnished in writing to the Trustee by the Company.

SECTION 1.6. *Notice to Holders; Waiver.*

Where this Indenture provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first class, postage prepaid, to each Holder affected by such event to the address of such Holder as it appears in the Securities Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. If, by reason of the suspension of or irregularities in regular mail service or for any other reason, it shall be impossible or impracticable to mail notice of any event to Holders when said notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee

(Ⅳ) AUSTIN:156180

12

shall be deemed to be a sufficient giving of such notice. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders. Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 1.7. *Effect of Headings and Table of Contents.*

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

SECTION 1.8. *Successors and Assigns.*

This Indenture shall be binding upon and shall inure to the benefit of any successor to the Company and the Trustee, including any successor by operation of law. Except in connection with a transaction involving the Company that is permitted under Article VIII and pursuant to which the assignee agrees in writing to perform the Company's obligations hereunder, the Company shall not assign its obligations hereunder.

SECTION 1.9. *Separability Clause.*

If any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

SECTION 1.10. *Benefits of Indenture.*

Nothing in this Indenture or in the Securities, express or implied, shall give to any Person, other than the parties hereto and their successors and assigns, the holders of Senior Debt, the Holders of the Securities and, to the extent expressly provided in Sections 5.2, 5.8, 5.9, 5.11, 5.13, 9.2 and 10.7, the holders of Preferred Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 1.11. *Governing Law.*

**This Indenture and the rights and obligations of each of the Holders, the Company and the Trustee shall be construed and enforced in accordance with and governed by the laws of the State of New York without reference to its conflict of laws provisions (other than Section 5-1401 of the General Obligations Law).**

SECTION 1.12. Submission to Jurisdiction.

ANY LEGAL ACTION OR PROCEEDING BY OR AGAINST ANY PARTY HERETO OR WITH RESPECT TO OR ARISING OUT OF THIS INDENTURE MAY BE BROUGHT IN OR REMOVED TO THE COURTS OF THE STATE OF NEW YORK, IN AND FOR THE

COUNTY OF NEW YORK, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK (IN EACH CASE SITTING IN THE BOROUGH OF MANHATTAN). BY EXECUTION AND DELIVERY OF THIS INDENTURE, EACH PARTY ACCEPTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS (AND COURTS OF APPEALS THEREFROM) FOR LEGAL PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE.

SECTION 1.13. *Non-Business Days.*

If any Interest Payment Date, Redemption Date or Stated Maturity of any Security shall not be a Business Day, then (notwithstanding any other provision of this Indenture or the Securities) payment of interest, premium, if any, or principal or other amounts in respect of such Security shall not be made on such date, but shall be made on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity, as the case may be, until such next succeeding Business Day) except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case with the same force and effect as if made on the Interest Payment Date or Redemption Date or at the Stated Maturity.

ARTICLE II

SECURITY FORMS

SECTION 2.1. *Form of Security.*

Any Security issued hereunder shall be in substantially the following form:

**Dunmore Homes, LLC**

**Junior Subordinated Note due 2035**

No. _____                                    $20,619,000

Dunmore Homes, LLC, a corporation organized and existing under the laws of Delaware (hereinafter called the "*Company,*" which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to Sigler & Co., or registered assigns, the principal sum of $20,619,000 on July 30, 2035. The Company further promises to pay interest on said principal sum from June 28, 2005, or from the most recent Interest Payment Date to which interest has been paid or duly provided for, quarterly in arrears on January 30, April 30, July 30 and October 30, of each year, commencing October 30, 2005, or if any such day is not a Business Day, on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after such Interest Payment Date until such next succeeding Business Day), except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case, with the same force and effect as if made on the Interest Payment Date, at a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and thereafter at a variable rate equal to LIBOR plus 4.5% per annum, together

with Additional Tax Sums, if any, as provided in Section 10.5 of the Indenture, until the principal hereof is paid or duly provided for or made available for payment; *provided, further*, that any overdue principal, premium, if any, or Additional Tax Sums and any overdue installment of interest shall bear Additional Interest at a fixed rate equal to 8.60% through the interest payment date in July 30, 2010 and thereafter at a variable rate equal to LIBOR plus 4.5% per annum (to the extent that the payment of such interest shall be legally enforceable), compounded quarterly, from the dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

The amount of interest payable shall be computed on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date shall, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest installment. Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities not less than ten (10) days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities may be listed, and upon such notice as may be required by such exchange, all as more fully provided in the Indenture.

Payment of principal of, premium, if any, and interest on this Security shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal, premium, if any, and interest due at the Maturity of this Security shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent, and payments of interest shall be made, subject to such surrender where applicable, by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register. Notwithstanding the foregoing, so long as the Holder of this Security is the Property Trustee, the payment of the principal of (and premium, if any) and interest (including any overdue installment of interest and Additional Tax Sums, if any) on this Security will be made at such place and to such account as may be designated by the Property Trustee.

The indebtedness evidenced by this Security is, to the extent provided in the Indenture, subordinate and junior in right of payment to the prior payment in full of all Senior Debt, and this Security is issued subject to the provisions of the Indenture with respect thereto. Each Holder of this Security, by accepting the same, (a) agrees to and shall be bound by such provisions, (b) authorizes and directs the Trustee on his or her behalf to take such actions as may be necessary or appropriate to effectuate the subordination so provided and (c) appoints the Trustee his or her attorney-in-fact for any and all such purposes. Each Holder hereof, by his or her acceptance hereof, waives all notice of the acceptance of the subordination provisions contained herein and in the Indenture by each holder of Senior Debt, whether now outstanding or hereafter incurred, and waives reliance by each such holder upon said provisions.

Unless the certificate of authentication hereon has been executed by the Trustee by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

## [FORM OF REVERSE OF SECURITY]

This Security is one of a duly authorized issue of securities of the Company (the "*Securities*") issued under the Junior Subordinated Indenture, dated as of June 28, 2005 (the "*Indenture*"), between the Company and JPMorgan Chase Bank, National Association, as Trustee (in such capacity, the "*Trustee*," which term includes any successor trustee under the Indenture), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Trustee, the holders of Senior Debt, the Holders of the Securities and the holders of the Preferred Securities, and of the terms upon which the Securities are, and are to be, authenticated and delivered.

All terms used in this Security that are defined in the Indenture or in the Amended and Restated Trust Agreement, dated as of June 28, 2005 (as modified, amended or supplemented from time to time, the "*Trust Agreement*"), relating to the Dunmore Homes Statutory Trust I (the "*Trust*") among the Company, as Depositor, the Trustees named therein and the Holders from time to time of the Trust Securities issued pursuant thereto, shall have the meanings assigned to them in the Indenture or the Trust Agreement, as the case may be.

The Company may, on any Interest Payment Date, at its option, upon not less than thirty (30) days' nor more than sixty (60) days' written notice to the Holders of the Securities (unless a shorter notice period shall be satisfactory to the Trustee) on or after July 30, 2010 and subject to the terms and conditions of Article XI of the Indenture, redeem this Security in whole at any time or in part from time to time at a Redemption Price equal to one hundred percent (100%) of the principal amount hereof, together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date.

In addition, upon the occurrence and during the continuation of a Special Event, the Company may, at its option, upon not less than thirty (30) days' nor more than sixty (60) days' written notice to the Holders of the Securities (unless a shorter notice period shall be satisfactory to the Trustee), redeem this Security, in whole but not in part, subject to the terms and conditions of Article XI of the Indenture at a Redemption Price equal to one hundred seven and one half percent (107.5%) of the principal amount hereof, together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date.

In the event of redemption of this Security in part only, a new Security or Securities for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the cancellation hereof. If less than all the Securities are to be redeemed, the particular Securities to be redeemed shall be selected not more than sixty (60) days prior to the Redemption Date by the Trustee from the Outstanding Securities not previously called for redemption, by such method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of a portion of the principal amount of any Security.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee at any time to enter into a supplemental indenture or indentures for the purpose of modifying in any manner the rights and obligations of the Company and of the Holders of the Securities, with the consent of the Holders of not less than a majority in principal amount of the Outstanding Securities. The Indenture also contains provisions permitting Holders of specified percentages in principal amount of the Securities, on behalf of the Holders of all Securities, to waive compliance by the Company with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium, if any, and interest, including any Additional Interest (to the extent legally enforceable), on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is restricted to transfers to "Qualified Purchasers" (as such term is defined in the Investment Company Act of 1940, as amended), and is registrable in the Securities Register, upon surrender of this Security for registration of transfer at the office or agency of the Company maintained for such purpose, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company and the Securities Registrar and duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Securities, of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities are issuable only in registered form without coupons in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities are exchangeable for a like aggregate principal amount of Securities and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

The Company and, by its acceptance of this Security or a beneficial interest herein, the Holder of, and any Person that acquires a beneficial interest in, this Security agree that, for United States federal, state and local tax purposes, it is intended that this Security constitute indebtedness.

This Security shall be construed and enforced in accordance with and governed by the laws of the State of New York, without reference to its conflict of laws provisions (other than Section 5-1401 of the General Obligations Law).

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed on this _____ day of _____, 20__.

|  |  |  |
|---|---|---|
| Dunmore | Homes, | LLC |

By: _____

　　　Name: _____

　　　Title: _____

SECTION 2.2. *Restricted Legend.*

(a)　　Any Security issued hereunder shall bear a legend in substantially the following form:

"[IF THIS SECURITY IS A GLOBAL SECURITY INSERT: THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("DTC") OR A NOMINEE OF DTC. THIS SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN DTC OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY DTC TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND SUCH SECURITIES, AND ANY INTEREST THEREIN, MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH

PURCHASER OF ANY SECURITIES IS HEREBY NOTIFIED THAT THE SELLER OF THE SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A UNDER THE SECURITIES ACT.

THE HOLDER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE AGREES FOR THE BENEFIT OF THE COMPANY THAT (A) SUCH SECURITIES MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY (I) TO THE COMPANY OR (II) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED PURCHASER" (AS DEFINED IN SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), AND (B) THE HOLDER WILL NOTIFY ANY PURCHASER OF ANY SECURITIES FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

THE SECURITIES WILL BE ISSUED AND MAY BE TRANSFERRED ONLY IN BLOCKS HAVING AN AGGREGATE PRINCIPAL AMOUNT OF NOT LESS THAN $100,000. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY ATTEMPTED TRANSFER OF SECURITIES, OR ANY INTEREST THEREIN, IN A BLOCK HAVING AN AGGREGATE PRINCIPAL AMOUNT OF LESS THAN $100,000 AND MULTIPLES OF $1,000 IN EXCESS THEREOF SHALL BE DEEMED TO BE VOID AND OF NO LEGAL EFFECT WHATSOEVER. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY SUCH PURPORTED TRANSFEREE SHALL BE DEEMED NOT TO BE THE HOLDER OF SUCH SECURITIES FOR ANY PURPOSE, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF PRINCIPAL OF OR INTEREST ON SUCH SECURITIES, OR ANY INTEREST THEREIN, AND SUCH PURPORTED TRANSFEREE SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN SUCH SECURITIES.

THE HOLDER OF THIS SECURITY, OR ANY INTEREST THEREIN, BY ITS ACCEPTANCE HEREOF OR THEREOF ALSO AGREES, REPRESENTS AND WARRANTS THAT IT IS NOT AN EMPLOYEE BENEFIT, INDIVIDUAL RETIREMENT ACCOUNT OR OTHER PLAN OR ARRANGEMENT SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") (EACH A "PLAN"), OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY PLAN'S INVESTMENT IN THE ENTITY, AND NO PERSON INVESTING "PLAN ASSETS" OF ANY PLAN MAY ACQUIRE OR HOLD THIS SECURITY OR ANY INTEREST THEREIN. ANY PURCHASER OR HOLDER OF THE SECURITIES OR ANY INTEREST THEREIN WILL BE DEEMED TO HAVE REPRESENTED BY ITS PURCHASE AND HOLDING THEREOF THAT IT IS NOT AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF SECTION 3(3) OF ERISA, OR A PLAN TO WHICH SECTION 4975 OF THE CODE IS APPLICABLE, A TRUSTEE OR OTHER PERSON ACTING ON BEHALF OF AN EMPLOYEE BENEFIT PLAN OR PLAN, OR ANY OTHER PERSON OR ENTITY USING THE ASSETS OF ANY EMPLOYEE BENEFIT PLAN OR PLAN TO FINANCE SUCH PURCHASE."

(b)    The above legends shall not be removed from any Security unless there is delivered to the Company satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required to ensure that any future transfers thereof may be made without restriction under or violation of the provisions of the Securities Act and other applicable law. Upon provision of such satisfactory evidence, the Company shall execute and deliver to the Trustee, and the Trustee shall deliver, upon receipt of a Company Order directing it to do so, a Security that does not bear the legend.

SECTION 2.3.  *Form of Trustee's Certificate of Authentication.*

The Trustee's certificate of authentication shall be in substantially the following form:

This is one of the Securities referred to in the within-mentioned Indenture.

Dated: _____

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, *not in its individual capacity, but solely as Trustee*

By: _____

*Authorized signatory*

SECTION 2.4.  *Temporary Securities.*

(a)    Pending the preparation of definitive Securities, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities that are printed, lithographed, typewritten, mimeographed or otherwise produced, in any denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as evidenced by their execution of such Securities.

(b)    If temporary Securities are issued, the Company will cause definitive Securities to be prepared without unreasonable delay. After the preparation of definitive Securities, the temporary Securities shall be exchangeable for definitive Securities upon surrender of the temporary Securities at the office or agency of the Company designated for that purpose without charge to the Holder. Upon surrender for cancellation of any one or more temporary Securities, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor one or more definitive Securities of any authorized denominations having the same Original Issue Date and Stated Maturity and having the same terms as such temporary Securities. Until so exchanged, the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities.

SECTION 2.5.  *Definitive Securities.*

The Securities issued on the Original Issue Date shall be in definitive form. The definitive Securities shall be printed, lithographed or engraved, or produced by any combination

of these methods, if required by any securities exchange on which the Securities may be listed, on a steel engraved border or steel engraved borders or may be produced in any other manner permitted by the rules of any securities exchange on which the Securities may be listed, all as determined by the officers executing such Securities, as evidenced by their execution of such Securities.

## ARTICLE III

### THE SECURITIES

SECTION 3.1. *Payment of Principal and Interest.*

(a)    The unpaid principal amount of the Securities shall bear interest at a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and thereafter at a variable rate of LIBOR plus 4.5% per annum until paid or duly provided for such interest to accrue from the Original Issue Date or from the most recent Interest Payment Date to which interest has been paid or duly provided for, and any overdue principal, premium, if any, or Additional Tax Sums and any overdue installment of interest shall bear Additional Interest at the rate equal to a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and thereafter at a variable rate of LIBOR plus 4.5% per annum compounded quarterly from the dates such amounts are due until they are paid or funds for the payment thereof are made available for payment.

(b)    Interest and Additional Interest on any Security that is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name that Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest, except that interest and any Additional Interest payable on the Stated Maturity (or any date of principal repayment upon early maturity) of the principal of a Security or on a Redemption Date shall be paid to the Person to whom principal is paid. The initial payment of interest on any Security that is issued between a Regular Record Date and the related Interest Payment Date shall be payable as provided in such Security.

(c)    Any interest on any Security that is due and payable, but is not timely paid or duly provided for, on any Interest Payment Date for Securities (herein called "*Defaulted Interest*") shall forthwith cease to be payable to the registered Holder on the relevant Regular Record Date by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in paragraph (i) or (ii) below:

(i)    The Company may elect to make payment of any Defaulted Interest to the Persons in whose names the Securities (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest (a "*Special Record Date*"), which shall be fixed in the following manner. At least thirty (30) days prior to the date of the proposed payment, the Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed

payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than fifteen (15) days and not less than ten (10) days prior to the date of the proposed payment and not less than ten (10) days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first class, postage prepaid, to each Holder of a Security at the address of such Holder as it appears in the Securities Register not less than ten (10) days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been so mailed, such Defaulted Interest shall be paid to the Persons in whose names the Securities (or their respective Predecessor Securities) are registered on such Special Record Date; or

(ii) The Company may make payment of any Defaulted Interest in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities may be listed and, upon such notice as may be required by such exchange (or by the Trustee if the Securities are not listed), if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such payment shall be deemed practicable by the Trustee.

(d)    Payments of interest on the Securities shall include interest accrued to but excluding the respective Interest Payment Dates. Interest payments for the Securities shall be computed and paid on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period.

(e)    Payment of principal of, premium, if any, and interest on the Securities shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal, premium, if any, and interest due at the Maturity of such Securities shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent and payments of interest shall be made subject to such surrender where applicable, by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register. Notwithstanding the foregoing, so long as the holder of this Security is the Property Trustee, the payment of the principal of (and premium, if any) and interest (including any overdue installment of interest and Additional Tax Sums, if any) on this Security will be made at such place and to such account as may be designated by the Property Trustee.

(f)    Subject to the foregoing provisions of this Section 3.1, each Security delivered under this Indenture upon transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, that were carried by such other Security.

SECTION 3.2. *Denominations.*

The Securities shall be in registered form without coupons and shall be issuable in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof.

SECTION 3.3. *Execution; Authentication, Delivery and Dating.*

(a)    At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities in an aggregate principal amount (including all then Outstanding Securities) not in excess of $20,619,000 executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities, and the Trustee in accordance with the Company Order shall authenticate and deliver such Securities. In authenticating such Securities, and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall be entitled to receive, and shall be fully protected in relying upon:

(i) a copy of any Board Resolution relating thereto; and

(ii) an Opinion of Counsel stating that: (1) such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute, and the Indenture constitutes, valid and legally binding obligations of the Company, each enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; (2) the Securities have been duly authorized and executed by the Company and have been delivered to the Trustee for authentication in accordance with this Indenture; (3) the Securities are not required to be registered under the Securities Act; and (4) the Indenture is not required to be qualified under the Trust Indenture Act.

(b)    The Securities shall be executed on behalf of the Company by its Chairman of the Board, its Vice Chairman of the Board, its Chief Executive Officer, its President or one of its Vice Presidents. The signature of any of these officers on the Securities may be manual or facsimile. Securities bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such offices at the date of such Securities.

(c)    No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Security a certificate of authentication substantially in the form provided for herein executed by the Trustee by the manual signature of one of its authorized signatories, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder. Notwithstanding the foregoing, if any Security shall have been authenticated and delivered hereunder but never issued and sold by the Company, and the Company shall deliver such Security to the Trustee for cancellation as provided in Section 3.8, for all purposes of this Indenture such Security shall be deemed never to have been authenticated and delivered hereunder and shall never be entitled to the benefits of this Indenture.

(d)    Each Security shall be dated the date of its authentication.

[If DTC Entry insert the following Section:]

SECTION 3.4.  *Global Securities.*

(a)    Upon the election of the Holder after the Original Issue Date, which election need not be in writing, the Securities owned by such Holder shall be issued in the form of one or more Global Securities registered in the name of the Depositary or its nominee. Each Global Security issued under this Indenture shall be registered in the name of the Depositary designated by the Company for such Global Security or a nominee thereof and delivered to such Depositary or a nominee thereof or custodian therefor, and each such Global Security shall constitute a single Security for all purposes of this Indenture.

(b)    Notwithstanding any other provision in this Indenture, no Global Security may be exchanged in whole or in part for registered Securities, and no transfer of a Global Security in whole or in part may be registered, in the name of any Person other than the Depositary for such Global Security or a nominee thereof unless (i) such Depositary advises the Trustee and the Company in writing that such Depositary is no longer willing or able to properly discharge its responsibilities as Depositary with respect to such Global Security, and no qualified successor is appointed by the Company within ninety (90) days of receipt by the Company of such notice, (ii) such Depositary ceases to be a clearing agency registered under the Exchange Act and no successor is appointed by the Company within ninety (90) days after obtaining knowledge of such event, (iii) the Company executes and delivers to the Trustee a Company Order stating that the Company elects to terminate the book-entry system through the Depositary or (iv) an Event of Default shall have occurred and be continuing.  Upon the occurrence of any event specified in clause (i), (ii), (iii) or (iv) above, the Trustee shall notify the Depositary and instruct the Depositary to notify all owners of beneficial interests in such Global Security of the occurrence of such event and of the availability of Securities to such owners of beneficial interests requesting the same.  The Trustee may conclusively rely, and be protected in relying, upon the written identification of the owners of beneficial interests furnished by the Depositary, and shall not be liable for any delay resulting from a delay by the Depositary.  Upon the issuance of such Securities and the registration in the Securities Register of such Securities in the names of the Holders of the beneficial interests therein, the Trustees shall recognize such holders of beneficial interests as Holders.

(c)    If any Global Security is to be exchanged for other Securities or canceled in part, or if another Security is to be exchanged in whole or in part for a beneficial interest in any Global Security, then either (i) such Global Security shall be so surrendered for exchange or cancellation as provided in this Article III or (ii) the principal amount thereof shall be reduced or increased by an amount equal to (x) the portion thereof to be so exchanged or canceled, or (y) the principal amount of such other Security to be so exchanged for a beneficial interest therein, as the case may be, by means of an appropriate adjustment made on the records of the Securities Registrar, whereupon the Trustee, in accordance with the Applicable Depositary Procedures, shall instruct the Depositary or its authorized representative to make a corresponding adjustment to its records.  Upon any such surrender or adjustment of a Global Security by the Depositary, accompanied by registration instructions, the Company shall execute and the Trustee shall authenticate and deliver any Securities issuable in exchange for such Global Security (or any

portion thereof) in accordance with the instructions of the Depositary. The Trustee shall not be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be fully protected in relying on, such instructions.

(d)    Every Security authenticated and delivered upon registration of transfer of, or in exchange for or in lieu of, a Global Security or any portion thereof shall be authenticated and delivered in the form of, and shall be, a Global Security, unless such Security is registered in the name of a Person other than the Depositary for such Global Security or a nominee thereof.

(e)    Securities distributed to holders of Book-Entry Preferred Securities (as defined in the applicable Trust Agreement) upon the dissolution of the Trust shall be distributed in the form of one or more Global Securities registered in the name of a Depositary or its nominee, and deposited with the Securities Registrar as custodian for such Depositary, or with such Depositary, for credit by the Depositary to the respective accounts of the beneficial owners of the Securities represented thereby (or such other accounts as they may direct). Securities distributed to holders of Preferred Securities other than Book-Entry Preferred Securities upon the dissolution of the Trust shall not be issued in the form of a Global Security or any other form intended to facilitate book-entry trading in beneficial interests in such Securities.

(f)    The Depositary or its nominee, as the registered owner of a Global Security, shall be the Holder of such Global Security for all purposes under this Indenture and the Securities, and owners of beneficial interests in a Global Security shall hold such interests pursuant to the Applicable Depositary Procedures. Accordingly, any such owner's beneficial interest in a Global Security shall be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Depositary Participants. The Securities Registrar and the Trustee shall be entitled to deal with the Depositary for all purposes of this Indenture relating to a Global Security (including the payment of principal and interest thereon and the giving of instructions or directions by owners of beneficial interests therein and the giving of notices) as the sole Holder of the Security and shall have no obligations to the owners of beneficial interests therein. Neither the Trustee nor the Securities Registrar shall have any liability in respect of any transfers effected by the Depositary.

(g)    The rights of owners of beneficial interests in a Global Security shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such owners and the Depositary and/or its Depositary Participants.

(h)    No holder of any beneficial interest in any Global Security held on its behalf by a Depositary shall have any rights under this Indenture with respect to such Global Security, and such Depositary may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the owner of such Global Security for all purposes whatsoever. None of the Company, the Trustee nor any agent of the Company or the Trustee will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Security or maintaining, supervising or reviewing any records relating to such beneficial ownership interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by a Depositary or impair, as between a Depositary and such holders of beneficial interests, the operation of

customary practices governing the exercise of the rights of the Depositary (or its nominee) as Holder of any Security.

SECTION 3.5. *Registration, Transfer and Exchange Generally.*

(a)    The Trustee shall cause to be kept at the Corporate Trust Office a register (the "*Securities Register*") in which the registrar and transfer agent with respect to the Securities (the "*Securities Registrar*"), subject to such reasonable regulations as it may prescribe, shall provide for the registration of Securities and of transfers and exchanges of Securities. The Trustee shall at all times also be the Securities Registrar. The provisions of Article VI shall apply to the Trustee in its role as Securities Registrar.

(b)    Subject to compliance with Section 2.2(b), upon surrender for registration of transfer of any Security at the offices or agencies of the Company designated for that purpose the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of any authorized denominations of like tenor and aggregate principal amount.

(c)    At the option of the Holder, Securities may be exchanged for other Securities of any authorized denominations, of like tenor and aggregate principal amount, upon surrender of the Securities to be exchanged at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities that the Holder making the exchange is entitled to receive.

(d)    All Securities issued upon any transfer or exchange of Securities shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such transfer or exchange.

(e)    Every Security presented or surrendered for transfer or exchange shall (if so required by the Company or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Securities Registrar, duly executed by the Holder thereof or such Holder's attorney duly authorized in writing.

(f)    No service charge shall be made to a Holder for any transfer or exchange of Securities, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer or exchange of Securities.

(g)    Neither the Company nor the Trustee shall be required pursuant to the provisions of this Section 3.5 (g): (i) to issue, register the transfer of or exchange any Security during a period beginning at the opening of business fifteen (15) days before the day of selection for redemption of Securities pursuant to Article XI and ending at the close of business on the day of mailing of the notice of redemption or (ii) to register the transfer of or exchange any Security so selected for redemption in whole or in part, except, in the case of any such Security to be redeemed in part, any portion thereof not to be redeemed.

(h)    The Company shall designate an office or offices or agency or agencies where Securities may be surrendered for registration or transfer or exchange. The Company initially designates the Corporate Trust Office as its office and agency for such purposes. The Company

shall give prompt written notice to the Trustee and to the Holders of any change in the location of any such office or agency.

(i)     The Securities may only be transferred to a "Qualified Purchaser" as such term is defined in Section 2(a)(51) of the Investment Company Act. Neither the Trustee nor the Securities Registrar shall be responsible for ascertaining whether any transfer hereunder complies with the registration provisions of or any exemptions from the Securities Act, applicable state securities laws or the applicable laws of any other jurisdiction, ERISA, the United States Internal Revenue Code of 1986, as amended, or the Investment Company Act; provided, that if a certificate is specifically required by the express terms of this Section 3.5 to be delivered to the Trustee or the Securities Registrar by a Holder or transferee of a Security, the Trustee and the Securities Registrar shall be under a duty to receive and examine the same to determine whether or not the certificate substantially conforms on its face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate does not comply with such terms.

SECTION 3.6. *Mutilated, Destroyed, Lost and Stolen Securities.*

(a)     If any mutilated Security is surrendered to the Trustee together with such security or indemnity as may be required by the Trustee to save the Company and the Trustee harmless, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a new Security of like tenor and aggregate principal amount and bearing a number not contemporaneously outstanding.

(b)     If there shall be delivered to the Trustee (i) evidence to its satisfaction of the destruction, loss or theft of any Security and (ii) such security or indemnity as may be required by it to save each of the Company and the Trustee harmless, then, in the absence of notice to the Company or the Trustee that such Security has been acquired by a *bona fide* purchaser, the Company shall execute and upon its written request the Trustee shall authenticate and deliver, in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and aggregate principal amount as such destroyed, lost or stolen Security, and bearing a number not contemporaneously outstanding.

(c)     If any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay such Security.

(d)     Upon the issuance of any new Security under this Section 3.6, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(e)     Every new Security issued pursuant to this Section 3.6 in lieu of any mutilated, destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the mutilated, destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

(f)    The provisions of this Section 3.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 3.7. *Persons Deemed Owners.*

The Company, the Trustee and any agent of the Company or the Trustee shall treat the Person in whose name any Security is registered as the owner of such Security for the purpose of receiving payment of principal of and any interest on such Security and for all other purposes whatsoever, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

SECTION 3.8. *Cancellation.*

All Securities surrendered for payment, redemption, transfer or exchange shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, and any such Securities and Securities surrendered directly to the Trustee for any such purpose shall be promptly canceled by it. The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder that the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly canceled by the Trustee. No Securities shall be authenticated in lieu of or in exchange for any Securities canceled as provided in this Section 3.8, except as expressly permitted by this Indenture. All canceled Securities shall be retained or disposed of by the Trustee in accordance with its customary practices and the Trustee shall deliver to the Company a certificate of such disposition.

SECTION 3.9. *Reserved.*

SECTION 3.10. *Reserved.*

SECTION 3.11. *Agreed Tax Treatment.*

Each Security issued hereunder shall provide that the Company and, by its acceptance or acquisition of a Security or a beneficial interest therein, the Holder of, and any Person that acquires a direct or indirect beneficial interest in, such Security, intend and agree to treat such Security as indebtedness of the Company for United States Federal, state and local tax purposes and to treat the Preferred Securities (including but not limited to all payments and proceeds with respect to the Preferred Securities) as an undivided beneficial ownership interest in the Securities (and any other Trust property) (and payments and proceeds therefrom, respectively) for United States Federal, state and local tax purposes. The provisions of this Indenture shall be interpreted to further this intention and agreement of the parties.

SECTION 3.12. *CUSIP Numbers.*

The Company in issuing the Securities may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption and other similar or related materials as a convenience to Holders; *provided*, that any such notice or other materials may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of redemption or other materials and that

reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.

## ARTICLE IV

### SATISFACTION AND DISCHARGE

SECTION 4.1. *Satisfaction and Discharge of Indenture.*

This Indenture shall, upon Company Request, cease to be of further effect (except as to any surviving rights of registration of transfer or exchange of Securities herein expressly provided for and as otherwise provided in this Section 4.1) and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when

(a)     either

(i) all Securities theretofore authenticated and delivered (other than (A) Securities that have been mutilated, destroyed, lost or stolen and that have been replaced or paid as provided in Section 3.6 and (B) Securities for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust as provided in Section 10.2) have been delivered to the Trustee for cancellation; or

(ii) all such Securities not theretofore delivered to the Trustee for cancellation

(A)     have become due and payable, or

(B)     will become due and payable at their Stated Maturity within one year of the date of deposit, or

(C)     are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company,

and the Company, in the case of subclause (ii)(A), (B) or (C) above, has deposited or caused to be deposited with the Trustee as trust funds in trust for such purpose (x) an amount in the currency or currencies in which the Securities are payable, (y) Government Obligations which through the scheduled payment of principal and interest in respect thereof in accordance with their terms will provide, not later than the due date of any payment, money in an amount or (z) a combination thereof, in each case sufficient, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge the entire indebtedness on such Securities not theretofore delivered to the Trustee for cancellation, for principal and any premium and interest (including any Additional Interest) to the date of such deposit (in the case of Securities that have become due and payable) or to the Stated Maturity (or any date of principal repayment upon early maturity) or Redemption Date, as the case may be;

(b)     the Company has paid or caused to be paid all other sums payable hereunder by the Company; and

(c)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 6.6, the obligations of the Company to any Authenticating Agent under Section 6.11 and, if money shall have been deposited with the Trustee pursuant to subclause (a)(ii) of this Section 4.1, the obligations of the Trustee under Section 4.2 and Section 10.2(e) shall survive.

SECTION 4.2. *Application of Trust Money.*

Subject to the provisions of Section 10.2(e), all money deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by the Trustee, in accordance with the provisions of the Securities and this Indenture, to the payment in accordance with Section 3.1, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal and any premium and interest (including any Additional Interest) for the payment of which such money or obligations have been deposited with or received by the Trustee. Moneys held by the Trustee under this Section 4.2 shall not be subject to the claims of holders of Senior Debt under Article XII.

## ARTICLE V

### REMEDIES

SECTION 5.1. *Events of Default.*

"*Event of Default*" means, wherever used herein with respect to the Securities, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of any interest upon any Security, including any Additional Interest in respect thereof, when it becomes due and payable, and continuance of such default for a period of thirty (30) days; or

(b)     default in the payment of the principal of or any premium on any Security at its Maturity; or

(c)     default in the performance, or breach, of any covenant or warranty of the Company in this Indenture and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the Company by the Trustee or to the Company and the Trustee by the Holders of at least twenty five percent (25%) in aggregate

principal amount of the Outstanding Securities a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(d)     the entry by a court having jurisdiction in the premises of a decree or order adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Company under any applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(e)     the institution by the Company of proceedings to be adjudicated a bankrupt or insolvent, or the consent by the Company to the institution of bankruptcy or insolvency proceedings against it, or the filing by the Company of a petition or answer or consent seeking reorganization or relief under any applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due and its willingness to be adjudicated a bankrupt or insolvent, or the taking of corporate action by the Company in furtherance of any such action; or

(f)     the Trust shall have voluntarily or involuntarily liquidated, dissolved, wound-up its business or otherwise terminated its existence, except in connection with (1) the distribution of the Securities to holders of the Preferred Securities in liquidation of their interests in the Trust, (2) the redemption of all of the outstanding Preferred Securities or (3) certain mergers, consolidations or amalgamations, each as and to the extent permitted by the Trust Agreement.

SECTION 5.2. *Acceleration of Maturity; Rescission and Annulment.*

(a)     If an Event of Default occurs and is continuing, then and in every such case the Trustee or the Holders of not less than twenty five percent (25%) in aggregate principal amount of the Outstanding Securities may declare the principal amount of all the Securities to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders), provided, that if, upon an Event of Default, the Trustee or the Holders of not less than twenty five percent (25%) in principal amount of the Outstanding Securities fail to declare the principal of all the Outstanding Securities to be immediately due and payable, the holders of at least twenty five percent (25%) in aggregate Liquidation Amount of the Preferred Securities then outstanding shall have the right to make such declaration by a notice in writing to the Property Trustee, the Company and the Trustee; and upon any such declaration the principal amount of and the accrued interest (including any Additional Interest) on all the Securities shall become immediately due and payable.

(b)     At any time after such a declaration of acceleration with respect to Securities has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article V, the Holders of a majority in aggregate

principal amount of the Outstanding Securities, by written notice to the Indenture Trustee, or the holders of a majority in aggregate Liquidation Amount of the Preferred Securities, by written notice to the Property Trustee, the Company and the Trustee, may rescind and annul such declaration and its consequences if:

    (i)  the Company has paid or deposited with the Trustee a sum sufficient to pay:

        (A)  all overdue installments of interest on all Securities,

        (B)  any accrued Additional Interest on all Securities,

        (C)  the principal of and any premium on any Securities that have become due otherwise than by such declaration of acceleration and interest (including any Additional Interest) thereon at the rate borne by the Securities, and

        (D)  all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, the Property Trustee and their agents and counsel; and

    (ii)  all Events of Default with respect to Securities, other than the non-payment of the principal of Securities that has become due solely by such acceleration, have been cured or waived as provided in Section 5.13;

*provided*, that if the Holders of such Securities fail to annul such declaration and waive such default, the holders of not less than a majority in aggregate Liquidation Amount of the Preferred Securities then outstanding shall also have the right to rescind and annul such declaration and its consequences by written notice to the Property Trustee, the Company and the Trustee, subject to the satisfaction of the conditions set forth in paragraph (b) of this Section 5.2. No such rescission shall affect any subsequent default or impair any right consequent thereon.

SECTION 5.3.  *Collection of Indebtedness and Suits for Enforcement by Trustee.*

(a)    The Company covenants that if:

    (i)  default is made in the payment of any installment of interest (including any Additional Interest) on any Security when such interest becomes due and payable and such default continues for a period of thirty (30) days, or

    (ii)  default is made in the payment of the principal of and any premium on any Security at the Maturity thereof,

the Company will, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of such Securities, the whole amount then due and payable on such Securities for principal and any premium and interest (including any Additional Interest) and, in addition thereto, all amounts owing the Trustee under Section 6.6.

(b)    If the Company fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceeding to judgment or

final decree, and may enforce the same against the Company or any other obligor upon such Securities and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Securities, wherever situated.

(c)    If an Event of Default with respect to Securities occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders of Securities by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

### SECTION 5.4. *Trustee May File Proofs of Claim.*

In case of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or similar judicial proceeding relative to the Company (or any other obligor upon the Securities), its property or its creditors, the Trustee shall be entitled and empowered, by intervention in such proceeding or otherwise, to take any and all actions authorized hereunder in order to have claims of the Holders and the Trustee allowed in any such proceeding. In particular, the Trustee shall be authorized to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to first pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts owing the Trustee, any predecessor Trustee and other Persons under Section 6.6.

### SECTION 5.5. *Trustee May Enforce Claim Without Possession of Securities.*

All rights of action and claims under this Indenture or the Securities may be prosecuted and enforced by the Trustee without the possession of any of the Securities or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, subject to Article XII and after provision for the payment of all the amounts owing the Trustee, any predecessor Trustee and other Persons under Section 6.6, be for the ratable benefit of the Holders of the Securities in respect of which such judgment has been recovered.

### SECTION 5.6. *Application of Money Collected.*

Any money or property collected or to be applied by the Trustee with respect to the Securities pursuant to this Article V shall be applied in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money or property on account of principal or any premium or interest (including any Additional Interest), upon presentation of the Securities and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

FIRST: To the payment of all amounts due the Trustee, any predecessor Trustee and other Persons under Section 6.6;

SECOND: To the payment of all Senior Debt of the Company if and to the extent required by Article XII;

THIRD: Subject to Article XII, to the payment of the amounts then due and unpaid upon the Securities for principal and any premium and interest (including any Additional Interest) in respect of which or for the benefit of which such money has been collected, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and any premium and interest (including any Additional Interest), respectively; and

FOURTH: The balance, if any, to the Person or Persons entitled thereto.

SECTION 5.7. *Limitation on Suits.*

Subject to Section 5.8, no Holder of any Securities shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture or for the appointment of a custodian, receiver, assignee, trustee, liquidator, sequestrator (or other similar official) or for any other remedy hereunder, unless:

(a)     such Holder has previously given written notice to the Trustee of a continuing Event of Default with respect to the Securities;

(b)     the Holders of not less than a majority in aggregate principal amount of the Outstanding Securities shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c)     such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)     the Trustee after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding for sixty (60) days; and

(e)     no direction inconsistent with such written request has been given to the Trustee during such sixty (60)-day period by the Holders of a majority in aggregate principal amount of the Outstanding Securities;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Securities, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

SECTION 5.8. *Unconditional Right of Holders to Receive Principal, Premium, if any, and Interest; Direct Action by Holders of Preferred Securities.*

Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to receive payment of the principal of and any premium on such Security at its Maturity and payment of interest (including any Additional Interest) on such Security when due and payable and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Any

registered holder of the Preferred Securities shall have the right, upon the occurrence of an Event of Default described in Section 5.1(a) or Section 5.1(b), to institute a suit directly against the Company for enforcement of payment to such holder of principal of and any premium and interest (including any Additional Interest) on the Securities having a principal amount equal to the aggregate Liquidation Amount of the Preferred Securities held by such holder.

SECTION 5.9. *Restoration of Rights and Remedies.*

If the Trustee, any Holder or any holder of Preferred Securities has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee, such Holder or such holder of Preferred Securities, then and in every such case the Company, the Trustee, such Holders and such holder of Preferred Securities shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee, such Holder and such holder of Preferred Securities shall continue as though no such proceeding had been instituted.

SECTION 5.10. *Rights and Remedies Cumulative.*

Except as otherwise provided in Section 3.6(f), no right or remedy herein conferred upon or reserved to the Trustee or the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 5.11. *Delay or Omission Not Waiver.*

No delay or omission of the Trustee, any Holder of any Securities or any holder of any Preferred Security to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Trustee or to the Holders and the right and remedy given to the holders of Preferred Securities by Section 5.8 may be exercised from time to time, and as often as may be deemed expedient, by the Trustee, the Holders or the holders of Preferred Securities, as the case may be.

SECTION 5.12. *Control by Holders.*

The Holders of not less than a majority in aggregate principal amount of the Outstanding Securities (or, as the case may be, the holders of a majority in aggregate Liquidation Amount of Preferred Securities) shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee; *provided,* that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture,

(b)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction, and

(c)     subject to the provisions of Section 6.2, the Trustee shall have the right to decline to follow such direction if a Responsible Officer or Officers of the Trustee shall, in good faith, reasonably determine that the proceeding so directed would be unjustly prejudicial to the Holders not joining in any such direction or would involve the Trustee in personal liability.

SECTION 5.13.  *Waiver of Past Defaults.*

(a)     The Holders of not less than a majority in aggregate principal amount of the Outstanding Securities or the holders of not less than a majority in aggregate Liquidation Amount of the Preferred Securities may waive any past Event of Default hereunder and its consequences except an Event of Default:

(i) in the payment of the principal of or any premium or interest (including any Additional Interest) on any Security (unless such Event of Default has been cured and the Company has paid to or deposited with the Trustee a sum sufficient to pay all installments of interest (including any Additional Interest) due and past due and all principal of and any premium on all Securities due otherwise than by acceleration), or

(ii) in respect of a covenant or provision hereof that under Article IX cannot be modified or amended without the consent of each Holder of any Outstanding Security.

(b)     Any such waiver shall be deemed to be on behalf of the Holders of all the Securities or, in the case of a waiver by holders of Preferred Securities issued by such Trust, by all holders of Preferred Securities.

(c)     Upon any such waiver, such Event of Default shall cease to exist and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

SECTION 5.14.  *Undertaking for Costs.*

All parties to this Indenture agree, and each Holder of any Security by his or her acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.14 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than ten percent (10%) in aggregate principal amount of the Outstanding Securities, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or any premium on the Security after the Stated Maturity or any interest (including any Additional Interest) on any Security after it is due and payable.

SECTION 5.15. *Waiver of Usury, Stay or Extension Laws.*

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any usury, stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VI

### THE TRUSTEE

SECTION 6.1. *Corporate Trustee Required.*

There shall at all times be a Trustee hereunder with respect to the Securities. The Trustee shall be a corporation organized and doing business under the laws of the United States or of any state thereof, authorized to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by Federal or state authority and having an office within the United States. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then, for the purposes of this Section 6.1, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.1, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

SECTION 6.2. *Certain Duties and Responsibilities.*

Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided*, that in the case of any such certificates or opinions that by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Indenture.

(b)     If an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Holders of at least a majority in aggregate principal amount of the Outstanding Securities (or, if applicable, from the holders of at least a majority in aggregate Liquidation Amount of Preferred Securities), exercise such of the

rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)    Notwithstanding the foregoing, no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.2. To the extent that, at law or in equity, the Trustee has duties and liabilities relating to the Holders, the Trustee shall not be liable to any Holder or any holder of Preferred Securities for the Trustee's good faith reliance on the provisions of this Indenture. The provisions of this Indenture, to the extent that they restrict the duties and liabilities of the Trustee otherwise existing at law or in equity, are agreed by the Company and the Holders and the holders of Preferred Securities to replace such other duties and liabilities of the Trustee.

(d)    No provisions of this Indenture shall be construed to relieve the Trustee from liability with respect to matters that are within the authority of the Trustee under this Indenture for its own negligent action, negligent failure to act or willful misconduct, except that:

(i)    the Trustee shall not be liable for any error or judgment made in good faith by an authorized officer of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(ii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of at least a majority in aggregate principal amount of the Outstanding Securities (or, as the case may be, the holders of a majority in aggregate Liquidation Amount of Preferred Securities) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee under this Indenture; and

(iii)    the Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Company and money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.

(e)    If at any time the Trustee hereunder is not the same Person as the Property Trustee under the Trust Agreement:

(i)    whenever a reference is made herein to the dissolution, termination or liquidation of the Trust, the Trustee shall be entitled to assume that no such dissolution, termination, or liquidation has occurred so long as the Securities are or continue to be registered in the name of such Property Trustee, and the Trustee shall be charged with notice or knowledge of such dissolution, termination or liquidation only upon written notice thereof given to the Trustee by the Depositor under the Trust Agreement; and

(ii) the Trustee shall not be charged with notice or knowledge that any Person is a holder of Preferred Securities or Common Securities issued by the Trust or whether any group of holders of Preferred Securities constitutes any specified percentage of all outstanding Preferred Securities for any purpose under this Indenture, unless and until the Trustee is furnished with a list of holders by such Property Trustee and the aggregate Liquidation Amount of the Preferred Securities then outstanding. The Trustee may conclusively rely and shall be protected in relying on such list.

(f)     Notwithstanding Section 1.10, the Trustee shall not, and shall not be deemed to, owe any fiduciary duty to the holders of any of the Trust Securities issued by the Trust and shall not be liable to any such holder (other than for the willful misconduct or negligence of the Trustee) if the Trustee in good faith (i) pays over or distributes to a registered Holder of the Securities or to the Company or to any other Person, cash, property or securities to which such holders of such Trust Securities shall be entitled or (ii) takes any action or omits to take any action at the request of the Holder of such Securities. Nothing in this paragraph shall affect the obligation of any other such Person to hold such payment for the benefit of, and to pay such amount over to, such holders of Preferred Securities or Common Securities or their representatives.

SECTION 6.3. *Notice of Defaults.*

Within ninety (90) days after the occurrence of any default actually known to the Trustee, the Trustee shall give the Holders notice of such default unless such default shall have been cured or waived; *provided,* that except in the case of a default in the payment of the principal of or any premium or interest on any Securities, the Trustee shall be fully protected in withholding the notice if and so long as the board of directors, the executive committee or a trust committee of directors and/or Responsible Officers of the Trustee in good faith determines that withholding the notice is in the interest of holders of Securities; and *provided, further,* that in the case of any default of the character specified in Section 5.1(c), no such notice to Holders shall be given until at least thirty (30) days after the occurrence thereof. For the purpose of this Section 6.3, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default.

SECTION 6.4. *Certain Rights of Trustee.*

Subject to the provisions of Section 6.2:

(a)     the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting in good faith and in accordance with the terms hereof upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     if (i) in performing its duties under this Indenture the Trustee is required to decide between alternative courses of action, (ii) in construing any of the provisions of this Indenture the Trustee finds ambiguous or inconsistent with any other provisions contained herein or (iii) the Trustee is unsure of the application of any provision of this Indenture, then, except as to any matter as to which the Holders are entitled to decide under the terms of this Indenture, the

Trustee shall deliver a notice to the Company requesting the Company's written instruction as to the course of action to be taken and the Trustee shall take such action, or refrain from taking such action, as the Trustee shall be instructed in writing to take, or to refrain from taking, by the Company; *provided*, that if the Trustee does not receive such instructions from the Company within ten Business Days after it has delivered such notice or such reasonably shorter period of time set forth in such notice the Trustee may, but shall be under no duty to, take such action, or refrain from taking such action, as the Trustee shall deem advisable and in the best interests of the Holders, in which event the Trustee shall have no liability except for its own negligence, bad faith or willful misconduct;

(c)    any request or direction of the Company shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(d)    the Trustee may consult with counsel (which counsel may be counsel to the Trustee, the Company or any of its Affiliates, and may include any of its employees) and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders or any holder of Preferred Securities pursuant to this Indenture, unless such Holders (or such holders of Preferred Securities) shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities that might be incurred by it in compliance with such request or direction, including reasonable advances as may be requested by the Trustee;

(f)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, indenture, note or other paper or document, but the Trustee in its discretion may make such inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney;

(g)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for any misconduct or negligence on the part of any such agent, attorney, custodian or nominee appointed with due care by it hereunder;

(h)    whenever in the administration of this Indenture the Trustee shall deem it desirable to receive instructions with respect to enforcing any remedy or right or taking any other action with respect to enforcing any remedy or right hereunder, the Trustees (i) may request instructions from the Holders (which instructions may only be given by the Holders of the same aggregate principal amount of Outstanding Securities as would be entitled to direct the Trustee under this Indenture in respect of such remedy, right or action), (ii) may refrain from enforcing such remedy or right or taking such action until such instructions are received and (iii) shall be protected in acting in accordance with such instructions;

(i)     except as otherwise expressly provided by this Indenture, the Trustee shall not be under any obligation to take any action that is discretionary under the provisions of this Indenture;

(j)     without prejudice to any other rights available to the Trustee under applicable law, when the Trustee incurs expenses or renders services in connection with any bankruptcy, insolvency or other proceeding referred to in clauses (d) or (e) of the definition of Event of Default, such expenses (including legal fees and expenses of its agents and counsel) and the compensation for such services are intended to constitute expenses of administration under any bankruptcy laws or law relating to creditors rights generally;

(k)     whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officers' Certificate addressing such matter, which, upon receipt of such request, shall be promptly delivered by the Company;

(l)     the Trustee shall not be charged with knowledge of any Event of Default unless either (i) a Responsible Officer of the Trustee shall have actual knowledge or (ii) the Trustee shall have received written notice thereof from the Company or a Holder; and

(m)     in the event that the Trustee is also acting as Paying Agent, Authenticating Agent or Securities Registrar hereunder, the rights and protections afforded to the Trustee pursuant to this Article VI shall also be afforded such Paying Agent, Authenticating Agent, or Securities Registrar.

SECTION 6.5.  *Parties May Hold Securities.*

The Trustee, any Authenticating Agent, any Paying Agent, any Securities Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with the Company with the same rights it would have if it were not Trustee, Authenticating Agent, Paying Agent, Securities Registrar or such other agent.

SECTION 6.6.  *Compensation; Reimbursement; Indemnity.*

(a)     The Company agrees:

(i) to pay to the Trustee from time to time reasonable compensation for all services rendered by it hereunder in such amounts as the Company and the Trustee shall agree from time to time (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii) to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence, bad faith or willful misconduct; and

(iii) to the fullest extent permitted by applicable law, to indemnify the Trustee and its Affiliates, and their officers, directors, shareholders, agents, representatives and employees for, and to hold them harmless against, any loss, damage, liability, tax (other than income, franchise or other taxes imposed on amounts paid pursuant to (i) or (ii) hereof), penalty, expense or claim of any kind or nature whatsoever incurred without negligence, bad faith or willful misconduct on its part arising out of or in connection with the acceptance or administration of this trust or the performance of the Trustee's duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

(b)    To secure the Company's payment obligations in this Section 6.6, the Company hereby grants and pledges to the Trustee and the Trustee shall have a lien prior to the Securities on all money or property held or collected by the Trustee, other than money or property held in trust to pay principal and interest on particular Securities. Such lien shall survive the satisfaction and discharge of this Indenture or the resignation or removal of the Trustee.

(c)    The obligations of the Company under this Section 6.6 shall survive the satisfaction and discharge of this Indenture and the earlier resignation or removal of the Trustee.

(d)    In no event shall the Trustee be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(e)    In no event shall the Trustee be liable for any failure or delay in the performance of its obligations hereunder because of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, embargo, government action, including any laws, ordinances, regulations, governmental action or the like which delay, restrict or prohibit the providing of the services contemplated by this Indenture.

SECTION 6.7. *Resignation and Removal; Appointment of Successor.*

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.8.

(b)    The Trustee may resign at any time by giving written notice thereof to the Company.

(c)    Unless an Event of Default shall have occurred and be continuing, the Trustee may be removed at any time by the Company by a Board Resolution. If an Event of Default shall have occurred and be continuing, the Trustee may be removed by Act of the Holders of a majority in aggregate principal amount of the Outstanding Securities, delivered to the Trustee and to the Company.

(d)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any reason, at a time when no Event of Default

shall have occurred and be continuing, the Company, by a Board Resolution, shall promptly appoint a successor Trustee, and such successor Trustee and the retiring Trustee shall comply with the applicable requirements of Section 6.8. If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any reason, at a time when an Event of Default shall have occurred and be continuing, the Holders, by Act of the Holders of a majority in aggregate principal amount of the Outstanding Securities, shall promptly appoint a successor Trustee, and such successor Trustee and the retiring Trustee shall comply with the applicable requirements of Section 6.8. If no successor Trustee shall have been so appointed by the Company or the Holders and accepted appointment within sixty (60) days after the giving of a notice of resignation by the Trustee or the removal of the Trustee in the manner required by Section 6.8, any Holder who has been a bona fide Holder of a Security for at least six months may, on behalf of such Holder and all others similarly situated, and any resigning Trustee may, at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)    The Company shall give notice to all Holders in the manner provided in Section 1.6 of each resignation and each removal of the Trustee and each appointment of a successor Trustee. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

SECTION 6.8.  *Acceptance of Appointment by Successor.*

(a)    In case of the appointment hereunder of a successor Trustee, each successor Trustee so appointed shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on the request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(b)    Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all rights, powers and trusts referred to in paragraph (a) of this Section 6.8.

(c)    No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article VI.

SECTION 6.9.  *Merger, Conversion, Consolidation or Succession to Business.*

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, *provided,* that such Person shall be otherwise qualified and eligible under this Article VI. In case any Securities shall

have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation or as otherwise provided above in this Section 6.9 to such authenticating Trustee may adopt such authentication and deliver the Securities so authenticated, and in case any Securities shall not have been authenticated, any successor to the Trustee may authenticate such Securities either in the name of any predecessor Trustee or in the name of such successor Trustee, and in all cases the certificate of authentication shall have the full force which it is provided anywhere in the Securities or in this Indenture that the certificate of the Trustee shall have.

SECTION 6.10. *Not Responsible for Recitals or Issuance of Securities.*

The recitals contained herein and in the Securities, except the Trustee's certificates of authentication, shall be taken as the statements of the Company, and neither the Trustee nor any Authenticating Agent assumes any responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Securities. Neither the Trustee nor any Authenticating Agent shall be accountable for the use or application by the Company of the Securities or the proceeds thereof.

SECTION 6.11. *Appointment of Authenticating Agent.*

(a)    The Trustee may appoint an Authenticating Agent or Agents with respect to the Securities, which shall be authorized to act on behalf of the Trustee to authenticate Securities issued upon original issue and upon exchange, registration of transfer or partial redemption thereof or pursuant to Section 3.6, and Securities so authenticated shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated by the Trustee hereunder. Wherever reference is made in this Indenture to the authentication and delivery of Securities by the Trustee or the Trustee's certificate of authentication, such reference shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent. Each Authenticating Agent shall be acceptable to the Company and shall at all times be a corporation organized and doing business under the laws of the United States of America, or of any State or Territory thereof or the District of Columbia, authorized under such laws to act as Authenticating Agent, having a combined capital and surplus of not less than $50,000,000 and subject to supervision or examination by Federal or state authority. If such Authenticating Agent publishes reports of condition at least annually pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section 6.11 the combined capital and surplus of such Authenticating Agent shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time an Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section 6.11, such Authenticating Agent shall resign immediately in the manner and with the effect specified in this Section 6.11.

(b)    Any Person into which an Authenticating Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which such Authenticating Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of an Authenticating Agent shall be the successor Authenticating Agent hereunder, provided such Person shall be otherwise eligible under this Section 6.11, without the execution or filing of any paper or any further act on the part of the Trustee or the Authenticating Agent.

(c)    An Authenticating Agent may resign at any time by giving written notice thereof to the Trustee and to the Company. The Trustee may at any time terminate the agency of an Authenticating Agent by giving written notice thereof to such Authenticating Agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time such Authenticating Agent shall cease to be eligible in accordance with the provisions of this Section 6.11, the Trustee may appoint a successor Authenticating Agent eligible under the provisions of this Section 6.11, which shall be acceptable to the Company, and shall give notice of such appointment to all Holders. Any successor Authenticating Agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent.

(d)    The Company agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services under this Section 6.11 in such amounts as the Company and the Authenticating Agent shall agree from time to time.

(e)    If an appointment of an Authenticating Agent is made pursuant to this Section 6.11, the Securities may have endorsed thereon, an alternative certificate of authentication in substantially the following form:

This is one of the Securities referred to in the within mentioned Indenture.

Dated: _____

                          JPMORGAN CHASE BANK, NATIONAL
                          ASSOCIATION, as Trustee

                          By: _____
                               *Authenticating Agent*

                          By: _____
                               *Authorized Signatory*

## ARTICLE VII

### HOLDER'S LISTS AND REPORTS BY COMPANY

SECTION 7.1. *Company to Furnish Trustee Names and Addresses of Holders.*

The Company will furnish or cause to be furnished to the Trustee:

(a)    semiannually, on or before June 30 and December 31 of each year, a list, in such form as the Trustee may reasonably require, of the names and addresses of the Holders as of a date not more than fifteen (15) days prior to the delivery thereof, and

(b)    at such other times as the Trustee may request in writing, within thirty (30) days after the receipt by the Company of any such request, a list of similar form and content as of a date not more than fifteen (15) days prior to the time such list is furnished,

in each case to the extent such information is in the possession or control of the Company and has not otherwise been received by the Trustee in its capacity as Securities Registrar.

SECTION 7.2.  *Preservation of Information, Communications to Holders.*

(a)    The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders contained in the most recent list furnished to the Trustee as provided in Section 7.1 and the names and addresses of Holders received by the Trustee in its capacity as Securities Registrar. The Trustee may destroy any list furnished to it as provided in Section 7.1 upon receipt of a new list so furnished.

(b)    The rights of Holders to communicate with other Holders with respect to their rights under this Indenture or under the Securities, and the corresponding rights and privileges of the Trustee, shall be as provided in the Trust Indenture Act.

(c)    Every Holder of Securities, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee nor any agent of either of them shall be held accountable by reason of the disclosure of information as to the names and addresses of the Holders made pursuant to the Trust Indenture Act.

SECTION 7.3.  *Reports by Company.*

(a)    The Company shall furnish to the Holders and to prospective purchasers of Securities, upon their request, the information required to be furnished pursuant to Rule 144A(d)(4) under the Securities Act. The delivery requirement set forth in the preceding sentence may be satisfied by compliance with Section 7.3(b) hereof.

(b)    The Company shall furnish to each of (i) the Trustee, (ii) the Holders and to subsequent holders of Securities, (iii) Cohen Bros. & Company, 1818 Market Street, 28th Floor, Philadelphia, Pennsylvania 19103, Attn: Mitchell Kahn or such other address as designated by Cohen Bros. & Company) and (iv) any beneficial owner of the Securities reasonably identified to the Company (which identification may be made either by such beneficial owner or by Cohen Bros. & Company), a duly completed and executed certificate substantially and substantively in the form attached hereto as Exhibit A, including the financial statements referenced in such Exhibit, which certificate and financial statements shall be so furnished by the Company not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Company and not later than ninety (90) days after the end of each fiscal year of the Company. The delivery requirements under this Section 7.3(b) may be satisfied by compliance with Section 8.16(b) of the Trust Agreement.

(c)    If the Company intends to file its annual and quarterly information with the Securities and Exchange Commission (the "*Commission*") in electronic form pursuant to Regulation S-T of the Commission using the Commission's Electronic Data Gathering, Analysis and Retrieval ("*EDGAR*") system, the Company shall notify the Trustee in the manner prescribed herein of each such annual and quarterly filing. The Trustee is hereby authorized and directed to

access the EDGAR system for purposes of retrieving the financial information so filed. Compliance with the foregoing shall constitute delivery by the Company of its financial statements to the Trustee in compliance with the provisions of Section 314(a) of the Trust Indenture Act, if applicable. The Trustee shall have no duty to search for or obtain any electronic or other filings that the Company makes with the Commission, regardless of whether such filings are periodic, supplemental or otherwise. Delivery of reports, information and documents to the Trustee pursuant to this Section 7.3(c) shall be solely for purposes of compliance with this Section 7.3(c) and, if applicable, with Section 314(a) of the Trust Indenture Act. The Trustee's receipt of such reports, information and documents shall not constitute notice to it of the content thereof or any matter determinable from the content thereof, including the Company's compliance with any of its covenants hereunder, as to which the Trustee is entitled to rely upon Officers' Certificates.

## ARTICLE VIII

### Consolidation, Merger, Conveyance, Transfer or Lease

SECTION 8.1.  *Company May Consolidate, Etc., Only on Certain Terms.*

The Company shall not consolidate with or merge into any other Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, and no Person shall consolidate with or merge into the Company or convey, transfer or lease its properties and assets substantially as an entirety to the Company, unless:

(a)     if the Company shall consolidate with or merge into another Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, the entity formed by such consolidation or into which the Company is merged or the Person that acquires by conveyance or transfer, or that leases, the properties and assets of the Company substantially as an entirety shall be an entity organized and existing under the laws of the United States of America or any State or Territory thereof or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, the due and punctual payment of the principal of and any premium and interest (including any Additional Interest) on all the Securities and the performance of every covenant of this Indenture on the part of the Company to be performed or observed;

(b)     immediately after giving effect to such transaction, no Event of Default, and no event that, after notice or lapse of time, or both, would constitute an Event of Default, shall have happened and be continuing; and

(c)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, any such supplemental indenture comply with this Article VIII and that all conditions precedent herein provided for relating to such transaction have been complied with; and the Trustee may rely upon such Officers' Certificate and Opinion of Counsel as conclusive evidence that such transaction complies with this Section 8.1.

SECTION 8.2. *Successor Company Substituted.*

(a)    Upon any consolidation or merger by the Company with or into any other Person, or any conveyance, transfer or lease by the Company of its properties and assets substantially as an entirety to any Person in accordance with Section 8.1 and the execution and delivery to the Trustee of the supplemental indenture described in Section 8.1(a), the successor entity formed by such consolidation or into which the Company is merged or to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; and in the event of any such conveyance or transfer, following the execution and delivery of such supplemental indenture, the Company shall be discharged from all obligations and covenants under the Indenture and the Securities.

(b)    Such successor Person may cause to be executed, and may issue either in its own name or in the name of the Company, any or all of the Securities issuable hereunder that theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such successor Person instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver any Securities that previously shall have been signed and delivered by the officers of the Company to the Trustee for authentication, and any Securities that such successor Person thereafter shall cause to be executed and delivered to the Trustee on its behalf. All the Securities so issued shall in all respects have the same legal rank and benefit under this Indenture as the Securities theretofore or thereafter issued in accordance with the terms of this Indenture.

(c)    In case of any such consolidation, merger, sale, conveyance or lease, such changes in phraseology and form may be made in the Securities thereafter to be issued as may be appropriate to reflect such occurrence.

ARTICLE IX

SUPPLEMENTAL INDENTURES

SECTION 9.1. *Supplemental Indentures without Consent of Holders.*

Without the consent of any Holders, the Company, when authorized by a Board Resolution, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee, for any of the following purposes:

(a)    to evidence the succession of another Person to the Company, and the assumption by any such successor of the covenants of the Company herein and in the Securities; or

(b)    to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make or amend any other provisions with respect to matters or questions arising under this Indenture, which shall not be inconsistent with the other provisions of this Indenture, *provided*, that such action pursuant to this clause (b) shall not adversely affect in any material respect the interests of any Holders or the holders of the Preferred Securities; or

(c)    to add to the covenants, restrictions or obligations of the Company or to add to the Events of Default, *provided*, that such action pursuant to this clause (c) shall not adversely affect in any material respect the interests of any Holders or the holders of the Preferred Securities; or

(d)    to modify, eliminate or add to any provisions of the Indenture or the Securities to such extent as shall be necessary to ensure that the Securities are treated as indebtedness of the Company for United States Federal income tax purposes, *provided*, that such action pursuant to this clause (d) shall not adversely affect in any material respect the interests of any Holders or the holders of the Preferred Securities.

SECTION 9.2.  *Supplemental Indentures with Consent of Holders.*

(a)    With the consent of the Holders of not less than a majority in aggregate principal amount of the Outstanding Securities, by Act of said Holders delivered to the Company and the Trustee, the Company, when authorized by a Board Resolution, and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders of Securities under this Indenture; *provided*, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Security,

(i) change the Stated Maturity of the principal or any premium of any Security or change the date of payment of any installment of interest (including any Additional Interest) on any Security, or reduce the principal amount thereof or the rate of interest thereon or any premium payable upon the redemption thereof or change the place of payment where, or the coin or currency in which, any Security or interest thereon is payable, or restrict or impair the right to institute suit for the enforcement of any such payment on or after such date, or

(ii) reduce the percentage in aggregate principal amount of the Outstanding Securities, the consent of whose Holders is required for any such supplemental indenture, or the consent of whose Holders is required for any waiver of compliance with any provision of this Indenture or of defaults hereunder and their consequences provided for in this Indenture, or

(iii) modify any of the provisions of this <u>Section 9.2</u>, <u>Section 5.13</u> or <u>Section 10.7</u>, except to increase any percentage in aggregate principal amount of the Outstanding Securities, the consent of whose Holders is required for any reason, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Security; ....

*provided, further,* that, so long as any Preferred Securities remain outstanding, no amendment under this <u>Section 9.2</u> shall be effective until the holders of a majority in Liquidation Amount of the Preferred Securities shall have consented to such amendment; *provided, further,* that if the consent of the Holder of each Outstanding Security is required for any amendment under this Indenture, such amendment shall not be effective until the holder of each Outstanding Preferred Security shall have consented to such amendment.

(b)     It shall not be necessary for any Act of Holders under this <u>Section 9.2</u> to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

SECTION 9.3.  *Execution of Supplemental Indentures.*

In executing or accepting the additional trusts created by any supplemental indenture permitted by this <u>Article IX</u> or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and shall be fully protected in conclusively relying upon, an Officers' Certificate and an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent herein provided for relating to such action have been complied with. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties, indemnities or immunities under this Indenture or otherwise.  Copies of the final form of each supplemental indenture shall be delivered by the Trustee at the expense of the Company to each Holder, and, if the Trustee is the Property Trustee, to each holder of Preferred Securities, promptly after the execution thereof.

SECTION 9.4.  *Effect of Supplemental Indentures.*

Upon the execution of any supplemental indenture under this <u>Article IX</u>, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities and every holder of Preferred Securities theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

SECTION 9.5.  *Reference in Securities to Supplemental Indentures.*

Securities authenticated and delivered after the execution of any supplemental indenture pursuant to this <u>Article IX</u> may, and shall if required by the Company, bear a notation in form approved by the Company as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities so modified as to conform, in the opinion of the Company, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for Outstanding Securities.

ARTICLE X

COVENANTS

SECTION 10.1.  *Payment of Principal, Premium, if any, and Interest.*

The Company covenants and agrees for the benefit of the Holders of the Securities that it will duly and punctually pay the principal of and any premium and interest (including any Additional Interest) on the Securities in accordance with the terms of the Securities and this Indenture.

SECTION 10.2.  *Money for Security Payments to be Held in Trust.*

(a)     If the Company shall at any time act as its own Paying Agent with respect to the Securities, it will, on or before each due date of the principal of and any premium or interest

(including any Additional Interest) on the Securities, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and any premium or interest (including Additional Interest) so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided, and will promptly notify the Trustee in writing of its failure so to act.

(b)    Whenever the Company shall have one or more Paying Agents, it will, prior to 10:00 a.m., New York City time, on each due date of the principal of or any premium or interest (including any Additional Interest) on any Securities, deposit with a Paying Agent a sum sufficient to pay such amount, such sum to be held as provided in the Trust Indenture Act and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of its failure so to act.

(c)    The Company will cause each Paying Agent for the Securities other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section 10.2, that such Paying Agent will (i) comply with the provisions of this Indenture and the Trust Indenture Act applicable to it as a Paying Agent and (ii) during the continuance of any default by the Company (or any other obligor upon the Securities) in the making of any payment in respect of the Securities, upon the written request of the Trustee, forthwith pay to the Trustee all sums held in trust by such Paying Agent for payment in respect of the Securities.

(d)    The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

(e)    Any money deposited with the Trustee or any Paying Agent, or then held by the Company in trust for the payment of the principal of and any premium or interest (including any Additional Interest) on any Security and remaining unclaimed for two years after such principal and any premium or interest has become due and payable shall (unless otherwise required by mandatory provision of applicable escheat or abandoned or unclaimed property law) be paid on Company Request to the Company, or (if then held by the Company) shall (unless otherwise required by mandatory provision of applicable escheat or abandoned or unclaimed property law) be discharged from such trust; and the Holder of such Security shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in the Borough of Manhattan, The City of New York, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Company.

SECTION 10.3. *Statement as to Compliance.*

The Company shall deliver to the Trustee, within one hundred and twenty (120) days after the end of each fiscal year of the Company ending after the date hereof, an Officers' Certificate covering the preceding calendar year, stating whether or not to the knowledge of the signers thereof the Company is in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided hereunder), and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge. The delivery requirements of this Section 10.3 may be satisfied by compliance with Section 8.16(a) of the Trust Agreement.

SECTION 10.4. *Calculation Agent.*

(a)    The Company hereby agrees that for so long as any of the Securities remain Outstanding, there will at all times be an agent appointed to calculate LIBOR in respect of each Interest Payment Date in accordance with the terms of Schedule A (the "*Calculation Agent*"). The Company has initially appointed the Property Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Payment Date. The Calculation Agent may be removed by the Company at any time. So long as the Property Trustee holds any of the Securities, the Calculation Agent shall be the Property Trustee, except as described in the immediately preceding sentence. If the Calculation Agent is unable or unwilling to act as such or is removed by the Company, the Company will promptly appoint as a replacement Calculation Agent the London office of a leading bank which is engaged in transactions in Eurodollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Company or its Affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)    The Calculation Agent shall be required to agree that, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date (as defined in Schedule A), but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will calculate the interest rate (the Interest Payment shall be rounded to the nearest cent, with half a cent being rounded upwards) for the related Interest Payment Date, and will communicate such rate and amount to the Company, the Trustee, each Paying Agent and the Depositary. The Calculation Agent will also specify to the Company the quotations upon which the foregoing rates and amounts are based and, in any event, the Calculation Agent shall notify the Company before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the foregoing rates and amounts or (ii) it has not determined and is not in the process of determining the foregoing rates and amounts, together with its reasons therefor. The Calculation Agent's determination of the foregoing rates and amounts for any Interest Payment Date will (in the absence of manifest error) be final and binding upon all parties. For the sole purpose of calculating the interest rate for the Securities, "Business Day" shall be defined as any day on which dealings in deposits in Dollars are transacted in the London interbank market.

SECTION 10.5. *Additional Tax Sums.*

So long as no Event of Default has occurred and is continuing, if (a) the Trust is the Holder of all of the Outstanding Securities and (b) a Tax Event described in clause (i) or (iii) in the definition of Tax Event in Section 1.1 hereof has occurred and is continuing, the Company shall pay to the Trust (and its permitted successors or assigns under the related Trust Agreement) for so long as the Trust (or its permitted successor or assignee) is the registered holder of the Outstanding Securities, such amounts as may be necessary in order that the amount of Distributions (including any Additional Interest Amount (as defined in the Trust Agreement)) then due and payable by the Trust on the Preferred Securities and Common Securities that at any time remain outstanding in accordance with the terms thereof shall not be reduced as a result of any Additional Taxes arising from such Tax Event (additional such amounts payable by the Company to the Trust, the "*Additional Tax Sums*"). Whenever in this Indenture or the Securities there is a reference in any context to the payment of principal of or interest on the Securities, such mention shall be deemed to include mention of the payments of the Additional Tax Sums provided for in this Section 10.5 to the extent that, in such context, Additional Tax Sums are, were or would be payable in respect thereof pursuant to the provisions of this Section 10.5 and express mention of the payment of Additional Tax Sums (if applicable) in any provisions hereof shall not be construed as excluding Additional Tax Sums in those provisions hereof where such express mention is not made.

SECTION 10.6. *Additional Covenants.*

(a)     The Company covenants and agrees with each Holder of Securities that if an Event of Default shall have occurred and be continuing, it shall not (i) declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to, any shares of the Company's capital stock (for the avoidance of doubt, the term "capital stock" includes both common stock and preferred stock of the Company), (ii) vote in favor of or permit or otherwise allow any of its subsidiaries to declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to or otherwise retire, any shares of such subsidiaries preferred stock (for the avoidance of doubt, whether such preferred stock is perpetual or otherwise), or (iii) make any payment of principal of or any interest or premium, if any, on or repay, repurchase or redeem any debt securities of the Company that rank *pari passu* in all respects with or junior in interest to the Securities (other than (A) repurchases, redemptions or other acquisitions of shares of capital stock of the Company in connection with any employment contract, benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants, in connection with a dividend reinvestment or stockholder stock purchase plan or in connection with the issuance of capital stock of the Company (or securities convertible into or exercisable for such capital stock) as consideration in an acquisition transaction entered into prior to such Event of Default, (B) as a result of an exchange or conversion of any class or series of the Company's capital stock (or any capital stock of a Subsidiary of the Company) for any class or series of the Company's capital stock or of any class or series of the Company's indebtedness for any class or series of the Company's capital stock, (C) the purchase of fractional interests in shares of the Company's capital stock pursuant to the conversion or exchange provisions of such capital stock or the security being converted or exchanged, (D) any declaration of a dividend in connection with any Rights Plan, the issuance of rights, stock or other property under any Rights Plan or the redemption or repurchase of rights pursuant thereto or (E) any dividend in the form of

stock, warrants, options or other rights where the dividend stock or the stock issuable upon exercise of such warrants, options or other rights is the same stock as that on which the dividend is being paid or ranks *pari passu* with or junior to such stock).

(b)     The Company also covenants with each Holder of Securities (i) to hold, directly or indirectly, one hundred percent (100%) of the Common Securities of the Trust, *provided*, that any permitted successor of the Company hereunder may succeed to the Company's ownership of such Common Securities, (ii) as holder of such Common Securities, not to voluntarily dissolve, wind-up or liquidate the Trust other than (A) in connection with a distribution of the Securities to the holders of the Preferred Securities in liquidation of the Trust or (B) in connection with certain mergers, consolidations or amalgamations permitted by the Trust Agreement and (iii) to use its reasonable commercial efforts, consistent with the terms and provisions of the Trust Agreement, to cause the Trust to continue to be taxable as a grantor trust and not as a corporation for United States Federal income tax purposes.

(c)     The Company also agrees to use its reasonable best efforts to meet the requirements to qualify, effective for the fiscal year ending December 31, 2005, as a real estate investment trust under the Internal Revenue Code of 1986, as amended.

SECTION 10.7. *Waiver of Covenants*.

The Company may omit in any particular instance to comply with any covenant or condition contained in <u>Section 10.6</u> if, before or after the time for such compliance, the Holders of at least a majority in aggregate principal amount of the Outstanding Securities shall, by Act of such Holders, and at least a majority of the aggregate Liquidation Amount of the Preferred Securities then outstanding, by consent of such holders, either waive such compliance in such instance or generally waive compliance with such covenant or condition, but no such waiver shall extend to or affect such covenant or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Company in respect of any such covenant or condition shall remain in full force and effect.

SECTION 10.8. *Treatment of Securities*.

The Company will treat the Securities as indebtedness, and the amounts, other than payments of principal, payable in respect of the principal amount of such Securities as interest, for all U.S. federal income tax purposes. All payments in respect of the Securities will be made free and clear of U.S. withholding tax to any beneficial owner thereof that has provided an Internal Revenue Service Form W-9 or W-8BEN (or any substitute or successor form) establishing its U.S. or non-U.S. status for U.S. federal income tax purposes, or any other applicable form establishing a complete exemption from U.S. withholding tax.

SECTION 10.9 *Financial Covenants*.

(a)     Minimum Net Worth.  For so long as the Debentures shall remain outstanding, the Net Worth of the Company and all of its Affiliates (the "Combined Companies") shall at all times equal or exceed the "Minimum Net Worth". The "Minimum Net Worth" shall be $40,000,000 plus 25% of the Earnings from Operations for each calculation period. The first calculation period will be the six month period ending December 31, 2005. Thereafter, the

Minimum Net Worth will be calculated on an annual basis based on the Minimum Net Worth from the prior year end balance. . For the avoidance of doubt, the Minimum Net Worth shall as of the date hereof be equal to or greater than $40,000,000 and shall at all times while the Debenture shall remain outstanding exceed $40,000,000 and the cumulative amount of 25% of Earnings from Operations calculated as of December 31, 2005 and every calendar year thereafter. Once the Net Worth of the Combined Companies equals or exceeds $100,000,000, the Minimum Net Worth shall equal $100,000,000

(b)    Maximum Debt-to-Equity Ratio.    The Combined Companies Debt-to-Equity Ratio shall not exceed 3:1, calculated quarterly, for as long as the Debentures shall remain outstanding.

(c)    Limitation on Additional Securities.    For as long as the Debentures shall remain outstanding, the Combined Companies shall not issue (i) unsecured debentures and related securities (ii) debt securities (and guarantees, if any, in respect of such debt securities) issued to any trust other than the Trust (or a trustee of any such trust), partnership or other entity affiliated with the Combined Companies that is a financing vehicle of the Combined Companies (a "financing entity") in connection with the issuance by such financing entity of equity securities or other securities pursuant to an instrument that ranks *pari passu* with or senior in right of payment to this Indenture, and (iii) debt securities (including guarantees) issued by the Combined Companies to a financing entity other than the Trust in connection with the issuance by such financing entity of equity securities or other securities pursuant to an instrument that ranks junior in right of payment to this Indenture and where such equity securities similar or other securities so issued equal in the aggregate more than 50% of Minimum Net Worth (as such is calculated in Section 10.9(a) hereof).

(d)    Minimum Cash Equivalents.    For as long as the Debentures shall remain outstanding, the Company shall at all time maintain cash and cash equivalents, as defined by GAAP, equal to or greater than $5,000,000, calculated annually.

"*Debt*" for the purpose of this Section 10.9 shall mean any and all notes, guaranties and other evidence of indebtedness (fixed or contingent), accounts payable, contingent liabilities, lease obligations, to the extent same are considered liabilities in accordance with GAAP, and any and all other obligations treated as obligations in accordance with GAAP, including related party payables.    For the avoidance of doubt, "Debt" shall include (i) other debt securities (and guarantees, if any, in respect of such debt securities) issued to any trust (or a trustee of any such trust), partnership or other entity affiliated with the Combined Companies that is a financing vehicle of the Combined Companies (a "financing entity") in connection with the issuance by such financing entity of equity securities or other securities pursuant to an instrument that ranks *pari passu* with or junior in right of payment to this Indenture and (ii) any capital stock which by the terms thereof (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), upon the happening of any event or otherwise (A) matures or is mandatory redeemable, pursuant to a sinking fund obligation or otherwise, (B) is convertible, exchangeable or exercisable for Debt, or (C) is redeemable in whole or in part at the option of the holder thereof.

"*Debt-to-Equity Ratio*" means the ratio of (a) the aggregate amount of all Debt of the Combined Companies to (b) Net Worth.

## ARTICLE XI

### REDEMPTION OF SECURITIES

SECTION 11.1. *Optional Redemption.*

The Company may, at its option, on any Interest Payment Date, on or after July 30, 2010, redeem the Securities in whole at any time or in part from time to time, at a Redemption Price equal to one hundred percent (100%) of the principal amount thereof (or of the redeemed portion thereof, as applicable), together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date (the "*Optional Redemption Price*").

SECTION 11.2. *Special Event Redemption.*

Prior to July 30, 2010, upon the occurrence and during the continuation of a Special Event, the Company may, at its option, redeem the Securities, in whole but not in part, at a Redemption Price equal to one hundred seven and one half percent (107.5%) of the principal amount thereof, together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date (the "*Special Redemption Price*").

SECTION 11.3. *Election to Redeem; Notice to Trustee.*

The election of the Company to redeem any Securities, in whole or in part, shall be evidenced by or pursuant to a Board Resolution. In case of any redemption at the election of the Company, the Company shall, not less than forty-five (45) days and not more than seventy-five (75) days prior to the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee and the Property Trustee under the Trust Agreement in writing of such date and of the principal amount of the Securities to be redeemed and provide the additional information required to be included in the notice or notices contemplated by Section 11.5. In the case of any redemption of Securities, in whole or in part, (a) prior to the expiration of any restriction on such redemption provided in this Indenture or the Securities or (b) pursuant to an election of the Company which is subject to a condition specified in this Indenture or the Securities, the Company shall furnish the Trustee with an Officers' Certificate and an Opinion of Counsel evidencing compliance with such restriction or condition.

SECTION 11.4. *Selection of Securities to be Redeemed.*

(a)     If less than all the Securities are to be redeemed, the particular Securities to be redeemed shall be selected and redeemed on a pro rata basis not more than sixty (60) days prior to the Redemption Date by the Trustee from the Outstanding Securities not previously called for redemption, *provided*, that the unredeemed portion of the principal amount of any Security shall be in an authorized denomination (which shall not be less than the minimum authorized denomination) for such Security.

(b)     The Trustee shall promptly notify the Company in writing of the Securities selected for redemption and, in the case of any Securities selected for partial redemption, the principal amount thereof to be redeemed. For all purposes of this Indenture, unless the context

otherwise requires, all provisions relating to the redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of such Security that has been or is to be redeemed.

(c)    The provisions of paragraphs (a) and (b) of this Section 11.4 shall not apply with respect to any redemption affecting only a single Security, whether such Security is to be redeemed in whole or in part. In the case of any such redemption in part, the unredeemed portion of the principal amount of the Security shall be in an authorized denomination (which shall not be less than the minimum authorized denomination) for such Security.

SECTION 11.5. *Notice of Redemption.*

(a)    Notice of redemption shall be given not later than the thirtieth (30th) day, and not earlier than the sixtieth (60th) day, prior to the Redemption Date to each Holder of Securities to be redeemed, in whole or in part, (unless a shorter notice shall be satisfactory to the Property Trustee under the related Trust Agreement).

(b)    With respect to Securities to be redeemed, in whole or in part, each notice of redemption shall state:

(i) the Redemption Date;

(ii) the Redemption Price or, if the Redemption Price cannot be calculated prior to the time the notice is required to be sent, the estimate of the Redemption Price, as calculated by the Company, together with a statement that it is an estimate and that the actual Redemption Price will be calculated on the fifth Business Day prior to the Redemption Date (and if an estimate is provided, a further notice shall be sent of the actual Redemption Price on the date that such Redemption Price is calculated);

(iii) if less than all Outstanding Securities are to be redeemed, the identification (and, in the case of partial redemption, the respective principal amounts) of the particular Securities to be redeemed;

(iv) that on the Redemption Date, the Redemption Price will become due and payable upon each such Security or portion thereof, and that any interest (including any Additional Interest) on such Security or such portion, as the case may be, shall cease to accrue on and after said date; and

(v) the place or places where such Securities are to be surrendered for payment of the Redemption Price.

(c)    Notice of redemption of Securities to be redeemed, in whole or in part, at the election of the Company shall be given by the Company or, at the Company's request, by the Trustee in the name and at the expense of the Company and shall be irrevocable. The notice if mailed in the manner provided above shall be conclusively presumed to have been duly given, whether or not the Holder receives such notice. In any case, a failure to give such notice by mail or any defect in the notice to the Holder of any Security designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Security.

SECTION 11.6. *Deposit of Redemption Price.*

Prior to 10:00 a.m., New York City time, on the Redemption Date specified in the notice of redemption given as provided in Section 11.5, the Company will deposit with the Trustee or with one or more Paying Agents (or if the Company is acting as its own Paying Agent, the Company will segregate and hold in trust as provided in Section 10.2) an amount of money sufficient to pay the Redemption Price of, and any accrued interest (including any Additional Interest) on, all the Securities (or portions thereof) that are to be redeemed on that date.

SECTION 11.7. *Payment of Securities Called for Redemption.*

(a)    If any notice of redemption has been given as provided in Section 11.5, the Securities or portion of Securities with respect to which such notice has been given shall become due and payable on the date and at the place or places stated in such notice at the applicable Redemption Price, together with accrued interest (including any Additional Interest) to the Redemption Date. On presentation and surrender of such Securities at a Place of Payment specified in such notice, the Securities or the specified portions thereof shall be paid and redeemed by the Company at the applicable Redemption Price, together with accrued interest (including any Additional Interest) to the Redemption Date.

(b)    Upon presentation of any Security redeemed in part only, the Company shall execute and the Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Company, a new Security or Securities, of authorized denominations, in aggregate principal amount equal to the unredeemed portion of the Security so presented and having the same Original Issue Date, Stated Maturity and terms.

(c)    If any Security called for redemption shall not be so paid upon surrender thereof for redemption, the principal of and any premium on such Security shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in the Security.

## ARTICLE XII

### SUBORDINATION OF SECURITIES

SECTION 12.1. *Securities Subordinate to Senior Debt.*

The Company covenants and agrees, and each Holder of a Security, by its acceptance thereof, likewise covenants and agrees, that, to the extent and in the manner hereinafter set forth in this Article XII, the payment of the principal of and any premium and interest (including any Additional Interest) on each and all of the Securities are hereby expressly made subordinate and subject in right of payment to the prior payment in full of all Senior Debt. For the Avoidance of doubt, the Securities are senior in right of payment to the debt obligation set forth in the agreement with U.S. Bancorp Equipment Finance, Inc. pertaining to the "Aircraft" as defined therein and in the Aircraft Security Agreement, in the original amount of $13,428,000.00 and other Non-Real Estate Debt.

SECTION 12.2. *No Payment When Senior Debt in Default; Payment Over of Proceeds Upon Dissolution; Etc.*

(a)    In the event and during the continuation of any default by the Company in the payment of any principal of or any premium or interest on any Senior Debt (following any grace period, if applicable) when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration of acceleration or otherwise, then, upon written notice of such default to the Company by the holders of such Senior Debt or any trustee therefor, unless and until such default shall have been cured or waived or shall have ceased to exist, no direct or indirect payment (in cash, property, securities, by set-off or otherwise) shall be made or agreed to be made on account of the principal of or any premium or interest (including any Additional Interest) on any of the Securities, or in respect of any redemption, repayment, retirement, purchase or other acquisition of any of the Securities.

(b)    In the event of a bankruptcy, insolvency or other proceeding described in clause (d) or (e) of the definition of Event of Default (each such event, if any, herein sometimes referred to as a "*Proceeding*"), all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property, shall be made to any Holder of any of the Securities on account thereof. Any payment or distribution, whether in cash, securities or other property (other than securities of the Company or any other entity provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the Securities, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment), which would otherwise (but for these subordination provisions) be payable or deliverable in respect of the Securities shall be paid or delivered directly to the holders of Senior Debt in accordance with the priorities then existing among such holders until all Senior Debt (including any interest thereon accruing after the commencement of any Proceeding) shall have been paid in full.

(c)    In the event of any Proceeding, after payment in full of all sums owing with respect to Senior Debt, the Holders of the Securities, together with the holders of any obligations of the Company ranking on a parity with the Securities, shall be entitled to be paid from the remaining assets of the Company the amounts at the time due and owing on account of unpaid principal of and any premium and interest (including any Additional Interest) on the Securities and such other obligations before any payment or other distribution, whether in cash, property or otherwise, shall be made on account of any capital stock or any obligations of the Company ranking junior to the Securities and such other obligations. If, notwithstanding the foregoing, any payment or distribution of any character or any security, whether in cash, securities or other property (other than securities of the Company or any other entity provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the Securities, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) shall be received by the Trustee or any Holder in contravention of any of the terms hereof and before all Senior Debt shall have been paid in full, such payment or distribution or security shall be received in trust for the benefit of, and shall be paid over or delivered and transferred to, the holders of the Senior Debt at the time outstanding in accordance with the priorities then existing among such holders

for application to the payment of all Senior Debt remaining unpaid, to the extent necessary to pay all such Senior Debt (including any interest thereon accruing after the commencement of any Proceeding) in full. In the event of the failure of the Trustee or any Holder to endorse or assign any such payment, distribution or security, each holder of Senior Debt is hereby irrevocably authorized to endorse or assign the same.

(d)    The Trustee and the Holders, at the expense of the Company, shall take such reasonable action (including the delivery of this Indenture to an agent for any holders of Senior Debt or consent to the filing of a financing statement with respect hereto) as may, in the opinion of counsel designated by the holders of a majority in principal amount of the Senior Debt at the time outstanding, be necessary or appropriate to assure the effectiveness of the subordination effected by these provisions.

(e)    The provisions of this Section 12.2 shall not impair any rights, interests, remedies or powers of any secured creditor of the Company in respect of any security interest the creation of which is not prohibited by the provisions of this Indenture.

(f)    The securing of any obligations of the Company, otherwise ranking on a parity with the Securities or ranking junior to the Securities, shall not be deemed to prevent such obligations from constituting, respectively, obligations ranking on a parity with the Securities or ranking junior to the Securities.

SECTION 12.3. *Payment Permitted If No Default.*

Nothing contained in this Article XII or elsewhere in this Indenture or in any of the Securities shall prevent (a) the Company, at any time, except during the pendency of the conditions described in paragraph (a) of Section 12.2 or of any Proceeding referred to in Section 12.2, from making payments at any time of principal of and any premium or interest (including any Additional Interest) on the Securities or (b) the application by the Trustee of any moneys deposited with it hereunder to the payment of or on account of the principal of and any premium or interest (including any Additional Interest) on the Securities or the retention of such payment by the Holders, if, at the time of such application by the Trustee, it did not have knowledge (in accordance with Section 12.8) that such payment would have been prohibited by the provisions of this Article XII except as provided in Section 12.8.

SECTION 12.4. *Subrogation to Rights of Holders of Senior Debt.*

Subject to the payment in full of all amounts due or to become due on all Senior Debt, or the provision for such payment in cash or cash equivalents or otherwise in a manner satisfactory to the holders of Senior Debt, the Holders of the Securities shall be subrogated to the extent of the payments or distributions made to the holders of such Senior Debt pursuant to the provisions of this Article XII (equally and ratably with the holders of all indebtedness of the Company that by its express terms is subordinated to Senior Debt of the Company to substantially the same extent as the Securities are subordinated to the Senior Debt and is entitled to like rights of subrogation by reason of any payments or distributions made to holders of such Senior Debt) to the rights of the holders of such Senior Debt to receive payments and distributions of cash, property and securities applicable to the Senior Debt until the principal of and any premium and interest (including any Additional Interest) on the Securities shall be paid in full. For purposes of

such subrogation, no payments or distributions to the holders of the Senior Debt of any cash, property or securities to which the Holders of the Securities or the Trustee would be entitled except for the provisions of this Article XII, and no payments made pursuant to the provisions of this Article XII to the holders of Senior Debt by Holders of the Securities or the Trustee, shall, as among the Company, its creditors other than holders of Senior Debt, and the Holders of the Securities, be deemed to be a payment or distribution by the Company to or on account of the Senior Debt.

SECTION 12.5. *Provisions Solely to Define Relative Rights.*

The provisions of this Article XII are and are intended solely for the purpose of defining the relative rights of the Holders of the Securities on the one hand and the holders of Senior Debt on the other hand. Nothing contained in this Article XII or elsewhere in this Indenture or in the Securities is intended to or shall (a) impair, as between the Company and the Holders of the Securities, the obligations of the Company, which are absolute and unconditional, to pay to the Holders of the Securities the principal of and any premium and interest (including any Additional Interest) on the Securities as and when the same shall become due and payable in accordance with their terms, (b) affect the relative rights against the Company of the Holders of the Securities and creditors of the Company other than their rights in relation to the holders of Senior Debt or (c) prevent the Trustee or the Holder of any Security (or to the extent expressly provided herein, the holder of any Preferred Security) from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, including filing and voting claims in any Proceeding, subject to the rights, if any, under this Article XII of the holders of Senior Debt to receive cash, property and securities otherwise payable or deliverable to the Trustee or such Holder.

SECTION 12.6. *Trustee to Effectuate Subordination.*

Each Holder of a Security by his or her acceptance thereof authorizes and directs the Trustee on his or her behalf to take such action as may be necessary or appropriate to acknowledge or effectuate the subordination provided in this Article XII and appoints the Trustee his or her attorney-in-fact for any and all such purposes.

SECTION 12.7. *No Waiver of Subordination Provisions.*

(a)     No right of any present or future holder of any Senior Debt to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof that any such holder may have or be otherwise charged with.

(b)     Without in any way limiting the generality of paragraph (a) of this Section 12.7, the holders of Senior Debt may, at any time and from to time, without the consent of or notice to the Trustee or the Holders of the Securities, without incurring responsibility to such Holders of the Securities and without impairing or releasing the subordination provided in this Article XII or the obligations hereunder of such Holders of the Securities to the holders of Senior Debt, do any one or more of the following: (i) change the manner, place or terms of payment or extend the

time of payment of, or renew or alter, Senior Debt, or otherwise amend or supplement in any manner Senior Debt or any instrument evidencing the same or any agreement under which Senior Debt is outstanding, (ii) sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise securing Senior Debt, (iii) release any Person liable in any manner for the payment of Senior Debt and (iv) exercise or refrain from exercising any rights against the Company and any other Person.

SECTION 12.8. *Notice to Trustee.*

(a)    The Company shall give prompt written notice to a Responsible Officer of the Trustee of any fact known to the Company that would prohibit the making of any payment to or by the Trustee in respect of the Securities. Notwithstanding the provisions of this Article XII or any other provision of this Indenture, the Trustee shall not be charged with knowledge of the existence of any facts that would prohibit the making of any payment to or by the Trustee in respect of the Securities, unless and until a Responsible Officer of the Trustee shall have received written notice thereof from the Company or a holder of Senior Debt or from any trustee, agent or representative therefor; *provided,* that if the Trustee shall not have received the notice provided for in this Section 12.8 at least two Business Days prior to the date upon which by the terms hereof any monies may become payable for any purpose (including, the payment of the principal of and any premium on or interest (including any Additional Interest) on any Security), then, anything herein contained to the contrary notwithstanding, the Trustee shall have full power and authority to receive such monies and to apply the same to the purpose for which they were received and shall not be affected by any notice to the contrary that may be received by it within two Business Days prior to such date.

(b)    The Trustee shall be entitled to rely on the delivery to it of a written notice by a Person representing himself or herself to be a holder of Senior Debt (or a trustee, agent, representative or attorney-in-fact therefor) to establish that such notice has been given by a holder of Senior Debt (or a trustee, agent, representative or attorney-in-fact therefor). In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Debt to participate in any payment or distribution pursuant to this Article XII, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Debt held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such Person under this Article XII and if such evidence is not furnished, the Trustee may defer any payment to such Person pending judicial determination as to the right of such Person to receive such payment.

SECTION 12.9. *Reliance on Judicial Order or Certificate of Liquidating Agent.*

Upon any payment or distribution of assets of the Company referred to in this Article XII, the Trustee and the Holders of the Securities shall be entitled to conclusively rely upon any order or decree entered by any court of competent jurisdiction in which such Proceeding is pending, or a certificate of the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee for the benefit of creditors, agent or other Person making such payment or distribution, delivered to the Trustee or to the Holders of Securities, for the purpose of ascertaining the Persons entitled to participate in such payment or distribution, the holders of the Senior Debt and other indebtedness

of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article XII.

SECTION 12.10. *Trustee Not Fiduciary for Holders of Senior Debt.*

The Trustee, in its capacity as trustee under this Indenture, shall not be deemed to owe any fiduciary duty to the holders of Senior Debt and shall not be liable to any such holders if it shall in good faith mistakenly pay over or distribute to Holders of Securities or to the Company or to any other Person cash, property or securities to which any holders of Senior Debt shall be entitled by virtue of this Article XII or otherwise.

SECTION 12.11. *Rights of Trustee as Holder of Senior Debt; Preservation of Trustee's Rights.*

The Trustee in its individual capacity shall be entitled to all the rights set forth in this Article XII with respect to any Senior Debt that may at any time be held by it, to the same extent as any other holder of Senior Debt, and nothing in this Indenture shall deprive the Trustee of any of its rights as such holder.

SECTION 12.12. *Article Applicable to Paying Agents.*

If at any time any Paying Agent other than the Trustee shall have been appointed by the Company and be then acting hereunder, the term "*Trustee*" as used in this Article XII shall in such case (unless the context otherwise requires) be construed as extending to and including such Paying Agent within its meaning as fully for all intents and purposes as if such Paying Agent were named in this Article XII in addition to or in place of the Trustee; *provided,* that Sections 12.8 and 12.11 shall not apply to the Company or any Affiliate of the Company if the Company or such Affiliate acts as Paying Agent.

¶ ¶ ¶ ¶

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

DUNMORE HOMES, LLC

By: _____
    Name: _____
    Title: _____

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Trustee

By: _____
    Name: _____
    Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

DUNMORE HOMES, LLC

By: _____
    Name: _____
    Title: _____

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Trustee

By: _____
    Name: ~~MARIA D. CALZADO~~
    Title: ~~Vice President~~

## DETERMINATION OF LIBOR

With respect to the Securities, the London interbank offered rate ("*LIBOR*") shall be determined by the Calculation Agent in accordance with the following provisions (in each case rounded to the nearest .000001%):

(1)    On the second LIBOR Business Day (as defined below) prior to an Interest Payment Date (except with respect to the first interest payment period, such date shall be a date that is two business days prior to July 30, 2010) (each such day, a *"LIBOR Determination Date"*), LIBOR for any given security shall for the following interest payment period equal the rate, as obtained by the Calculation Agent from Bloomberg Financial Markets Commodities News, for three-month Eurodollar deposits that appears on Dow Jones Telerate Page 3750 (as defined in the International Swaps and Derivatives Association, Inc. 1991 Interest Rate and Currency Exchange Definitions), or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date.

(2)    If, on any LIBOR Determination Date, such rate does not appear on Dow Jones Telerate Page 3750 or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for three-month Eurodollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in the City of New York selected by the Calculation Agent are quoting on the relevant LIBOR Determination Date for [three-month Eurodollar deposits in an amount determined by the Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; *provided* that, if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date.

(3)    As used herein: "*Reference Banks*" means four major banks in the London interbank market selected by the Calculation Agent; and "*LIBOR Business Day*" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

## Form of Officer's Financial Certificate

The undersigned, the [Chief Financial Officer/Treasurer/Assistant Treasurer/ Secretary/ Assistant Secretary, Chairman/Vice Chairman/Chief Executive Officer/President/Vice President] hereby certifies, pursuant to Section 7.3(b) of the Junior Subordinated Indenture, dated as of June 28, 2005 (the "Indenture"), among Dunmore Homes, LLC (the "Company") and JPMorgan Chase Bank, National Association, as trustee, that, as of [date], [20___]:

[FOR FISCAL YEAR END: Attached hereto are the audited consolidated financial statements (including the balance sheet, income statement and statement of cash flows, and notes thereto, together with the report of the independent accountants thereon) of the Company and its consolidated subsidiaries for the three years ended [date], 20___.]

[FOR FISCAL QUARTER END: Attached hereto are the unaudited consolidated and consolidating financial statements (including the balance sheet and income statement) of the Company and its consolidated subsidiaries for the fiscal quarter ended [date], 20___.]

The financial statements fairly present in all material respects, in accordance with U.S. generally accepted accounting principles ("GAAP"), the financial position of the Company and its consolidated subsidiaries, and the results of operations and changes in financial condition as of the date, and for the [quarter] [annual] period ended [date], 20___, and such financial statements have been prepared in accordance with GAAP consistently applied throughout the period involved (expect as otherwise noted therein).

IN WITNESS WHEREOF, the undersigned has executed this Officer's Financial Certificate as of this _____ day of _____, 20__.

By: _____
Name: _____

Dunmore Homes, LLC
2150 Professional Drive, Suite 150
Roseville, California 95661
(916) 771-7500

## DUNMORE HOMES, LLC

## JUNIOR SUBORDINATED NOTE DUE 2035

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND SUCH SECURITIES, AND ANY INTEREST THEREIN, MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF ANY SECURITIES IS HEREBY NOTIFIED THAT THE SELLER OF THE SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A UNDER THE SECURITIES ACT.

THE HOLDER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE AGREES FOR THE BENEFIT OF THE COMPANY THAT (A) SUCH SECURITIES MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY (I) TO THE COMPANY, OR (II) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED PURCHASER" (AS DEFINED IN SECTION 2(A)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), AND (B) THE HOLDER WILL NOTIFY ANY PURCHASER OF ANY PREFERRED SECURITIES FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

THE SECURITIES WILL BE ISSUED AND MAY BE TRANSFERRED ONLY IN BLOCKS HAVING AN AGGREGATE PRINCIPAL AMOUNT OF NOT LESS THAN $100,000. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY ATTEMPTED TRANSFER OF SECURITIES, OR ANY INTEREST THEREIN, IN A BLOCK HAVING AN AGGREGATE PRINCIPAL AMOUNT OF LESS THAN $100,000 AND MULTIPLES OF $1,000 IN EXCESS THEREOF SHALL BE DEEMED TO BE VOID AND OF NO LEGAL EFFECT WHATSOEVER. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY SUCH PURPORTED TRANSFEREE SHALL BE DEEMED NOT TO BE THE HOLDER OF SUCH SECURITIES FOR ANY PURPOSE, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF PRINCIPAL OF OR INTEREST ON SUCH SECURITIES, OR ANY INTEREST THEREIN, AND SUCH PURPORTED TRANSFEREE SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN SUCH SECURITIES.

THE HOLDER OF THIS SECURITY, OR ANY INTEREST THEREIN, BY ITS ACCEPTANCE HEREOF OR THEREOF ALSO AGREES, REPRESENTS AND WARRANTS THAT IT IS NOT AN EMPLOYEE BENEFIT, INDIVIDUAL RETIREMENT ACCOUNT OR OTHER PLAN OR ARRANGEMENT SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,

AS AMENDED ("*ERISA*"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*CODE*") (EACH A "*PLAN*"), OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY PLAN'S INVESTMENT IN THE ENTITY, AND NO PERSON INVESTING "PLAN ASSETS" OF ANY PLAN MAY ACQUIRE OR HOLD THIS SECURITY OR ANY INTEREST THEREIN. ANY PURCHASER OR HOLDER OF THE SECURITIES OR ANY INTEREST THEREIN WILL BE DEEMED TO HAVE REPRESENTED BY ITS PURCHASE AND HOLDING THEREOF THAT IT IS NOT AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF SECTION 3(3) OF ERISA, OR A PLAN TO WHICH SECTION 4975 OF THE CODE IS APPLICABLE, A TRUSTEE OR OTHER PERSON ACTING ON BEHALF OF AN EMPLOYEE BENEFIT PLAN OR PLAN, OR ANY OTHER PERSON OR ENTITY USING THE ASSETS OF ANY EMPLOYEE BENEFIT PLAN OR PLAN TO FINANCE SUCH PURCHASE.

**Dunmore Homes, LLC**

**Floating Rate Junior Subordinated Note due 2035**

No. D-1                                                    $20,619,000

Dunmore Homes, LLC, a corporation organized and existing under the laws of Delaware (hereinafter called the "*Company,*" which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to Sigler & Co., or registered assigns, the principal sum of $20,619,000 on July 30, 2035. The Company further promises to pay interest on said principal sum from June 28, 2005, or from the most recent Interest Payment Date to which interest has been paid or duly provided for, quarterly in arrears on January 30, April 30, July 30 and October 30, of each year, commencing October 30, 2005, or if any such day is not a Business Day, on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after such Interest Payment Date until such next succeeding Business Day), except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case, with the same force and effect as if made on the Interest Payment Date; at a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and thereafter at a variable rate equal to LIBOR plus 4.5% per annum, together with Additional Tax Sums, if any, as provided in Section 10.5 of the Indenture, until the principal hereof is paid or duly provided for or made available for payment; *provided, further,* that any overdue principal, premium, if any, or Additional Tax Sums and any overdue installment of interest shall bear Additional Interest at a fixed rate equal to 8.60% through the interest payment date in July 30, 2010 and thereafter at a variable rate equal to LIBOR plus 4.5% per annum (to the extent that the payment of such interest shall be legally enforceable), compounded quarterly, from the dates such amounts are due until they are paid or made available for payment, and such interest shall be payable on demand.

The amount of interest payable shall be computed on the basis of a 360-day year and the actual number of days elapsed in the relevant interest period. The interest so payable, and punctually paid or duly provided for, on any Interest Payment Date shall, as provided in the Indenture, be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest installment. Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the Holder on such Regular Record Date and may either be paid to the Person in whose name this Security (or one or more Predecessor Securities) is registered at the close of business on a Special Record Date for the payment of such Defaulted Interest to be fixed by the Trustee, notice whereof shall be given to Holders of Securities not less than ten (10) days prior to such Special Record Date, or be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Securities may be listed, and upon such notice as may be required by such exchange, all as more fully provided in the Indenture.

During an Event of Default, the Company shall not (i) declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to, any of the Company's capital stock or (ii) make any payment of principal of or any interest or premium, if any, on or repay, repurchase or redeem any debt securities of the Company that rank

- 3 -

*pari passu* in all respects with or junior in interest to this Security (other than (a) repurchases, redemptions or other acquisitions of shares of capital stock of the Company in connection with (1) any employment contract, benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants, (2) a dividend reinvestment or stockholder stock purchase plan and (3) the issuance of capital stock of the Company (or securities convertible into or exercisable for such capital stock) as consideration in an acquisition transaction entered into prior to such Event of Default, (b) as a result of an exchange or conversion of any class or series of the Company's capital stock (or any capital stock of a Subsidiary of the Company) for any class or series of the Company's capital stock or of any class or series of the Company's indebtedness for any class or series of the Company's capital stock, (c) the purchase of fractional interests in shares of the Company's capital stock pursuant to the conversion or exchange provisions of such capital stock or the security being converted or exchanged, (d) any declaration of a dividend in connection with any Rights Plan, the issuance of rights, stock or other property under any Rights Plan, or the redemption or repurchase of rights pursuant thereto or (e) any dividend in the form of stock, warrants, options or other rights where the dividend stock or the stock issuable upon exercise of such warrants, options or other rights is the same stock as that on which the dividend is being paid or ranks *pari passu* with or junior to such stock).

Payment of principal of, premium, if any, and interest on this Security shall be made in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. Payments of principal, premium, if any, and interest due at the Maturity of this Security shall be made at the Place of Payment upon surrender of such Securities to the Paying Agent, and payments of interest shall be made, subject to such surrender where applicable, by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing to the Paying Agent at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Security Register. Notwithstanding the foregoing, so long as the Holder of this Security is the Property Trustee, the payment of the principal of (and premium, if any) and interest (including any overdue installment of interest and Additional Tax Sums, if any) on this Security will be made at such place and to such account as may be designated by the Property Trustee.

The indebtedness evidenced by this Security is, to the extent provided in the Indenture, subordinate and junior in right of payment to the prior payment in full of all Senior Debt, and this Security is issued subject to the provisions of the Indenture with respect thereto. Each Holder of this Security, by accepting the same, (a) agrees to and shall be bound by such provisions, (b) authorizes and directs the Trustee on his or her behalf to take such actions as may be necessary or appropriate to effectuate the subordination so provided and (c) appoints the Trustee his or her attorney-in-fact for any and all such purposes. Each Holder hereof, by his or her acceptance hereof, waives all notice of the acceptance of the subordination provisions contained herein and in the Indenture by each holder of Senior Debt, whether now outstanding or hereafter incurred, and waives reliance by each such holder upon said provisions.

-4-

Unless the certificate of authentication hereon has been executed by the Trustee by manual signature, this Security shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

## [REVERSE OF SECURITY]

This Security is one of a duly authorized issue of securities of the Company (the "*Securities*") issued under the Junior Subordinated Indenture, dated as of June 28, 2005 (the "*Indenture*"), between the Company and JPMorgan Chase Bank, National Association, as Trustee (in such capacity, the "*Trustee*," which term includes any successor trustee under the Indenture), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Trustee, the holders of Senior Debt, the Holders of the Securities and the holders of the Preferred Securities, and of the terms upon which the Securities are, and are to be, authenticated and delivered.

All terms used in this Security that are defined in the Indenture or in the Amended and Restated Trust Agreement, dated as of June 28, 2005 (as modified, amended or supplemented from time to time, the "*Trust Agreement*"), relating to the Dunmore Homes Statutory Trust I (the "*Trust*") among the Company, as Depositor, the Trustees named therein and the Holders from time to time of the Trust Securities issued pursuant thereto, shall have the meanings assigned to them in the Indenture or the Trust Agreement, as the case may be.

The Company may, on any Interest Payment Date, at its option, upon not less than thirty (30) days' nor more than sixty (60) days' written notice to the Holders of the Securities (unless a shorter notice period shall be satisfactory to the Trustee) on or after July 30, 2010 and subject to the terms and conditions of Article XI of the Indenture, redeem this Security in whole at any time or in part from time to time at a Redemption Price equal to one hundred percent (100%) of the principal amount hereof, together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date.

In addition, upon the occurrence and during the continuation of a Special Event, the Company may, at its option, upon not less than thirty (30) days' nor more than sixty (60) days' written notice to the Holders of the Securities (unless a shorter notice period shall be satisfactory to the Trustee), redeem this Security, in whole but not in part, subject to the terms and conditions of Article XI of the Indenture at a Redemption Price equal to one hundred seven and one half percent (107.5%) of the principal amount hereof, together, in the case of any such redemption, with accrued interest, including any Additional Interest, through but excluding the date fixed as the Redemption Date.

In the event of redemption of this Security in part only, a new Security or Securities for the unredeemed portion hereof will be issued in the name of the Holder hereof upon the cancellation hereof. If less than all the Securities are to be redeemed, the particular Securities to be redeemed shall be selected not more than sixty (60) days prior to the Redemption Date by the Trustee from the Outstanding Securities not previously called for redemption, by such method as the Trustee shall deem fair and appropriate and which may provide for the selection for redemption of a portion of the principal amount of any Security.

The Indenture permits, with certain exceptions as therein provided, the Company and the Trustee at any time to enter into a supplemental indenture or indentures for the purpose of modifying in any manner the rights and obligations of the Company and of the Holders of the

Securities, with the consent of the Holders of not less than a majority in principal amount of the Outstanding Securities. The Indenture also contains provisions permitting Holders of specified percentages in principal amount of the Securities, on behalf of the Holders of all Securities, to waive compliance by the Company with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Security shall be conclusive and binding upon such Holder and upon all future Holders of this Security and of any Security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon this Security.

No reference herein to the Indenture and no provision of this Security or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of and any premium, if any, and interest, including any Additional Interest (to the extent legally enforceable), on this Security at the times, place and rate, and in the coin or currency, herein prescribed.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Security is restricted to transfers to "Qualified Purchasers" (as such term is defined in the Investment Company Act of 1940, as amended), and is registrable in the Securities Register, upon surrender of this Security for registration of transfer at the office or agency of the Company maintained for such purpose, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company and the Securities Registrar and duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Securities, of like tenor, of authorized denominations and for the same aggregate principal amount, will be issued to the designated transferee or transferees.

The Securities are issuable only in registered form without coupons in minimum denominations of $100,000 and any integral multiple of $1,000 in excess thereof. As provided in the Indenture and subject to certain limitations therein set forth, Securities are exchangeable for a like aggregate principal amount of Securities and of like tenor of a different authorized denomination, as requested by the Holder surrendering the same.

No service charge shall be made for any such registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this Security is registered as the owner hereof for all purposes, whether or not this Security be overdue, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

The Company and, by its acceptance of this Security or a beneficial interest herein, the Holder of, and any Person that acquires a beneficial interest in, this Security agree that, for United States federal, state and local tax purposes, it is intended that this Security constitute indebtedness.

- 7 -

This Security shall be construed and enforced in accordance with and governed by the laws of the State of New York, without reference to its conflict of laws provisions (other than Section 5-1401 of the General Obligations Law).

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed on this 28 day of JUNE, 2005.

Dunmore Homes, LLC

By: _____

Name:

Title:

This is one of the Securities referred to in the within-mentioned Indenture.

Dated: _____, 2005

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, *not in its individual capacity, but solely as Trustee*

By: _____

*Authorized signatory*

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed on this _____ day of _____, 2005.

Dunmore Homes, LLC

By: _____
Name:
Title:

This is one of the Securities referred to in the within-mentioned Indenture.

Dated: JUNE 28 , 2005

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, *not in its individual capacity, but solely as Trustee*

By: _____
*Authorized signatory*

AMENDED AND RESTATED TRUST AGREEMENT

among

DUNMORE HOMES, LLC,
as *Depositor*

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
as *Property Trustee*

CHASE BANK USA, NATIONAL ASSOCIATION,
as *Delaware Trustee*

and

THE ADMINISTRATIVE TRUSTEES NAMED HEREIN
as *Administrative Trustees*

Dated as of JUNE 28, 2005

Dunmore Homes Statutory Trust I

(9) AUSTIN/156184

## TABLE OF CONTENTS

Page

### ARTICLE I.
### DEFINED TERMS

Section 1.1.    Definitions.................................................................................. 1

### ARTICLE II.
### THE TRUST

Section 2.1.    Name.................................................................................... 11
Section 2.2.    Office of the Delaware Trustee; Principal Place of Business ............ 11
Section 2.3.    Initial Contribution of Trust Property; Fees, Costs and Expenses......... 11
Section 2.4.    Purposes of Trust ................................................................. 12
Section 2.5.    Authorization to Enter into Certain Transactions ........................... 12
Section 2.6.    Assets of Trust ...................................................................... 15
Section 2.7.    Title to Trust Property............................................................. 15

### ARTICLE III.
### PAYMENT ACCOUNT; PAYING AGENTS

Section 3.1.    Payment Account .................................................................. 15
Section 3.2.    Appointment of Paying Agents................................................. 15

### ARTICLE IV.
### DISTRIBUTIONS; REDEMPTION

Section 4.1.    Distributions......................................................................... 16
Section 4.2.    Redemption .......................................................................... 17
Section 4.3.    Subordination of Common Securities ......................................... 20
Section 4.4.    Payment Procedures .............................................................. 21
Section 4.5.    Withholding Tax .................................................................... 21
Section 4.6.    Tax Returns and Other Reports................................................. 21
Section 4.7.    Payment of Taxes, Duties, Etc. of the Trust ............................... 22
Section 4.8.    Payments under Indenture or Pursuant to Direct Actions................. 22
Section 4.9.    Exchanges ............................................................................ 22
Section 4.10.   Calculation Agent ................................................................. 23
Section 4.11.   Certain Accounting Matters ..................................................... 23

### ARTICLE V.
### SECURITIES

Section 5.1.    Initial Ownership .................................................................. 24

**TABLE OF CONTENTS**
(continued)

Page

Section 5.2.     Authorized Trust Securities ................................................................ 24

Section 5.3.     Issuance of the Common Securities; Subscription and Purchase of
                 Notes ................................................................................................ 25

Section 5.4.     The Securities Certificates ................................................................ 25

Section 5.5.     Rights of Holders .............................................................................. 26

Section 5.6.     Book-Entry Preferred Securities ....................................................... 26

Section 5.7.     Registration of Transfer and Exchange of Preferred Securities
                 Certificates ...................................................................................... 28

Section 5.8.     Mutilated, Destroyed, Lost or Stolen Securities Certificates.............. 29

Section 5.9.     Persons Deemed Holders .................................................................. 30

Section 5.10.    Cancellation ..................................................................................... 30

Section 5.11.    Ownership of Common Securities by Depositor ................................. 30

Section 5.12.    Restricted Legends ........................................................................... 31

Section 5.13.    Form of Certificate of Authentication ............................................... 33

**ARTICLE VI.**
**MEETINGS; VOTING; ACTS OF HOLDERS**

Section 6.1.     Notice of Meetings ............................................................................ 33

Section 6.2.     Meetings of Holders of the Preferred Securities ............................... 34

Section 6.3.     Voting Rights .................................................................................... 34

Section 6.4.     Proxies, Etc ...................................................................................... 34

Section 6.5.     Holder Action by Written Consent ................................................... 35

Section 6.6.     Record Date for Voting and Other Purposes ..................................... 35

Section 6.7.     Acts of Holders ................................................................................ 35

Section 6.8.     Inspection of Records ....................................................................... 36

Section 6.9.     Limitations on Voting Rights ............................................................ 36

Section 6.10.    Acceleration of Maturity; Rescission of Annulment; Waivers of Past
                 Defaults ............................................................................................ 37

**ARTICLE VII.**
**REPRESENTATIONS AND WARRANTIES**

Section 7.1.     Representations and Warranties of the Property Trustee and the
                 Delaware Trustee ............................................................................. 39

Section 7.2.     Representations and Warranties of Depositor..................................... 40

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE VIII.
THE TRUSTEES

Section 8.1.    Number of Trustees.................................................. 42

Section 8.2.    Property Trustee Required ...................................... 42

Section 8.3.    Delaware Trustee Required....................................... 42

Section 8.4.    Appointment of Administrative Trustees..................... 43

Section 8.5.    Duties and Responsibilities of the Trustees ............... 43

Section 8.6.    Notices of Defaults and Extensions ......................... 45

Section 8.7.    Certain Rights of Property Trustee ......................... 45

Section 8.8.    Delegation of Power ............................................. 47

Section 8.9.    Parties May Hold Securities.................................... 48

Section 8.10.   Compensation; Reimbursement; Indemnity ................... 48

Section 8.11.   Resignation and Removal; Appointment of Successor........ 49

Section 8.12.   Acceptance of Appointment by Successor ..................... 50

Section 8.13.   Merger, Conversion, Consolidation or Succession to Business ..................... 50

Section 8.14.   Not Responsible for Recitals, Issuance of Securities, or Representations ....................................................... 51

Section 8.15.   Property Trustee May File Proofs of Claim.................. 51

Section 8.16.   Reports to the Property Trustee ............................. 52

ARTICLE IX.
TERMINATION, LIQUIDATION AND MERGER

Section 9.1.    Dissolution Upon Expiration Date.............................. 53

Section 9.2.    Early Termination ............................................... 53

Section 9.3.    Termination...................................................... 53

Section 9.4.    Liquidation...................................................... 54

Section 9.5.    Mergers, Consolidations, Amalgamations or Replacements of Trust ........... 55

ARTICLE X.
MISCELLANEOUS PROVISIONS

Section 10.1.   Limitation of Rights of Holders.............................. 56

Section 10.2.   Agreed Tax Treatment of Trust and Trust Securities ....... 57

Section 10.3.   Amendment....................................................... 57

# TABLE OF CONTENTS
## (continued)

|  |  |  | Page |
|---|---|---|---|
| Section 10.4. | Separability | | 58 |
| Section 10.5. | Governing Law | | 58 |
| Section 10.6. | Successors | | 59 |
| Section 10.7. | Headings | | 59 |
| Section 10.8. | Reports, Notices and Demands | | 59 |
| Section 10.9. | Agreement Not to Petition | | 60 |
| Section 10.10. | Counterparts | | 60 |

# TABLE OF CONTENTS

Page

Exhibit A    Certificate of Trust of Dunmore Homes Statutory Trust I
Exhibit B    Form of Common Securities Certificate
Exhibit C    Reserved
Exhibit D    Form of Preferred Securities Certificate
Exhibit E    Form of Transferor Certificate
Exhibit F    Reserved
Exhibit G    Form of Officer's Financial Certificate

Schedule A    Determination of LIBOR

THIS AMENDED AND RESTATED TRUST AGREEMENT, dated as of June 28, 2005, among (i) Dunmore Homes, LLC, a Delaware corporation (including any successors or permitted assigns, the "*Depositor*"), (ii) JPMorgan Chase Bank, National Association, as property trustee (in such capacity, the "*Property Trustee*"), (iii) Chase Bank USA, National Association, a national banking association, as Delaware trustee (in such capacity, the "*Delaware Trustee*"), (iv) William West and an individual, Sidney Dunmore, each of whose address is c/o 2150 Professional Drive, Suite 150, Roseville, California 95661 as administrative trustees (in such capacities, each an "*Administrative Trustee*" and, collectively, the "*Administrative Trustees*" and, together with the Property Trustee and the Delaware Trustee, the "*Trustees*") and (v) the several Holders, as hereinafter defined.

WITNESSETH

WHEREAS, the Depositor, the Property Trustee and the Delaware Trustee have heretofore created a Delaware statutory trust pursuant to the Delaware Statutory Trust Act by entering into a Trust Agreement, dated as of June 27, 2005 (the "*Original Trust Agreement*"), and by executing and filing with the Secretary of State of the State of Delaware the Certificate of Trust, substantially in the form attached as Exhibit A; and

WHEREAS, the Depositor and the Trustees desire to amend and restate the Original Trust Agreement in its entirety as set forth herein to provide for, among other things, (i) the issuance of the Common Securities by the Trust to the Depositor, (ii) the issuance and sale of the Preferred Securities by the Trust pursuant to the Purchase Agreement and (iii) the acquisition by the Trust from the Depositor of all of the right, title and interest in and to the Notes;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each party, for the benefit of the other parties and for the benefit of the Holders, hereby amends and restates the Original Trust Agreement in its entirety and agrees as follows:

ARTICLE I

DEFINED TERMS

SECTION 1.1.  *Definitions.*

For all purposes of this Trust Agreement, except as otherwise expressly provided or unless the context otherwise requires:

      (a)     the terms defined in this Article I have the meanings assigned to them in this Article I;

      (b)     the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(c)     all accounting terms used but not defined herein have the meanings assigned to them in accordance with United States generally accepted accounting principles;

(d)     unless the context otherwise requires, any reference to an "Article", a "Section", a "Schedule" or an "Exhibit" refers to an Article, a Section, a Schedule or an Exhibit, as the case may be, of or to this Trust Agreement;

(e)     the words "hereby", "herein", "hereof" and "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(f)     a reference to the singular includes the plural and vice versa; and

(g)     the masculine, feminine or neuter genders used herein shall include the masculine, feminine and neuter genders.

"*Act*" has the meaning specified in <u>Section 6.7</u>.

"*Additional Interest*" has the meaning specified in Section 1.1 of the Indenture.

"*Additional Interest Amount*" means, with respect to Trust Securities of a given Liquidation Amount and/or a given period, the amount of Additional Interest paid by the Depositor on a Like Amount of Notes for such period.

"*Additional Taxes*" has the meaning specified in Section 1.1 of the Indenture.

"*Additional Tax Sums*" has the meaning specified in Section 10.5 of the Indenture.

"*Administrative Trustee*" means each of the Persons identified as an "*Administrative Trustee*" in the preamble to this Trust Agreement, solely in each such Person's capacity as Administrative Trustee of the Trust and not in such Person's individual capacity, or any successor Administrative Trustee appointed as herein provided.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Applicable Depositary Procedures*" means, with respect to any transfer or transaction involving a Book-Entry Preferred Security, the rules and procedures of the Depositary for such Book-Entry Preferred Security, in each case to the extent applicable to such transaction and as in effect from time to time.

*"Bankruptcy Event"* means, with respect to any Person:

(a) the entry of a decree or order by a court having jurisdiction in the premises (i) judging such Person a bankrupt or insolvent, (ii) approving as properly filed a petition seeking reorganization, arrangement, adjudication or composition of or in respect of such Person under any applicable Federal or state bankruptcy, insolvency, reorganization or other similar law, (iii) appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such Person or of any substantial part of its property or (iv) ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days; or

(b) the institution by such Person of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law, or the consent by it to the filing of any such petition or to the appointment of a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of such Person or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due and its willingness to be adjudicated a bankrupt or insolvent, or the taking of corporate action by such Person in furtherance of any such action.

*"Bankruptcy Laws"* means all Federal and state bankruptcy, insolvency, reorganization and other similar laws, including the United States Bankruptcy Code.

*"Book-Entry Preferred Security"* means a Preferred Security, the ownership and transfers of which shall be made through book entries by a Depositary.

*"Business Day"* means a day other than (a) a Saturday or Sunday, (b) a day on which banking institutions in the City of New York are authorized or required by law or executive order to remain closed or (c) a day on which the Corporate Trust Office is closed for business.

*"Calculation Agent"* has the meaning specified in Section 4.10.

*"Closing Date"* has the meaning specified in the Purchase Agreement.

*"Code"* means the United States Internal Revenue Code of 1986, as amended.

*"Commission"* means the Securities and Exchange Commission, as from time to time constituted, created under the Exchange Act or, if at any time after the execution of this Trust

Agreement such Commission is not existing and performing the duties assigned to it, then the body performing such duties at such time.

"*Common Securities Certificate*" means a certificate evidencing ownership of Common Securities, substantially in the form attached as Exhibit B.

"*Common Security*" means an undivided beneficial interest in the assets of the Trust, having a Liquidation Amount of $1,000 and having the rights provided therefor in this Trust Agreement.

"*Common Securities Subscription Agreement*" means the agreement of even date herewith by and between the Depositor and the Trust pertaining to the sale and purchase of the Common Securities.

"*Corporate Trust Office*" means the principal office of the Property Trustee at which any particular time its corporate trust business shall be administered, which office at the date of this Trust Agreement is located at 600 Travis, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services—Dunmore Homes Statutory Trust I.

"*Definitive Preferred Securities Certificates*" means Preferred Securities issued in certificated, fully registered form that are not Global Preferred Securities.

"*Delaware Statutory Trust Act*" means Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.*, or any successor statute thereto, in each case as amended from time to time.

"*Delaware Trustee*" means the Person identified as the "*Delaware Trustee*" in the preamble to this Trust Agreement, solely in its capacity as Delaware Trustee of the Trust and not in its individual capacity, or its successor in interest in such capacity, or any successor Delaware Trustee appointed as herein provided.

"*Depositary*" means an organization registered as a clearing agency under the Exchange Act that is designated as Depositary by the Depositor or any successor thereto. DTC will be the initial Depositary.

"*Depositary Participant*" means a broker, dealer, bank, other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of securities deposited with the Depositary.

"*Depositor*" has the meaning specified in the preamble to this Trust Agreement and any successors and permitted assigns.

"*Depositor Affiliate*" has the meaning specified in Section 4.9.

"*Distribution Date*" has the meaning specified in Section 4.1(a)(i).

"*Distributions*" means amounts payable in respect of the Trust Securities as provided in Section 4.1.

"*DTC*" means The Depository Trust Company, a New York corporation, or any successor thereto.

"*Early Termination Event*" has the meaning specified in Section 9.2.

"*Event of Default*" means any one of the following events (whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) the occurrence of a Note Event of Default; or

(b) default by the Trust in the payment of any Distribution when it becomes due and payable, and continuation of such default for a period of thirty (30) days; or

(c) default by the Trust in the payment of any Redemption Price of any Trust Security when it becomes due and payable; or

(d) default in the performance, or breach, in any material respect of any covenant or warranty of the Trustees in this Trust Agreement (other than those specified in clause (b) or (c) above) and continuation of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the Trustees and to the Depositor by the Holders of at least twenty five percent (25%) in aggregate Liquidation Amount of the Outstanding Preferred Securities a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "*Notice of Default*" hereunder; or

(e) the occurrence of a Bankruptcy Event with respect to the Property Trustee if a successor Property Trustee has not been appointed within ninety (90) days thereof.

"*Exchange Act*" means the Securities Exchange Act of 1934, and any successor statute thereto, in each case as amended from time to time.

"*Expiration Date*" has the meaning specified in Section 9.1.

"*Fiscal Year*" shall be the fiscal year of the Trust, which shall be the calendar year, or such other period as is required by the Code.

"*Global Preferred Security*" means a Preferred Securities Certificate evidencing ownership of Book-Entry Preferred Securities.

"*Holder*" means a Person in whose name a Trust Security or Trust Securities are registered in the Securities Register; any such Person shall be deemed to be a beneficial owner within the meaning of the Delaware Statutory Trust Act.

"*Indemnified Person*" has the meaning specified in Section 8.10(c).

"*Indenture*" means the Junior Subordinated Indenture executed and delivered by the Depositor and the Note Trustee contemporaneously with the execution and delivery of this Trust Agreement, for the benefit of the holders of the Notes, a copy of which is attached hereto as Exhibit D, as amended or supplemented from time to time.

"*Indenture Redemption Price*" means the Optional Note Redemption Price or the Special Note Redemption Price, as applicable.

"*Initial Purchaser*" shall mean the initial purchasers of the Preferred Securities.

"*Interest Payment Date*" has the meaning specified in Section 1.1 of the Indenture.

"*Investment Company Act*" means the Investment Company Act of 1940, or any successor statute thereto, in each case as amended from time to time.

"*Investment Company Event*" has the meaning specified in Section 1.1 of the Indenture.

"*Junior Subordinated Note Purchase Agreement*" means the agreement of even date herewith by and between the Depositor and the Trust pertaining to the issuance and purchase of the Notes.

"*LIBOR*" has the meaning specified in Schedule A.

"*LIBOR Business Day*" has the meaning specified in Schedule A.

"*LIBOR Determination Date*" has the meaning specified in Schedule A.

"*Lien*" means any lien, pledge, charge, encumbrance, mortgage, deed of trust, adverse ownership interest, hypothecation, assignment, security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever.

"*Like Amount*" means (a) with respect to a redemption of any Trust Securities, Trust Securities having a Liquidation Amount equal to the principal amount of Notes to be contemporaneously redeemed or paid at maturity in accordance with the Indenture, the proceeds of which will be used to pay the Redemption Price of such Trust Securities, (b) with respect to a distribution of Notes to Holders of Trust Securities in connection with a dissolution of the Trust, Notes having a principal amount equal to the Liquidation Amount of the Trust Securities of the Holder to whom such Notes are distributed and (c) with respect to any distribution of Additional Interest Amounts to Holders of Trust Securities, Notes having a principal amount equal to the Liquidation Amount of the Trust Securities in respect of which such distribution is made.

"*Liquidation Amount*" means the stated amount of $1,000 per Trust Security.

"*Liquidation Date*" means the date on which assets are to be distributed to Holders in accordance with Section 9.4(a) hereunder following dissolution of the Trust.

*"Liquidation Distribution"* has the meaning specified in <u>Section 9.4(d)</u>.

*"Majority in Liquidation Amount"* means Common or Preferred Securities, as the case may be, representing more than fifty percent (50%) of the aggregate Liquidation Amount of all (or a specified group of) then Outstanding Common or Preferred Securities, as the case may be.

*"Note Event of Default"* means any *"Event of Default"* specified in <u>Section 5.1</u> of the Indenture.

*"Note Redemption Date"* means, with respect to any Notes to be redeemed under the Indenture, the date fixed for redemption of such Notes under the Indenture.

*"Note Trustee"* means the Person identified as the *"Trustee"* in the Indenture, solely in its capacity as Trustee pursuant to the Indenture and not in its individual capacity, or its successor in interest in such capacity, or any successor Trustee appointed as provided in the Indenture.

*"Notes"* means the Depositor's Junior Subordinated Notes issued pursuant to the Indenture.

*"Officers' Certificate"* means a certificate signed by the Chief Executive Officer, the President or an Executive Vice President, and by the Chief Financial Officer, Treasurer or an Assistant Treasurer, of the Depositor, and delivered to the Trustees. Any Officers' Certificate delivered with respect to compliance with a condition or covenant provided for in this Trust Agreement (other than the certificate provided pursuant to <u>Section 8.16</u> which is not an Officers' Certificate) shall include:

> (a) a statement by each officer signing the Officers' Certificate that such officer has read the covenant or condition and the definitions relating thereto;
>
> (b) a brief statement of the nature and scope of the examination or investigation undertaken by such officer in rendering the Officers' Certificate;
>
> (c) a statement that such officer has made such examination or investigation as, in such officer's opinion, is necessary to enable such officer to express an informed opinion as to whether or not such covenant or condition has been complied with; and
>
> (d) a statement as to whether, in the opinion of such officer, such condition or covenant has been complied with.

*"Operative Documents"* means the Purchase Agreement, the Indenture, the Trust Agreement, the Notes and the Trust Securities.

*"Opinion of Counsel"* means a written opinion of counsel, who may be counsel for, or an employee of, the Depositor or any Affiliate of the Depositor.

*"Optional Redemption Price"* means, with respect to any Trust Security, an amount equal to one hundred percent (100%) of the Liquidation Amount of such Trust Security on the Redemption Date, plus accumulated and unpaid Distributions to the Redemption Date, plus the related amount of the premium, if any, and/or accrued interest, including Additional Interest, if any, thereon paid by the Depositor upon the concurrent redemption or payment at maturity of a Like Amount of Notes.

*"Optional Note Redemption Price"* means, with respect to any Note to be redeemed on any Redemption Date under the Indenture, an amount equal to one hundred percent (100%) of the outstanding principal amount of such Note, together with accrued interest, including any Additional Interest (to the extent legally enforceable), thereon through but not including the date fixed as such Redemption Date.

*"Original Issue Date"* means the date of original issuance of the Trust Securities.

*"Original Trust Agreement"* has the meaning specified in the recitals to this Trust Agreement.

*"Outstanding"*, when used with respect to any Trust Securities, means, as of the date of determination, all Trust Securities theretofore executed and delivered under this Trust Agreement, except:

> (a) Trust Securities theretofore canceled by the Property Trustee or delivered to the Property Trustee for cancellation;
>
> (b) Trust Securities for which payment or redemption money in the necessary amount has been theretofore deposited with the Property Trustee or any Paying Agent in trust for the Holders of such Trust Securities; *provided,* that if such Trust Securities are to be redeemed, notice of such redemption has been duly given pursuant to this Trust Agreement; and
>
> (c) Trust Securities that have been paid or in exchange for or in lieu of which other Trust Securities have been executed and delivered pursuant to the provisions of this Trust Agreement, unless proof satisfactory to the Property Trustee is presented that any such Trust Securities are held by Holders in whose hands such Trust Securities are valid, legal and binding obligations of the Trust;

*provided,* that in determining whether the Holders of the requisite Liquidation Amount of the Outstanding Preferred Securities have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Preferred Securities owned by the Depositor, any Trustee or any Affiliate of the Depositor or of any Trustee shall be disregarded and deemed not to be Outstanding, except that (i) in determining whether any Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Preferred Securities that such Trustee knows to be so owned shall be so disregarded and (ii) the foregoing shall not apply at any time when all of the Outstanding Preferred Securities are owned by the Depositor, one or more of the Trustees and/or any such Affiliate. Preferred Securities so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Administrative Trustees the pledgee's right so to act with

respect to such Preferred Securities and that the pledgee is not the Depositor, any Trustee or any Affiliate of the Depositor or of any Trustee.

"*Owner*" means each Person who is the beneficial owner of Book-Entry Preferred Securities as reflected in the records of the Depositary or, if a Depositary Participant is not the beneficial owner, then the beneficial owner as reflected in the records of the Depositary Participant.

"*Paying Agent*" means any Person authorized by the Administrative Trustees to pay Distributions or other amounts in respect of any Trust Securities on behalf of the Trust.

"*Payment Account*" means a segregated non-interest-bearing corporate trust account maintained by the Property Trustee for the benefit of the Holders in which all amounts paid in respect of the Notes will be held and from which the Property Trustee, through the Paying Agent, shall make payments to the Holders in accordance with Sections 3.1, 4.1 and 4.2.

"*Person*" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint stock company, company, limited liability company, trust, unincorporated association or government, or any agency or political subdivision thereof, or any other entity of whatever nature.

"*Preferred Security*" means an undivided beneficial interest in the assets of the Trust, having a Liquidation Amount of $1,000 and having the rights provided therefor in this Trust Agreement.

"*Preferred Securities Certificate*" means a certificate evidencing ownership of Preferred Securities, substantially in the form attached as Exhibit C.

"*Property Trustee*" means the Person identified as the "*Property Trustee*" in the preamble to this Trust Agreement, solely in its capacity as Property Trustee of the Trust and not in its individual capacity, or its successor in interest in such capacity, or any successor Property Trustee appointed as herein provided.

"*Purchase Agreement*" means the Purchase Agreement executed and delivered by the Trust, the Depositor and the Initial Purchaser, as purchaser, contemporaneously with the execution and delivery of this Trust Agreement, as amended from time to time.

"*QIB*" means a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act of 1933, as amended.

"*QP*" means a "Qualified Purchaser" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended.

"*QIB/QP*" means a QIB that is also a QP.

"*Redemption Date*" means, with respect to any Trust Security to be redeemed, the date fixed for such redemption by or pursuant to this Trust Agreement; *provided*, that each Note

Redemption Date and the stated maturity (or any date of principal repayment upon early maturity) of the Notes shall be a Redemption Date for a Like Amount of Trust Securities.

"*Redemption Price*" means the Special Redemption Price or Optional Redemption Price, as applicable. If the Depositor has redeemed the Notes at the Special Note Redemption Price, the Trust shall redeem the Trust Securities at the Special Redemption Price. If the Depositor has redeemed the Notes at the Optional Note Redemption Price, the Trust shall redeem the Trust Securities at the Optional Redemption Price.

"*Reference Banks*" has the meaning specified in Schedule A.

"*Responsible Officer*" means, with respect to the Property Trustee, the officer in the Institutional Trust Services department of the Property Trustee having direct responsibility for the administration of this Trust Agreement.

"*Securities Act*" means the Securities Act of 1933, and any successor statute thereto, in each case as amended from time to time.

"*Securities Certificate*" means any one of the Common Securities Certificates or the Preferred Securities Certificates.

"*Securities Register*" and "*Securities Registrar*" have the respective meanings specified in Section 5.7.

"*Special Redemption Price*" means, with respect to any Trust Security, an amount equal to one hundred seven and one half percent (107.5%) of the Liquidation Amount of such Trust Security on the Redemption Date, plus accumulated and unpaid Distributions to the Redemption Date, plus the related amount of the premium, if any, and/or accrued interest, including Additional Interest, if any, thereon paid by the Depositor upon the concurrent redemption or payment at maturity of a Like Amount of Notes.

"*Special Note Redemption Price*" means, with respect to any Note to be redeemed on any Redemption Date under the Indenture, an amount equal to one hundred seven and one half percent (107.5%) of the outstanding principal amount of such Note, together with accrued interest, including Additional Interest, thereon through but not including the date fixed as such Redemption Date.

"*Successor Securities*" has the meaning specified in Section 9.5(a).

"*Tax Event*" has the meaning specified in Section 1.1 of the Indenture.

"*Trust*" means the Delaware statutory trust known as "Dunmore Homes Statutory Trust I," which was created on June 27, 2005 under the Delaware Statutory Trust Act pursuant to the Original Trust Agreement and the filing of the Certificate of Trust, and continued pursuant to this Trust Agreement.

*"Trust Agreement"* means this Amended and Restated Trust Agreement, as the same may be modified, amended or supplemented from time to time in accordance with the applicable provisions hereof, including all Schedules and Exhibits.

*"Trustees"* means the Administrative Trustees, the Property Trustee and the Delaware Trustee, each as defined in this Article I.

*"Trust Property"* means (a) the Notes, (b) any cash on deposit in, or owing to, the Payment Account and (c) all proceeds and rights in respect of the foregoing and any other property and assets for the time being held or deemed to be held by the Property Trustee pursuant to the trusts of this Trust Agreement.

*"Trust Security"* means any one of the Common Securities or the Preferred Securities.

## ARTICLE II

### THE TRUST

SECTION 2.1.  *Name.*

The trust continued hereby shall be known as "Dunmore Homes Statutory Trust I", as such name may be modified from time to time by the Administrative Trustees following written notice to the Holders of Trust Securities and the other Trustees, in which name the Trustees may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued.

SECTION 2.2.  *Office of the Delaware Trustee; Principal Place of Business.*

The address of the Delaware Trustee in the State of Delaware is Chase Bank USA, National Association, 500 Stanton Christiana Road, Building 4 (3rd Floor), Newark, DE 19713, Attention: Worldwide Securities Services, or such other address in the State of Delaware as the Delaware Trustee may designate by written notice to the Holders, the Depositor, the Property Trustee and the Administrative Trustees. The principal executive office of the Trust is 2150 Professional Drive, Suite 150, Roseville, California 95661, Attention: William West, as such address may be changed from time to time by the Administrative Trustees following written notice to the Holders and the other Trustees.

SECTION 2.3.  *Initial Contribution of Trust Property; Fees, Costs and Expenses.*

The Property Trustee acknowledges receipt from the Depositor in connection with the Original Trust Agreement of the sum of ten dollars ($10), which constituted the initial Trust Property. The Depositor shall pay all fees, costs and expenses of the Trust (except with respect to the Trust Securities) as they arise or shall, upon request of any Trustee, promptly reimburse such Trustee for any such fees, costs and expenses paid by such Trustee. The Depositor shall make no claim upon the Trust Property for the payment of such fees, costs or expenses.

SECTION 2.4.  *Purposes of Trust.*

(a)    The exclusive purposes and functions of the Trust are to (i) issue and sell Trust Securities and use the proceeds from such sale to acquire the Notes and (ii) engage in only those activities necessary or incidental thereto. The Delaware Trustee, the Property Trustee and the Administrative Trustees are trustees of the Trust, and have all the rights, powers and duties to the extent set forth herein.  The Trustees hereby acknowledge that they are trustees of the Trust.

(b)    So long as this Trust Agreement remains in effect, the Trust (or the Trustees acting on behalf of the Trust) shall not undertake any business, activities or transaction except as expressly provided herein or contemplated hereby. In particular, the Trust (or the Trustees acting on behalf of the Trust) shall not (i) acquire any investments or engage in any activities not authorized by this Trust Agreement, (ii) sell, assign, transfer, exchange, mortgage, pledge, set-off or otherwise dispose of any of the Trust Property or interests therein, including to Holders, except as expressly provided herein, (iii) incur any indebtedness for borrowed money or issue any other debt, (iv) take or consent to any action that would result in the placement of a Lien on any of the Trust Property, (v) take or consent to any action that would reasonably be expected to cause the Trust to become taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes, (vi) take or consent to any action that would cause the Notes to be treated as other than indebtedness of the Depositor for United States federal income tax purposes or (vii) take or consent to any action that would cause the Trust to be deemed to be an "investment company" required to be registered under the Investment Company Act.

SECTION 2.5.    *Authorization to Enter into Certain Transactions.*

(a)    The Trustees shall conduct the affairs of the Trust in accordance with and subject to the terms of this Trust Agreement. In accordance with the following provisions (i) and (ii), the Trustees shall have the authority to enter into all transactions and agreements determined by the Trustees to be appropriate in exercising the authority, express or implied, otherwise granted to the Trustees, under this Trust Agreement, and to perform all acts in furtherance thereof, including the following:

(i)    As among the Trustees, each Administrative Trustee shall severally have the power and authority to act on behalf of the Trust with respect to the following matters:

(A)    the issuance and sale of the Trust Securities;

(B)    to cause the Trust to enter into, and to execute, deliver and perform on behalf of the Trust, such agreements as may be necessary or desirable in connection with the purposes and function of the Trust, including, without limitation, a common securities subscription agreement and a junior subordinated note purchase agreement;

(C)    assisting in the sale of the Preferred Securities in one or more transactions exempt from registration under the Securities Act, and in compliance with applicable state securities or blue sky laws;

(D)    assisting in the sending of notices (other than notices of default) and other information regarding the Trust Securities and the Notes to the Holders in accordance with this Trust Agreement;

(E)    the appointment of a Paying Agent and Securities Registrar in accordance with this Trust Agreement;

(F)    execution of the Trust Securities on behalf of the Trust in accordance with this Trust Agreement;

(G)    execution and delivery of closing certificates, if any, pursuant to the Purchase Agreement and application for a taxpayer identification number for the Trust;

(H)    preparation and filing of all applicable tax returns and tax information reports that are required to be filed on behalf of the Trust;

(I)    establishing a record date with respect to all actions to be taken hereunder that require a record date to be established, except as provided in Section 6.10(a);

(J)    unless otherwise required by the Delaware Statutory Trust Act to execute on behalf of the Trust (either acting alone or together with the other Administrative Trustees) any documents that such Administrative Trustee has the power to execute pursuant to this Trust Agreement; and

(K)    the taking of any action incidental to the foregoing as such Administrative Trustee may from time to time determine is necessary or advisable to give effect to the terms of this Trust Agreement.

(ii)    As among the Trustees, the Property Trustee shall have the power, duty and authority to act on behalf of the Trust with respect to the following matters:

(A)    the receipt and holding of legal title of the Notes;

(B)    the establishment of the Payment Account;

(C)    the collection of interest, principal and any other payments made in respect of the Notes and the holding of such amounts in the Payment Account;

(D)    the distribution through the Paying Agent of amounts distributable to the Holders in respect of the Trust Securities;

(E)    the exercise of all of the rights, powers and privileges of a holder of the Notes in accordance with the terms of this Trust Agreement;

(F)    the sending of notices of default and other information regarding the Trust Securities and the Notes to the Holders in accordance with this Trust Agreement;

(G)    the distribution of the Trust Property in accordance with the terms of this Trust Agreement;

(H)    to the extent provided in this Trust Agreement, the winding up of the affairs of and liquidation of the Trust, provided that the Administrative Trustees shall have the power, duty and authority to act on behalf of the Trust with respect to the preparation, execution and filing of the certificate of cancellation of the Trust with the Secretary of State of the State of Delaware; and

(I)    the taking of any action incidental to the foregoing as the Property Trustee may from time to time determine is necessary or advisable to give effect to the terms of this Trust Agreement and protect and conserve the Trust Property for the benefit of the Holders (without consideration of the effect of any such action on any particular Holder).

(b)    In connection with the issue and sale of the Preferred Securities, the Depositor shall have the right and responsibility to assist the Trust with respect to, or effect on behalf of the Trust, the following (and any actions taken by the Depositor in furtherance of the following prior to the date of this Trust Agreement are hereby ratified and confirmed in all respects):

(i)    the negotiation of the terms of, and the execution and delivery of, the Purchase Agreement providing for the sale of the Preferred Securities in one or more transactions exempt from registration under the Securities Act, and in compliance with applicable state securities or blue sky laws; and

(ii)    the taking of any other actions necessary or desirable to carry out any of the foregoing activities.

(c)    Notwithstanding anything herein to the contrary, the Administrative Trustees are authorized and directed to conduct the affairs of the Trust and authorized to operate the Trust so that the Trust will not be taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes, so that the Notes will be treated as indebtedness of the Depositor for United States federal income tax purposes and so that the Trust will not be deemed to be an "investment company" required to be registered under the Investment Company Act. In respect thereof, each Administrative Trustee is authorized to take any action, not inconsistent with applicable law, the Certificate of Trust or this Trust Agreement, that such Administrative Trustee determines in his or her discretion to be necessary or desirable for such purposes, as long as such action does not adversely affect in any material respect the interests of the Holders of the Outstanding Preferred Securities. In no event shall the Administrative Trustees be liable to the Trust or the Holders for any failure to comply with this Section 2.5 to the extent that such failure results solely from a change in law or regulation or in the interpretation thereof.

(d)      Any action taken by a Trustee in accordance with its powers shall constitute the act of and serve to bind the Trust. In dealing with any Trustee acting on behalf of the Trust, no Person shall be required to inquire into the authority of such Trustee to bind the Trust. Persons dealing with the Trust are entitled to rely conclusively on the power and authority of any Trustee as set forth in this Trust Agreement.

SECTION 2.6.   *Assets of Trust.*

The assets of the Trust shall consist of the Trust Property.

SECTION 2.7.   *Title to Trust Property.*

(a)      Legal title to all Trust Property shall be vested at all times in the Property Trustee and shall be held and administered by the Property Trustee in trust for the benefit of the Trust and the Holders in accordance with this Trust Agreement.

(b)      The Holders shall not have any right or title to the Trust Property other than the undivided beneficial interest in the assets of the Trust conferred by their Trust Securities and they shall have no right to call for any partition or division of property, profits or rights of the Trust except as described below. The Trust Securities shall be personal property giving only the rights specifically set forth therein and in this Trust Agreement.

## ARTICLE III.

### PAYMENT ACCOUNT; PAYING AGENTS

SECTION 3.1.    *Payment Account.*

(a)      On or prior to the Closing Date, the Property Trustee shall establish the Payment Account. The Property Trustee and the Paying Agent shall have exclusive control and sole right of withdrawal with respect to the Payment Account for the purpose of making deposits in and withdrawals from the Payment Account in accordance with this Trust Agreement. All monies and other property deposited or held from time to time in the Payment Account shall be held by the Property Trustee in the Payment Account for the exclusive benefit of the Holders and for Distribution as herein provided.

(b)      The Property Trustee shall deposit in the Payment Account, promptly upon receipt, all payments of principal of or interest on, and any other payments with respect to, the Notes. Amounts held in the Payment Account shall not be invested by the Property Trustee pending distribution thereof.

SECTION 3.2.    *Appointment of Paying Agents.*

The Paying Agent shall initially be the Property Trustee. The Paying Agent shall make Distributions to Holders from the Payment Account and shall report the amounts of such Distributions to the Property Trustee and the Administrative Trustees. Any Paying Agent shall have the revocable power to withdraw funds from the Payment Account solely for the purpose of

making the Distributions referred to above. The Administrative Trustees may revoke such power and remove the Paying Agent in their sole discretion. Any Person acting as Paying Agent shall be permitted to resign as Paying Agent upon thirty (30) days' written notice to the Administrative Trustees and the Property Trustee. If the Property Trustee shall no longer be the Paying Agent or a successor Paying Agent shall resign or its authority to act be revoked, the Administrative Trustees shall appoint a successor (which shall be a bank or trust company) to act as Paying Agent. Such successor Paying Agent appointed by the Administrative Trustees shall execute and deliver to the Trustees an instrument in which such successor Paying Agent shall agree with the Trustees that as Paying Agent, such successor Paying Agent will hold all sums, if any, held by it for payment to the Holders in trust for the benefit of the Holders entitled thereto until such sums shall be paid to such Holders. The Paying Agent shall return all unclaimed funds to the Property Trustee and upon removal of a Paying Agent such Paying Agent shall also return all funds in its possession to the Property Trustee. The provisions of Article VIII shall apply to the Property Trustee also in its role as Paying Agent, for so long as the Property Trustee shall act as Paying Agent and, to the extent applicable, to any other Paying Agent appointed hereunder. Any reference in this Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise.

## ARTICLE IV.

### DISTRIBUTIONS; REDEMPTION

SECTION 4.1.   *Distributions.*

(a)     The Trust Securities represent undivided beneficial interests in the Trust Property, and Distributions (including any Additional Interest Amounts) will be made on the Trust Securities at the rate and on the dates that payments of interest (including any Additional Interest) are made on the Notes. Accordingly:

(i)     Distributions on the Trust Securities shall be cumulative, and shall accumulate whether or not there are funds of the Trust available for the payment of Distributions. Distributions shall accumulate from June 28, 2005, and, except as provided in clause (ii) below, shall be payable quarterly in arrears on January 30, April 30, July 30 and October 30, of each year, commencing on October 30, 2005. If any date on which a Distribution is otherwise payable on the Trust Securities is not a Business Day, then the payment of such Distribution shall be made on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after each such date until the next succeeding Business Day), except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case, with the same force and effect as if made on such date (each date on which Distributions are payable in accordance with this Section 4.1(a)(i), a "*Distribution Date*");

(ii)     Distributions shall accumulate in respect of the Trust Securities at a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and

thereafter at a variable rate equal to LIBOR plus 4.5% per annum of the Liquidation Amount of the Trust Securities, such rate being the rate of interest payable on the Notes. LIBOR shall be determined by the Calculation Agent in accordance with **Schedule A**. The amount of Distributions payable for any period less than a full Distribution period shall be computed on the basis of a 360-day year and the actual number of days elapsed in the relevant Distribution period. The amount of Distributions payable for any period shall include any Additional Interest Amounts in respect of such period; and.

(iii)    Distributions on the Trust Securities shall be made by the Paying Agent from the Payment Account and shall be payable on each Distribution Date only to the extent that the Trust has funds then on hand and available in the Payment Account for the payment of such Distributions.

(b)    Distributions on the Trust Securities with respect to a Distribution Date shall be payable to the Holders thereof as they appear on the Securities Register for the Trust Securities at the close of business on the relevant record date, which shall be at the close of business on the fifteenth day (whether or not a Business Day) preceding the relevant Distribution Date. Distributions payable on any Trust Securities that are not punctually paid on any Distribution Date as a result of the Depositor having failed to make an interest payment under the Notes will cease to be payable to the Person in whose name such Trust Securities are registered on the relevant record date, and such defaulted Distributions and any Additional Interest Amounts will instead be payable to the Person in whose name such Trust Securities are registered on the special record date, or other specified date for determining Holders entitled to such defaulted Distribution and Additional Interest Amount, established in the same manner, and on the same date, as such is established with respect to the Notes under the Indenture.

(c)    As a condition to the payment of any principal of or interest on the Trust Securities without the imposition of withholding tax, the Administrative Trustees shall require the previous delivery of properly completed and signed applicable U.S. federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) and any other certification acceptable to it to enable the Property Trustee or any Paying Agent to determine their respective duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Trust Securities.

SECTION 4.2.    *Redemption.*

(a)    On each Note Redemption Date and on the stated maturity (or any date of principal repayment upon early maturity) of the Notes and on each other date on (or in respect of) which any principal on the Notes is repaid, the Trust will be required to redeem a Like Amount of Trust Securities at the Redemption Price.

(b)    Notice of redemption shall be given by the Property Trustee by first-class mail, postage prepaid, mailed not less than thirty (30) nor more than sixty (60) days prior to the

Redemption Date to each Holder of Trust Securities to be redeemed, at such Holder's address appearing in the Securities Register. All notices of redemption shall state:

(i)　the Redemption Date;

(ii)　the Redemption Price or, if the Redemption Price cannot be calculated prior to the time the notice is required to be sent, the estimate of the Redemption Price provided pursuant to the Indenture, as calculated by the Depositor, together with a statement that it is an estimate and that the actual Redemption Price will be calculated by the Calculation Agent on the fifth Business Day prior to the Redemption Date (and if an estimate is provided, a further notice shall be sent of the actual Redemption Price on the date that such Redemption Price is calculated);

(iii)　if less than all the Outstanding Trust Securities are to be redeemed, the identification (and, in the case of partial redemption, the respective amounts) and Liquidation Amounts of the particular Trust Securities to be redeemed;

(iv)　that on the Redemption Date, the Redemption Price will become due and payable upon each such Trust Security, or portion thereof, to be redeemed and that Distributions thereon will cease to accumulate on such Trust Security or such portion, as the case may be, on and after said date, except as provided in Section 4.2(d);

(v)　the place or places where the Trust Securities are to be surrendered for the payment of the Redemption Price; and

(vi)　such other provisions as the Property Trustee deems relevant.

(c)　The Trust Securities (or portion thereof) redeemed on each Redemption Date shall be redeemed at the Redemption Price with the proceeds from the contemporaneous redemption or payment at maturity of Notes. Redemptions of the Trust Securities (or portion thereof) shall be made and the Redemption Price shall be payable on each Redemption Date only to the extent that the Trust has funds then on hand and available in the Payment Account for the payment of such Redemption Price. Under the Indenture, the Notes may be redeemed by the Depositor on any Interest Payment Date, at the Depositor's option, on or after July 30, 2010, in whole or in part, from time to time at the Optional Note Redemption Price; *provided*, that the Depositor shall have received the prior approval of any Applicable Insurance Regulatory Authority then required. The Notes may also be redeemed by the Depositor, at its option pursuant to the terms of the Indenture, in whole but not in part, upon the occurrence and during the continuation of an Investment Company Event or a Tax Event, at the Special Note Redemption Price; *provided*, that the Depositor shall have received the prior approval of any Applicable Insurance Regulatory Authority then required.

(d)　If the Property Trustee gives a notice of redemption in respect of any Preferred Securities, then by 10:00 A.M., New York City time, on the Redemption Date, the Depositor shall deposit sufficient funds with the Property Trustee to pay the Redemption Price. If such deposit has been made by such time, then by 12:00 noon, New York City time, on the Redemption Date, the Property Trustee will, with respect to Book-Entry Preferred Securities, irrevocably deposit with the Depositary for such Book-Entry Preferred Securities, to the extent

available therefor, funds sufficient to pay the applicable Redemption Price and will give such Depositary irrevocable instructions and authority to pay the Redemption Price to the Holders of the Preferred Securities. With respect to Preferred Securities that are not Book-Entry Preferred Securities, the Property Trustee will irrevocably deposit with the Paying Agent, to the extent available therefor, funds sufficient to pay the applicable Redemption Price and will give the Paying Agent irrevocable instructions and authority to pay the Redemption Price to the Holders of the Preferred Securities upon surrender of their Preferred Securities Certificates. Notwithstanding the foregoing, Distributions payable on or prior to the Redemption Date for any Trust Securities (or portion thereof) called for redemption shall be payable to the Holders of such Trust Securities as they appear on the Securities Register on the relevant record dates for the related Distribution Dates. If notice of redemption shall have been given and funds deposited as required, then upon the date of such deposit, all rights of Holders holding Trust Securities (or portion thereof) so called for redemption will cease, except the right of such Holders to receive the Redemption Price and any Distribution payable in respect of the Trust Securities on or prior to the Redemption Date, but without interest, and, in the case of a partial redemption, the right of such Holders to receive a new Trust Security or Securities of authorized denominations, in aggregate Liquidation Amount equal to the unredeemed portion of such Trust Security or Securities, and such Securities (or portion thereof) called for redemption will cease to be Outstanding. In the event that any date on which any Redemption Price is payable is not a Business Day, then payment of the Redemption Price payable on such date will be made on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after each such date until the next succeeding Business Day), except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case, with the same force and effect as if made on such date. In the event that payment of the Redemption Price in respect of any Trust Securities (or portion thereof) called for redemption is improperly withheld or refused and not paid either by the Trust, Distributions on such Trust Securities (or portion thereof) will continue to accumulate, as set forth in Section 4.1, from the Redemption Date originally established by the Trust for such Trust Securities (or portion thereof) to the date such Redemption Price is actually paid, in which case the actual payment date will be the date fixed for redemption for purposes of calculating the Redemption Price.

(e)     Subject to Section 4.3(a), if less than all the Outstanding Trust Securities are to be redeemed on a Redemption Date, then the aggregate Liquidation Amount of Trust Securities to be redeemed shall be allocated *pro rata* to the Common Securities and the Preferred Securities based upon the relative aggregate Liquidation Amounts of the Common Securities and the Preferred Securities. The Preferred Securities to be redeemed shall be selected on a *pro rata* basis based upon their respective Liquidation Amounts not more than sixty (60) days prior to the Redemption Date by the Property Trustee from the Outstanding Preferred Securities not previously called for redemption; *provided*, that with respect to Holders that would be required to hold less than one hundred (100) but more than zero (0) Trust Securities as a result of such redemption, the Trust shall redeem Trust Securities of each such Holder so that after such redemption such Holder shall hold either one hundred (100) Trust Securities or such Holder no longer holds any Trust Securities, and shall use such method (including, without limitation, by lot) as the Trust shall deem fair and appropriate; and *provided*, *further*, that so long as the Preferred Securities are Book-Entry Preferred Securities, such selection shall be made in accordance with the Applicable Depositary Procedures for the Preferred Securities by such

Depositary. The Property Trustee shall promptly notify the Securities Registrar in writing of the Preferred Securities (or portion thereof) selected for redemption and, in the case of any Preferred Securities selected for partial redemption, the Liquidation Amount thereof to be redeemed. For all purposes of this Trust Agreement, unless the context otherwise requires, all provisions relating to the redemption of Preferred Securities shall relate, in the case of any Preferred Securities redeemed or to be redeemed only in part, to the portion of the aggregate Liquidation Amount of Preferred Securities that has been or is to be redeemed.

(f)     The Trust in issuing the Trust Securities may use "CUSIP" numbers (if then generally in use), and, if so, the Property Trustee shall indicate the "CUSIP" numbers of the Trust Securities in notices of redemption and related materials as a convenience to Holders; *provided*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Trust Securities or as contained in any notice of redemption and related materials.

SECTION 4.3.     *Subordination of Common Securities.*

(a)     Payment of Distributions (including any Additional Interest Amounts) on, the Redemption Price of and the Liquidation Distribution in respect of, the Trust Securities, as applicable, shall be made, *pro rata* among the Common Securities and the Preferred Securities based on the Liquidation Amount of the respective Trust Securities; *provided*, that if on any Distribution Date, Redemption Date or Liquidation Date an Event of Default shall have occurred and be continuing, no payment of any Distribution (including any Additional Interest Amounts) on, Redemption Price of or Liquidation Distribution in respect of, any Common Security, and no other payment on account of the redemption, liquidation or other acquisition of Common Securities, shall be made unless payment in full of all accumulated and unpaid Distributions (including any Additional Interest Amounts) on all Outstanding Preferred Securities for all Distribution periods terminating on or prior thereto, or in the case of payment of the Redemption Price the full amount of such Redemption Price on all Outstanding Preferred Securities then called for redemption, or in the case of payment of the Liquidation Distribution the full amount of such Liquidation Distribution on all Outstanding Preferred Securities, shall have been made or provided for, and all funds immediately available to the Property Trustee shall first be applied to the payment in full in cash of all Distributions (including any Additional Interest Amounts) on, or the Redemption Price of or the Liquidation Distribution in respect of, the Preferred Securities then due and payable.

(b)     In the case of the occurrence of any Event of Default, the Holders of the Common Securities shall have no right to act with respect to any such Event of Default under this Trust Agreement until all such Events of Default with respect to the Preferred Securities have been cured, waived or otherwise eliminated. Until all such Events of Default under this Trust Agreement with respect to the Preferred Securities have been so cured, waived or otherwise eliminated, the Property Trustee shall act solely on behalf of the Holders of the Preferred Securities and not on behalf of the Holders of the Common Securities, and only the Holders of all the Preferred Securities will have the right to direct the Property Trustee to act on their behalf.

SECTION 4.4.    *Payment Procedures.*

Payments of Distributions (including any Additional Interest Amounts), the Redemption Price, Liquidation Amount or any other amounts in respect of the Preferred Securities shall be made by wire transfer at such place and to such account at a banking institution in the United States as may be designated in writing at least ten (10) Business Days prior to the date for payment by the Person entitled thereto unless proper written transfer instructions have not been received by the relevant record date, in which case such payments shall be made by check mailed to the address of such Person as such address shall appear in the Securities Register. If any Preferred Securities are held by a Depositary, such Distributions thereon shall be made to the Depositary in immediately available funds. Payments in respect of the Common Securities shall be made in such manner as shall be mutually agreed between the Property Trustee and the Holder of all the Common Securities.

SECTION 4.5.    *Withholding Tax.*

(a)    The Trust and the Administrative Trustees shall comply with all withholding and backup withholding tax requirements under United States federal, state and local law. The Administrative Trustees on behalf of the Trust shall request, and the Holders shall provide to the Trust, such forms or certificates as are necessary to establish an exemption from withholding and backup withholding tax with respect to each Holder and any representations and forms as shall reasonably be requested by the Administrative Trustees on behalf of the Trust to assist it in determining the extent of, and in fulfilling, its withholding and backup withholding tax obligations. The Administrative Trustees shall file required forms with applicable jurisdictions and, unless an exemption from withholding and backup withholding tax is properly established by a Holder, shall remit amounts withheld with respect to the Holder to applicable jurisdictions. To the extent that the Trust is required to withhold and pay over any amounts to any jurisdiction with respect to Distributions or allocations to any Holder, the amount withheld shall be deemed to be a Distribution in the amount of the withholding to the Holder. In the event of any claimed overwithholding, Holders shall be limited to an action against the applicable jurisdiction. If the amount required to be withheld was not withheld from actual Distributions made, the Administrative Trustees on behalf of the Trust may reduce subsequent Distributions by the amount of such required withholding.

SECTION 4.6.    *Tax Returns and Other Reports.*

The Administrative Trustees shall prepare (or cause to be prepared) at the principal office of the Trust in the United States, as defined for purposes of Treasury regulations section 301.7701-7, at the Depositor's expense, and file, all United States federal, state and local tax and information returns and reports required to be filed by or in respect of the Trust. The Administrative Trustees shall prepare at the principal office of the Trust in the United States, as defined for purposes of Treasury regulations section 301.7701-7, and furnish (or cause to be prepared and furnished), by January 31 in each taxable year of the Trust to each Holder all Internal Revenue Service forms and returns required to be provided by the Trust. The Administrative Trustees shall provide the Depositor, Cohen Bros. & Co. and the Property Trustee with a copy of all such returns and reports promptly after such filing or furnishing.

SECTION 4.7.   *Payment of Taxes, Duties, Etc. of the Trust.*

Upon receipt under the Notes of Additional Tax Sums and upon the written direction of the Administrative Trustees, the Property Trustee shall promptly pay, solely out of monies on deposit pursuant to this Trust Agreement, any Additional Taxes imposed on the Trust by the United States or any other taxing authority.

SECTION 4.8.   *Payments under Indenture or Pursuant to Direct Actions.*

Any amount payable hereunder to any Holder of Preferred Securities shall be reduced by the amount of any corresponding payment such Holder (or any Owner with respect thereto) has directly received pursuant to Section 5.8 of the Indenture or Section 6.10(b) of this Trust Agreement.

SECTION 4.9.   *Exchanges.*

(a)   If at any time the Depositor or any of its Affiliates (in either case, a *"Depositor Affiliate"*) is the Owner or Holder of any Preferred Securities, such Depositor Affiliate shall have the right to deliver to the Property Trustee all or such portion of its Preferred Securities as it elects and, subject to compliance with Sections 2.2 and 3.5 of the Indenture, receive, in exchange therefor, a Like Amount of Notes. Such election shall be exercisable effective on any Distribution Date by such Depositor Affiliate delivering to the Property Trustee (i) at least ten (10) Business Days prior to the Distribution Date on which such exchange is to occur, the registration instructions and the documentation, if any, required pursuant to Sections 2.2 and 3.5 of the Indenture to enable the Indenture Trustee to issue the requested Like Amount of Notes, (ii) a written notice of such election specifying the Liquidation Amount of Preferred Securities with respect to which such election is being made and the Distribution Date on which such exchange shall occur, which Distribution Date shall be not less than ten (10) Business Days after the date of receipt by the Property Trustee of such election notice and (iii) shall be conditioned upon such Depositor Affiliate having delivered or caused to be delivered to the Property Trustee or its designee the Preferred Securities that are the subject of such election by 10:00 A.M. New York time, on the Distribution Date on which such exchange is to occur. After the exchange, such Preferred Securities will be canceled and will no longer be deemed to be Outstanding and all rights of the Depositor Affiliate with respect to such Preferred Securities will cease.

(b)   In the case of an exchange described in Section 4.9(a), the Property Trustee on behalf of the Trust will, on the date of such exchange, exchange Notes having a principal amount equal to a proportional amount of the aggregate Liquidation Amount of the Outstanding Common Securities, based on the ratio of the aggregate Liquidation Amount of the Preferred Securities exchanged pursuant to Section 4.9(a) divided by the aggregate Liquidation Amount of the Preferred Securities Outstanding immediately prior to such exchange, for such proportional amount of Common Securities held by the Depositor (which contemporaneously shall be canceled and no longer be deemed to be Outstanding); *provided,* that the Depositor delivers or causes to be delivered to the Property Trustee or its designee the required amount of Common Securities to be exchanged by 10:00 A.M. New York time, on the Distribution Date on which such exchange is to occur.

SECTION 4.10. *Calculation Agent.*

(a) The Property Trustee shall initially, and, subject to the immediately following sentence, for so long as it holds any of the Notes, be the Calculation Agent for purposes of determining LIBOR for each Distribution Date. The Calculation Agent may be removed by the Administrative Trustees at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Administrative Trustees, the Administrative Trustees will promptly appoint as a replacement Calculation Agent the London office of a leading bank which is engaged in transactions in six-month Eurodollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Administrative Trustee or its Affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b) The Calculation Agent shall be required to agree that, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will calculate the interest rate (rounded to the nearest cent, with half a cent being rounded upwards) for the related Distribution Date, and will communicate such rate and amount to the Depositor, the Administrative Trustees, the Note Trustee, each Paying Agent and the Depositary. The Calculation Agent will also specify to the Administrative Trustee the quotations upon which the foregoing rates and amounts are based and, in any event, the Calculation Agent shall notify the Administrative Trustees before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the foregoing rates and amounts or (ii) it has not determined and is not in the process of determining the foregoing rates and amounts, together with its reasons therefor. The Calculation Agent's determination of the foregoing rates and amounts for any Distribution Date will (in the absence of manifest error) be final and binding upon all parties. For the sole purpose of calculating the interest rate for the Trust Securities, "Business Day" shall be defined as any day on which dealings in deposits in Dollars are transacted in the London interbank market.

SECTION 4.11. Certain Accounting Matters.

(a) At all times during the existence of the Trust, the Administrative Trustees shall keep, or cause to be kept at the principal office of the Trust in the United States, as defined for purposes of Treasury Regulations section 301.7701-7, full books of account, records and supporting documents, which shall reflect in reasonable detail each transaction of the Trust. The books of account shall be maintained on the accrual method of accounting, in accordance with generally accepted accounting principles, consistently applied.

(b) The Administrative Trustees shall either (i) if the Depositor is then subject to such reporting requirements, cause each Form 10-K and Form 10-Q prepared by the Depositor and filed with the Commission in accordance with the Exchange Act to be delivered to each Holder, with a copy to the Property Trustee, within thirty (30) days after the filing thereof or (ii) cause to be prepared at the principal office of the Trust in the United States, as defined for purposes of Treasury Regulations section 301.7701-7, and delivered to each of the Holders, with a copy to the Property Trustee, within ninety (90) days after the end of each Fiscal Year, annual financial

statements of the Trust, including a balance sheet of the Trust as of the end of such Fiscal Year, and the related statements of income or loss.

(c)     If the Depositor intends to file its annual and quarterly information with the Commission in electronic form pursuant to Regulation S-T of the Commission using the Commission's Electronic Data Gathering, Analysis and Retrieval ("*EDGAR*") system, the Administrative Trustees shall notify the Property Trustee in the manner prescribed herein of each such annual and quarterly filing. The Property Trustee is hereby authorized and directed to access the EDGAR system for purposes of retrieving the financial information so filed. Compliance with the foregoing shall constitute delivery by the Administrative Trustees of its financial statements to the Property Trustee in compliance with the provisions of Section 314(a) of the Trust Indenture Act, if applicable. The Property Trustee shall have no duty to search for or obtain any electronic or other filings that the Depositor makes with the Commission, regardless of whether such filings are periodic, supplemental or otherwise. Delivery of reports, information and documents to the Property Trustee pursuant to this Section 4.11(c) shall be solely for purposes of compliance with this Section 4.11 and, if applicable, with Section 314(a) of the Trust Indenture Act. The Property Trustee's receipt of such reports, information and documents shall not constitute notice to it of the content thereof or any matter determinable from the content thereof, including the Depositor's compliance with any of its covenants hereunder, as to which the Property Trustee is entitled to rely upon Officers' Certificates.

(d)     The Trust shall maintain one or more bank accounts in the United States, as defined for purposes of Treasury Regulations section 301.7701-7, in the name and for the sole benefit of the Trust; *provided, however,* that all payments of funds in respect of the Notes held by the Property Trustee shall be made directly to the Payment Account and no other funds of the Trust shall be deposited in the Payment Account. The sole signatories for such accounts (including the Payment Account) shall be designated by the Property Trustee.

## ARTICLE V.

### SECURITIES

SECTION 5.1.     *Initial Ownership.*

Upon the creation of the Trust and the contribution by the Depositor referred to in Section 2.3 and until the issuance of the Trust Securities, and at any time during which no Trust Securities are Outstanding, the Depositor shall be the sole beneficial owner of the Trust.

SECTION 5.2.     *Authorized Trust Securities.*

The Trust shall be authorized to issue one series of Preferred Securities having an aggregate Liquidation Amount of $20,000,000 and one series of Common Securities having an aggregate Liquidation Amount of $619,000.

SECTION 5.3.    *Issuance of the Common Securities; Subscription and Purchase of Notes.*

On the Closing Date, an Administrative Trustee, on behalf of the Trust, shall execute and deliver to the Depositor Common Securities Certificates, registered in the name of the Depositor, evidencing an aggregate of 619 Common Securities having an aggregate Liquidation Amount of $619,000, against receipt by the Trust of the aggregate purchase price of such Common Securities of $619,000. Contemporaneously therewith and with the sale by the Trust to the Holders of an aggregate of 20,000 Preferred Securities having an aggregate Liquidation Amount of $20,000,000 an Administrative Trustee, on behalf of the Trust, shall purchase from the Depositor Notes, to be registered in the name of the Property Trustee on behalf of the Trust and having an aggregate principal amount equal to $20,619,000, and, in satisfaction of the purchase price for such Notes, the Property Trustee, on behalf of the Trust, shall deliver to the Depositor the sum of $20,619,000 (being the aggregate amount paid by the Holders for the Preferred Securities, and the amount paid by the Depositor for the Common Securities).

SECTION 5.4.    *The Securities Certificates.*

(a)    The Preferred Securities Certificates shall be issued in minimum denominations of $100,000 Liquidation Amount and integral multiples of $1,000 in excess thereof, and the Common Securities Certificates shall be issued in minimum denominations of $10,000 Liquidation Amount and integral multiples of $1,000 in excess thereof. The Securities Certificates shall be executed on behalf of the Trust by manual or facsimile signature of at least one Administrative Trustee. Securities Certificates bearing the signatures of individuals who were, at the time when such signatures shall have been affixed, authorized to sign such Securities Certificates on behalf of the Trust shall be validly issued and entitled to the benefits of this Trust Agreement, notwithstanding that such individuals or any of them shall have ceased to be so authorized prior to the delivery of such Securities Certificates or did not have such authority at the date of delivery of such Securities Certificates.

(b)    On the Closing Date, upon the written order of an authorized officer of the Depositor, the Administrative Trustees shall cause Securities Certificates to be executed on behalf of the Trust and delivered, without further corporate action by the Depositor, in authorized denominations.

(c)    The Preferred Securities issued to QIBs/QPs may be, except as provided in Section 5.6, Book-Entry Preferred Securities issued in the form of one or more Global Preferred Securities registered in the name of the Depositary, or its nominee and deposited with the Depositary or a custodian for the Depositary for credit by the Depositary to the respective accounts of the Depositary Participants thereof (or such other accounts as they may direct). The Preferred Securities issued to a Person other than a QIB/QP shall be issued in the form of Definitive Preferred Securities Certificates.

(d)    A Preferred Security shall not be valid until authenticated by the manual signature of an authorized signatory of the Property Trustee. Such signature shall be conclusive evidence that the Preferred Security has been authenticated under this Trust Agreement. Upon written order of the Trust signed by one Administrative Trustee, the Property Trustee shall authenticate

the Preferred Securities for original issue. The Property Trustee may appoint an authenticating agent that is a U.S. Person acceptable to the Trust to authenticate the Preferred Securities. A Common Security need not be so authenticated and shall be valid upon execution by one or more Administrative Trustees. The form of this certificate of authentication can be found in Section 5.13.

SECTION 5.5.    *Rights of Holders.*

The Trust Securities shall have no preemptive or similar rights and when issued and delivered to Holders against payment of the purchase price therefor will be fully paid and non-assessable by the Trust.    Except as provided in Section 5.11(b), the Holders of the Trust Securities, in their capacities as such, shall be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the General Corporation Law of the State of Delaware.

SECTION 5.6.    *Book-Entry Preferred Securities.*

(a)    A Global Preferred Security may be exchanged, in whole or in part, for Definitive Preferred Securities Certificates registered in the names of the Owners only if such exchange complies with Section 5.7 and (i) the Depositary advises the Administrative Trustees and the Property Trustee in writing that the Depositary is no longer willing or able properly to discharge its responsibilities with respect to the Global Preferred Security, and no qualified successor is appointed by the Administrative Trustees within ninety (90) days of receipt of such notice, (ii) the Depositary ceases to be a clearing agency registered under the Exchange Act and the Administrative Trustees fail to appoint a qualified successor within ninety (90) days of obtaining knowledge of such event, (iii) the Administrative Trustees at their option advise the Property Trustee in writing that the Trust elects to terminate the book-entry system through the Depositary or (iv) a Note Event of Default has occurred and is continuing. Upon the occurrence of any event specified in clause (i), (ii), (iii) or (iv) above, the Administrative Trustees shall notify the Depositary and instruct the Depositary to notify all Owners of Book-Entry Preferred Securities, the Delaware Trustee and the Property Trustee of the occurrence of such event and of the availability of the Definitive Preferred Securities Certificates to Owners of the Preferred Securities requesting the same. Upon the issuance of Definitive Preferred Securities Certificates, the Trustees shall recognize the Holders of the Definitive Preferred Securities Certificates as Holders.  Notwithstanding the foregoing, if an Owner of a beneficial interest in a Global Preferred Security wishes at any time to transfer an interest in such Global Preferred Security to a Person other than a QIB/QP, such transfer shall be effected, subject to the Applicable Depositary Procedures, in accordance with the provisions of this Section 5.6 and Section 5.7, and the transferee shall receive a Definitive Preferred Securities Certificate in connection with such transfer.  A holder of a Definitive Preferred Securities Certificate that is a QIB/QP may, upon request and in accordance with the provisions of this Section 5.6 and Section 5.7, exchange such Definitive Preferred Securities Certificate for a beneficial interest in a Global Preferred Security.

(b)    If any Global Preferred Security is to be exchanged for Definitive Preferred Securities Certificates or canceled in part, or if any Definitive Preferred Securities Certificate is to be exchanged in whole or in part for any Global Preferred Security, then either (i) such Global Preferred Security shall be so surrendered for exchange or cancellation as provided in this Article

V or (ii) the aggregate Liquidation Amount represented by such Global Preferred Security shall be reduced, subject to Section 5.4, or increased by an amount equal to the Liquidation Amount represented by that portion of the Global Preferred Security to be so exchanged or canceled, or equal to the Liquidation Amount represented by such Definitive Preferred Securities Certificates to be so exchanged for any Global Preferred Security, as the case may be, by means of an appropriate adjustment made on the records of the Securities Registrar, whereupon the Property Trustee, in accordance with the Applicable Depositary Procedures, shall instruct the Depositary or its authorized representative to make a corresponding adjustment to its records. Upon any such surrender to the Administrative Trustees or the Securities Registrar of any Global Preferred Security or Securities by the Depositary, accompanied by registration instructions, the Administrative Trustees, or any one of them, shall execute the Definitive Preferred Securities Certificates in accordance with the instructions of the Depositary. None of the Securities Registrar or the Trustees shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be fully protected in relying on, such instructions.

(c)     Every Definitive Preferred Securities Certificate executed and delivered upon registration or transfer of, or in exchange for or in lieu of, a Global Preferred Security or any portion thereof shall be executed and delivered in the form of, and shall be, a Global Preferred Security, unless such Definitive Preferred Securities Certificate is registered in the name of a Person other than the Depositary for such Global Preferred Security or a nominee thereof.

(d)     The Depositary or its nominee, as registered owner of a Global Preferred Security, shall be the Holder of such Global Preferred Security for all purposes under this Trust Agreement and the Global Preferred Security, and Owners with respect to a Global Preferred Security shall hold such interests pursuant to the Applicable Depositary Procedures. The Securities Registrar and the Trustees shall be entitled to deal with the Depositary for all purposes of this Trust Agreement relating to the Global Preferred Securities (including the payment of the Liquidation Amount of and Distributions on the Book-Entry Preferred Securities represented thereby and the giving of instructions or directions by Owners of Book-Entry Preferred Securities represented thereby and the giving of notices) as the sole Holder of the Book-Entry Preferred Securities represented thereby and shall have no obligations to the Owners thereof. None of the Trustees nor the Securities Registrar shall have any liability in respect of any transfers effected by the Depositary.

(e)     The rights of the Owners of the Book-Entry Preferred Securities shall be exercised only through the Depositary and shall be limited to those established by law, the Applicable Depositary Procedures and agreements between such Owners and the Depositary and/or the Depositary Participants; provided, that solely for the purpose of determining whether the Holders of the requisite amount of Preferred Securities have voted on any matter provided for in this Trust Agreement, to the extent that Preferred Securities are represented by a Global Preferred Security, the Trustees may conclusively rely on, and shall be fully protected in relying on, any written instrument (including a proxy) delivered to the Property Trustee by the Depositary setting forth the Owners' votes or assigning the right to vote on any matter to any other Persons either in whole or in part. To the extent that Preferred Securities are represented by a Global Preferred Security, the initial Depositary will make book-entry transfers among the Depositary Participants and receive and transmit payments on the Preferred Securities that are

represented by a Global Preferred Security to such Depositary Participants, and none of the Depositor or the Trustees shall have any responsibility or obligation with respect thereto.

(f)      To the extent that a notice or other communication to the Holders is required under this Trust Agreement, for so long as Preferred Securities are represented by a Global Preferred Security, the Trustees shall give all such notices and communications to the Depositary, and shall have no obligations to the Owners.

SECTION 5.7.     *Registration of Transfer and Exchange of Preferred Securities Certificates.*

(a)      The Property Trustee shall keep or cause to be kept, at the Corporate Trust Office, a register or registers (the *"Securities Register"*) in which the registrar and transfer agent with respect to the Trust Securities (the *"Securities Registrar"*), subject to such reasonable regulations as it may prescribe, shall provide for the registration of Preferred Securities Certificates and Common Securities Certificates and registration of transfers and exchanges of Preferred Securities Certificates as herein provided. The Person acting as the Property Trustee shall at all times also be the Securities Registrar. The provisions of Article VIII shall apply to the Property Trustee in its role as Securities Registrar.

(b)      Subject to Section 5.7(d), upon surrender for registration of transfer of any Preferred Securities Certificate at the office or agency maintained pursuant to Section 5.7(f), the Administrative Trustees or any one of them shall execute by manual or facsimile signature and deliver to the Property Trustee, and the Property Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Preferred Securities Certificates in authorized denominations of a like aggregate Liquidation Amount as may be required by this Trust Agreement dated the date of execution by such Administrative Trustee or Trustees. At the option of a Holder, Preferred Securities Certificates may be exchanged for other Preferred Securities Certificates in authorized denominations and of a like aggregate Liquidation Amount upon surrender of the Preferred Securities Certificate to be exchanged at the office or agency maintained pursuant to Section 5.7(f). Whenever any Preferred Securities Certificates are so surrendered for exchange, the Administrative Trustees or any one of them shall execute by manual or facsimile signature and deliver to the Property Trustee, and the Property Trustee shall authenticate and deliver, the Preferred Securities Certificates that the Holder making the exchange is entitled to receive.

(c)      The Securities Registrar shall not be required, (i) to issue, register the transfer of or exchange any Preferred Security during a period beginning at the opening of business fifteen (15) days before the day of selection for redemption of such Preferred Securities pursuant to Article IV and ending at the close of business on the day of mailing of the notice of redemption or (ii) to register the transfer of or exchange any Preferred Security so selected for redemption in whole or in part, except, in the case of any such Preferred Security to be redeemed in part, any portion thereof not to be redeemed.

(d)      Every Preferred Securities Certificate presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Securities Registrar duly executed by the Holder or such

Holder's attorney duly authorized in writing and accompanied by a certificate of the transferor substantially in the form set forth as Exhibit E hereto.

(e)  No service charge shall be made for any registration of transfer or exchange of Preferred Securities Certificates, but the Property Trustee on behalf of the Trust may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Preferred Securities Certificates.

(f)  The Administrative Trustees shall designate an office or offices or agency or agencies where Preferred Securities Certificates may be surrendered for registration of transfer or exchange and initially designate the Corporate Trust Office as its office and agency for such purposes. The Administrative Trustees shall give prompt written notice to the Depositor, the Property Trustee and to the Holders of any change in the location of any such office or agency.

(g)  The Preferred Securities may only be transferred to a "Qualified Purchaser" as such term is defined in Section 2(a)(51) of the Investment Company Act. Neither the Property Trustee nor the Securities Registrar shall be responsible for ascertaining whether any transfer hereunder complies with the registration provisions of or any exemptions from the Securities Act, applicable state securities laws or the applicable laws of any other jurisdiction, ERISA, the Code or the Investment Company Act; provided, that if a certificate is specifically required by the express terms of this Section 5.7 to be delivered to the Trustee or the Securities Registrar, such party shall be under a duty to receive and examine the same to determine whether or not the certificate substantially conforms on its face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate does not comply with such terms.

SECTION 5.8.  *Mutilated, Destroyed, Lost or Stolen Securities Certificates.*

(a)  If any mutilated Securities Certificate shall be surrendered to the Securities Registrar together with such security or indemnity as may be required by the Securities Registrar to save each of the Trustees harmless, the Administrative Trustees, or any one of them, on behalf of the Trust, shall execute and make available for delivery in exchange therefor a new Securities Certificate of like class, tenor and denomination.

(b)  If the Securities Registrar shall receive evidence to its satisfaction of the destruction, loss or theft of any Securities Certificate and there shall be delivered to the Securities Registrar such security or indemnity as may be required by it to save each of the Trustees harmless, then in the absence of notice that such Securities Certificate shall have been acquired by a protected purchaser, the Administrative Trustees, or any one of them, on behalf of the Trust, shall execute and make available for delivery, and, with respect to Preferred Securities, the Property Trustee shall authenticate, in exchange for or in lieu of any such destroyed, lost or stolen Securities Certificate, a new Securities Certificate of like class, tenor and denomination.

(c)  In connection with the issuance of any new Securities Certificate under this Section 5.8, the Administrative Trustees or the Securities Registrar may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

(d)    Any duplicate Securities Certificate issued pursuant to this Section 5.8 shall constitute conclusive evidence of an undivided beneficial interest in the assets of the Trust corresponding to that evidenced by the mutilated, lost, stolen or destroyed Securities Certificate, as if originally issued, whether or not the lost, stolen or destroyed Securities Certificate shall be found at any time.

(e)    If any such mutilated, destroyed, lost or stolen Securities Certificate has become or is about to become due and payable, the Depositor in its discretion may provide the Administrative Trustee with the funds to pay such Trust Security and upon receipt of such funds, the Administrative Trustee shall pay such Trust Security instead of issuing a new Securities Certificate.

(f)    The provisions of this Section 5.8 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement of mutilated, destroyed, lost or stolen Securities Certificates.

SECTION 5.9.    *Persons Deemed Holders.*

The Trustees and the Securities Registrar shall each treat the Person in whose name any Securities Certificate shall be registered in the Securities Register as the owner of such Securities Certificate for the purpose of receiving Distributions and for all other purposes whatsoever, and none of the Trustees and the Securities Registrar shall be bound by any notice to the contrary.

SECTION 5.10.    *Cancellation.*

All Preferred Securities Certificates surrendered for registration of transfer or exchange or for payment shall, if surrendered to any Person other than the Property Trustee, be delivered to the Property Trustee, and any such Preferred Securities Certificates and Preferred Securities Certificates surrendered directly to the Property Trustee for any such purpose shall be promptly canceled by it. The Administrative Trustees may at any time deliver to the Property Trustee for cancellation any Preferred Securities Certificates previously delivered hereunder that the Administrative Trustees may have acquired in any manner whatsoever, and all Preferred Securities Certificates so delivered shall be promptly canceled by the Property Trustee. No Preferred Securities Certificates shall be executed and delivered in lieu of or in exchange for any Preferred Securities Certificates canceled as provided in this Section 5.10, except as expressly permitted by this Trust Agreement. All canceled Preferred Securities Certificates shall be retained by the Property Trustee in accordance with its customary practices.

SECTION 5.11.    *Ownership of Common Securities by Depositor.*

(a)    On the Closing Date, the Depositor shall acquire, and thereafter shall retain, beneficial and record ownership of the Common Securities. Neither the Depositor nor any successor Holder of the Common Securities may transfer less than all the Common Securities, and the Depositor or any such successor Holder may transfer the Common Securities only (i) in connection with a consolidation or merger of the Depositor into another Person, or any conveyance, transfer or lease by the Depositor of its properties and assets substantially as an entirety to any Person (in which event such Common Securities will be transferred to such surviving entity, transferee or lessee, as the case may be), pursuant to Section 8.1 of the

Indenture or (ii) to the Depositor or an Affiliate of the Depositor, in each such case in compliance with applicable law (including the Securities Act, and applicable state securities and blue sky laws). To the fullest extent permitted by law, any attempted transfer of the Common Securities other than as set forth in the immediately preceding sentence shall be void. The Administrative Trustees shall cause each Common Securities Certificate issued to the Depositor to contain a legend stating substantially "THIS CERTIFICATE IS NOT TRANSFERABLE EXCEPT IN COMPLIANCE WITH APPLICABLE LAW AND SECTION 5.11 OF THE TRUST AGREEMENT."

(b)    Any Holder of the Common Securities shall be liable for the debts and obligations of the Trust in the manner and to the extent set forth with respect to the Depositor and agrees that it shall be subject to all liabilities to which the Depositor may be subject and, prior to becoming such a Holder, shall deliver to the Administrative Trustees an instrument of assumption satisfactory to such Trustees.

SECTION 5.12.    *Restricted Legends.*

(a)    Each Preferred Security Certificate shall bear a legend in substantially the following form:

"[IF THIS SECURITY IS A GLOBAL SECURITY INSERT: THIS PREFERRED SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE TRUST AGREEMENT HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITORY TRUST COMPANY ("DTC") OR A NOMINEE OF DTC. THIS PREFERRED SECURITY IS EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN DTC OR ITS NOMINEE ONLY IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE TRUST AGREEMENT, AND NO TRANSFER OF THIS PREFERRED SECURITY (OTHER THAN A TRANSFER OF THIS PREFERRED SECURITY AS A WHOLE BY DTC TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC) MAY BE REGISTERED EXCEPT IN LIMITED CIRCUMSTANCES.

UNLESS THIS PREFERRED SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO Dunmore Homes Statutory Trust I OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY PREFERRED SECURITY ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THE PREFERRED SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION

UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND SUCH PREFERRED SECURITIES OR ANY INTEREST THEREIN, MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF ANY PREFERRED SECURITIES IS HEREBY NOTIFIED THAT THE SELLER OF THE PREFERRED SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A UNDER THE SECURITIES ACT.

THE HOLDER OF THE PREFERRED SECURITIES REPRESENTED BY THIS CERTIFICATE AGREES FOR THE BENEFIT OF THE TRUST AND THE DEPOSITOR THAT (A) SUCH PREFERRED SECURITIES MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY (I) TO THE TRUST, OR (II) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED PURCHASER" (AS DEFINED IN SECTION 2(A)(51) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), AND (B) THE HOLDER WILL NOTIFY ANY PURCHASER OF ANY PREFERRED SECURITIES FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

THE PREFERRED SECURITIES WILL BE ISSUED AND MAY BE TRANSFERRED ONLY IN BLOCKS HAVING AN AGGREGATE LIQUIDATION AMOUNT OF NOT LESS THAN $100,000. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY ATTEMPTED TRANSFER OF PREFERRED SECURITIES, OR ANY INTEREST THEREIN, IN A BLOCK HAVING AN AGGREGATE LIQUIDATION AMOUNT OF LESS THAN $100,000 AND MULTIPLES OF $1,000 IN EXCESS THEREOF SHALL BE DEEMED TO BE VOID AND OF NO LEGAL EFFECT WHATSOEVER. TO THE FULLEST EXTENT PERMITTED BY LAW, ANY SUCH PURPORTED TRANSFEREE SHALL BE DEEMED NOT TO BE THE HOLDER OF SUCH PREFERRED SECURITIES FOR ANY PURPOSE, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF PRINCIPAL OF OR INTEREST ON SUCH PREFERRED SECURITIES, OR ANY INTEREST THEREIN, AND SUCH PURPORTED TRANSFEREE SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN SUCH PREFERRED SECURITIES. -

THE HOLDER OF THIS SECURITY, OR ANY INTEREST THEREIN, BY ITS ACCEPTANCE HEREOF OR THEREOF ALSO AGREES, REPRESENTS AND WARRANTS THAT IT IS NOT AN EMPLOYEE BENEFIT, INDIVIDUAL RETIREMENT ACCOUNT OR OTHER PLAN OR ARRANGEMENT SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") (EACH A "PLAN"), OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF ANY PLAN'S INVESTMENT IN THE ENTITY, AND NO PERSON INVESTING "PLAN ASSETS" OF ANY PLAN MAY ACQUIRE OR HOLD THIS PREFERRED SECURITY OR ANY INTEREST THEREIN. ANY PURCHASER OR HOLDER OF THE PREFERRED SECURITIES OR ANY INTEREST THEREIN WILL BE

DEEMED TO HAVE REPRESENTED BY ITS PURCHASE AND HOLDING THEREOF THAT IT IS NOT AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF SECTION 3(3) OF ERISA, OR A PLAN TO WHICH SECTION 4975 OF THE CODE IS APPLICABLE, A TRUSTEE OR OTHER PERSON ACTING ON BEHALF OF AN EMPLOYEE BENEFIT PLAN OR PLAN, OR ANY OTHER PERSON OR ENTITY USING THE ASSETS OF ANY EMPLOYEE BENEFIT PLAN OR PLAN TO FINANCE SUCH PURCHASE."

(b)    The above legend shall not be removed from any of the Preferred Securities Certificates unless there is delivered to the Property Trustee and the Depositor satisfactory evidence, which may include an opinion of counsel, as may be reasonably required to ensure that any future transfers thereof may be made without restriction under the provisions of the Securities Act and other applicable law. Upon provision of such satisfactory evidence, one or more of the Administrative Trustees on behalf of the Trust shall execute and deliver to the Property Trustee, and the Property Trustee shall deliver, at the written direction of the Administrative Trustees and the Depositor, Preferred Securities Certificates that do not bear the legend.

SECTION 5.13.    *Form of Certificate of Authentication.*

The Property Trustee's certificate of authentication shall be in substantially the following form:

This is one of the Preferred Securities referred to in the within-mentioned Trust Agreement.

Dated:                                   JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
                                         not in its individual
                                         capacity, but solely as Property Trustee


                                         By:    _____
                                                Authorized signatory


## ARTICLE VI.

### MEETINGS; VOTING; ACTS OF HOLDERS

SECTION 6.1.    *Notice of Meetings.*

Notice of all meetings of the Holders of the Preferred Securities, stating the time, place and purpose of the meeting, shall be given by the Property Trustee pursuant to Section 10.8 to each Holder of Preferred Securities, at such Holder's registered address, at least fifteen (15) days and not more than ninety (90) days before the meeting. At any such meeting, any business properly before the meeting may be so considered whether or not stated in the notice of the meeting. Any adjourned meeting may be held as adjourned without further notice.

SECTION 6.2.     *Meetings of Holders of the Preferred Securities.*

(a)     No annual meeting of Holders is required to be held. The Property Trustee, however, shall call a meeting of the Holders of the Preferred Securities to vote on any matter upon the written request of the Holders of at least twenty five percent (25%) in aggregate Liquidation Amount of the Outstanding Preferred Securities and the Administrative Trustees or the Property Trustee may, at any time in their discretion, call a meeting of the Holders of the Preferred Securities to vote on any matters as to which such Holders are entitled to vote.

(b)     The Holders of at least a Majority in Liquidation Amount of the Preferred Securities, present in person or by proxy, shall constitute a quorum at any meeting of the Holders of the Preferred Securities.

(c)     If a quorum is present at a meeting, an affirmative vote by the Holders present, in person or by proxy, holding Preferred Securities representing at least a Majority in Liquidation Amount of the Preferred Securities held by the Holders present, either in person or by proxy, at such meeting shall constitute the action of the Holders of the Preferred Securities, unless this Trust Agreement requires a lesser or greater number of affirmative votes.

SECTION 6.3.     *Voting Rights.*

Holders shall be entitled to one vote for each $10,000 of Liquidation Amount represented by their Outstanding Trust Securities in respect of any matter as to which such Holders are entitled to vote.

SECTION 6.4.     *Proxies, Etc.*

At any meeting of Holders, any Holder entitled to vote thereat may vote by proxy, *provided,* that no proxy shall be voted at any meeting unless it shall have been placed on file with the Administrative Trustees, or with such other officer or agent of the Trust as the Administrative Trustees may direct, for verification prior to the time at which such vote shall be taken. Pursuant to a resolution of the Property Trustee, proxies may be solicited in the name of the Property Trustee or one or more officers of the Property Trustee. Only Holders of record shall be entitled to vote. When Trust Securities are held jointly by several Persons, any one of them may vote at any meeting in person or by proxy in respect of such Trust Securities, but if more than one of them shall be present at such meeting in person or by proxy, and such joint owners or their proxies so present disagree as to any vote to be cast, such vote shall not be received in respect of such Trust Securities. A proxy purporting to be executed by or on behalf of a Holder shall be deemed valid unless challenged at or prior to its exercise, and the burden of proving invalidity shall rest on the challenger. No proxy shall be valid more than three years after its date of execution.

SECTION 6.5.     *Holder Action by Written Consent.*

Any action that may be taken by Holders at a meeting may be taken without a meeting and without prior notice if Holders holding at least a Majority in Liquidation Amount of all Preferred Securities entitled to vote in respect of such action (or such lesser or greater proportion thereof as shall be required by any other provision of this Trust Agreement) shall consent to the

action in writing; *provided*, that notice of such action is promptly provided to the Holders of Preferred Securities that did not consent to such action. Any action that may be taken by the Holders of all the Common Securities may be taken without a meeting and without prior notice if such Holders shall consent to the action in writing.

SECTION 6.6.    *Record Date for Voting and Other Purposes.*

Except as provided in Section 6.10(a), for the purposes of determining the Holders who are entitled to notice of and to vote at any meeting or to act by written consent, or to participate in any distribution on the Trust Securities in respect of which a record date is not otherwise provided for in this Trust Agreement, or for the purpose of any other action, the Administrative Trustees may from time to time fix a date, not more than ninety (90) days prior to the date of any meeting of Holders or the payment of a Distribution or other action, as the case may be, as a record date for the determination of the identity of the Holders of record for such purposes.

SECTION 6.7.    *Acts of Holders.*

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided or permitted by this Trust Agreement to be given, made or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent thereof duly appointed in writing; and, except as otherwise expressly provided herein, such action shall become effective when such instrument or instruments are delivered to an Administrative Trustee. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the *"Act"* of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustees, if made in the manner provided in this Section 6.7.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that any Trustee receiving the same deems sufficient.

(c)    The ownership of Trust Securities shall be proved by the Securities Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Trust Security shall bind every future Holder of the same Trust Security and the Holder of every Trust Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustees, the Administrative Trustees or the Trust in reliance thereon, whether or not notation of such action is made upon such Trust Security.

(e)     Without limiting the foregoing, a Holder entitled hereunder to take any action hereunder with regard to any particular Trust Security may do so with regard to all or any part of the Liquidation Amount of such Trust Security or by one or more duly appointed agents each of which may do so pursuant to such appointment with regard to all or any part of such Liquidation Amount.

(f)     If any dispute shall arise among the Holders or the Trustees with respect to the authenticity, validity or binding nature of any request, demand, authorization, direction, notice, consent, waiver or other Act of such Holder or Trustee under this Article VI, then the determination of such matter by the Property Trustee shall be conclusive with respect to such matter.

SECTION 6.8.     *Inspection of Records.*

Upon reasonable written notice to the Administrative Trustees and the Property Trustee, the records of the Trust shall be open to inspection by any Holder during normal business hours for any purpose reasonably related to such Holder's interest as a Holder.

SECTION 6.9.     *Limitations on Voting Rights.*

(a)     Except as expressly provided in this Trust Agreement and in the Indenture and as otherwise required by law, no Holder of Preferred Securities shall have any right to vote or in any manner otherwise control the administration, operation and management of the Trust or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Securities Certificates, be construed so as to constitute the Holders from time to time as partners or members of an association.

(b)     So long as any Notes are held by the Property Trustee on behalf of the Trust, the Property Trustee shall not (i) direct the time, method and place of conducting any proceeding for any remedy available to the Note Trustee, or exercise any trust or power conferred on the Property Trustee with respect to the Notes, (ii) waive any past default that may be waived under Section 5.13 of the Indenture or waive compliance with any covenant or condition under Section 10.7 of the Indenture, (iii) exercise any right to rescind or annul a declaration that the principal of all the Notes shall be due and payable or (iv) consent to any amendment, modification or termination of the Indenture or the Notes, where such consent shall be required, without, in each case, obtaining the prior approval of the Holders of at least a Majority in Liquidation Amount of the Preferred Securities; *provided*, that where a consent under the Indenture would require the consent of each holder of Notes (or each Holder of Preferred Securities) affected thereby, no such consent shall be given by the Property Trustee without the prior written consent of each Holder of Preferred Securities. The Property Trustee shall not revoke any action previously authorized or approved by a vote of the Holders of the Preferred Securities, except by a subsequent vote of the Holders of the Preferred Securities. In addition to obtaining the foregoing approvals of the Holders of the Preferred Securities, prior to taking any of the foregoing actions, the Property Trustee shall, at the expense of the Depositor, obtain an Opinion of Counsel experienced in such matters to the effect that such action shall not cause the Trust to be taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes.

(c)    If any proposed amendment to the Trust Agreement provides for, or the Trustees otherwise propose to effect, (i) any action that would adversely affect in any material respect the powers, preferences or special rights of the Preferred Securities, whether by way of amendment to the Trust Agreement or otherwise or (ii) the dissolution, winding-up or termination of the Trust, other than pursuant to the terms of this Trust Agreement, then the Holders of Outstanding Preferred Securities as a class will be entitled to vote on such amendment or proposal and such amendment or proposal shall not be effective except with the approval of the Holders of at least a Majority in Liquidation Amount of the Preferred Securities. Notwithstanding any other provision of this Trust Agreement, no amendment to this Trust Agreement may be made if, as a result of such amendment, it would cause the Trust to be taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes.

SECTION 6.10.    *Acceleration of Maturity; Rescission of Annulment; Waivers of Past Defaults.*

(a)    For so long as any Preferred Securities remain Outstanding, if, upon a Note Event of Default, the Note Trustee fails or the holders of not less than twenty five percent (25%) in principal amount of the outstanding Notes fail to declare the principal of all of the Notes to be immediately due and payable, the Holders of at least twenty five percent (25%) in Liquidation Amount of the Preferred Securities then Outstanding shall have the right to make such declaration in writing to the Property Trustee, the Depositor and the Note Trustee. At any time after a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained by the Note Trustee as provided in the Indenture, the Holders of at least a Majority in Liquidation Amount of the Preferred Securities, by written notice to the Property Trustee, the Depositor and the Note Trustee, may rescind and annul such declaration and its consequences if:

(i)    the Depositor has paid or deposited with the Note Trustee a sum sufficient to pay:

(A)    all overdue installments of interest on all of the Notes;

(B)    any accrued Additional Interest on all of the Notes;

(C)    the principal of and any premium, if any, on any Notes that have become due otherwise than by such declaration of acceleration and interest and Additional Interest thereon at the rate borne by the Notes; and

(D)    all sums paid or advanced by the Note Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Note Trustee, the Property Trustee and their agents and counsel; and

(ii)    all Note Events of Default, other than the non-payment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in Section 5.13 of the Indenture.

Upon receipt by the Property Trustee of written notice requesting such an acceleration, or rescission and annulment thereof, by Holders of any part of the Preferred Securities, a record

date shall be established for determining Holders of Outstanding Preferred Securities entitled to join in such notice, which record date shall be at the close of business on the day the Property Trustee receives such notice. The Holders on such record date, or their duly designated proxies, and only such Persons, shall be entitled to join in such notice, whether or not such Holders remain Holders after such record date; *provided*, that, unless such declaration of acceleration, or rescission and annulment, as the case may be, shall have become effective by virtue of the requisite percentage having joined in such notice prior to the day that is ninety (90) days after such record date, such notice of declaration of acceleration, or rescission and annulment, as the case may be, shall automatically and without further action by any Holder be canceled and of no further effect. Nothing in this paragraph shall prevent a Holder, or a proxy of a Holder, from giving, after expiration of such ninety (90)-day period, a new written notice of declaration of acceleration, or rescission and annulment thereof, as the case may be, that is identical to a written notice that has been canceled pursuant to the proviso to the preceding sentence, in which event a new record date shall be established pursuant to the provisions of this Section 6.10(a).

(b)    For so long as any Preferred Securities remain Outstanding, to the fullest extent permitted by law and subject to the terms of this Trust Agreement and the Indenture, upon a Note Event of Default specified in paragraph (a) or (b) of Section 5.1 of the Indenture, any Holder of Preferred Securities shall have the right to institute a proceeding directly against the Depositor, pursuant to Section 5.8 of the Indenture, for enforcement of payment to such Holder of any amounts payable in respect of Notes having an aggregate principal amount equal to the aggregate Liquidation Amount of the Preferred Securities of such Holder.    Except as set forth in Section 6.10(a) and this Section 6.10(b), the Holders of Preferred Securities shall have no right to exercise directly any right or remedy available to the holders of, or in respect of, the Notes.

(c)    Notwithstanding paragraphs (a) and (b) of this Section 6.10, the Holders of at least a Majority in Liquidation Amount of the Preferred Securities may, on behalf of the Holders of all the Preferred Securities, waive any Note Event of Default, except any Note Event of Default arising from the failure to pay any principal of or any premium, if any, or interest on (including any Additional Interest) the Notes (unless such Note Event of Default has been cured and a sum sufficient to pay all matured installments of interest and all principal and premium, if any, on all Notes due otherwise than by acceleration has been deposited with the Note Trustee) or a Note Event of Default in respect of a covenant or provision that under the Indenture cannot be modified or amended without the consent of the holder of each outstanding Note. Upon any such waiver, such Note Event of Default shall cease to exist and any Note Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture; but no such waiver shall affect any subsequent Note Event of Default or impair any right consequent thereon.

(d)    Notwithstanding paragraphs (a) and (b) of this Section 6.10, the Holders of at least a Majority in Liquidation Amount of the Preferred Securities may, on behalf of the Holders of all the Preferred Securities, waive any past Event of Default and its consequences. Upon such waiver, any such Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Trust Agreement, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

(e)    The Holders of a Majority in Liquidation Amount of the Preferred Securities shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Property Trustee in respect of this Trust Agreement or the Notes or exercising any trust or power conferred upon the Property Trustee under this Trust Agreement; *provided*, that, subject to Sections 8.5 and 8.7, the Property Trustee shall have the right to decline to follow any such direction if the Property Trustee being advised by counsel determines that the action so directed may not lawfully be taken, or if the Property Trustee in good faith shall, by an officer or officers of the Property Trustee, determine that the proceedings so directed would be illegal or involve it in personal liability or be unduly prejudicial to the rights of Holders not party to such direction, and *provided, further*, that nothing in this Trust Agreement shall impair the right of the Property Trustee to take any action deemed proper by the Property Trustee and which is not inconsistent with such direction.

## ARTICLE VII.

### REPRESENTATIONS AND WARRANTIES

SECTION 7.1.    *Representations and Warranties of the Property Trustee and the Delaware Trustee.*

--- The Property Trustee and the Delaware Trustee, each severally on behalf of and as to itself, hereby represents and warrants for the benefit of the Depositor and the Holders that:

(a)    the Property Trustee is a national banking association, duly organized and validly existing under the laws of the United States of America;

(b)    the Property Trustee has full corporate power, authority and legal right to execute, deliver and perform its obligations under this Trust Agreement and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement;

(c)    the Delaware Trustee is a national banking association, duly formed and validly existing under the laws of the United States;

(d)    the Delaware Trustee has full corporate power, authority and legal right to execute, deliver and perform its obligations under this Trust Agreement and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement;

(e)    this Trust Agreement has been duly authorized, executed and delivered by the Property Trustee and the Delaware Trustee and constitutes the legal, valid and binding agreement of each of the Property Trustee and the Delaware Trustee enforceable against each of them in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws affecting creditors' rights generally and to general principles of equity;

(f)     the execution, delivery and performance of this Trust Agreement have been duly authorized by all necessary corporate or other action on the part of the Property Trustee and the Delaware Trustee and do not require any approval of stockholders of the Property Trustee and the Delaware Trustee and such execution, delivery and performance will not (i) violate the respective Articles of Association or By-laws of the Property Trustee or the Delaware Trustee, (ii) violate any provision of, or constitute, with or without notice or lapse of time, a default under, or result in the imposition of any lien on any properties included in the Trust Property pursuant to the provisions of any indenture, mortgage, credit agreement, license or other agreement or instrument to which the Property Trustee or the Delaware Trustee is a party or by which it is bound, or (iii) violate any applicable law, governmental rule or regulation of the United States or the State of Delaware, as the case may be, governing the banking, trust or general powers of the Property Trustee or the Delaware Trustee or any order, judgment or decree applicable to the Property Trustee or the Delaware Trustee;

(g)     neither the authorization, execution or delivery by the Property Trustee or the Delaware Trustee of this Trust Agreement nor the consummation of any of the transactions by the Property Trustee or the Delaware Trustee contemplated herein requires the consent or approval of, the giving of notice to, the registration with or the taking of any other action with respect to any governmental authority or agency under any existing law of the United States or the State of Delaware governing the banking, trust or general powers of the Property Trustee or the Delaware Trustee, as the case may be; and

(h)     to the best of each of the Property Trustee's and the Delaware Trustee's knowledge, there are no proceedings pending or threatened against or affecting the Property Trustee or the Delaware Trustee in any court or before any governmental authority, agency or arbitration board or tribunal that, individually or in the aggregate, would materially and adversely affect the Trust or would question the right, power and authority of the Property Trustee or the Delaware Trustee, as the case may be, to enter into or perform its obligations as one of the Trustees under this Trust Agreement.

SECTION 7.2.     *Representations and Warranties of Depositor.*

The Depositor hereby represents and warrants for the benefit of the Holders that:

(a)     the Depositor is a limited liability company duly organized, validly existing and in good standing under the laws of its state of Delaware;

(b)     the Depositor has full power and authority to execute, deliver and perform its obligations under this Trust Agreement and has taken all necessary action to authorize the execution, delivery and performance by it of this Trust Agreement;

(c)     this Trust Agreement has been duly authorized, executed and delivered by the Depositor and constitutes the legal, valid and binding agreement of the Depositor enforceable against the Depositor in accordance with its terms, subject to applicable

bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity;

(d)  the Securities Certificates issued at the Closing Date on behalf of the Trust have been duly authorized and will have been duly and validly executed, issued and delivered by the applicable Trustees pursuant to the terms and provisions of, and in accordance with the requirements of, this Trust Agreement and the Holders will be, as of such date, entitled to the benefits of this Trust Agreement;

(e)  the execution, delivery and performance of this Trust Agreement have been duly authorized by all necessary corporate or other action on the part of the Depositor and do not require any approval of stockholders of the Depositor and such execution, delivery and performance will not (i) violate the other organizational documents of the Depositor or (ii) violate any applicable law, governmental rule or regulation governing the Depositor or any material portion of its property or any order, judgment or decree applicable to the Depositor or any material portion of its property;

(f)  neither the authorization, execution or delivery by the Depositor of this Trust Agreement nor the consummation of any of the transactions by the Depositor contemplated herein requires the consent or approval of, the giving of notice to, the registration with or the taking of any other action with respect to any governmental authority or agency under any existing law governing the Depositor or any material portion of its property; and

(g)  there are no proceedings pending or, to the best of the Depositor's knowledge, threatened against or affecting the Depositor or any material portion of its property in any court or before any governmental authority, agency or arbitration board or tribunal that, individually or in the aggregate, would materially and adversely affect the Trust or would question the right, power and authority of the Depositor, as the case may be, to enter into or perform its obligations under this Trust Agreement.

## ARTICLE VIII.

### THE TRUSTEES

SECTION 8.1.  *Number of Trustees.*

The number of Trustees shall be four (4); *provided,* that the Property Trustee and the Delaware Trustee may be the same Person, in which case the number of Trustees shall be three (3).  The number of Trustees may be increased or decreased by Act of the Holder of the Common Securities subject to Sections 8.2, 8.3, and 8.4.  The death, resignation, retirement, removal, bankruptcy, incompetence or incapacity to perform the duties of a Trustee shall not operate to annul, dissolve or terminate the Trust.

## SECTION 8.2. *Property Trustee Required.*

There shall at all times be a Property Trustee hereunder with respect to the Trust Securities. The Property Trustee shall be a corporation organized and doing business under the laws of the United States or of any state thereof, authorized to exercise corporate trust powers, having a combined capital and surplus of at least fifty million dollars ($50,000,000), subject to supervision or examination by federal or state authority and having an office within the United States. If any such Person publishes reports of condition at least annually pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 8.2, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Property Trustee shall cease to be eligible in accordance with the provisions of this Section 8.2, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VIII.

## SECTION 8.3. *Delaware Trustee Required.*

(a)    If required by the Delaware Statutory Trust Act, there shall at all times be a Delaware Trustee with respect to the Trust Securities. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 8.3, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VIII. The Delaware Trustee shall have the same rights, privileges and immunities as the Property Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Property Trustee or the Administrative Trustees set forth herein. The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and for taking such actions as are required to be taken by a Delaware trustee under the Delaware Statutory Trust Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (a) accepting legal process served on the Trust in the State of Delaware and (b) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

## SECTION 8.4. *Appointment of Administrative Trustees.*

(a)    There shall at all times be one or more Administrative Trustees hereunder with respect to the Trust Securities. Each Administrative Trustee shall be either a natural person who is at least 21 years of age or a legal entity that shall act through one or more persons authorized to bind that entity. Each of the individuals identified as an *"Administrative Trustee"* in the preamble of this Trust Agreement hereby accepts his or her appointment as such.

(b)  Except where a requirement for action by a specific number of Administrative Trustees is expressly set forth in this Trust Agreement, any act required or permitted to be taken by, and any power of the Administrative Trustees may be exercised by, or with the consent of, any one such Administrative Trustee. Whenever a vacancy in the number of Administrative Trustees shall occur, until such vacancy is filled by the appointment of an Administrative Trustee in accordance with Section 8.11, the Administrative Trustees in office, regardless of their number (and notwithstanding any other provision of this Trust Agreement), shall have all the powers granted to the Administrative Trustees and shall discharge all the duties imposed upon the Administrative Trustees by this Trust Agreement.

SECTION 8.5.    *Duties and Responsibilities of the Trustees.*

(a)  The rights, immunities, duties and responsibilities of the Trustees shall be as provided by this Trust Agreement and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Trustees; *provided, however,* that if an Event of Default known to the Property Trustee has occurred and is continuing, the Property Trustee shall, prior to the receipt of directions, if any, from the Holders of at least a Majority in Liquidation Amount of the Preferred Securities, exercise such of the rights and powers vested in it by this Trust Agreement, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Notwithstanding the foregoing, no provision of this Trust Agreement shall require any of the Trustees to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its or their rights or powers, if it or they shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. Whether or not herein expressly so provided, every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to the Trustees shall be subject to the provisions of this Section 8.5. Nothing in this Trust Agreement shall be construed to release any Administrative Trustee from liability for his or her own negligent action, negligent failure to act; or his or her own willful misconduct. To the extent that, at law or in equity, a Trustee has duties and liabilities relating to the Trust or to the Holders, such Trustee shall not be liable to the Trust or to any Holder for such Trustee's good faith reliance on the provisions of this Trust Agreement. The provisions of this Trust Agreement, to the extent that they restrict the duties and liabilities of the Trustees otherwise existing at law or in equity, are agreed by the Depositor and the Holders to replace such other duties and liabilities of the Trustees.

(b)  All payments made by the Property Trustee or a Paying Agent in respect of the Trust Securities shall be made only from the revenue and proceeds from the Trust Property and only to the extent that there shall be sufficient revenue or proceeds from the Trust Property to enable the Property Trustee or a Paying Agent to make payments in accordance with the terms hereof. Each Holder, by its acceptance of a Trust Security, agrees that it will look solely to the revenue and proceeds from the Trust Property to the extent legally available for distribution to it as herein provided and that the Trustees are not personally liable to it for any amount distributable in respect of any Trust Security or for any other liability in respect of any Trust Security. This Section 8.5(b) does not limit the liability of the Trustees expressly set forth elsewhere in this Trust Agreement.

(c)    No provisions of this Trust Agreement shall be construed to relieve the Property Trustee from liability with respect to matters that are within the authority of the Property Trustee under this Trust Agreement for its own negligent action, negligent failure to act or willful misconduct; except that:

(i)    the Property Trustee shall not be liable for any error or judgment made in good faith by an authorized officer of the Property Trustee, unless it shall be proved that the Property Trustee was negligent in ascertaining the pertinent facts;

(ii)    the Property Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of at least a Majority in Liquidation Amount of the Preferred Securities relating to the time, method and place of conducting any proceeding for any remedy available to the Property Trustee hereunder or under the Indenture, or exercising any trust or power conferred upon the Property Trustee under this Trust Agreement;

(iii)    the Property Trustee's sole duty with respect to the custody, safe keeping and physical preservation of the Notes and the Payment Account shall be to deal with such Property in a similar manner as the Property Trustee deals with similar property for its own account, subject to the protections and limitations on liability afforded to the Property Trustee under this Trust Agreement;

(iv)    the Property Trustee shall not be liable for any interest on any money received by it except as it may otherwise agree in writing with the Depositor; and money held by the Property Trustee need not be segregated from other funds held by it except in relation to the Payment Account maintained by the Property Trustee pursuant to Section 3.1 and except to the extent otherwise required by law; and

(v)    the Property Trustee shall not be responsible for monitoring the compliance by the Administrative Trustees or the Depositor with their respective duties under this Trust Agreement, nor shall the Property Trustee be liable for the default or misconduct of any other Trustee or the Depositor.

SECTION 8.6.    *Notices of Defaults and Extensions.*

(a)    Within ninety (90) days after the occurrence of a default actually known to the Property Trustee, the Property Trustee shall transmit notice of such default to the Holders, the Administrative Trustees and the Depositor, unless such default shall have been cured or waived. For the purpose of this Section 8.6, the term *"default"* means any event that is, or after notice or lapse of time or both would become, an Event of Default.

(b)    The Property Trustee shall not be charged with knowledge of any Event of Default unless either (i) a Responsible Officer of the Property Trustee shall have actual knowledge or (ii) the Property Trustee shall have received written notice thereof from the Depositor, an Administrative Trustee or a Holder.

(c)    The Property Trustee shall notify all Holders of the Preferred Securities of any notice of default received with respect to the Notes.

SECTION 8.7.    *Certain Rights of Property Trustee.*

Subject to the provisions of Section 8.5:

(a)    the Property Trustee may conclusively rely and shall be protected in acting or refraining from acting in good faith and in accordance with the terms hereof upon any resolution, Opinion of Counsel, certificate, written representation of a Holder or transferee, certificate of auditors or any other resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, appraisal, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    if (i) in performing its duties under this Trust Agreement the Property Trustee is required to decide between alternative courses of action, (ii) in construing any of the provisions of this Trust Agreement the Property Trustee finds a provision ambiguous or inconsistent with any other provisions contained herein or (iii) the Property Trustee is unsure of the application of any provision of this Trust Agreement, then, except as to any matter as to which the Holders of the Preferred Securities are entitled to vote under the terms of this Trust Agreement, the Property Trustee shall deliver a notice to the Depositor requesting the Depositor's written instruction as to the course of action to be taken and the Property Trustee shall take such action, or refrain from taking such action, as the Property Trustee shall be instructed in writing to take, or to refrain from taking, by the Depositor; *provided,* that if the Property Trustee does not receive such instructions of the Depositor within ten (10) Business Days after it has delivered such notice or such reasonably shorter period of time set forth in such notice, the Property Trustee may, but shall be under no duty to, take such action, or refrain from taking such action, as the Property Trustee shall deem advisable and in the best interests of the Holders, in which event the Property Trustee shall have no liability except for its own negligence, bad faith or willful misconduct;

(c)    any direction or act of the Depositor contemplated by this Trust Agreement shall be sufficiently evidenced by an Officers' Certificate unless otherwise expressly provided herein;

(d)    any direction or act of an Administrative Trustee contemplated by this Trust Agreement shall be sufficiently evidenced by a certificate executed by such Administrative Trustee and setting forth such direction or act;

(e)    the Property Trustee shall have no duty to see to any recording, filing or registration of any instrument (including any financing or continuation statement or any filing under tax or securities laws) or any re-recording, re-filing or re-registration thereof;

(f)    the Property Trustee may consult with counsel (which counsel may be counsel to the Property Trustee, the Depositor or any of its Affiliates, and may include any of its employees) and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon and in accordance with such advice; the

Property Trustee shall have the right at any time to seek instructions concerning the administration of this Trust Agreement from any court of competent jurisdiction;

(g)    the Property Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of any of the Holders pursuant to this Trust Agreement, unless such Holders shall have offered to the Property Trustee reasonable security or indemnity against the costs, expenses (including reasonable attorneys' fees and expenses) and liabilities that might be incurred by it in compliance with such request or direction, including reasonable advances as may be requested by the Property Trustee; *provided, however,* that nothing contained in this Section 8.7(g) shall be construed to relieve the Property Trustee, upon the occurrence of an Event of Default, of its obligation to exercise the rights and powers in it vested by this Trust Agreement; provided, further, that nothing contained in this Section 8.7(g) shall prevent the Property Trustee from exercising its rights under Section 8.11 hereof;

(h)    the Property Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture, note or other evidence of indebtedness or other paper or document, unless requested in writing to do so by one or more Holders, but the Property Trustee may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Property Trustee shall determine to make such inquiry or investigation, it shall be entitled to examine the books, records and premises of the Depositor, personally or by agent or attorney;

(i)    the Property Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through its agents, attorneys, custodians or nominees and the Property Trustee shall not be responsible for any negligence or misconduct on the part of any such agent, attorney, custodian or nominee appointed with due care by it hereunder;

(j)    whenever in the administration of this Trust Agreement the Property Trustee shall deem it desirable to receive instructions with respect to enforcing any remedy or right hereunder, the Property Trustee (i) may request instructions from the Holders (which instructions may only be given by the Holders of the same proportion in Liquidation Amount of the Trust Securities as would be entitled to direct the Property Trustee under this Trust Agreement in respect of such remedy, right or action), (ii) may refrain from enforcing such remedy or right or taking such other action until such instructions are received and (iii) shall be protected in acting in accordance with such instructions;

(k)    except as otherwise expressly provided by this Trust Agreement, the Property Trustee shall not be under any obligation to take any action that is discretionary under the provisions of this Trust Agreement;

(l)    without prejudice to any other rights available to the Property Trustee under applicable law, when the Property Trustee incurs expenses or renders services in connection with a Bankruptcy Event, such expenses (including legal fees and expenses of

its agents and counsel) and the compensation for such services are intended to constitute expenses of administration under any bankruptcy law or law relating to creditors' rights generally; and

(m)    whenever in the administration of this Trust Agreement the Property Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Property Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and rely on an Officers' Certificate which, upon receipt of such request, shall be promptly delivered by the Depositor.

No provision of this Trust Agreement shall be deemed to impose any duty or obligation on any Trustee to perform any act or acts or exercise any right, power, duty or obligation conferred or imposed on it, in any jurisdiction in which it shall be illegal, or in which such Person shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, or to exercise any such right, power, duty or obligation.

SECTION 8.8.    *Delegation of Power.*

Any Trustee may, by power of attorney consistent with applicable law, delegate to any other natural person over the age of 21 its, his or her power for the purpose of executing any documents contemplated in Section 2.5. The Trustees shall have power to delegate from time to time to such of their number or to the Depositor the doing of such things and the execution of such instruments either in the name of the Trust or the names of the Trustees or otherwise as the Trustees may deem expedient, to the extent such delegation is not prohibited by applicable law or contrary to the provisions of this Trust Agreement.

SECTION 8.9.    *Parties May Hold Securities.*

Any Trustee or any other agent of any Trustee or the Trust, in its individual or any other capacity, may become the owner or pledgee of Trust Securities and except as provided in the definition of the term *"Outstanding"* in Article I, may otherwise deal with the Trust with the same rights it would have if it were not an Trustee or such other agent.

SECTION 8.10.    *Compensation; Reimbursement; Indemnity.*

The Depositor agrees:

(a)    to pay to the Trustees from time to time such reasonable compensation for all services rendered by them hereunder as may be agreed by the Depositor and the Trustees from time to time (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(b)    to reimburse the Trustees upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustees in accordance with any provision of this Trust Agreement (including the reasonable compensation and the expenses and disbursements of their agents and counsel), except any such expense,

disbursement or advance as may be attributable to their gross negligence, bad faith or willful misconduct; and

(c)   to the fullest extent permitted by applicable law, to indemnify and hold harmless (i) each Trustee, (ii) any Affiliate of any Trustee, (iii) any officer, director, shareholder, employee, representative or agent of any Trustee or any Affiliate of any Trustee and (iv) any employee or agent of the Trust (referred to herein as an *"Indemnified Person"*) from and against any loss, damage, liability, tax (other than income, franchise or other taxes imposed on amounts paid pursuant to Section 8.10(a) or (b) hereof), penalty, expense or claim of any kind or nature whatsoever incurred without negligence, bad faith or willful misconduct on its part, arising out of or in connection with the acceptance or administration of the Trust hereunder, including the advancement of funds to cover the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

The Trust shall have no payment, reimbursement or indemnity obligations to the Trustees under this Section 8.10. The provisions of this Section 8.10 shall survive the termination of this Trust Agreement and the earlier removal or resignation of any Trustee.

No Trustee may claim any Lien on any Trust Property whether before or after termination of the Trust as a result of any amount due pursuant to this Section 8.10.

To the fullest extent permitted by law, in no event shall the Property Trustee and the Delaware Trustee be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

In no event shall the Property Trustee and the Delaware Trustee be liable for any failure or delay in the performance of its obligations hereunder because of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, embargo, government action, including any laws, ordinances, regulations, governmental action or the like which delay, restrict or prohibit the providing of the services contemplated by this Trust Agreement.

SECTION 8.11.   *Resignation and Removal; Appointment of Successor.*

(a)   No resignation or removal of any Trustee and no appointment of a successor Trustee pursuant to this Article VIII shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 8.12.

(b)   A Trustee may resign at any time by giving written notice thereof to the Depositor and, in the case of the Property Trustee and the Delaware Trustee, to the Holders.

(c)   Unless an Event of Default shall have occurred and be continuing, the Property Trustee or the Delaware Trustee, or both of them, may be removed (with or without cause) at any time by Act of the Holder of Common Securities. If an Event of Default shall have occurred and be continuing, the Property Trustee or the Delaware Trustee, or both of them, may be removed (with or without cause) at such time by Act of the Holders of at least a Majority in Liquidation

Amount of the Preferred Securities, delivered to the removed Trustee (in its individual capacity and on behalf of the Trust). An Administrative Trustee may be removed (with or without cause) only by Act of the Holder of the Common Securities at any time.

(d)     If any Trustee shall resign, be removed or become incapable of acting as Trustee, or if a vacancy shall occur in the office of any Trustee for any reason, at a time when no Event of Default shall have occurred and be continuing, the Holder of the Common Securities, by Act of the Holder of the Common Securities, shall promptly appoint a successor Trustee or Trustees, and such successor Trustee and the retiring Trustee shall comply with the applicable requirements of <u>Section 8.12</u>. If the Property Trustee or the Delaware Trustee shall resign, be removed or become incapable of continuing to act as the Property Trustee or the Delaware Trustee, as the case may be, at a time when an Event of Default shall have occurred and be continuing, the Holders of the Preferred Securities, by Act of the Holders of a Majority in Liquidation Amount of the Preferred Securities, shall promptly appoint a successor Property Trustee or Delaware Trustee, and such successor Property Trustee or Delaware Trustee and the retiring Property Trustee or Delaware Trustee shall comply with the applicable requirements of <u>Section 8.12</u>. If an Administrative Trustee shall resign, be removed or become incapable of acting as Administrative Trustee, at a time when an Event of Default shall have occurred and be continuing, the Holder of the Common Securities by Act of the Holder of Common Securities shall promptly appoint a successor Administrative Trustee and such successor Administrative Trustee and the retiring Administrative Trustee shall comply with the applicable requirements of <u>Section 8.12</u>. If no successor Trustee shall have been so appointed by the Holder of the Common Securities or Holders of the Preferred Securities, as the case may be, and accepted appointment in the manner required by <u>Section 8.12</u> within thirty (30) days after the giving of a notice of resignation by a Trustee, the removal of a Trustee, or a Trustee becoming incapable of acting as such Trustee, any Holder who has been a Holder of Preferred Securities for at least six (6) months may, on behalf of himself and all others similarly situated, and any resigning Trustee may, in each case, at the expense of the Depositor, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)     The Depositor shall give notice of each resignation and each removal of the Property Trustee or the Delaware Trustee and each appointment of a successor Property Trustee or Delaware Trustee to all Holders in the manner provided in <u>Section 10.8</u>. Each notice shall include the name of the successor Property Trustee or Delaware Trustee and the address of its Corporate Trust Office if it is the Property Trustee.

(f)     Notwithstanding the foregoing or any other provision of this Trust Agreement, in the event any Administrative Trustee or a Delaware Trustee who is a natural person dies or becomes, in the opinion of the Holder of Common Securities, incompetent or incapacitated, the vacancy created by such death, incompetence or incapacity may be filled by (i) the unanimous act of the remaining Administrative Trustees if there are at least two of them or (ii) otherwise by the Holder of the Common Securities (with the successor in each case being a Person who satisfies the eligibility requirement for Administrative Trustees or Delaware Trustee, as the case may be, set forth in <u>Sections 8.3</u> and <u>8.4</u>).

(g)     Upon the appointment of a successor Delaware Trustee, such successor Delaware Trustee shall file a Certificate of Amendment to the Certificate of Trust in accordance with Section 3810 of the Delaware Statutory Trust Act.

SECTION 8.12.   *Acceptance of Appointment by Successor.*

(a)     In case of the appointment hereunder of a successor Trustee, each successor Trustee shall execute and deliver to the Depositor and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and each such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of the Trust or any successor Trustee such retiring Trustee shall, upon payment of its charges, duly assign, transfer and deliver to such successor Trustee all Trust Property, all proceeds thereof and money held by such retiring Trustee hereunder with respect to the Trust Securities and the Trust.

(b)     Upon request of any such successor Trustee, the Trust (or the retiring Trustee if requested by the Depositor) shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts referred to in the preceding paragraph.

(c)     No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article VIII.

SECTION 8.13.   *Merger, Conversion, Consolidation or Succession to Business.*

Any Person into which the Property Trustee or the Delaware Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all the corporate trust business of such Trustee, shall be the successor of such Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, *provided,* that such Person shall be otherwise qualified and eligible under this Article VIII.

SECTION 8.14.   *Not Responsible for Recitals, Issuance of Securities, or Representations.*

The recitals contained herein and in the Securities Certificates shall be taken as the statements of the Trust and the Depositor, and the Trustees do not assume any responsibility for their correctness. The Trustees make no representations as to the title to, or value or condition of, the property of the Trust or any part thereof, nor as to the validity or sufficiency of this Trust Agreement, the Notes or the Trust Securities. The Trustees shall not be accountable for the use or application by the Depositor of the proceeds of the Notes. It is expressly understood and agreed by the parties hereto that insofar as any document, agreement or certificate is executed on behalf of the Trust by any Trustee (i) such document, agreement or certificate is executed and delivered by such Trustee, not in its individual capacity but solely as Trustee under this Trust Agreement in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements made on the part of the Trust is made and intended

not as individual capacity but is made and intended not as representations, warranties, covenants, undertakings and agreements by any Trustee in its individual capacity but is made and intended for the purpose of binding only the Trust and (iii) under no circumstances shall any Trustee in its individual capacity be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Trust Agreement or any other document, agreement or certificate.

SECTION 8.15.    *Property Trustee May File Proofs of Claim.*

(a)    In case of any Bankruptcy Event (or event that with the passage of time would become a Bankruptcy Event) relative to the Trust or any other obligor upon the Trust Securities or the property of the Trust or of such other obligor or their creditors, the Property Trustee (irrespective of whether any Distributions on the Trust Securities shall then be due and payable and irrespective of whether the Property Trustee shall have made any demand on the Trust for the payment of any past due Distributions) shall be entitled and empowered, to the fullest extent permitted by law, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of any Distributions owing and unpaid in respect of the Trust Securities and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Property Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Property Trustee, its agents and counsel) and of the Holders allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Holder to make such payments to the Property Trustee and, in the event the Property Trustee shall consent to the making of such payments directly to the Holders, to pay to the Property Trustee first any amount due it for the reasonable compensation, expenses, disbursements and advances of the Property Trustee, its agents and counsel, and any other amounts due the Property Trustee.

(b)    Nothing herein contained shall be deemed to authorize the Property Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or compensation affecting the Trust Securities or the rights of any Holder thereof or to authorize the Property Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 8.16.    *Reports to the Property Trustee.*

(a)    The Depositor and the Administrative Trustees shall deliver to the Property Trustee, not later than forty five (45) days after the end of each of the first three fiscal quarters of the Depositor and not later than ninety (90) days after the end of each fiscal year of the Trust ending after the date of this Trust Agreement, an Officers' Certificate covering the preceding fiscal year, stating whether or not to the knowledge of the signers thereof the Depositor and the

Trust are in default in the performance or observance of any of the terms, provisions and conditions of this Trust Agreement (without regard to any period of grace or requirement of notice provided hereunder) and, if the Depositor or the Trust shall be in default, specifying all such defaults and the nature and status thereof of which they have knowledge.

(b)    The Depositor shall furnish (i) to the Property Trustee; (ii) Taberna Preferred Funding II Ltd., c/o Cohen Bros. & Co., 1818 Market Street, 28th Floor, Philadelphia, Pennsylvania 19103 or such other address as designated by Taberna Preferred Funding II Ltd.; and (iii) any Owner of the Preferred Securities reasonably identified to the Depositor and the Trust (which identification may be made either by such Owner or by Cohen Bros. & Company) a duly completed and executed certificate substantively and substantially in the form attached hereto as Exhibit G, including the financial statements referenced in such Exhibit, which certificate and financial statements shall be so furnished by the Depositor not later than forty five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Depositor and not later than ninety (90) days after the end of each fiscal year of the Depositor.

The Property Trustee shall obtain all reports, certificate and information, which it is entitled to obtain under each of the Operative Documents.

## ARTICLE IX.

### TERMINATION, LIQUIDATION AND MERGER

SECTION 9.1.    *Dissolution Upon Expiration Date.*

Unless earlier dissolved, the Trust shall automatically dissolve on June 30, 2040 (the *"Expiration Date"*), and the Trust Property shall be liquidated in accordance with Section 9.4.

SECTION 9.2.    *Early Termination.*

The first to occur of any of the following events is an *"Early Termination Event"*, upon the occurrence of which the Trust shall be dissolved:

(a)    the occurrence of a Bankruptcy Event in respect of, or the dissolution or liquidation of, the Depositor, in its capacity as the Holder of the Common Securities, unless the Depositor shall have transferred the Common Securities as provided by Section 5.11, in which case this provision shall refer instead to any such successor Holder of the Common Securities;

(b)    the written direction to the Property Trustee from the Holder of the Common Securities at any time to dissolve the Trust and, after satisfaction of any liabilities of the Trust as required by applicable law, to distribute the Notes to Holders in exchange for the Preferred Securities (which direction is optional and wholly within the discretion of the Holder of the Common Securities); *provided*, that the Holder of the Common Securities shall have received the prior approval of all necessary Applicable Insurance Regulatory Authorities then required;

(c)     the redemption of all of the Preferred Securities in connection with the payment at maturity or redemption of all the Notes; and

(d)     the entry of an order for dissolution of the Trust by a court of competent jurisdiction.

SECTION 9.3.     *Termination.*

The respective obligations and responsibilities of the Trustees and the Trust shall terminate upon the latest to occur of the following: (a) the distribution by the Property Trustee to Holders of all amounts required to be distributed hereunder upon the liquidation of the Trust pursuant to Section 9.4, or upon the redemption of all of the Trust Securities pursuant to Section 4.2; (b) the satisfaction of any expenses owed by the Trust; and (c) the discharge of all administrative duties of the Administrative Trustees, including the performance of any tax reporting obligations with respect to the Trust or the Holders.

SECTION 9.4.     *Liquidation.*

(a)     If an Early Termination Event specified in Section 9.2(a), (b) or (d) occurs or upon the Expiration Date, the Trust shall be liquidated by the Property Trustee as expeditiously as the Property Trustee shall determine to be possible by distributing, after satisfaction of liabilities to creditors of the Trust as provided by applicable law, to each Holder a Like Amount of Notes, subject to Section 9.4(d). Notice of liquidation shall be given by the Property Trustee not less than thirty (30) nor more than sixty (60) days prior to the Liquidation Date to each Holder of Trust Securities at such Holder's address appearing in the Securities Register. All such notices of liquidation shall:

(i)     state the Liquidation Date;

(ii)     state that from and after the Liquidation Date, the Trust Securities will no longer be deemed to be Outstanding and (subject to Section 9.4(d)) any Securities Certificates not surrendered for exchange will be deemed to represent a Like Amount of Notes; and

(iii)     provide such information with respect to the mechanics by which Holders may exchange Securities Certificates for Notes, or if Section 9.4(d) applies, receive a Liquidation Distribution, as the Property Trustee shall deem appropriate.

(b)     Except where Section 9.2(c) or 9.4(d) applies, in order to effect the liquidation of the Trust and distribution of the Notes to Holders, the Property Trustee, either itself acting as exchange agent or through the appointment of a separate exchange agent, shall establish a record date for such distribution (which shall not be more than forty five (45) days prior to the Liquidation Date nor prior to the date on which notice of such liquidation is given to the Holders) and establish such procedures as it shall deem appropriate to effect the distribution of Notes in exchange for the Outstanding Securities Certificates.

(c)     Except where Section 9.2(c) or 9.4(d) applies, after the Liquidation Date, (i) the Trust Securities will no longer be deemed to be Outstanding, (ii) certificates representing a Like

Amount of Notes will be issued to Holders of Securities Certificates, upon surrender of such Certificates to the exchange agent for exchange, (iii) the Depositor shall use its best efforts to have the Notes listed on the New York Stock Exchange or on such other exchange, interdealer quotation system or self-regulatory organization on which the Preferred Securities are then listed, if any, (iv) Securities Certificates not so surrendered for exchange will be deemed to represent a Like Amount of Notes bearing accrued and unpaid interest in an amount equal to the accumulated and unpaid Distributions on such Securities Certificates until such certificates are so surrendered (and until such certificates are so surrendered, no payments of interest or principal will be made to Holders of Securities Certificates with respect to such Notes) and (v) all rights of Holders holding Trust Securities will cease, except the right of such Holders to receive Notes upon surrender of Securities Certificates.

(d)    Notwithstanding the other provisions of this Section 9.4, if distribution of the Notes in the manner provided herein is determined by the Property Trustee not to be permitted or practical, the Trust Property shall be liquidated, and the Trust shall be wound up by the Property Trustee in such manner as the Property Trustee determines.  In such event, Holders will be entitled to receive out of the assets of the Trust available for distribution to Holders, after satisfaction of liabilities to creditors of the Trust as provided by applicable law, an amount equal to the Liquidation Amount per Trust Security plus accumulated and unpaid Distributions thereon to the date of payment (such amount being the *"Liquidation Distribution"*). If, upon any such winding up the Liquidation Distribution can be paid only in part because the Trust has insufficient assets available to pay in full the aggregate Liquidation Distribution, then, subject to the next succeeding sentence, the amounts payable by the Trust on the Trust Securities shall be paid on a *pro rata* basis (based upon Liquidation Amounts). The Holder of the Common Securities will be entitled to receive Liquidation Distributions upon any such winding up *pro rata* (based upon Liquidation Amounts) with Holders of all Trust Securities, except that, if an Event of Default has occurred and is continuing, the Preferred Securities shall have a priority over the Common Securities as provided in Section 4.3.

SECTION 9.5.    *Mergers, Consolidations, Amalgamations or Replacements of Trust.*

The Trust may not merge with or into, consolidate, amalgamate, or be replaced by, or convey, transfer or lease its properties and assets substantially as an entirety to, any Person except pursuant to this Article IX. At the request of the Holders of the Common Securities, without the consent of the Holders of the Preferred Securities, the Trust may merge with or into, consolidate, amalgamate, or be replaced by or convey, transfer or lease its properties and assets substantially as an entirety to a trust organized as such under the laws of any State; *provided*, that:

(a)    such successor entity either (i) expressly assumes all of the obligations of the Trust under this Trust Agreement with respect to the Preferred Securities or (ii) substitutes for the Preferred Securities other securities having substantially the same terms as the Preferred Securities (such other Securities, the *"Successor Securities"*) so long as the Successor Securities have the same priority as the Preferred Securities with respect to distributions and payments upon liquidation, redemption and otherwise;

(b)     a trustee of such successor entity possessing substantially the same powers and duties as the Property Trustee is appointed to hold the Notes;

(c)     if the Preferred Securities or the Notes are rated, such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease does not cause the Preferred Securities or the Notes (including any Successor Securities) to be downgraded by any nationally recognized statistical rating organization that then assigns a rating to the Preferred Securities or the Notes;

(d)     the Preferred Securities are listed, or any Successor Securities will be listed upon notice of issuance, on any national securities exchange or interdealer quotation system on which the Preferred Securities are then listed, if any;

(e)     such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease does not adversely affect the rights, preferences and privileges of the Holders of the Preferred Securities (including any Successor Securities) in any material respect;

(f)     such successor entity has a purpose substantially identical to that of the Trust;

(g)     prior to such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease, the Depositor has received an Opinion of Counsel to the effect that (i) such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease does not adversely affect the rights, preferences and privileges of the Holders of the Preferred Securities (including any Successor Securities) in any material respect; (ii) following such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease, neither the Trust nor such successor entity will be required to register as an "investment company" under the Investment Company Act and (iii) following such merger, consolidation, amalgamation, replacement, conveyance, transfer or lease, the Trust (or the successor entity) will continue to be classified as a grantor trust for U.S. federal income tax purposes; and

(h)     the Depositor or its permitted transferee owns all of the common securities of such successor entity.

Notwithstanding the foregoing, the Trust shall not, except with the consent of Holders of all of the Preferred Securities, consolidate, amalgamate, merge with or into, or be replaced by or convey, transfer or lease its properties and assets substantially as an entirety to any other Person or permit any other entity to consolidate, amalgamate, merge with or into, or replace, the Trust if such consolidation, amalgamation, merger, replacement, conveyance, transfer or lease would cause the Trust or the successor entity to be taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes or cause the Notes to be treated as other than indebtedness of the Depositor for United States federal income tax purposes.

## ARTICLE X.

### MISCELLANEOUS PROVISIONS

SECTION 10.1.  *Limitation of Rights of Holders.*

Except as set forth in Section 9.2, the death, bankruptcy, termination, dissolution or incapacity of any Person having an interest, beneficial or otherwise, in Trust Securities shall not operate to terminate this Trust Agreement, nor annul, dissolve or terminate the Trust nor entitle the legal representatives or heirs of such Person or any Holder for such Person, to claim an accounting, take any action or bring any proceeding in any court for a partition or winding up of the arrangements contemplated hereby, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

SECTION 10.2.  *Agreed Tax Treatment of Trust and Trust Securities.*

The parties hereto and, by its acceptance or acquisition of a Trust Security or a beneficial interest therein, the Holder of, and any Person that acquires a beneficial interest in, such Trust Security intend and agree to treat the Trust as a grantor trust for United States federal, state and local tax purposes, and to treat the Trust Securities (including all payments and proceeds with respect to such Trust Securities) as undivided beneficial ownership interests in the Trust Property (and payments and proceeds therefrom, respectively) for United States federal, state and local tax purposes and to treat the Notes as indebtedness of the Depositor for United States federal, state and local tax purposes. The provisions of this Trust Agreement shall be interpreted to further this intention and agreement of the parties set forth in this Section 10.2.

SECTION 10.3.  *Amendment.*

(a)    This Trust Agreement may be amended from time to time by the Property Trustee, the Administrative Trustees and the Holder of all the Common Securities, without the consent of any Holder of the Preferred Securities, (i) to cure any ambiguity, correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make or amend any other provisions with respect to matters or questions arising under this Trust Agreement, which shall not be inconsistent with the other provisions of this Trust Agreement, (ii) to modify, eliminate or add to any provisions of this Trust Agreement to such extent as shall be necessary to ensure that the Trust will neither be taxable as a corporation nor be classified as other than a grantor trust for United States federal income tax purposes at all times that any Trust Securities are Outstanding or to ensure that the Notes are treated as indebtedness of the Depositor for United States federal income tax purposes, or to ensure that the Trust will not be required to register as an "investment company" under the Investment Company Act or (iii) to add to the covenants, restrictions or obligations of the Depositor; *provided,* that in the case of clauses (i), (ii) or (iii), such action shall not adversely affect in any material respect the interests of any Holder.

(b)    Except as provided in Section 10.3(c), any provision of this Trust Agreement may be amended by the Property Trustee, the Administrative Trustees and the Holder of all of the Common Securities and with (i) the consent of Holders of at least a Majority in Liquidation

Amount of the Preferred Securities and (ii) receipt by the Trustees of an Opinion of Counsel to the effect that such amendment or the exercise of any power granted to the Trustees in accordance with such amendment will not cause the Trust to be taxable as a corporation or classified as other than a grantor trust for United States federal income tax purposes or affect the treatment of the Notes as indebtedness of the Depositor for United States federal income tax purposes or affect the Trust's exemption from status (or from any requirement to register) as an "investment company" under the Investment Company Act.

(c)     Notwithstanding any other provision of this Trust Agreement, without the consent of each Holder, this Trust Agreement may not be amended to (i) change the accrual rate, amount, currency or timing of any Distribution on or the redemption price of the Trust Securities or otherwise adversely affect the amount of any Distribution or other payment required to be made in respect of the Trust Securities as of a specified date, (ii) restrict or impair the right of a Holder to institute suit for the enforcement of any such payment on or after such date, (iii) reduce the percentage of aggregate Liquidation Amount of Outstanding Preferred Securities, the consent of whose Holders is required for any such amendment, or the consent of whose Holders is required for any waiver of compliance with any provision of this Trust Agreement or of defaults hereunder and their consequences provided for in this Trust Agreement; (iv) impair or adversely affect the rights and interests of the Holders in the Trust Property, or permit the creation of any Lien on any portion of the Trust Property; or (v) modify the definition of "Outstanding," this Section 10.3(c), Sections 4.1, 4.2, 4.3, 6.10(c) or Article IX.

(d)     Notwithstanding any other provision of this Trust Agreement, no Trustee shall enter into or consent to any amendment to this Trust Agreement that would cause the Trust to be taxable as a corporation or to be classified as other than a grantor trust for United States federal income tax purposes or that would cause the Notes to fail or cease to be treated as indebtedness of the Depositor for United States federal income tax purposes or that would cause the Trust to fail or cease to qualify for the exemption from status (or from any requirement to register) as an "investment company" under the Investment Company Act.

(e)     If any amendment to this Trust Agreement is made, the Administrative Trustees or the Property Trustee shall promptly provide to the Depositor and the Note Trustee a copy of such amendment.

(f)     No Trustee shall be required to enter into any amendment to this Trust Agreement that affects its own rights, duties or immunities under this Trust Agreement. The Trustees shall be entitled to receive an Opinion of Counsel and an Officers' Certificate stating that any amendment to this Trust Agreement is in compliance with this Trust Agreement and all conditions precedent herein provided for relating to such action have been met.

(g)     No amendment or modification to this Trust Agreement that adversely affects in any material respect the rights, duties, liabilities, indemnities or immunities of the Delaware Trustee hereunder shall be permitted without the prior written consent of the Delaware Trustee.

SECTION 10.4.  *Separability.*

If any provision in this Trust Agreement or in the Securities Certificates shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

SECTION 10.5.  *Governing Law.*

**THIS TRUST AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF EACH OF THE HOLDERS, THE TRUST, THE DEPOSITOR AND THE TRUSTEES WITH RESPECT TO THIS TRUST AGREEMENT AND THE TRUST SECURITIES SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REFERENCE TO ITS CONFLICTS OF LAWS PROVISIONS.**

SECTION 10.6.  *Successors.*

This Trust Agreement shall be binding upon and shall inure to the benefit of any successor to the Depositor, the Trust and any Trustee, including any successor by operation of law. Except in connection with a transaction involving the Depositor that is permitted under Article VIII of the Indenture and pursuant to which the assignee agrees in writing to perform the Depositor's obligations hereunder, the Depositor shall not assign its obligations hereunder.

SECTION 10.7.  *Headings.*

The Article and Section headings are for convenience only and shall not affect the construction of this Trust Agreement

SECTION 10.8.  *Reports, Notices and Demands.*

(a)  Any report, notice, demand or other communication that by any provision of this Trust Agreement is required or permitted to be given or served to or upon any Holder or the Depositor may be given or served in writing delivered in person, or by reputable, overnight courier, by telecopy or by deposit thereof, first-class postage prepaid, in the United States mail, addressed, (a) in the case of a Holder of Preferred Securities, to such Holder as such Holder's name and address may appear on the Securities Register; and (b) in the case of the Holder of all the Common Securities or the Depositor, to Dunmore Homes, LLC 2150 Professional Drive, Suite 150, Roseville, California 95661, Attention: Mr. West, or to such other address as may be specified in a written notice by the Holder of all the Common Securities or the Depositor, as the case may be; to the Property Trustee. Such report, notice, demand or other communication to or upon a Holder or the Depositor shall be deemed to have been given when received in person, within one (1) Business Day following delivery by overnight courier, when telecopied with receipt confirmed, or within three (3) Business Days following delivery by mail, except that if a notice or other document is refused delivery or cannot be delivered because of a changed address of which no notice was given, such notice or other document shall be deemed to have been delivered on the date of such refusal or inability to deliver.

(b)    Any notice, demand or other communication that by any provision of this Trust Agreement is required or permitted to be given or served to or upon the Property Trustee, the Delaware Trustee, the Administrative Trustees or the Trust shall be given in writing by deposit thereof, first-class postage prepaid, in the U.S. mail, personal delivery or facsimile transmission, addressed to such Person as follows: (i) with respect to the Property Trustee to JPMorgan Chase Bank, National Association, 600 Travis, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services—Dunmore Homes Statutory Trust I, facsimile no. (713) 216-2101, (ii) with respect to the Delaware Trustee, to Chase Bank USA, National Association, 500 Stanton Christiana Road, Building 4 (3rd Floor), Newark, Delaware 19713, Worldwide Securities Services—Dunmore Homes Statutory Trust I, facsimile no. (302) 552-6280; (iii) with respect to the Administrative Trustees, to them at the address above for notices to the Depositor, marked "Attention: Administrative Trustees of Dunmore Homes Statutory Trust I," and (iv) with respect to the Trust, to its principal executive office specified in Section 2.2, with a copy to the Property Trustee. Such notice, demand or other communication to or upon the Trust, the Property Trustee or the Administrative Trustees shall be deemed to have been sufficiently given or made only upon actual receipt of the writing by the Trust, the Property Trustee or the Administrative Trustees.

SECTION 10.9.   *Agreement Not to Petition.*

Each of the Trustees and the Depositor agree for the benefit of the Holders that, until at least one year and one day after the Trust has been terminated in accordance with Article IX, they shall not file, or join in the filing of, a petition against the Trust under any Bankruptcy Law or otherwise join in the commencement of any proceeding against the Trust under any Bankruptcy Law. If the Depositor takes action in violation of this Section 10.9, the Property Trustee agrees, for the benefit of Holders, that at the expense of the Depositor, it shall file an answer with the applicable bankruptcy court or otherwise properly contest the filing of such petition by the Depositor against the Trust or the commencement of such action and raise the defense that the Depositor has agreed in writing not to take such action and should be estopped and precluded therefrom and such other defenses, if any, as counsel for the Property Trustee or the Trust may assert.

SECTION 10.10.   *Counterparts.* This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Trust Agreement as of the day and year first above written.

DUNMORE HOMES, LLC,

as Depositor

By: _____

Name:

Title:


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Property Trustee

CHASE MANHATTAN BANK USA, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____

By: _____

Name:

Name:

Title:

Title:


_____

Administrative Trustee

Name:

_____

Administrative Trustee

Name:

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Trust Agreement as of the day and year first above written.

DUNMORE HOMES, LLC,

as Depositor

By: _____

    Name:

    Title:

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Property Trustee

By: _____

    Name: MARIA D. CALZADO
             Vice President

    Title:

CHASE BANK USA, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____

    Name:

    Title:

_____
Administrative Trustee

Name:

_____
Administrative Trustee

Name:

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Trust Agreement as of the day and year first above written.

DUNMORE HOMES, LLC,

as Depositor

By: _____

    Name:

    Title:

| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Property Trustee | CHASE BANK USA, NATIONAL ASSOCIATION, as Delaware Trustee |
|---|---|
| By: _____ | By: _Sarika M. Sheth_____ |
|   Name: |   Name: **Sarika M. Sheth** |
|   Title: |   Title: **Trust Officer** |
| _____ | _____ |
| Administrative Trustee | Administrative Trustee |
| Name: | Name: |

Exhibit A

## CERTIFICATE OF TRUST

### OF

### Dunmore Homes Statutory Trust I

This Certificate of Trust of Dunmore Homes Statutory Trust I (the *"Trust"*) is being duly executed and filed on behalf of the Trust by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. C. §3801 et seq.) (the *"Act"*).

1.    <u>Name</u>.  The name of the statutory trust formed by this Certificate of Trust is: Dunmore Homes Statutory Trust I.

2.    <u>Delaware Trustee</u>.  The name and business address of the trustee of the Trust with its principal place of business in the State of Delaware are:

Chase Bank USA, National Association
c/o JPMorgan Chase Bank, National Association
500 Stanton Christiana Road, OPS4/3rd Floor
Newark, Delaware 19713
Attention: Worldwide Securities Services.

3.    <u>Effective Date</u>.  This Certificate of Trust shall be effective upon its filing with the Secretary of State of the State of Delaware.

IN WITNESS WHEREOF, the undersigned have duly executed this Certificate of Trust in accordance with Section 3811(a)(1) of the Act.

CHASE BANK USA, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Delaware Trustee

By: _____

Name:

Title:

# **Exhibit B**

JAN.28.2008 11:31 212-941-0299    DLS INC    P192



**DLS** **Demovsky Lawyer Service**
Premier Nationwide Document Retrieval
and Process Service Company

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X

TABERNA CAPITAL MANAGEMENT, LLC,

        Plaintiff,

        -against-

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

        Defendants.

-----------------------------------------------------------X

STATE OF CALIFORNIA  )
              S.S.
COUNTY OF SACRAMENTO  )

Index No. 08/600155

AFFIDAVIT OF SERVICE

NEW YORK
COUNTY CLERK'S OFFICE

FEB 08 2008

NOT COMPARED
WITH COPY FILE

JENICE ROSSNER , being duly sworn, deposes and says that he/she is

over eighteen years of age, is an agent of the attorney service, DLS, INC., and is not party to this action.

That on the 24th day of January, 2008, at approximately the time of 12 15 PM, deponent

served a true copy of the SUMMONS AND COMPLAINT upon DHI DEVELOPMENT f/k/a

DUNMORE HOMES, LLC at 8781 Sierra College Boulevard, Granite Bay, CA, by personally delivering

and leaving the same with PAM McMANN who informed deponent that she holds the position of Office

Manager with that company and is authorized by appointment to receive service at that address.

PAM McMANN is a white female, approximately 57 years of age, stands approximately 5

feet 5 inches tall, weighs approximately 140 pounds with brown hair.

*Jenice Rossner*
PROCESS SERVER

State of California, County of Sacramento
Subscribed and Sworn to (or affirmed) before me on
this ___ day of _____, 2008 By
JENICE ROSSNER , personally
known to me or proved to me on the basis of
satisfactory evidence to be the person(s) who
appeared before me.

NOTARY PUBLIC

DLS, Inc.
01 Broadway
e 510
Y, NY 10013
1-915-1220
ww.dlsny.com



ELLIOTT BENNER
COMM. # 1777865
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES NOV. 4, 2011

# **Exhibit C**

JAN.28.2008 11:31 212-941-0235    DLS INC



**Demovsky Lawyer Service**
Premier Nationwide Document Retrieval
and Process Service Company

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------X

TABERNA CAPITAL MANAGEMENT, LLC,

     Plaintiff,

     -against-

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

     Defendants.
-------------------------------------------------------X

Index No. 08/600155

**AFFIDAVIT OF SERVICE**

NEW YORK
COUNTY CLERK'S OFFICE

FEB 08 2008

NOT COMPARED
WITH COPY FILE

STATE OF CALIFORNIA   )
               S.S.
COUNTY OF SACRAMENTO  )

JENICE ROSSNER , being duly sworn, deposes and says that he/she is

over eighteen years of age, is an agent of the attorney service, DLS, INC., and is not party to this action.

That on the 24th day of January, 2008, at approximately the time of 12:15 PM, deponent

served a true copy of the SUMMONS AND COMPLAINT upon MICHAEL A. KANE at 878 Sierra

College Boulevard, Granite Bay, CA, by personally delivering and leaving the same with Office

Manager, PAM McMANN, a person of suitable age and discretion at that address, the actual

place of business. At the time of service, deponent asked whether MICHAEL A. KANE is in

active military service for the United States of America or for the State in any capacity whatever

or dependent upon a person in active military service and received a negative reply.

PAM McMANN is a white female, approximately 37 years of age, stands approximately 5

feet 5 inches tall, weighs approximately 140 pounds with brown hair.

*Jenice Rossn*
PROCESS SERVER

State of California, County of Sacramento
Subscribed and Sworn to (or affirmed) before me on
this 5th day of February, 2008 By
JENICE ROSSNER personally
known to me or proved to me on the basis of
satisfactory evidence to be the person(s) who
appeared before me.

NOTARY PUBLIC



ELLIOTT BENNER
COMM. # 1777865
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES NOV. 4, 2011

DLS, Inc.
... Broadway
... 510
... NY 10013
2-925-1220
www.dlsny.com

  **Demovsky Lawyer Service**
Premier Nationwide Document Retrieval
and Process Service Company

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X

TABERNA CAPITAL MANAGEMENT, LLC,

        Plaintiff,

     -against-

SIDNEY B. DUNMORE, MICHAEL A. KANE,
and DHI DEVELOPMENT f/k/a DUNMORE
HOMES, LLC,

       Defendants.
------------------------------------------------------------X

Index No. 08/600155

AFFIDAVIT OF MAILING

NEW YORK
COUNTY CLERK'S OFFICE

FEB 08 2008

NOT COMPARED
WITH COPY FILE

STATE OF NEW YORK  )
                S.S.
COUNTY OF NEW YORK  )

      HOWARD D. GOLDMAN, being duly sworn, deposes and says that he is over the age of

eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

      That on the 29th day of January, 2008, deponent served a true copy of the SUMMONS

AND COMPLAINT upon MICHAEL A. KANE by first class mail, by enclosing a true copy thereof in a

securely sealed and postpaid wrapper with the words "PERSONAL AND CONFIDENTIAL" written on

the same envelope, and not indicating on the outside that it is from an attorney or concerns an action

against the person to be served, and depositing the same into an official depository maintained by the

Government of the United States, City and State of New York, addressed as follows:

MICHAEL A. KANE
8781 Sierra College Boulevard
Granite Bay, CA 95746

HOWARD D. GOLDMAN
#932192

Sworn to before me this
29th day of January, 2008

JONATHAN T. RIPPS
Notary Public, State of New York
NO. 01RI6109718
Qualified in Rockland County
Certificate Filed in New York County
Commission Expires May 17, 20___

NOTARY PUBLIC

D.L.S., Inc.
401 Broadway
Ste 510
NY, NY 10013
212-925-1220
www.dlsny.com

# __Exhibit D__

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
DAVID L. NEALE (DN 1948/CA State Bar No. 141225)
BETH ANN R. YOUNG (CA State Bar No. 143945)
MICHELLE S. GRIMBERG (CA State Bar No. 217327)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:   (310) 229-1234
Facsimile:   (310) 229-1244

Attorneys for Defendant Sidney B. Dunmore

DIEPENBROCK HARRISON
KRISTA J. DUNZWEILER (State Bar No. 227384)
400 Capitol Mall, Suite 1800
Sacramento, California 95814
Telephone: (916) 492-5000
Facsimile: (916) 446-4535

Attorneys for Defendant Michael A. Kane

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| TABERNA CAPITAL MANAGEMENT, LLC, | : Index No. 08/600155 |
| Plaintiff, | : |
| - against - | : **NOTICE OF REMOVAL OF STATE COURT CIVIL ACTION** |
| SIDNEY B. DUNMORE, MICHAEL A. KANE, and DHI DEVELOPMENT f/k/a DUNMORE HOMES, LLC, | **TO FEDERAL COURT** |
| Defendants. | : |

## TO PLAINTIFF AND THE CLERK OF THE ABOVE-ENTITLED COURT:

**PLEASE TAKE NOTICE** that on or about February 21, 2008, defendants Sidney B.

Dunmore and Michael A. Kane (collectively, "Defendants") filed in the United States District

Court, Southern District of New York, a Notice to Federal Court of Removal of Civil Action

from State Court. DHI Development f/k/a Dunmore Homes, LLC, consented to the removal. A

copy of this Federal Notice of Removal is attached hereto as Exhibit "A".

    **PLEASE TAKE FURTHER NOTICE,** that by the filing of said Federal Notice of

Removal, and by the filing of this Notice to State Court herein and a copy of same in the Federal

Court, the above-entitled action has been removed from this Court to the United States District

Court, Southern District of New York, pursuant to 28 U.S.C. §§ 1441 and 1446 and this Court

may proceed no further unless and until the case is remanded.

                Respectfully submitted,

Dated: February 21, 2008        LEVENE, NEALE, BENDER, RANKIN &
                      BRILL L.L.P.

                      By: _____

                          David L. Neale
                          Beth Ann R. Young
                          Michelle Sharoni Grimberg
                      Attorneys for Defendant Sidney B. Dunmore

Dated: February 21, 2008        DIEPENBROCK HARRISON

                      By: _____

                        Krista J. Dunzweiler
                      Attorneys for Defendant Michael A. Kane

## PROOF OF SERVICE
## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action; my business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067.

On February 21, 2008 I served the document(s) described as:

## NOTICE OF REMOVAL OF STATE COURT
## CIVIL ACTION TO FEDERAL COURT

On the interested parties in this action by placing a true copy(ies) thereof, enclosed in sealed envelopes, with first class postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as follows:

Kenneth G. Roberts                 DHI DEVELOPMENT
James L. Simpson                   f/k/a DUNMORE HOMES, LLC
WOLF, BLOCK, SCHORR AND            8781 Sierra College Blvd., Suite 100
    SOLIS-COHEN LLP                Granite Bay, CA 95746
250 Park Avenue
New York, NY 10177

Krista J. Dunzweiler
DIEPENBROCK HARRISON
400 Capitol Mall, Suite 1800
Sacramento, CA 95814

__X__ (By Mail) I caused such envelope with postage thereon, fully prepaid to be placed in the United States mail. Executed on February 21, 2008, at Los Angeles, California.

_____ (By Facsimile) I caused said document to be sent via facsimile to the offices of the addressee so designated on the attached list. Executed on _____ __, 2008, at Los Angeles, California.

_____ (By Federal Express/Overnight Mail) I caused such envelope to be delivered by Federal Express (or Express Mail), next business day delivery to the offices of the addressees. Executed on _____ _____, 2008, at Los Angeles, California.

__X__ (State) I declare under penalty of perjury under the laws of the State of New York that the above is true and correct.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

_____
Angela Antonio

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action; my business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067.

On February 21, 2008 I served the document(s) described as:

**NOTICE TO FEDERAL COURT OF REMOVAL OF**
**CIVIL ACTION FROM STATE COURT**

On the interested parties in this action by placing a true copy(ies) thereof, enclosed in sealed envelopes, with first class postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as follows:

Kenneth G. Roberts                          DHI DEVELOPMENT
James L. Simpson                            f/k/a DUNMORE HOMES, LLC
WOLF, BLOCK, SCHORR AND                     8781 Sierra College Blvd., Suite 100
    SOLIS-COHEN LLP                         Granite Bay, CA 95746
250 Park Avenue
New York, NY 10177

Krista J. Dunzweiler
DIEPENBROCK HARRISON
400 Capitol Mall, Suite 1800
Sacramento, CA 95814

  _X_  (By Mail) I caused such envelope with postage thereon, fully prepaid to be placed in the United States mail. Executed on February 21, 2008, at Los Angeles, California.
  _____  (By Facsimile) I caused said document to be sent via facsimile to the offices of the addressee so designated on the attached list. Executed on _____ __, 2008, at Los Angeles, California.
  _____  (By Federal Express/Overnight Mail) I caused such envelope to be delivered by Federal Express (or Express Mail), next business day delivery to the offices of the addressees. Executed on _____ _____, 2008, at Los Angeles, California.

  _X_  (Federal) I declare that I am an employee in the offices of a member of the State Bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Angela Antonio

# **Exhibit C**



**California Business Portal**

Secretary of State **DEBRA BOWEN**

**DISCLAIMER:** The information displayed here is current as of FEB 29, 2008 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| DHI DEVELOPMENT | | |
| **Number:** C1580012 | **Date Filed:** 2/25/1987 | **Status:** active |
| **Jurisdiction:** California | | |
| **Address** | | |
| 8781 SIERRA COLLEGE BLVD STE 100 | | |
| GRANITE BAY, CA 95746 | | |
| **Agent for Service of Process** | | |
| SIDNEY B DUNMORE | | |
| 8781 SIERRA COLLEGE BLVD STE 100 | | |
| GRANITE BAY, CA 95746 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

# **<u>Exhibit D</u>**

Division of Corporations - Online Services                                  Page 1 of 1



# State of Delaware

The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & L

State Directory | Help | Search Delaware                    Citizen Services | Business Services | V

**Department of State: Division of Corporations**

Frequently Asked Questions    View Search Results

<table>
<tr><td colspan="3">

## Entity Details

</td></tr>
</table>

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 3697957 | Incorporation Date / Formation Date: | 08/28/2003 (mm/dd/yyyy) |
| Entity Name: | TABERNA CAPITAL MANAGEMENT, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | ANDREW M. LUBIN | | |
| Address: | 110 S. POPLAR STREET SUITE 101 | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00

Would you like ◯ Status ◯ Status,Tax & History Information    [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov