UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
-----------------------------------------------------------------x
TABERNA CAPITAL MANAGEMENT, LLC,          :

                    Plaintiff,          :          08 Civ. 1817 (JSR)

          - against -          :

                                        :          **DECLARATION OF**
SIDNEY B. DUNMORE, MICHAEL A. KANE,          :          **JILL L. MANDELL IN**
and DHI DEVELOPMENT f/k/a DUNMORE                    **OPPOSITION TO**
HOMES, LLC,          :          **DEFENDANTS' MOTIONS TO**
                                        **DISMISS OR TRANSFER**

                    Defendants.          :

-----------------------------------------------------------------x

    I, Jill L. Mandell, hereby declare, pursuant to the penalty of perjury, that the following is true:

    1.      I am a member of the Bar of this Court and an associate of WolfBlock LLP,

attorneys for plaintiff Taberna Capital Management, LLC ("Taberna").  I respectfully submit this

declaration in opposition to defendants' motions to dismiss for lack of personal jurisdiction or

improper venue or to transfer this action to the federal district court located in their home

venue—the Eastern District of California.  I have personal knowledge of the facts herein.

    2.      Taberna's Complaint alleges that in 2007, Sidney B. Dunmore ("Sidney

Dunmore") and Michael A. Kane ("Kane") caused DHI Development ("DHI") to default on a

$20 million note beneficially owned by Taberna.  (Complaint ¶¶ 16-21)[1]  The Complaint also

alleges that Sidney Dunmore and Kane caused DHI to unlawfully transfer its assets to an entity

Sidney Dunmore and Kane formed in New York, Dunmore Homes, Inc. ("Dunmore NY"), in a

scheme to avoid paying the $20 million.  (Complaint ¶¶ 29-32)

    3.      Kane became the owner of Dunmore NY.  (Kane Aff. ¶ 4, Mar. 8, 2008)

---

[1]      A full copy of the Complaint already has been set forth in this motion record by both
defendants.  (Dunmore Req. Jud. Notice Ex. B (Removal Notice Ex. A)); (Kane Req. Jud.
Notice Ex. B (Removal Notice Ex. A)).

4.      According to Dunmore NY's bankruptcy filings, Sidney Dunmore is a member of Dunmore NY's senior management in his capacity as a so-called "consultant." (Strauch Aff. ¶ 70 & sched. 9, Nov. 13, 2007, a copy of which is annexed hereto as Exhibit A)

5.      In response to defendants' motions, Taberna obtained leave to serve expedited jurisdictional document requests (a copy of which is annexed hereto as Exhibit B). In response to these requests, Sidney Dunmore produced 116 pages of documents which included an Asset Purchase Agreement between DHI and Dunmore NY, (a copy of which is annexed hereto as Exhibit C), and emails between Sidney Dunmore and Kane (copies of which are annexed hereto as Exhibit D). Kane produced 413 pages of documents, which included an unsigned Agreement, (a copy of which is annexed hereto as Exhibit E), many copies of a Confidentiality Agreement, (copies of which are annexed hereto as Exhibit F), and an unsigned individual confidentiality agreement (a copy of which is annexed hereto as Exhibit G).

6.      Sidney Dunmore and Kane caused the sale of DHI's $250 million in assets to Dunmore NY in exchange for $500. (Ex. C § 2.1) They then filed a Chapter 11 petition for Dunmore NY in New York, in the United States Bankruptcy Court for the Southern District of New York. *In re Dunmore Homes, Inc*., Case No. 07-13533 (MG).

7.      Taberna is the beneficial owner of a $20 million Note (the "Note") issued by DHI and the Indenture (the "Indenture") governing it.[2]

8.      Taberna commenced this action in the Supreme Court of New York, County of New York, against DHI for breach of the Indenture, and against Sidney Dunmore and Kane for

---

[2]      The Indenture and Note are attached as Exhibits A and B to the Complaint, and have already been produced by both defendants on this motion record, as described above in Note 1.

The Note and the Indenture were issued to JP Morgan Chase, as Trustee, and were subsequently transferred to The Bank of New York, as Trustee.

tortious interference, breach of fiduciary duty, fraudulent conveyance, alter-ego liability, and unjust enrichment – arising out of their scheme to deprive Taberna of the $20 million owing by DHI.

9.     Sidney Dunmore and Kane removed the action to this Court by Notice of Removal dated February 21, 2008.  (Dunmore Req. Jud. Notice Ex. B; Kane Reg. Jud. Notice Ex. B)  At page 4 of the Notice of Removal, Sidney Dunmore signed a consent on behalf of DHI.

10.     The Indenture contains the following forum selection clause:

SECTION 1.12. Submission to Jurisdiction.

Any legal action or proceeding by or against any party hereto **or with respect to** or arising out of this Indenture may be brought in or removed to the courts of the State of New York, in *and* for the County of New York, or of the United States of America for the **Southern District of New York** (in each case sitting in the borough of Manhattan). by execution and delivery of this Indenture, **each party accepts, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts** (and courts of appeals therefrom) for legal proceedings arising out of or in connection with this Indenture.

(quoted provision attached hereto as Exhibit H) (emphasis added).[3]

11.     Sidney Dunmore and Kane caused DHI to transfer its assets to Dunmore NY at a time when DHI was experiencing Events of Default outlined in Section 5.1 of the Indenture—which transfer violated Section 8.1(b) of the Indenture.  According to DHI's papers filed in the bankruptcy proceeding, the transfer was done to facilitate Sidney Dunmore's receipt, personally, of a multi-million dollar income tax benefit.  (Strauch Aff. ¶ 30) (attached hereto as Ex. A)

---

[3]     The full Indenture has already been placed on the motion record by both defendants, as indicated above in Notes 1 and 2.

12.    An unsigned Agreement produced by Kane—but not by Sidney Dunmore—reveals that Sidney Dunmore, through Dunmore Investments, LLC—another one of his corporate entities—paid Kane $250,000 for Kane's participation.  (Ex. E ¶ 1)

13.    Sidney Dunmore and Kane deliberately chose New York as the state of incorporation for their fraudulent transferee – specifically to avail themselves of what they perceived to be the advantage of a New York venue to perpetrate their fraud.  In an email dated August 20, 2007, Sidney Dunmore wrote to Kane that "our Southern Cal. Attorneys are putting together a **New York C corp.** to use instead of Delaware they seem to **like that venue better**." (Ex. D) (emphasis added).  This was merely 10 days prior to their creation of the transferee corporation, Dunmore NY, as evidenced by the certificate of incorporation attached hereto as Exhibit I.

14.    When California trade creditors moved to transfer the bankruptcy proceeding to California, Sidney Dunmore and Kane caused Dunmore NY to oppose the transfer motion and argue that New York was the most convenient venue.  A copy of Dunmore NY's opposition brief is annexed hereto as Exhibit J.

15.    On Taberna's behalf, The Bank of New York, as Trustee under the Indenture, also opposed transfer and argued that New York was the most convenient forum.  A copy of the Trustee's opposition brief is annexed hereto as Exhibit K.

16.    The bankruptcy court ultimately transferred the case, finding that California was the more convenient forum for the majority of Dunmore NY's trade creditors – none of whom are parties or witnesses in the case at bar.  (Dunmore Req. Jud. Notice Ex. A; Kane Req. Jud. Notice Ex. A)

17.    Taberna is headquartered at 450 Park Avenue, New York, New York.

18.     The Trustee of the Indenture, The Bank of New York, is also headquartered in Manhattan, at One Wall Street.

19.     The Indenture and the Note were issued under New York law.

WHEREFORE, plaintiff Taberna Capital Management, LLC respectfully requests that the Court deny defendants' motions to dismiss or transfer.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        March ___, 2008


_____
                    Jill L. Mandell

# EXHIBIT A

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Richard M. Pachulski (CA Bar No. 90073)
Debra Grassgreen (CA Bar No. 169978)
Maria A. Bove (MB-8687)

[Proposed] Counsel for the Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DUNMORE HOMES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 07-13533 (MG) |

## AFFIDAVIT OF DOUG STRAUCH
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

Doug Strauch, being duly sworn, deposes and says:

1.      I am the Vice President of Finance of Dunmore Homes, Inc., the debtor

and debtor in possession in the above-captioned chapter 11 case (the "Debtor"). In this capacity,

I am familiar with the day-to-day operations, business and financial affairs of the Debtor and the

other Dunmore Companies (as defined below).

2.      The Debtor is a New York corporation. The Debtor is the direct or

indirect parent of various non-debtor affiliates, as described below (collectively, the "Dunmore

Companies").

3.      As described more fully below, the commencement of this case resulted

from the significant and well publicized downturn in the real estate development industry, the

---

[1] The last four digits of the Debtor's Federal Tax I.D. Number are 8267.

19499-001\DOCS_SF:56819.5

Dunmore Companies' significant land holdings, and the liquidity pressures placed upon the Debtor stemming from the foregoing. The Debtor believes that the initiation of this chapter 11 case will provide it access to the necessary capital (as well as a "breathing spell") to complete the restructuring of its operations or effect a restructuring transaction pursuant to a process that was commenced prepetition. If successful, this will enable the Debtor to preserve its position as a leader in the California residential real estate market.

4.    I submit this Affidavit pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules") in support of (a) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on November 8, 2007 (the "Petition Date") and (b) the "first-day" relief that Dunmore has requested in certain motions and applications filed with the Court (collectively, the "First Day Pleadings"), and to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of this chapter 11 case.

5.    The relief sought in the First Day Pleadings is intended to enable the Debtor to operate effectively and avoid or minimize certain adverse consequences that might otherwise result from the commencement of this chapter 11 case. In particular, the First Day Pleadings seek relief aimed at ensuring the smooth transition of the Debtor's business into chapter 11 and maintaining employee morale. I have reviewed the First Day Pleadings and I believe that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and the success of the Debtor's reorganization.

6.    Except as otherwise indicated, all facts set forth in this Affidavit are based upon personal knowledge, my review of relevant documents or my opinion based upon

experience, knowledge and information concerning the operations of the Debtor and the

Dunmore Companies. If called upon to testify, I would testify competently to the facts set forth

in this Affidavit.

7.      Part I of this Affidavit provides an overview of the Dunmore Companies'

business. Part II provides a description of the Dunmore Companies' organizational structure,

significant indebtedness and capital structure. Part III provides a discussion of the Dunmore

Companies' financial performance, the events that compelled the commencement of this

reorganization case and the Debtor's restructuring goals. Part IV sets forth the relevant facts in

support of the First Day Pleadings. Part V contains information required by Local Bankruptcy

Rule 1007-2.

## Part I

### The Dunmore Companies' Business and Organizational Structure

8.      The Dunmore Companies build single family residential housing for first

time homebuyers and, in certain instances, second time move up buyers located in communities

throughout Northern and Central California. The Dunmore Companies perform entitlement and

land development work in preparing sites for homebuilding and build communities and homes

from the foundation to the finishing touches.

9.      Prior to September 10, 2007, the Subsidiaries and the other assets of the

Debtor were owned by Dunmore Homes, a California corporation ("Dunmore California").

Dunmore California is the successor by merger to Dunmore Homes, LLC. On September 10,

2007, Dunmore California, sold all of its assets to the Debtor, a New York corporation wholly

owned by Michael Kane. The Debtor assumed all the liabilities of Dunmore California (the

"Sale"). Contemporaneously therewith, Dunmore California changed its name to DHI Development, Inc., a California corporation.

10. Dunmore California is wholly owned by Sidney B. Dunmore. Sidney B. Dunmore acquired his experience from his father, George Dunmore, who was also a homebuilder in the Sacramento region using the Dunmore name in various entities since the early 1950's. Dunmore California and other Dunmore family entities had been building residential communities in California for over 50 years. When Dunmore California sold its assets to the Debtor, it transferred its name and reputation as a premier private, independent homebuilder in California.

11. Today, over 22,000 families throughout California and Nevada call their Dunmore community home. In addition, over the last half-century, the Dunmore Companies and their predecessors and family entities received numerous awards for quality, designs, customer-care and community service. Most recently, Dunmore California attained the NAHB National Homebuilder Quality (NHQ) certification, which at the time made Dunmore one of only 4 NHQ certified builders in California and the 9th NHQ certified builder in the country.

12.     The Dunmore Companies have 26 communities which are organized into fourteen limited liability companies and one limited partnership, (collectively, the "Subsidiaries") which are all owned (in whole or in substantial part) by the Debtor.[2]  The Dunmore Companies have financed fifteen of these Subsidiary entities, representing twenty-five communities, with secured debt at the Subsidiary level.  Such financing has been provided by nine different lenders (or lending groups) and is generally guaranteed by the Debtor (or the Debtor is a co-borrower).  The Subsidiaries are not currently debtors but are engaged in an out of court restructuring process.

13.     As of the Petition Date, the Debtor employed approximately 37 people, down from approximately 132 at this time last year.

14.     With existing home inventory levels spiking and home value falling, a rapid increase in foreclosures and severe dislocation in the sub-prime mortgage market, Sacramento and the Central Valley home-buyers markets have been among the hardest hit in the U.S.  As a result, beginning in September of 2005, Dunmore California experienced declining home absorption and pricing levels and deteriorating financial performance.  Further, the impact of the recent sub-prime mortgage market dislocation impacted Dunmore California heavily as a significant majority of their customers had been financed with sub-prime or non-conventional mortgages.  The prolonged downturn, coupled with the Dunmore Companies' significant land

---

[2]  The Subsidiaries are: Dunmore Canterbury LLC ("Canterbury"; Dunmore Country Villas, LLC ("Country Villas"); Dunmore Fullerton Ranch, LLC (Fullerton Ranch"); Dunmore Highland, LLC ("Highland"); Dunmore Laguna Reserve, LLC ("Laguna Reserve"); Dunmore Orchard LLC ("Orchard"); Dunmore-Providence LLC ("Providence"); Dunmore Stone Creek, LLC ("Stone Creek"); Fahrens Park LP ("Fahrens Park"); Dunmore Viscaya LLC ("Viscaya"); Dunmore Diamond Ridge LLC ("Diamond Ridge"); Dunmore Croftwood LLC ("Croftwood"); Dunmore Westport, LLC ("Westport"); Dunmore Sycamore Ranch LLC ("Sycamore Ranch"); and Dunmore Montecito LLC ("Montecito").  The Debtor wholly owns all of the Subsidiaries except Dunmore Croftwood, LLC, Dunmore Diamond Ridge, LLC, Dunmore Highlands, LLC and Dunmore Viscaya, LLC, all of which are operated as joint ventures with Weyerhauser Realty Investors ("WRI").  The Debtor also has an interest in the following inactive subsidiaries: Dunmore Brown Estates, LLC; Dunmore Reflections II, LLC; Dunmore Wildhawk, LLC; Fairways, LLC; Dunmore Sierra, LLC; Dunmore Delano, LLC; Dunmore Wildhawk North LP; and the Dunmore Homes Statutory Trust 1.

holdings, resulted in a severe liquidity crisis. In response to market conditions and its financial

performance, Dunmore California and the Subsidiaries halted nearly all home construction and

land development operations and sales operations on August 1, 2007. Payroll has been reduced

by over 50%; however, the core management and operating staff remain employed to ensure that

an efficient transition back to a state of full operations can proceed when justified. Additionally,

beginning in August 2007, Dunmore California and the Subsidiaries experienced a series of

technical and non-technical defaults under many of its existing secured debt agreements.

        15.    Thereafter, several suppliers recorded mechanics liens and commenced

litigation against the Dunmore Companies and Dunmore California. In addition, various Secured

Lenders recorded notice of default and elections to sell under their respective deeds of trust. One

Secured Lender --RBC-- sued the Debtor, Dunmore California, certain Subsidiaries, and certain

individuals and has alleged that the Sale was a fraudulent conveyance.

        16.    Among other pending actions, on or about September 11, 2007, Cal Sierra

Construction, Inc. ("Cal Sierra") recorded mechanics liens against certain property owned by

Laguna Reserve in connection with work performed by Cal Sierra pursuant to a purported

agreement with the Debtor. On September 25, 2007, Cal Sierra filed a complaint against

Dunmore and Laguna Reserve, alleging causes of action for breach of contract, foreclosure of

mechanic's lien, unjust enrichment and accounts stated. Cal Sierra also sought prejudgment writs

of attachment (the "Writs") against the Debtor and Laguna Reserve for $1,977,121.40, plus fees

and costs in obtaining the writs. The hearing on the motion seeking the Writs was scheduled for

November 8, 2007. The hearing as to the Debtor was stayed as a result of its bankruptcy filing.

However, the Sacramento County Superior Court issued a writ of attachment against all assets of

Laguna Reserve. Cal Sierra has filed a similar lawsuit, and has also sought a writ of attachment, against Croftwood.

## Part II

### Capital Structure

17.    The book value of the Debtor's consolidated assets was approximately $280,592,251 and consolidated liabilities totaled approximately $250,285,447 as of September 30, 2007.[3]

*Assets*

18.    As of the Petition Date, the Debtor's principal assets included: (a) its interests in the Subsidiaries; (b) cash on hand of approximately $119,000, (c) an option to purchase 19.8 acres of property in Northern California with an estimated value in excess of the option exercise price of $815,000 (the "Cordano Option"),[4] (d) the Debtor's interest in the Executive Non Qualified Excess Plan (the "Deferred Compensation Plan") valued at approximately $1,700,000, (e) a note from Mr. Dunmore (the "Lender Receivable"), in the amount of approximately $11.2 million as of the Petition Date, which is secured by Mr. Dunmore's anticipated 2007 Federal tax refund, (f) 161 acres of mitigation property in Northern California, which is encumbered by a first lien in favor of Sacramento Valley Farm Credit, with

---

[3]  To the extent the financial results of Dunmore's prepetition business operations are set forth herein, they include not only the operations of the Debtor, but also the operations of non-debtor subsidiaries and affiliates. The Debtor will file schedules and statements of financial affairs pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") at a later date by a deadline to be established by this Court.

[4]  The Cordano Option was entered into in 2001, at an option exercise price of $1,660,000. The buyer (Dunmore California) exercised its first "Closing Notice" to the seller in October 2006. Under the terms of the agreement, the seller can continue to extend the closing date annually, until 2013. Under this arrangement, a "Closing Notice" is due by the buyer each year, in October at which time the seller may opt to continue the option for an additional twelve months. The option has non-applicable, non-refundable, semi-annual deposits of approximately $46,000 as calculated in the agreement. The Cordano Option has a current estimated valuation of $125,000 per acre on 19.8 acres, for a total valuation of $2,475,000. The value in excess of the option price today is $815,000.

an estimated equity value of $2.8 million,[5] (g) a receivable due from Dunmore Land Company in the amount of approximately $351,000; and (h) $350,000 in certificates of deposit which may be subject to restrictions on their use.[6]

### *Significant Indebtedness*

19.     Twenty-five of the Debtor's twenty-six communities are financed by secured debt pursuant to loan agreements with nine lenders or lending groups (the "Secured Lenders") representing eleven individual lenders.[7]  Approximately $196 million of secured debt is owed at the Subsidiary level.  Dunmore California is the guarantor, and in certain circumstances, the co-borrower with a Subsidiary on the project debt, and the Debtor assured the guaranty obligators in connection with the Sale.  In addition, the Debtor is the primary obligor of approximately $2 million in debt, which is secured by a second lien on the assets of Dunmore Montecito, LLC, Dunmore Fullerton Ranch, LLC, and Dunmore Highland, LLC.  Lastly, the Debtor is obligated on $20 million of Trust Preferred Securities (as defined below).

20.     Specifically, the Debtor's debt obligations consist primarily of the following:

a.     Secured Subsidiary Debt

21.     The chart annexed hereto as Exhibit A, shows the various Secured Lenders and their principal collateral:

---

[5] This 161 acre parcel is under review by a prospective purchaser to be purchased as mitigation property for their use. The estimated market value of the property is $27,000 per acre, on approximately 161 acres, with a total estimated valuation of $4,347,000. Sacramento Valley Farm Credit holds a first trust deed on the property, with an outstanding balance of $1,529,567.23 as of September 30, 2007. The Debtor is currently working on this sale to the prospective purchaser which would result in positive cash flow to the Debtor of approximately $2,817,433.
[6] The Debtor holds two certificates of deposit at Guaranty Bank that are held as "Dunmore Homes for the Benefit of the City of Fresno."
[7] The Secured Lenders are: JMP Securities ("JMP"); Sacramento Valley Farm Credit ("Sacramento"); RBC Builder Finance ("RBC"); Indymac Bank ("Indymac"); Guaranty Bank ("Guaranty"); Key Bank ("Key Bank"); Wachovia Bank, N.A. ("Wachovia"); Affinity Bank ("Affinity"); Comerica Bank ("Comerica"); Franklin Bank ("Franklin"); and United Commercial Bank ("United").

(i)    <u>RBC</u>:  RBC is the lender to the Montecito, Stone Creek, Providence and Diamond Ridge developments.  The Debtor is a co-borrower on the RBC debt which was approximately $39.0 million as of August 31, 2007.

(ii)    <u>IndyMac</u>:  Indymac is the lender on the Whispering Oaks and Windsor developments.  Mr. Dunmore and the Debtor guaranteed the Obligations to Indymac in connection with the loan for Whispering Oaks.  The Debtor guaranteed the obligations to Indymac in connection with the loan for Windsor.  Indymac was owed approximately $8.4 million, as of August 31, 2007.

(iii)    <u>Guaranty Bank</u>:  Guaranty Bank has a master loan agreement and has financed five of the current developments through loans to four subsidiaries.  The Debtor is a co-obligor on the debt to Guaranty.  Guaranty was owed approximately $37.7 million, as of August 31, 2007.

(iv)    <u>Key Bank</u>:  Key bank is the agent for a bank group (which includes Franklin and Wachovia) that is the lender to Highlands/Wildhawk project.  The debt on that project was $31.5 million as of August 31, 2007.  Key Bank is also the lender on the Cypress Cove and Villas projects.  The debt to Key Bank on those projects was $26.0 million as of August 31, 2007.

(v)    <u>Wachovia</u>:  In addition to being a participant in the Wildhawk loan, Wachovia is the lender on the Westport/Trevina developments.  The Debtor guaranteed Westports' obligations to Wachovia in connection therewith.  The debt to Wachovia on account of the Trevina developments was approximately $9.7 million as of August 31, 2007.

(vi)    <u>Comerica</u>:  Comerica is the agent for Affinity and United on the loan to Croftwood for the Lakepoint development.  The Debtor guaranteed Croftwood's

obligations to Comerica in connection therewith.  The outstanding amount due on account of the

Croftwood loan was approximately $24.5 million as of August 31, 2007.  Comerica is also the

lender on the Country Villas/Sundance II development.  The Debtor guaranteed the obligations

to Comerica in connection with the Country Villas loan.  The outstanding balance on the Country

Villas Loan as of August 31, 2007 was $7.2 million.

      (vii)   <u>Affinity</u>:  In addition to being a participant in the Croftwood/Lake

Pointe loan, Affinity is the lender on the Orchard/Laurelwood Development.  Mr. Dunmore and

the Debtor guaranteed the obligations to Affinity in connection with the Orchard/Laurelwood

development.  The debt to Affinity was approximately $10.5 million as of August 31, 2007.

    b.   <u>Direct Obligations</u>

      (i)   <u>JMP</u>:  JMP loaned Dunmore California $2 million in May 2007

secured by junior interests in property owned by Montecito, Fullerton Ranch and Highlands.  Mr.

Dunmore guaranteed the loan from JMP.

      (ii)   <u>Sacramento Valley Farm Credit</u>:  As is set forth above, Sacramento

Valley Farm Credit is the lender on the Stone Mitigation Property.

    c.   <u>Trust Preferred Securities</u>

    22.   On or about June 28, 2005, Dunmore California entered into that certain

Junior Subordinated Indenture Agreement (as amended, the "Indenture Agreement") with JP

Morgan Chase Bank, National Association, as indenture trustee.  Pursuant to the Indenture

Agreement, Dunmore California issued a series of junior subordinated notes (collectively, the

"Trust Preferred Securities"), which mature on July 30, 2035.  As of the Petition Date, the

aggregate total amount outstanding under the Trust Preferred Securities was approximately $20

million.  The Debtor assumed the obligations of Dunmore California pursuant to the Sale.

d.    Obligations to Sureties

23.    Travelers Casualty and Surety Company of America ("Travelers") issued payment and performance bonds ("Bonds") in favor of certain of the Subsidiaries. Dunmore California and Mr. Dunmore each executed a General Agreement of Indemnity in favor of Travelers for any loss incurred in connection with the Bonds. The Debtor assured Dunmore California's obligations to Travelers in connection with the indemnity agreement. Travelers asserts a security interest in Dunmore California's property to secure the indemnification obligation. However, as of the Petition Date, that security interest was unperfected because no UCC-1 financing statement was filed.

e.    Trade Debt

24.    As homebuilders, the Dunmore Companies engage the services of various contractors and subcontractors. Certain contractors and subcontractors have recorded pre-petition mechanics' liens on certain of the Subsidiaries' property in connection with the failure to pay the amounts due pursuant to contracts with such contractors. In addition certain land development contractors have filed claims against the Bonds. As of the Petition Date, the Debtor estimates that the Dunmore Companies have, on a consolidated basis, approximately $28 million in trade debt, approximately $16 million of which is allegedly secured debt as a result of recorded liens and approximately $9 million is bonded. Some of the contractors assert direct claims against Dunmore California. The Debtor assumed those obligations in connection with the Sale.

f.    Other Liabilities

25.    The Debtor also has significant contingent liabilities, including potential liabilities relating to homeowner warranty obligations. These claims are covered, in whole or in part, by insurance.

*Equity*

26.    The Debtor is a privately held company. The Debtor's equity ownership is set forth in the organizational chart attached hereto as Schedule 1.

## Part III

### Financial Performance and Events Leading to the Commencement of the Chapter 11 Case and Restructuring Initiatives

27.    Several external factors have severely impacted the Dunmore Companies' operations and financial performance and ultimately prompted the liquidity pressures that precipitated the need to file this case. Among other things, the Dunmore Companies have been faced with a continued decline in the residential real estate market, which has resulted in declining home sales in terms of unit absorption and pricing. Certain of these factors are described in greater detail below. Importantly, these factors are not anomalies that affect the Dunmore Companies in isolation. Rather, these factors are a symptom of a much broader downturn in the U.S. residential real estate market, which already has taken its toll on several of the Debtor's suppliers and competitors.

28.    Reduced Sales. The Dunmore Companies' financial performance has been severely impacted by the current economic climate in the U.S. housing and mortgage market, resulting in drastically reduced home sales in terms of unit absorption and pricing.

29.    Resulting Liquidity Issues. The Dunmore Companies faced severe liquidity issues in the period immediately preceding the commencement of this chapter 11 case.

Notwithstanding the diligent pursuit of several out-of-court alternatives, including an effort to refinance certain prepetition secured debt and add working capital availability, the Debtor was unable to conclude these efforts within the necessary timeframe. There was no single cause for the Debtor's liquidity issues; rather, a confluence of several factors led to the Debtor being left with insufficient cash to carry on its business operations outside of chapter 11. These factors include: (a) reduced home sales; (b) technical and monetary defaults under lending agreements; (c) lack of long-term access to capital; and (d) pending and threatened litigation.

      30.    <u>Prepetition Sale Transaction.</u>  One of the acts Dunmore California took to maximize value was the Sale transaction mentioned above. Specifically, on September 10, 2007, Dunmore California sold all of its assets to the Debtor for $500 and the assumption of all liabilities in the transaction. Following the Sale, Dunmore California changed its name to DHI Development, Inc. The Sale extinguished Dunmore California's rights to the assets and derivatively eliminated Mr. Dunmore's economic interest in the assets by virtue of the ownership of his stock in Dunmore California. The effect of the Sale will allow Mr. Dunmore to realize net tax losses in 2007 (based on tax returns to be filed in 2008) that will likely entitle Mr. Dunmore to a substantial Federal tax refund. In connection with the Sale, the Debtor and Mr. Dunmore entered into a note modification agreement pursuant to which, among other things, the Lender Receivable was collateralized by the anticipated Federal tax refund and the due date of the Lender Receivable was modified so that the Lender Receivable is payable the earlier of the date the Federal tax refund is received or December 31, 2009. Mr. Dunmore has guaranteed certain obligations of the Debtor and Dunmore California and asserts that he may have a right of offset against the Lender Receivable if he satisfies or reduces those certain obligations. The note modification agreement also provides an expedited dispute resolution procedure for any claims

of offset asserted by Mr. Dunmore to the extent that Mr. Dunmore and Debtor cannot mutually

agree on the offsets asserted by Mr. Dunmore.

### *Prepetition Restructuring Process and Attempts to Obtain Financing.*

       31.     In mid-August 2007, Dunmore California advised the Secured Lenders

that it had retained restructuring counsel and advisors to review alternatives and engage the

Secured Lenders in a dialogue regarding ways to workout the Dunmore Companies' debts. A

detailed review of the Dunmore Companies' projects and overhead was conducted, including

market assessments and budget review.

       32.     In mid-September 2007, following the Sale, the Debtor met individually

with each Secured Lender to present the projected cash flow of the projects and to propose a

restructuring scenario whereby the projects would be built out by the existing lender or taken

over by a "backstop" lender. An investment banker was retained and two weeks later, the Debtor

met with the Secured Lenders as a group to provide an update and to describe the marketing

process for their debt.

       33.     Over the month of October 2007, the Debtor aggressively marketed the

projects. Forty five potential buyers or investors were contacted and numerous parties conducted

diligence calls, financial reviews, and market studies. As of the Petition Date the marketing

process was ongoing.

       34.     The goal of this process will be to find a strategic partner or source of

capital that will result in a restructure of the Debtor's obligations so that it will be in a position to

compete successfully when the housing market recovers. The Debtor believes that this process

will provide it with the best opportunity for returning to financial and operational health.

35.     The Debtor also pursued unsecured financing as part of efforts to recapitalize.  The 45 potential investors were contacted and a variety of alternatives were discussed, including (a) the extension of unsecured, second-lien, or first-lien credit, and (b) whether these parties would lend outside of a bankruptcy.  Of the parties contacted, the ones who expressed an interest in funding indicated they would only do so on a priming first lien basis.  Accordingly, the Debtor sought and obtained post-petition financing from Mr. Dunmore.  The Debtor and Mr. Dunmore engaged in good faith and arms-length negotiation that culminated in a credit agreement with Mr. Dunmore.  No promises have been made, inducements given, or consideration paid or promised to be paid, other than as expressly set forth in the credit agreement.

## Part IV

### Facts in Support of First Day Pleadings

36.     Shortly following the filing of its chapter 11 case, the Debtor also filed a number of First Day Pleadings.  The Court will conduct a hearing on November 16, 2007 (the "First Day Hearing"), at which time the Court will hear and consider certain First Day Pleadings.  The Debtor also anticipates that the Court will consider the remainder of the First Day Pleadings at a later time.[8]

37.     Generally, the First Day Pleadings have been designed to meet the goals of: (a) continuing the Debtor's operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of employees and certain other key constituencies; (c) obtaining necessary postpetition financing; and (d) establishing procedures for the smooth and efficient administration of this chapter 11 case.  I have reviewed

---

[8]  Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

each of the First Day Pleadings, including the exhibits thereto and supporting memoranda, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

38.    I also believe that it is critical that the First Day Motions be heard as soon as possible. If the First Day Motions are not granted on an expedited basis, the Debtor will not have access to cash and will be unable to fulfill its obligations to, among others, employees, customers, and suppliers. Under such circumstances, the Debtor will not be able to continue operations.

39.    The use of cash collateral and the borrowing under the Credit Agreement (as such term is defined below) are integral to the preservation of the value of the Debtor's business because they support the operations of the Subsidiaries. In the absence of expedient approval of the use of cash collateral and the Credit Agreement, the continued existence of the Dunmore Companies is at risk.

40.    Accordingly, the expedited approval of the First Day Motions is (a) critical to the continued viability of the Debtor and (b) in the best interests of all of the Debtor's stakeholders.

## *The Case Administration Motions*

    a.    <u>Extension of Time to File Schedules and Statements</u>

        41.    Because of the size and complexity of the Debtor's operations and the press of business incident to the commencement of this chapter 11 case, the Debtor was unable to assemble, prior to the Petition Date, all of the information necessary to complete and file the required schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements"). Accordingly, the Debtor will seek the entry of an order extending by forty-five (45) days, or until January 7, 2008, the date by which the Schedules and Statements must be filed pursuant to Bankruptcy Rule 1007.

    b.    <u>Case Management Order</u>

        42.    The Debtor will present a motion requesting that this Court enter an order providing for certain notice, hearing and other case management procedures in this chapter 11 case. Given that the Debtor has thousands of potential creditors, requiring that service be made upon each of these parties would be a waste of the Debtor's limited resources. In addition, the Debtor believes that requiring paper service of certain pleadings only upon the main parties in interest, such as the U.S. Trustee; any Committees appointed in this case; counsel for Secured Lenders and the Debtor's proposed postpetition lender; and any party with a particularized interest in the initial pleading, as well as authorizing service on all parties by email, will be efficient and save the estate significant time and expense. Additionally, due to the likely volume of motions and other pleadings that will be filed in this case, the Debtor believes that special hearing procedures should be established to assist in administering the case docket and avoid constant (and unpredictable) hearings before this Court. Among other things, the Debtor has

proposed that such hearing procedures include the creation of regularly scheduled omnibus

hearings at which the Court, the Debtor and other main parties in interest can address several

motions at once, thereby avoiding the substantial time and expense of scheduling separate

hearings on each discrete matter.  The motion further seeks the establishment of a number of

other case management procedures to be utilized in this chapter 11 case for the benefit of the

Court and parties in interest.

       c.      Adequate Assurance of Payment of Utilities

       43.     The Debtor currently uses electric, natural gas, heat, water, sewer and

other similar services under 11 separate accounts provided by approximately 10 different utility

companies (collectively, the "Utility Companies").  The Debtor estimates that its average

monthly obligations to the Utility Companies on account of services rendered total

approximately $25,858.65.  Uninterrupted utility service is essential to the Debtor's ongoing

operations and, therefore, to the success of the Debtor's reorganization.  The temporary or

permanent discontinuation of utility services at any of the Debtor's properties could irreparably

harm the Debtor's businesses and jeopardize the Debtor's reorganization efforts.

       44.     Pursuant to section 366(c)(2) of the Bankruptcy Code, I understand that a

utility may alter, refuse or discontinue a chapter 11 Debtor's utility service if the utility does not

receive from the debtor or the trustee adequate "assurance of payment" within 30 days of the

commencement of the Debtor's chapter 11 case.  To comply with the requirements of section

366 of the Bankruptcy Code, the Debtor will seek an order of this Court authorizing it to provide,

within ten (10) days of the entry of the interim order, a deposit to each Utility Company in an

amount equal to the Debtor's calculation of the cost of two weeks' worth of utility service, based

on the historical average over the past 52 weeks, as set forth on the Utility Service List attached

as Exhibit A to the motion.  In addition, if any Utility Company believes additional assurance is

required, it may request such assurance, pursuant to specific procedures set forth in the motion.

     d.     Appointment of Claims and Noticing Agent

     45.     The Debtor recognizes that the large number of creditors and other parties

in interest involved in its chapter 11 case may impose heavy administrative and other burdens

upon the Court and the Clerk's Office.  To relieve the Court and the Clerk's Office of these

burdens, the Debtor will seek the entry of an order appointing Kurtzman Carson Consultants,

LLC ("KCC") as the Debtor's claims and noticing agent in this chapter 11 case to, among other

things: (a) prepare and serve all notices required in the Debtor's chapter 11 case, including notice

of the commencement of this chapter 11 case and the initial meeting of creditors under section

341 of the Bankruptcy Code; (b) maintain the official claims register; and (c) mail and tabulate

ballots in connection with any vote to accept or reject a plan or plans of reorganization proposed

in this chapter 11 case.  The Debtor selected KCC based on (a) KCC's experience as a claims

and noticing agent in this Court and (b) its reputation as a provider of quality services.

**_The Employee Motions_**

     e.     Employee Wages and Benefits

     46.     The Debtor's workforce includes approximately 37 full-time and part-time

hourly and salaried employees (collectively, the "Employees").

     47.     Any delay or disruption in the provision of employee benefits or the

payment of compensation will impair the Debtor's relationships with the Employees, and

irreparably impair workforce morale at the very time when the dedication, confidence and

cooperation of the Employees are most critical.  At this critical early stage, the Debtor simply

cannot risk the substantial disruption of business operations that would inevitably result from any

decline in workforce morale attributable to the Debtor's failure to make Unpaid Compensation payments in the ordinary course of their businesses.

48.    Accordingly, the Debtor will request the entry of an order authorizing the Debtor, in accordance with its stated policies (as such policies may be modified from time to time) and in the Debtor's sole discretion, (i) to pay (a) certain prepetition wages, salaries, overtime pay, incentive pay, contractual compensation, sick pay, vacation pay, holiday pay and other accrued compensation to Employees; (b) prepetition business expenses, including travel expenses to Employees; (c) prepetition contributions to, and benefits under, the Employees' benefit plans; (d) prepetition payroll deductions and withholdings with respect to Employees; and (e) all costs and expenses incident to the foregoing payments and contributions (including payroll-related taxes and processing costs), and (ii) to continue its health benefits and workers' compensation programs in the ordinary course of its business.

49.    In the instant case, the Debtor believes that the amount of prepetition wages, salaries and contractual compensation owing to or on account of any particular Employee will not exceed the sum of $10,095 allowable as a priority claim under section 507(a)(4) or section 507(a)(5) of the Bankruptcy Code.

### *Motions and Applications Relating to Professionals*

f.    Professional Retention Applications

50.    The retention of certain chapter 11 professionals is essential to the Debtor's reorganization efforts. Accordingly, the Debtor seeks to retain various professionals to represent and assist it. These professionals include: (a) Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel; and (b) Alvarez & Marsal North America, LLC and Alvarez & Marsal Securities, LLC, as financial advisors and investment bankers, respectively. The Debtor believes

that (a) the foregoing professionals are well qualified to provide the services contemplated by

their various retention applications, (b) the services to be provided by the foregoing professionals

are necessary for the Debtor's successful reorganization and (c) the foregoing professionals will

coordinate their services to avoid any duplication of effort.  The Debtor may find it necessary to

seek to retain additional professionals to assist it as its chapter 11 case progresses.

      g.     <u>Ordinary Course Professionals</u>

      51.     The Debtor's officers, management, and other employees, in the

performance of their duties, regularly call upon a wide variety of professionals (each, an

"Ordinary Course Professional").  The Ordinary Course Professionals include attorneys and

consultants to provide services to assist the Debtor in carrying out its assigned duties and

responsibilities.  These Ordinary Course Professionals provide valuable — often critical —

assistance in addressing issues of importance to the Debtor and its business.

      52.     The Debtor desires to continue to employ the Ordinary Course

Professionals to render a wide variety of services to the estate in the same manner and for the

same purposes as such services were provided prior to the Petition Date.  The Debtor believes

that the Ordinary Course Professionals are not "professionals" within the meaning of section

327(a) of the Bankruptcy Code.  Accordingly, pursuant to sections 105(a), 327, 328 and 330 of

the Bankruptcy Code and Bankruptcy Rule 2014(a), the Debtor will seek entry of an order

authorizing them to retain, employ and pay Ordinary Course Professionals and Service Providers

in the ordinary course of the Debtor's business, effective as of the Petition Date, on the terms and

conditions set forth in the motion.

53.    Notwithstanding the foregoing, the Debtor intends to separately retain any Ordinary Course Professional that becomes materially involved in the administration of this case, pursuant to section 327 of the Bankruptcy Code.

h.    Interim Compensation

54.    Given the size and complexity of the Debtor's chapter 11 case and the amounts of fees and expenses that will be incurred by the Debtor's professionals, the Debtor will seek the entry of an administrative order establishing an orderly, regular process for the monthly compensation and reimbursement of the Debtor's attorneys and other professionals that are consistent with the procedures adopted by courts in this District for the interim compensation of professionals in other large chapter 11 cases.

i.    Debtor in Possession Financing and Use of Cash Collateral

55.    The Debtor will need funds to pay payroll, utility expenses, insurance and other charges to maintain its business operations and to preserve the assets of the Subsidiaries prior to receiving revenue or additional cash or cash equivalents ("Cash") postpetition..

56.    Accordingly, the Debtor, as the borrower, has negotiated and entered into an agreement to receive a postpetition loan of $1,000,000 from Mr. Dunmore (the "DIP Lender"), subject to this Court's approval pursuant to the orders attached as Exhibits 1 and 2 (the "DIP Orders") to the Debtor in Possession Financing Agreement (the "Credit Agreement"), attached the *Emergency Motion of Debtor for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105 and 361, 362, 363 and 364 and Bankruptcy Rule 4001: (I) Authorizing Debtor to Obtain Secured Postpetition Financing; (II) Authorizing Debtor to Use Cash Collateral; (III) Modifying the Automatic Stay; (IV) Granting Adequate Protection; (V) Scheduling A Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") as Exhibit A.

57.     In addition to the postpetition financing to be provided under the Credit Agreement, the Debtor will require the use of Cash on hand as of the Petition Date (the "Prepetition Cash") to operate its business and maintain its property. Certain of the Secured Lenders and Travelers Casualty and Surety Company (collectively, the "Secured Parties") may assert an interest in the Prepetition Cash. Specifically, certain Secured Lenders may claim a security interest in the Prepetition Cash based on provisions in loan documents that grant a security interest in loan proceeds or as proceeds of personal property collateral. In addition, Travelers asserts a security interest in personal property of the Debtors but failed to file a UCC-1 financing statement or take any other actions to perfect such interest. No perfection of any prepetition lien on the Prepetition Cash may have occurred because: (a) none of the Debtor's current Cash is held at any financial institution that may be a prepetition lender; (b) no prepetition Secured Lender had a control agreement as to any of the Debtor's accounts; and (c) all Cash was commingled. Nonetheless, the Prepetition Cash may be collateral ("Cash Collateral") of certain Secured Parties at least unless and until their liens are set aside under the bankruptcy strong-arm powers. The Debtor proposes to use Cash Collateral for expenditures up to the aggregate amount for disbursements and accruals reflected in the cash collateral budget (the "Cash Collateral Budget") attached as Exhibit A to the DIP Orders (Exhibits 1 and 2 to Exhibit A), subject to any additional restrictions set forth in the Credit Agreement.

58.     The requested use of cash collateral and borrowing will help provide assurances to the Debtor's suppliers, vendors and employees that they will be paid for postpetition services. These assurances will be essential to the Debtor's efforts to persuade their vendors to continue providing services to the Debtor. Authority to use cash collateral and approval of the DIP Financing thus is crucial to maximizing the value of the Debtor's estate.

## Part V

### Information Required by Local Rule 1007-2

59.     Local Bankruptcy Rule 1007-2 requires that certain information about the Debtor be provided in this Affidavit.  This required information is provided below and in the attached schedules.  Unless otherwise indicated, the financial information contained herein is un-audited and provided on a consolidated basis for the Debtor and its non-debtor affiliates.

60.     This case was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.  Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

61.     No committee was organized before the Petition Date.  Accordingly, Local Rule 1007-2(a)(3) is inapplicable.

62.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 hereto lists the following information — to the extent available — with respect to each of the holders of the Debtor's 20 largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address); telephone number; the name(s) of persons(s) familiar with the Debtor's accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

63.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 hereto provides the following information — to the extent available — with respect to each of the holders of the five largest secured claims against the Debtor: the creditor's name and address (including the number, street, apartment or suite number and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

64.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> hereto provides a summary of the Debtor's and nondebtor affiliates' consolidated assets and liabilities.

65.    None of the Debtor's securities are publicly held.  Accordingly, Local Bankruptcy Rule 1007-2(a)(7) is inapplicable.

66.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 5</u> hereto provides a list of all of the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity and the court in which any proceeding relating thereto is pending.

67.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 6</u> hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtor operate their businesses.

68.    Pursuant to Local Bankruptcy Rule 1007-2(a)(l0), <u>Schedule 7</u> hereto provides the location of the Debtor's substantial assets; the location of their books and records and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

69.    Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 8</u> provides a list of the nature of present actions or proceedings, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property is imminent.

70.    Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 9</u> hereto provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

71.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), Schedule 10 hereto provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtor, for the 30-day period following the Petition Date.

72.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 11 hereto provides, for the 30-day period following the Petition Date, a list of estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

I respectfully request that all of the relief requested in the First-Day Pleadings be granted along with such other and further relief as is just.

Dunmore Homes, Inc.

By: _Doug Strauch_

Doug Strauch
Vice President, Finance

Sworn to and subscribed before
me this _13_ day of November, 2007

_Cathryn Dawn Eytchison_
Notary Public

My Commission expires: _January 9, 2009_

CATHRYN DAWN EYTCHISON
Commission # 1542846
Notary Public - California
Placer County
My Comm. Expires Jan 9, 2009

**Exhibit A**

**Secured Lenders**

EXHIBIT A

# Dunmore Homes
# Secured Lenders



Non-Weyerhaeuser Projects

Weyerhaeuser Projects

Montecito LLC
1.  Montecito I        (D,C)
2.  Montecito II       (D,C)

Stone Creek LLC
3.  Cobblestone       (S,C)
4.  Stone Creek       (S,C)

Providence LLC
5.  Providence        (S,N)

Fullerton Ranch LLC*
6.  Whispering Oaks   (R,N)

Canterbury LLC
7.  Windsor           (S,N)
8.  Kensington        (S,N)

Fahrens Park LLC
9.  Copper Creek      (S,C)

Laguna Reserve LLC
10. Marina Court      (D,N)
11. Cypress Cove      (S,N)
12. The Villas        (S,N)

Westport LLC
13. Trevina I         (D,C)
14. Trevina II        (D,C)

Orchard LLC*
15. Laurelwood        (D,N)

Country Villas LLC
16. Sundance II       (S,C)

Syacamore Ranch LLC
17. Sycamore Ranch    (R,C)

RBC

IndyMac

Guaranty

Key

Franklin

Wachovia

Affinity

Comerica

United Commercial

Diamond Ridge LLC
18. Tiffany          (S,C)
19. Emerald          (S,C)

Viscaya LLC
20. Viscaya I        (S,C)
21. Viscaya II       (S,C)

Highlands LLC (Wildhawk)
22. Aurora           (R,N)
23. Bridgewater      (R,N)
24. Cheyenne         (R,N)
25. Dakota           (R,N)

Croftwood LLC
26. LakePointe       (D,N)

Notes

☐ = legal entity

⬭ = lender

⬚ = JMP has second lien on assets

* Denotes LLC debt guaranteed by Mr. Dunmore

S  = finished & selling
D  = in development
R  = raw land
N  = northern CA (Sacramento)
C  = central valley

## Schedule 1

## Corporate Chart

DUNMORE HOMES, Inc.
Ownership Stucture Diagram
New



11/12/2007

Schedule 2

20 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the Debtor's 20 largest unsecured claims[2] (the "Top 20 List"). The Top 20 List does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim trade debt, bank loan, government contract, etc. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| JPMorgan Chase Bank, National Association as Indenture Trustee | JPMorgan Chase Bank, National Association 600 Travis, 50th Floor Houston, TX 77002 Attn: Maria D. Calzado Fax: 713-216-2101 -and- Chase Bank USA, National Association 500 Stanton Christiana Road, Building 4 (3rd Floor) Newark, DE 19713 Attn: Sarika M. Sheth Fax: 302-552-6280 | Junior Subordinated Notes | | | | $20,000,000.00 |
| Travelers Cas. & Surety Co. of America | 33650 6th Avenue S., Ste. 200 Federal Way, WA 98003 Contact: Christopher E. Butler Tel: 253-943-5806 Fax: 866-842-9201 | Surety Bonds | X | | X | $9,147,084 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. Certain claims may be subject to offsets, rebates, discounts, reconciliations, credits and adjustments, which are not reflected on this schedule

[2] The amounts outstanding for trade indebtedness represent estimated amounts as of the Petition Date.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim trade debt, bank loan, government contract, etc. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| Cal Sierra Construction, Inc. | 5904 Van Alstine Ave.<br>Carmichael , CA 95608<br>Contact: Patsy Lobotzke and Marco Lucich<br>Tel: 916-485-3909<br>Fax: 916-485-3906<br>-and-<br>Downey Brannd LLP<br>Frank R. Perrott, Esq.<br>Matthew J. Weber, Esq.<br>3425 Brookside Road, Suite A<br>Stockton, CA 95219-1757<br>Tel: 209-473-6450<br>Fax: 209-473-6455<br>(Counsel for Cal Sierra Construction, Inc.) | Trade / Construction | X | | X | $4,159,269.00 |
| The Aleco Corporation | 2202 Zeus Ct.<br>Bakersfield, CA 93380<br>Contact: Jay Marks<br>Tel: (661) 393-9030<br>Fax: (661) 393-9034<br>-and-<br>Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, LLP<br>4550 California Avenue, 2d Floor<br>Bakersfield, CA 93309<br>Tel: 661-395-1000<br>Fax: 661-326-0418<br>(Counsel for The Aleco Corporation) | Trade / Construction | X | | X | $2,382,850.79 |
| JMP Securities | 600 Montgomery St., Suite 1100<br>San Francisco, CA 94111<br>Contact: Jim Fowler<br>Tel: 415-835-8941<br>Fax: 415-835-8986 | Loan | | | | $2,000,000.00 |
| Teichert Construction, Inc. | P.O. Box 13557<br>Sacramento, CA 95853<br>Contact: Ken McCurdy<br>Tel: 916-484-3011<br>Fax: 916-484-6506 | Trade / Construction | X | | X | $1,639,196.69 |
| MacKay & Somps – Sacramento | 1771 Tribute Rd., Ste. E<br>Sacramento, CA 95815<br>Contact: Paul Hart<br>Tel: 916-929-6092<br>Fax: 916-923-5625 | Trade / Construction | X | | X | $1,523,812.00 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim trade debt, bank loan, government contract, etc. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| Pacific Paving Co., Inc. | 3498 W. Ashcroft Ave.<br>Fresno, CA 93722<br>Contact: David Sumpter<br>Tel: 559-438-1744<br>Fax: 559-438-1742 | Trade / Construction | X | | X | $871,225.19 |
| Hemington Landscape Service | 4170 Business Drive<br>Cameron Park, CA 95682<br>Contact: Mark Hemington<br>Tel: 530-677-9290<br>Fax: 530-677-0590<br>-and-<br>Howard S. Nevins, Esq.<br>Hefner Stark & Marois, LLP<br>2150 River Plaza Drive, Suite 450<br>Sacramento, CA 95833-3883<br>Tel: 916-925-6620<br>Fax: 916-925-1127<br>(Counsel for Hemington Landscape Service) | Trade / Construction | X | | X | $827,941.87 |
| Granite Construction Company | 2716 Granite Ct.<br>Fresno, CA 93706<br>Contact: Jodie Leemann<br>Tel: 559-441-5744<br>Fax: 559-441-5791 | Trade / Construction | X | | X | $737,834.58 |
| MCH Electric, Inc. | 31084 S. Highway 33<br>Tracy, CA 95304<br>Contact: Jim Humphrey<br>Tel: 209-835-9755<br>Fax: 209-835-9745 | Trade / Construction | X | | X | $641,467.13 |
| De Silva Gates Construction | 11555 Dublin Blvd.<br>Dublin, CA 94568<br>Contact: Don Holmes<br>Tel: 925-829-9220<br>Fax: 925-803-4294 | Trade / Construction | X | | X | $623,636.42 |
| PML Landscape, Inc. | 4991 E. McKinley, Ste. 103<br>Fresno, CA 93727<br>Contact: Aaron McCauley<br>Tel: 559-292-4998<br>Fax: 559-292-4773 | Trade / Construction | X | | X | $495,978.16 |
| Kern Masonry Structures, Inc. | P.O. Box 80334<br>Bakersfield, CA 93308<br>Contact: Rebecca Deufel<br>Tel: 661-399-6006<br>Fax: 661-399-6090 | Trade / Construction | X | | X | $490,926.21 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim trade debt, bank loan, government contract, etc. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| SGN Nelson Construction | 5047 Robert J. Mathews Parkway<br>El Dorado Hills, CA 95762<br>Contact: Stuart Nelson<br>Tel: 916-933-7891<br>Fax: 916-933-7893 | Trade / Construction | X | | X | $391,236.00 |
| Valley Utility Services Inc. | 1779 Tribute Rd.<br>Sacramento, CA 95815<br>Contact: John Benedict<br>Tel: 916-924-9113<br>Fax: 916-924-3488 | Trade / Construction | X | | X | $368,055.03 |
| Cooper, White and Cooper, LLP | 1333 N California Blvd. Suite 450<br>Walnut Creek, CA 94596<br>Contact: Kathleen Carpenter<br>Tel: 925-935-0700<br>Fax: 925-256-9428 | Legal Fees | | | | $339,058.44 |
| Beutler Corporation | P.O. Box 515015<br>Sacramento, CA 95851<br>Contact: Gary Beutler<br>Tel: 916-646-2222<br>Fax: 916-646-2267 | Trade / Construction | X | | X | $286,375.87 |
| B&D Plumbing (CVC Construction) | P.O. Box 2590<br>Rancho Cordova, CA 95741<br>Contact: Ron Ghoede<br>Tel: 916-852-8561<br>Fax: 916-852-8183 | Trade / Construction | X | | X | $276,615.56 |
| Palumbo Bergstrom LLP | 18301 Von Karman Avenue #850<br>Irvine, CA 92612<br>Contact: David Wasson<br>Tel: 949-442-0300<br>Fax: 949-251-1331 | Legal Fees | | | | $251,837.59 |

## Schedule 3

### 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the Debtor's five largest secured claims.[1]

| Name of Creditor and Mailing Address | Amount of Claim | BRIEF DESCRIPTION AND ESTIMATE OF THE VALUE OF THE COLLATERAL SECURING THE CLAIM | Disputed |
|---|---|---|---|
| Sacramento Valley Farm Credit<br>Attn: Charles Denny<br>939 Live Oak Blvd.<br>Yuba City, CA 95991<br>Phone: 530-671-1420<br>Email: charles.denny@sacagloan.com | $1,531,940 | Real Property | |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

## Schedule 4

### Consolidated Balance Sheet
### of Dunmore Homes, Inc. and its Consolidated Subsidiaries
### as of September 30, 2007
### (UNAUDITED)

| | Dunmore Homes Consolidation 2007.SEP | Dunmore Homes Consolidation 2006.DEC |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | 2,358,632 | 5,725,023 |
| Credits and reimbursements receivable | 3,881,202 | 3,623,328 |
| Deferred Compensation Investments | 1,507,460 | 1,507,460 |
| Property and equipment, net | 944,986 | 18,909,499 |
| Intercompany due to/from, net | - | - |
| Land and real estate under development | 256,826,750 | 268,519,445 |
| Investments in subsidiaries | - | - |
| Assets held for investment | - | 412 |
| Prepaids, receivables and other assets | 2,050,372 | 5,918,113 |
| Receivables from related parties | 350,750 | 5,000,000 |
| Notes Receiveable from related parties | 11,140,267 | 19,824,281 |
| Utility deposits | 1,531,833 | 944,252 |
| **Total Assets** | 280,592,251 | 329,971,813 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| **LIABILITIES** | | |
| Trade payables and retainage | 26,474,776 | 18,621,275 |
| Accrued construction costs and other liab. | 3,462,170 | 2,631,200 |
| Customer deposits | 6,979 | 269,626 |
| Deferred Compensation Payable | 1,498,133 | 1,498,133 |
| Deferred permit fees | - | - |
| Notes payable | 194,270,694 | 195,901,943 |
| Notes payable, subordinated | 22,000,000 | 23,902,500 |
| Payables to related parties | - | - |
| Accrued warranty costs | 2,572,694 | 2,222,385 |
| **Total Liabilities** | 250,285,447 | 245,047,062 |
| **Minority Interest in Equity** | 30,805,406 | 24,257,829 |
| **Members' Equity** | (498,602) | 60,666,922 |
| **Total liabilities and equity** | $  280,592,251 | $  329,971,813 |

## Schedule 5

### Debtor's Property Not in the Debtor's Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor or agent for any such entity.

| Third Party | Property Description |
|---|---|
| 8781 Sierra College, LLC<br>2920 Prospect Park Drive, Suite 215<br>Rancho Cordova, CA 95670 | Security Deposit ($51,626.85) |
| Fresno Herndon Investors, LLC<br>8080 North Palm Avenue, Suite 207<br>Fresno, CA 93711 | Security Deposit ($8,500) |
| Principal Trust Company<br>1013 Center Road<br>Wilmington, DE 19805 | Deferred Compensation Plan Assets ($1.7 million) |

## Schedule 6

### Debtor's Property

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtor operate their businesses:

| Address | Type of Interest | Description of Use |
|---|---|---|
| 8781 Sierra College Blvd., Suite 100 Granite Bay, CA 95746 | Leasehold | Corporate Headquarters |
| 7050 N. Fresno St., Ste. 105 Fresno, CA 93720 | Leasehold | Corporate Office |

## Schedule 7

### Location of Debtor's Substantial Assets and Books and
### Records and Nature, Location and Value of Assets Held Outside the United States

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its records and the nature, location and value of any assets held by the Debtor outside of the territorial limits of the United States.

### Location of Debtor's Substantial Assets:

The Debtor own real property in counties throughout Northern and Central California. The Debtor additionally have personal property assets in each of the corporate offices from which they operate their business. The Debtor hold no assets outside the territorial limits of the United States.

### Location of the Debtor's Books and Records:

The primary location of the Debtor's books and records is at Dunmore's corporate headquarters located at:

Dunmore Homes, Inc.
8781 Sierra College Blvd., Suite 100
Granite Bay, CA 95746

The Debtor also maintains certain records at its corporate office located at:

Dunmore Homes, Inc.
7050 N. Fresno St., Ste. 105
Fresno, CA  93720

## Schedule 8

### Pending Litigation

1) *Swan, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court
Case No. 05AS01766.

2) *Barksdale, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court
Case No. 04AS03485.

3) *Pitts v. Dunmore Development, et al.* – San Francisco County Superior Court
Case No. CGC-06-453679.

4) *Barnes v. Dunmore Homes, et al.* – Sacramento County Superior Court
Case No. 07AS03301.

5) *East Linda of Edgewater v. Dunmore Homes, et al.* – Yuba County Superior Court
Case No. 070000164.

6) *Navarro, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court
Case No. 07AS03217.

7) *Cal SierraConstruction, Inc. v. Dunmore Homes, et al.* – Placer County Superior Court
Case No. S-CV-22025.

8) *Cal SierraConstruction, Inc. v. Dunmore Homes, et al.* – Sacramento County Superior
Court Case No. 07AS04407.

9) *Hemington Landscape v. Dunmore Homes, et al.* – Sacramento County Superior Court
Case No. 07AS04181.

10) *Homebuyers Real Estate Inc. v. Dunmore Homes, et al.* – Orange County Superior Court.

11) *Pabco Building Products (Gladding McBean) v. Dunmore et al.* – Sacramento Superior
Court Case No. 07AS04580.

12) *Northern California Collection Service (Sac Bee) v. Dunmore Homes, et al.* –
Sacramento County Superior Court Case No. 07AS04388.

13) *Geramia Pools, Inc. v. Dunmore Laguna Reserve, LLC* – American Arbitration
Association Caso No. 74 110 01277 07 MOMA.

14) *Riddio Construction v. Dunmore Homes & Dunmore Laguna Reserve LLC* – Sacramento
Superior Court Case No. 07AS04568.

15) *The Aleco Corporation v. Dunmore Diamon Ridge, et al.* – Kern County Superior Court
Case No. S-1500-CV 262093 SPC.

16)     *RBC Centura Bank v. Dunmore Montecito, LLC, et al.* – Fresno County Superior Court
        Case No. 07-CECG03762.

## Schedule 9

### Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtor's existing senior management, a description of their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| Michael A. Kane – President | 2007 | Michael A. Kane is President of Dunmore Homes, Inc. ("Dunmore Homes"). <br><br> Mr. Kane's experience spans multi-acre custom home site development, single family, multifamily and commercial mortgage loan origination, as well as purchase of non-performing real estate, management, redevelopment, marketing and sales. <br><br> Prior to purchasing Dunmore Homes, Mr. Kane spent 14 years with Comstock Mortgage as a Senior Loan Officer where he funded more than $400 million in single family and multifamily mortgage loans. Mr. Kane also worked for Warren Moore Development in El Dorado Hills, CA, focusing on land acquisition and development of finished lot subdivisions. <br><br> Mr. Kane has a Bachelor's degree in Real Estate and Land Use, with a minor in Real Estate Law from California State University, Sacramento, and is a licensed real estate broker in the State of California. |
| Sidney B. Dunmore – Prior President and Current Consultant | | Sidney Dunmore's father George P. Dunmore started the company in 1953. Since 1977, Sidney B. Dunmore has expanded and directed the company. He began working in the field at the age of 14. He was a painter, roofer, plumber, electrician, carpenter, project superintendent, estimator and general superintendent prior to becoming Vice President of Dunmore Construction Company. In 1977, Mr. Dunmore became the Chief Executive Officer of Dunmore Development, Inc. During Mr. Dunmore's tenure, Dunmore Homes grew to $100,000,000 in sales volume in 1990 prior to the recession of the 1990's. Dunmore Homes grew to $250,000,000+ in sales in 2004, closing 776 homes. <br><br> In addition to his leadership role in the company, Mr. Dunmore is a Life Director and past president of the California Building Industry Association. He is also a Life Director and past president of the Building Association of Superior California and was a Director of the National |

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| | | Association of Home Builders.  He was the 1992 President of the Pacific Coast Builders' Conference.  In 1994, he was inducted into the California Building Industry Hall of Fame and is the youngest California builder to ever receive this prestigious award. |
| William P. West – Prior Chief Financial Officer and Current Consultant | | William P. West joined Dunmore Homes in 2003 as its Chief Financial Officer.  In that role, Mr. West was responsible for managing all financing and accounting activities of the company.  In addition, he oversaw the company's risk management function.  Mr. West brings over 15 years of experience to Dunmore Homes, including real estate accounting and financing, acquisition and integration, strategic planning and business process reengineering. Prior to joining Dunmore Homes, Mr. West was with the consulting group of KPMG LLP, selling and managing finance and accounting engagements to companies ranging in size from $50 million to $5 billion.  From 1994 to 1999, Mr. West held various finance and strategic planning positions at American Golf Corporation, the largest golf course management company in the world. From 1992 to 1994, Mr. West was a Division Controller with Kaufman & Broad Home Corporation.  From 1988 to 1992, Mr. West held several finance positions with The Anden Group, including Assistant Treasurer and Director of Finance.  Prior to 1988, Mr. West was a certified public accountant with KPMG LLP. Mr. West received a B.S. in Business Administration from the University of Southern California and is a Certified Public Accountant. |
| Michael J. Lutz – Division President | | Michael J. Lutz joined Dunmore Homes in April 2005 as President of its Central Valley Division.  Mr. Lutz is responsible for managing the establishment and expansion of the company's land acquisition, community development and homebuilding operations in California's Central Valley, with current operations in Fresno and Bakersfield.  Mr. Lutz brings 24 years of community development and homebuilding experience to Dunmore Homes, including strategic and business planning; land acquisition, finance, entitlement and development; acquisition and integration; product development and marketing; and business process improvement. Prior to his appointment as Division President with Dunmore Homes, Mr. Lutz spent 24 years with Lennar |

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| | | Corporation, and its subsidiary U.S. Home Corporation. During this period, he held several positions including, from 2001 to 2004, President of Lennar's Carolina Division with operations in Raleigh and Charlotte, North Carolina and Charleston, South Carolina; and from 1993 to 2001, President of U.S. Home's Southern California Division with operations in Los Angeles, Riverside, San Bernardino and Kern Counties.<br><br>Mr. Lutz attended Villanova University, is a member of the NAHB and has served as an officer on various boards of the local chapters of the NAHB. |
| Thomas A. Ingram, Esq. – General Counsel | | Thomas A. Ingram is General Counsel for Dunmore Homes. Relying on his extensive experience litigating construction defect claims and providing counsel to residential builders, commercial contractors and subcontractors, Mr. Ingram is a key contributor to Dunmore Homes' risk management program, with emphasis on developing and implementing Dunmore's litigation mitigation program and SB 800 compliance and response programs.<br><br>Mr. Ingram is currently serving as the Vice Chairman of the CBIA Legal Action Committee. He served as a member of the Association of General Contractors (AGC) Legal Advisory Committee, and was a past Executive Director of Mediation Services for the National Arbitration Center, Los Angeles, California. Mr. Ingram previously served as Construction Disputes Mediator and Judge Pro Tempore, Superior Court of Los Angeles County.<br><br>Mr. Ingram earned his J.D. at Pepperdine University School of Law and was admitted to the California State Bar in 1988. He was also awarded the American Jurisprudence Award in Trial Practice and was a member of Pepperdine University's National Trial Team and Moot Court Honors Board. Mr. Ingram also maintains Dunmore's Corporate Real Estate Broker's license. |
| John Slaughter – VP of Construction / Operations (Sacramento) | | John Slaughter joined Dunmore Homes as Vice President of Construction and Operations in May 2003. Mr. Slaughter manages all of the contracting and purchasing in the Operations Department as well as all home construction for the Dunmore Homes communities located throughout the greater Sacramento region and the Central Valley.<br><br>Prior to joining Dunmore Homes, he began his construction experience as a superintendent at Morrison |

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| | | Homes, Hal Porter Homes and Del Webb at Sun City Roseville, California.  He moved into other positions with Del Webb and was eventually promoted to Vice President of Construction at Sun City Lincoln Hills in Lincoln, California.  There he managed the construction, purchasing and customer care departments for over 900 homes per year.  He left Del Webb in 2001 to broaden his experience with John Laing Homes in Roseville.  As an employee of John Laing Homes, he was selected for their Leadership Development Program.  John has a California Contractor's license and has been involved with the Building Industry Association as well as the National Association of Home Builders. |
| | | Mr. Slaughter received a B.S. degree in Building Construction from Texas A&M University in 1988. |
| Doug Strauch – VP of Finance | | Doug Strauch joined Dunmore Homes in 2005 as its Vice President of Finance.  Mr. Strauch is responsible for managing the accounting, finance and IT departments and all accounting activities of the company including overseeing all financial reporting, tax reporting, budgeting and forecasting and management of Dunmore's financial reporting systems.  In addition, he assists the Chief Financial Officer in overseeing the company's risk management function. |
| | | Mr. Strauch brings over 12 years of experience to Dunmore Homes, including real estate accounting and financing, acquisition and integration, strategic planning and business process analysis. Prior to joining Dunmore Homes, Mr. Strauch was a senior manager in the audit group of KPMG LLP, where he performed audits of home builders, land development companies, and construction companies ranging in size from $30 million to $2 billion. |
| | | Mr. Strauch has received a B.S. in Business Administration from the California State University, at Sacramento and is a Certified Public Accountant. |
| Shawn Marie McKinley – Director of Sales & Marketing | | Shawn Marie McKinley is responsible for overseeing Dunmore Home's sales, escrow and marketing staff at all of their Northern California communities.  In addition, she will also be responsible for developing new communities and training Dunmore's sales staff. |
| | | Ms. McKinley has been a licensed broker since 2000, and has undergone continuous sales training and mentoring through the Institute of Residential Marketing.  In addition to receiving her MIRM designation and being inducted into the |

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| | | Building Industry Association, Ms. McKinley has earned (CMP) Certified Marketing Professional and (CSP) Certified Sales Person designations. Shawn-Marie was awarded the "2006 Sales Director of Year" by the North State BIA. In 2001 she relocated from Newport Beach to Sacramento to work as a Community Sales Manager for various homebuilders within Serrano, a premier master-planned golf community in El Dorado Hills. |
| Steven C. Hall – VP of Land (Central Valley) | | Steven C. Hall joined Dunmore Homes as Vice President of Land in March, 2006.  Mr. Hall is responsible for directing and managing the company's land acquisition, entitlement and development operations in the Central Valley Division.  Mr. Hall brings over 25 years of development and homebuilding experience to Dunmore Homes, including finance and marketing of residential subdivision in the Central Valley. <br><br> Prior to joining Dunmore Homes, Mr. Hall was the President and Chief Executive Officer of Sandalwood Construction Company and Sandalwood Realty Corporation from 1981 to 2006.  From 1969 to 1981 he was in the banking industry, last serving as the Vice President and Senior Loan Officer of the Bank of Fresno. <br><br> Mr. Hall has received a B.A. in Liberal Studies from the California State University, Stanislaus and is a licensed General Contractor.  He is also a past president of the Building Industry Association of the San Joaquin Valley. |
| Jason Belles – Treasurer | | Jason Belles joined Dunmore Homes in 2002 and currently holds the position of Treasurer.  Mr. Belles is responsible for managing the loan portfolio, new project loan pipeline, and long term company financial forecasting.  He also works with outside consultants and local governments to establish Community Facilities Districts and SCIP financing programs at various Dunmore projects.  In addition, he also reviews the budgets and financial reporting of Dunmore's ABA with National City Mortgage. <br><br> Mr. Belles has over seven years of experience in banking and homebuilding, having previously worked for First Bank & Trust.  While at First Bank, Mr. Belles was responsible for opening new business accounts and training staff.  During his tenure at Dunmore Homes, Mr. Belles has closed over $500 million dollars in Senior Debt, Subordinated Debt, Bond Debt and Joint Venture financing. |

| NAME AND TITLE | TENURE | BRIEF SUMMARY OF RELEVANT RESPONSIBILITIES AND EXPERIENCE |
|---|---|---|
| | | Mr. Belles has received an M.B.A. in Urban Land Development and a B.S. in Business Administration from the California State University, Sacramento. |
| George A. Allen III – Director of Customer Care and Warranty | | George A. Allen III joined Dunmore Homes in November of 2005. Mr. Allen's responsible for directing and managing all home warranties for each community built by Dunmore homes that fall in the ten year statute. Duties include completion of warranty claims, cost control and recovery of funds used in repairs. Mr. Allen works closely with the risk department and Quality departments to minimize the threat of plaintiff attorney lawsuits.<br><br>Mr. Allen brings with him over 20 years experience in the home building industry and has held positions with Pulte Homes, Richmond American Homes, Meritage Homes and other local private builders.  These positions ranged from Laborer to project Superintendent and all that falls in between. Mr. Allen was raised in the industry and possesses a wealth of information.<br><br>During his career Mr. Allen acquired his State Contractors License and is involved with local youth programs and educational facilities development to provide a bright future for our youth. |
| Steve Roberts – Director of Land Development | | Steve Roberts joined Dunmore Homes in June, 2006 as the Director of Land Development. Steve is responsible for land development field operations and engineering in the Sacramento region.<br><br>Prior to joining Dunmore Homes, Mr. Roberts spent fifteen years managing projects in the heavy / civil, commercial, and site development sectors of the construction industry. Prior employers include: Bechtel Corporation, where he oversaw multi-million dollar airport infrastructure projects; Con-Way Transportation, where Steve managed the development of dozens of industrial facilities across the country; and Del Webb / Pulte Homes, where he worked as the Lead Land Development Superintendent and Project Manager at several communities in the Las Vegas and Sacramento markets.<br><br>Mr. Roberts received his B.S. in Construction Management in 1992 from California State University, Chico. Steve is also a licensed general contractor. |

## Schedule 10

### Payroll

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtor, for the 30-day period following the filing of the Debtor's chapter 11 petition.

| Payments to Employees (Not Including Officers, Directors, and Stockholders)[1] | Week 1 $0<br>Week 2 $100,000<br>Week 3 $0<br>Week 4 $100,000 |
| --- | --- |
| Payments to Officers, Directors, and Stockholders | Week 1 $0<br>Week 2 $35,000<br>Week 3 $0<br>Week 4 $35,000 |
| Payments to Financial and Business Consultants[2] | Week 1 $25,000<br>Week 2 $25,000<br>Week 3 $25,000<br>Week 4 $75,000 |

---

[1] Amounts include estimated employee wages and salaries, payroll taxes and other various benefits.

[2] Amounts reported herein represent the Debtor's estimated liabilities for the fees and expenses of financial and business professionals to be retained under the Bankruptcy Code in these cases. The Debtor does not expect to disperse cash in satisfaction of these liabilities within the first 30 days following the filing of this chapter 11 case.

**Schedule 11**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtor's chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $30,000 |
| **Cash Disbursements** | $495,000 |
| **Net Cash Loss** | $465,000 |
| **Unpaid Obligations** | $70,000 |
| **Unpaid Receivables** | $0 |

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
-----------------------------------------------------------------x
TABERNA CAPITAL MANAGEMENT, LLC,    :

               Plaintiff,    :      08 Civ. 1817 (JSR)

         - against -    :

                               **FIRST REQUEST FOR**
SIDNEY B. DUNMORE, MICHAEL A. KANE,    :    **DOCUMENTS TO**
and DHI DEVELOPMENT f/k/a DUNMORE         **<u>DEFENDANTS</u>**
HOMES, LLC,    :

             Defendants.    :
-----------------------------------------------------------------x

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff Taberna Capital Management, LLC hereby requests defendants to produce the following documents on or before March 21, 2008, at 10:00 a.m., at the offices of WolfBlock LLP, 250 Park Avenue, New York, NY 10177.

Please see Local Civil Rule 26.3 for definitions and instructions.  In supplementation of L.R. 26.3(c)(5), the word "defendants" also means "each, all, any, and/or some of the defendants" and also includes any agent or representative of any defendant.  The time period for these Requests is January 1, 2006 to date.

<u>REQUESTS FOR PRODUCTION</u>

1.     All documents concerning the formation, organization and capitalization of Dunmore Homes, Inc. ("Dunmore NY").

2.     All documents concerning communications between defendants concerning the formation, organization and capitalization of Dunmore NY.

3.     All documents concerning communications between defendants, on the one hand, and any other person, on the other hand, concerning the formation, organization and capitalization of Dunmore NY.

4.     All documents concerning potential transfer, assignment or sale of assets or stock of DHI Development f/k/a Dunmore Homes, LLC ("DHI") to an entity formed or located, or to be formed or located, in New York.

NYC:760718.1

5.      All documents concerning communications between defendants concerning potential transfer, assignment or sale of assets or stock of DHI to an entity formed or located, or to be formed or located, in New York.

6.      All documents concerning communications between defendants, on the one hand, and any other person, on the other hand, concerning potential transfer, assignment or sale of assets or stock of DHI to an entity formed or located, or to be formed or located, in New York.

7.      All documents concerning transfer of assets or stock from DHI to Dunmore NY.

8.      All documents concerning communications between defendants concerning transfer of assets or stock from DHI to Dunmore NY.

9.      All documents concerning communications between defendants, on the one hand, and any other person, on the other hand, concerning transfer of assets or stock from DHI to Dunmore NY.

10.      All documents concerning agreements, contracts, licenses, or understandings between defendants.

11.      All documents concerning agreements, contracts, licenses, or understandings between defendants, on the one hand, and any person residing, incorporated, located, or working in New York.

12.      All documents concerning investment or brokerage services provided to or for defendants by any person residing, incorporated, located, or working in New York.

13.      All documents concerning investments made by defendants in or relating to any person located or incorporated in New York.

14.      All documents concerning accounting services provided to defendants by any person residing, incorporated, located, or working in New York.

15.      All documents concerning any property, real or personal, located within New York in which defendants have any interest of any kind.

16.      All documents concerning any corporation, partnership, limited partnership, limited liability partnership, limited liability corporation, or any other entity formed under the laws of New York in which defendants have any interest of any kind.

Dated: New York, New York
March 13, 2008

WOLFBLOCK LLP

By: _____ /s/ _____
    Kenneth G. Roberts (kroberts@wolfblock.com)
Attorneys for Plaintiff
250 Park Avenue
New York, New York 10177
(212) 986-1116

# EXHIBIT C

EXECUTION VERSION

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this _10_ day of September, 2007, by and between Dunmore Homes, Inc., a New York corporation ("Buyer"), on the one hand, and  Dunmore Homes, a California corporation ("Seller" and, together with Buyer, the "Parties").

## RECITALS

A.    Seller is engaged in the business of acquiring, developing, and marketing single family residential real property from their facilities located in Granite Bay, California (the "Business").

B.    Seller wishes to sell to Buyer substantially all of the assets of Seller heretofore used in connection with or arising out of the operation of the Business, all at the price and on the other terms and conditions specified in detail below and Buyer wishes to so purchase and acquire such assets from Seller.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    Transfer of Assets.

1.1    Purchase and Sale of Assets.  On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, the Seller's right, title and interest as of the Closing Date in the following assets (collectively, the "Property"):

1.1.1    Limited Liability Company Interests.  All of Seller's right, title and interest as a member of those limited liability companies described on **Schedule 1.1.1** attached hereto and incorporated herein by this reference and in such ownership percentages as are set forth on **Schedule 1.1.1** (collectively, the "Membership Interests").

1.1.2    Leases and Contracts.  Seller's right, title and interest in and to (i) the lessee's interest under those real property leases described on **Schedule 1.1.2-(i)** attached to this Agreement and incorporated herein by this reference (collectively, the "Real Property Leases"), (ii) the lessee's interest under those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, if any, described on **Schedule 1.1.2-(ii)** attached to this Agreement and incorporated herein by this reference (collectively, the "Other Leases"), and (iii) those other contracts, leases, orders,

SD 00001

purchase orders, licenses, contracts, agreements and similar arrangements described on **Schedule 1.1.2-(iii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Contracts"** and together with the Real Property Leases and Other Leases, the **"Leases and Contracts"**).

       1.1.3   <u>Real Property and Improvements</u>. All real property owned by Seller, which real property is more particularly described on **Schedule 1.1.3** attached to this Agreement and incorporated herein by this reference, together with any buildings, structures, improvements and fixtures located thereon, and all easements, rights of way, and other rights and interests appurtenant thereto (collectively, the **"Real Property"**)

       1.1.4   <u>Personal Property</u>. All of those items of equipment and tangible personal property owned by Seller and heretofore used in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, fixtures and furnishings and other items of tangible personal property listed or described in **Schedule 1.1.4** attached to this Agreement and incorporated herein by this reference (collectively, the **"Personal Property"**).

       1.1.5   <u>Intangible Property</u>. All intangible personal property owned or held by Seller and heretofore used in connection with the Business, but in all cases only to the extent of Seller's interest and only to the extent transferable, together with all books, records and like items pertaining to the Business, including, without limitation, the name "Dunmore Homes," the goodwill of the Business, patents, processes, trademarks, trade names, service marks, catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business and any right, title and interest of Seller in and to those items described on **Schedule 1.1.5** attached hereto and incorporated herein by this reference (collectively, the **"Intangible Property"**). As used in this Agreement, Intangible Property shall in all events exclude any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege.

       1.1.6   <u>Governmental Permits</u>. To the extent transferable and assignable, all of Seller's interest in all licenses, certificates of occupancy, permits, registrations, certificates of public convenience and necessity, approvals, licenses, easements, authorizations and operating rights issued or granted by any governmental or similar authority having jurisdiction over the Business, including, without limitation, those described on **Schedule 1.1.6** attached hereto and incorporated herein by this reference (collectively, the **"Permits and Licenses"**).

       1.1.7   <u>Deposits, Etc</u>. All cash deposits and prepaid items associated with the Property (collectively, the **"Deposits"**).

       1.1.8   <u>Cash</u>. All cash (including checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities (collectively, the **"Cash"**) .

**SD 00002**

1.1.9    Accounts Receivable. All accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing (collectively, the "**Receivables**").

1.1.10    Vendor Items. All promotional allowances and vendor rebates and similar items (collectively, the "**Vendor-Related Assets**").

1.1.11    Tax Receivables. All tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the Closing Date (collectively, the "**Tax Receivables**").

1.1.12    Bank Accounts. All bank accounts, safety deposit boxes, lock boxes and the like (the "**Banking Assets**").

1.1.13    Claims, Etc.    All claims, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (collectively, the "**Claims**").

1.1.14    Phone Numbers. All telephone numbers (the "**Phone Numbers**").

1.1.15    Insurance Proceeds.    All rights as the insured under the policies of insurance described on Schedule 1.1.15 attached hereto and incorporated herein by this reference and in and to all proceeds of such insurance policies (collectively, the "**Insurance Interests**").

1.1.16    Benefit Plan Assets.    All of Seller's right, title and interest (i) under those certain benefit plans described on Schedule **1.1.16** attached hereto and incorporated herein by this reference (collectively, the "**Benefit Plans**") and (ii) in and to all assets held pursuant thereto (collectively, the "**Benefit Plan Interests**" and, together with the Licenses and Permits, Deposits, Cash, Receivables, Vendor-Related Assets, Tax Receivables, Banking Assets, Claims, Phone Numbers, and Insurance Interests, the "**Assignment Property**").

1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Property shall in any event exclude all of the following (collectively, the "**Excluded Assets**"): (i) those items, if any, excluded pursuant to the provisions of Section 1.1 above; (ii) Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof; (iii) all capital stock of Seller; (iv) tax records, minute books, stock transfer books and corporate seals of Seller (provided that Buyer shall have access to such information prior to the Closing in connection with its due diligence and inspection of the Property and shall, subject to the terms and provisions of that certain Confidentiality Agreement dated August 28, 2007, between Seller and Michael Kane, be permitted to keep copies of all such materials); (v) all rights, claims and causes of action, if any, of Seller against former officers, directors, employees, members, principals, agents, and representatives of Seller, and (vi) those additional assets, if any, listed on Schedule 1.2 attached hereto and incorporated herein by this reference.

SD 00003

1.3    <u>Instruments of Transfer</u>.  The sale, assignment, transfer, conveyance and delivery of the Property to Buyer shall be made by deeds, assignments, bill of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Property to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Seller or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon Seller.

2.  <u>Consideration</u>.

2.1    <u>Purchase Price</u>.   Subject to the provisions of Section 2.4 below, the cash consideration to be paid by Buyer to Seller for the Property (the "**Purchase Price**") shall be an amount equal to Five Hundred Dollars ($500.00).

2.2    <u>Assumed Liabilities</u>.  Effective as of the Closing Date, Buyer shall assume all then existing indebtedness, liabilities and obligations of Seller (whether known or unknown, contingent or liquidated) of every kind and nature, including, without limitation: (i) all indebtedness, liability and obligations of Seller under or in connection with the loans and loan facilities described on **Schedule 2.2** attached hereto and incorporated herein by this reference (collectively, the "**Indebtedness**"), (ii) all obligations of Seller now existing or hereafter arising or accruing under the Leases and Contracts and the operating agreements and related agreements of the limited liability companies to which the Membership Interests relate, (iii) those with respect to trade payables of the Business and obligations to customers of Seller for refunds, rebates, returns, discounts and the like and existing as of the Closing Date, (iv) with respect to any product liability or warranty claims, (v) those, if any, with respect to all environmental liabilities (whether now existing or hereafter arising) under federal, state and local law relating to or arising out of or in connection with the Business (including, without limitation, administrative or civil fines or penalties for violations of environmental laws, or remediation or response costs for contamination), (vi) all obligations and liability of Seller under or in connection with the Benefit Plans, and (vii) with respect to any such additional indebtedness, liabilities and obligations as may be set forth or described on **Schedule 2.2-(vii)** hereto (collectively, the "**Assumed Liabilities**").

2.3    <u>Purchase Price Allocation</u>.  Not later than ten (10) days following the Closing Date, Buyer shall prepare and deliver to Seller for their review and consideration a schedule (the "**Allocation Schedule**") allocating the Purchase Price among the various assets comprising the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision.  If Seller disagrees with or raise objections to the Allocation Schedule, Buyer and Seller will negotiate in good faith to resolve such objections.  If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Seller shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).  Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  If,

SD 00004

on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Seller shall be free to make their own respective allocations of the Purchase Price for tax purposes.

3. Closing Transactions.

3.1    Closing Conference.  The Closing of the transactions provided for herein (the "**Closing**") shall take place at such place or places as the Parties may mutually agree upon.

3.2    Closing Date.  The Closing shall be held concurrently with the mutual execution and delivery of this Agreement.

3.3    Seller's Deliveries to Buyer at Closing.  On the Closing Date, Seller shall make the following deliveries to Buyer:

3.3.1    An Assignment of Membership Interests substantially in the form and content attached as **Exhibit "A"** to this Agreement and incorporated herein by this reference (the "**Assignment of Membership Interests**").

3.3.2    An Assignment and Assumption of Leases and Contracts substantially in the form and content attached as **Exhibit "B"** hereto, duly executed by Seller pursuant to which Seller shall assign to Buyer Seller's interest, if any, in the Leases and Contracts (the "**Assignment of Leases**").

3.3.3    A Bill of Sale and Assignment, duly executed by Seller in the form and on the terms of the bill of sale attached hereto as **Exhibit "C,"** pursuant to which Seller transfers and assigns to Buyer Seller's right, title and interest in and to the Personal Property and the Assignment Property (the "**Bill of Sale**").

3.3.4    A counterpart Assignment of Intangible Property, duly executed by Seller, in the form and content of the assignment of intangible property attached as **Exhibit "D"** hereto, pursuant to which Seller assigns to Buyer Seller's interest, if any, in and to the Intangible Property (the "**Assignment of Intangible Property**").

3.3.5    A deed(s), duly executed and acknowledged by Seller, pursuant to which Seller transfers to Buyer Seller's right, title and interest in the Real Property (the "**Deed**").

3.3.6    A statement(s) under Section 1445 of the Internal Revenue Code with respect to the Real Property, in form and content satisfactory to the Parties (the "**FIRPTA Affidavit**").

3.3.7    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Seller to Buyer at the Closing.

3.4    Buyer's Deliveries to Seller at Closing.  On the Closing Date, Buyer shall make or cause the following deliveries to Seller:

DOCS_LA:171449.1
DOCS_LA:172068.3

5

SD 00005

3.4.1   Payment of the Purchase Price.

3.4.2   A counterpart of the Assignment of Leases, duly-executed by Buyer.

3.4.3   A counterpart of the Assignment of Intangible Property, duly-executed by Buyer.

3.4.4   An Assumption of Liabilities with respect to the Assumed Liabilities, in the form and content attached as **Exhibit "E"** hereto and incorporated herein by this reference, duly-executed by Buyer (the **"Assumption of Liabilities"**).

3.4.5   Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Seller at the Closing.

3.5   Sales, Use and Other Taxes.  Any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Property is located, or any subdivision of any such state, which may be payable by reason of the sale of the Property under this Agreement or the transactions contemplated herein shall be shared equally between Buyer and Seller.

3.6   Possession.  Right to possession of the Property shall transfer to Buyer on the Closing Date.  Seller shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Seller's actual possession that are required to be transferred to Buyer by this Agreement.

4.   Conditions Precedent to Closing.

4.1   Conditions to Seller's Obligations.  Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

4.1.1   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.2   Buyer shall have executed and delivered to Seller the Assignment of Leases, Assignment of Intangible Property, the Assignment of Membership Interests, and the Assumption of Liabilities.

4.1.3   Buyer shall have delivered, or shall be prepared to deliver to Seller at the Closing, all cash and other documents required of Buyer to be delivered at the Closing.

4.1.4   Buyer shall have delivered to Seller appropriate evidence of all necessary corporate action by Buyer in connection with the transactions contemplated hereby,

SD 00006

including, without limitation: (i) certified copies of resolutions duly adopted by Buyer's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a certificate as to the incumbency of officers of Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

4.1.5   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.1.6   Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.2    Conditions to Buyer's Obligations.   Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1   Seller shall have substantially performed or tendered performance of each and every covenant on Seller's part to be performed which, by its terms, is required to be performed or capable of performance at or before the Closing.

4.2.2   All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3   Seller shall have executed and be prepared to deliver to Buyer the Assignment of Membership Interests, the Assignment of Leases, the Assumption of Liabilities,the Bill of Sale, the Deed(s), the Assignment of Intangible Property, and the FIRPTA Affidavit.

4.2.4   Seller shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all other documents required of Seller to be delivered at the Closing.

4.2.5   Seller shall have delivered to Buyer appropriate evidence of all necessary corporate action by Seller in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by Seller's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Seller of this Agreement; and (ii) a certificate as to the incumbency of officers of Seller executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

SD 00007

4.2.6   Seller shall have executed and be prepared to file its Amended Articles, amending its corporate name to "DHI Development, a California corporation;" with Seller hereby undertaking to coordinate the filing of such Amended Articles with the filing of Buyer's foreign qualification documentation with the California Secretary of State as soon reasonably possible following theClosing.

4.2.7   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.

5.   Seller's Representations and Warranties.  Seller hereby makes the following representations and warranties to Buyer:

5.1   Organization, Standing and Power. Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California. Seller has all requisite entity power and authority to own, lease and operate its properties, to carry on Seller's business as now being conducted and Seller has the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

5.2   Validity and Execution. This Agreement and such other agreements and instruments have been duly executed and delivered by Seller and each constitutes the valid and binding obligation of Seller enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

5.3   No Conflict. The consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer; or (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority.

5.4   Withholding.  Seller has withheld and paid all taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 (or any other applicable form) required with respect thereto have been properly completed and timely filed.

SD 00008

5.5    The Property.  Seller owns outright and has good title to all the owned Property; and no person other Seller has any ownership interest in any of the Property.

6.  Buyer's Warranties and Representations.  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller:

6.1    Organization, Standing and Power.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.  Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

6.2    No Conflict.  The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized.  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or its assets or properties may be bound.

7.  "AS IS" Transaction.  Buyer hereby acknowledges and agrees that, except only as provided in Section 5 above, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Property (including, without limitation, income to be derived or expenses to be incurred in connection with the Property, the physical condition of the Personal Property,  the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Real Property Lease or any other real property or improvements comprising a part of the Real Property, the zoning of any such Real Property or improvements, the value of the Property (or any portion thereof), the transferability of the Property or any portion thereof, the terms, amount, validity, collectibility or enforceability of any Assumed Liabilities or Lease or Contract, the merchantability or fitness of the Personal Property or any other portion of the Property for any particular purpose, whether the assignment of any  Lease or Contract without the consent of the counterparties thereto or any Lease or Contract, the Real Property or any other portion of the Property without the consent of the lender(s) who are the holders of the Indebtedness would constitute a breach or default under such Lease or Contract or the agreements or instruments evidencing or securing the Indebtedness, or any other matter or thing relating to the Property or any portion thereof).  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Property.  Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions the Property and all such other matters relating to or affecting or comprising the Property and/or the Assumed Liabilities (including, without limitation, those matters disclosed to Buyer pursuant to **Schedule 7** attached hereto and incorporated herein by this reference) as Buyer deemed necessary or appropriate and

SD 00009

that in proceeding with its acquisition of the Property, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in Section 5 above, Buyer will accept the Property at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS."

8.    [RESERVED.]

9.    <u>Employee Matters.</u>

(a)    Buyer shall have offered to employ, commencing on the Closing Date, all employees of Seller (other than those who elect not accept employment with Buyer) at their salaries, compensation levels and terms and conditions of employment applicable to their employment by Seller immediately prior to the Closing. Such employees who become employees of Buyer shall be collectively referred to as the **"Transferred Employees."**

(b)    Buyer shall give Transferred Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by the Buyer in which such Transferred Employees participate for such Transferred Employees' service with the Seller.

(c)    With respect to any welfare benefit plans maintained by Buyer for the benefit of Transferred Employees on and after the Closing Date, Buyer shall (i) cause there to be waived any eligibility requirements or pre-existing condition limitations, and (ii) give effect, in determining any deductible and maximum out-of-pocket limitations, amounts paid by such Transferred Employees with respect to Benefit Plans maintained by the Seller.

(d)    Except as set forth on Schedule 9(d),(i) Seller has not received written notice of any pending material non-compliance by Seller with any federal or state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, or any written notice asserting that Seller is engaged in any unfair labor practice; (ii) there is no unfair labor practice complaint against Seller pending before the National Labor Relations Board; (iii) there is no labor strike, dispute, slowdown or stoppage actually pending or, to the knowledge of Seller, threatened against or involving or affecting Seller; (iv) no representation question exists respecting the employees of Seller; and (v) to Seller's knowledge, no grievance or arbitration proceeding is pending against Seller relating to any organized labor matters.

(e)    Seller shall retain and shall be responsible for paying and discharging all liabilities for vacation time, sick leave, personal leave and other compensated time off accrued by Seller's employees as of the Closing Date.

(f)    Buyer shall provide group health plan continuation coverage, pursuant to the requirements of COBRA, to all Seller employees, former employees of Seller receiving group health plan continuation coverage from Seller on the Closing Date, and former employees of Seller who are in a COBRA-election period on the Closing Date, each only to the extent that

SD 000010

such persons: (i) properly request such coverage; (ii) will not be hired by Buyer; and (C) timely pay for such coverage.

(g) Buyer shall be indemnified and held harmless by Seller for any and all liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including, without limitation, reasonable attorneys' fees and expenses) actually suffered or incurred by Buyer and arising out of, resulting from or relating to claims by any Transferred Employee relating to facts and circumstances occurring before the Closing Date.

10. Miscellaneous.

10.1    Risk of Loss.  The risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date.  Risk of loss shall be on Seller prior to the Closing becoming effective.  Should the Property or a substantial portion of the Property be destroyed prior to the Closing becoming effective, Buyer need not proceed with the sale.  Buyer may waive its rights under this Section.

10.2    Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

10.3    Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested or by facsimile, and shall be deemed communicated as of the date of mailing or facsimile transmission (with answer back confirmation of such transmission).  Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 10.3.

|  |  |
|---|---|
| To Seller: | Dunmore Homes<br>8781 Sierra College Boulevard<br>Suite 100<br>Granite Bay, CA  95746<br>Attn: Thomas A. Ingram, Esq.,<br>    General Counsel<br>Facsimile:  (916) 677-0052 |
| With a copy to: | Pachulski Stang Ziehl & Jones LLP<br>150 California Street, 15th Floor<br>San Francisco, CA  94111<br>Attn: Debra I Grassgreen, Esq.<br>Facsimile:  (415) 263-7010 |
| To Buyer: | 3626 Fair Oaks Blvd, Ste 100 |

SD 000011

Sacramento, CA 95864
Attention: Mr. Michael Kane
Facsimile (916) 974-3275

With a copy to:    Diepenbrock Harrison
400 Capitol Mall, Suite 1800
Sacramento, CA 95814
Attn: Keith W. McBride, Esq.
Facsimile: (916) 446-4535

10.4    Entire Agreement. This instrument and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Property. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

10.5    Modification. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

10.6    Closing Date. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

10.7    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

10.8    Captions. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.9    Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.

10.10    Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

DOCS_LA:171449.1
DOCS_LA:172068.3

SD 000012

10.11    Brokerage Obligations. Seller and the Buyer each represent and warrant to the other that, such Party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby. It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Seller 's estates in connection with this transaction, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

10.12    Payment of Fees and Expenses. Except as provided in Section 10.2 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

10.13    Survival. The respective representations, warranties, covenants and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing, and shall remain in full force and effect until March 10, 2008.

10.14    Assignments. This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion.

10.15    Binding Effect. Subject to the provisions of Section 10.14, above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

10.16    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

10.17    Good Faith. All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.18    Construction. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

10.19    Counterparts. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

SD 000013

10.20  <u>Time is of the Essence</u>.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.21  <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent that the context otherwise requires:

10.21.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

10.21.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

10.21.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

10.21.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

10.21.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

10.21.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

10.21.7 any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

10.21.8 references to a person are also to its permitted successors and assigns; and

10.21.9 the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

SD 000014

**In Witness Whereof,** Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

BUYER:

Dunmore Homes, Inc., a New York corporation

By: _____
Name: Michael Kane
Its: _____


SELLER:

D unmore Homes a California corporation
By: _____
Name: Thomas A. Ingram
Its:  Secretary

SD 000015

Exhibit "A"

## ASSIGNMENT OF MEMBERSHIP INTERESTS

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which is hereby acknowledged, effective as of September *12*, 2007(the **"Effective Date"**), **Dunmore Homes , a California corporation** (the **"Assignor"**), hereby transfers, assigns, and delivers to Dunmore Homes, Inc., a New York corporation (the **"Assignee"**) the Membership Interests.

This Assignment of Membership Interests (the **"Assignment"**) is being made and given pursuant to that certain Asset Purchase Agreement of even date herewith by and between Assignor, as seller, and Assignee, as buyer (the **"APA"**). Except for terms specifically defined herein, capitalized terms used in this Assignment are intended to have the same meanings as such terms have when used in the APA.

This Assignment shall be governed by and construed and interpreted in accordance with the laws of the State of California.

This Assignment shall inure to the benefit of and shall be binding upon the heirs, executors, successors and assigns of Assignor and Assignee; provided, however, nothing herein shall be deemed to confer upon the Assignee any right to further transfer the Membership Interests (or any of them) except in accordance with the applicable terms, conditions and provisions of the operating agreements or other governing documents of the relevant entity in effect as of the date of any such proposed further assignment or transfer.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the APA (including, without limitation, the acknowledgement and disclaimer set forth in Section 7). If there shall be any conflict between the terms of this Assignment and the APA, the terms of the APA shall control.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

SD 000016

IN WITNESS WHEREOF, Assignor has executed and delivered this Assignment as of the Effective Date.

ASSIGNOR:

Dunmore Homes , a California corporation

By: _____
Name: Thomas A. Ingram
Title: Secretary

SD 000017

Exhibit "B"

**ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS**

This Assignment and Assumption of Leases and Contracts (this "**Assignment**") is entered into as of this _/()_ th day of September, 2007, between Dunmore Homes, a California corporation (the "**Assignor**"), on the one hand, and Dunmore Homes, Inc., a New York corporation (the "**Assignee**"), on the other hand, with respect to the following facts and circumstances:

      A.     Assignor, as Seller, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement of even date herewith (the "**Purchase Agreement**"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

      B.     Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.2 and 3.4.2 of the Purchase Agreement.

      NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

      1.     <u>Assignment</u>.  Effective as of the Closing Date, Assignor hereby assigns to Assignee all of his right, title and interest in and to the Leases and Contracts (collectively, the "**Assigned Contracts**").

      2.  <u>Assumption</u>.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting Party thereunder.

      3.  <u>Terms of the Purchase Agreement</u>.  Assignor and Assignee acknowledge and agree that the representations and, to the extent not performed or waived prior to or at the Closing, warranties, covenants, and agreements contained in the Purchase Agreement shall not be superseded hereby but rather the representations and, to such extent, such other provisions of the Purchase Agreement, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern. Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

      4.  <u>Attorneys' Fees</u>. In the event that either Party hereto brings and action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing

SD 000018

Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

5. <u>Amendments</u>.  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

6. <u>Execution in Counterparts</u>.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the Parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature  promptly thereafter.

7. <u>Delivery Pursuant to Purchase Agreement</u>.  Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

8. <u>Governing Law</u>.  This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of California.

SD 000019

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

ASSIGNOR:

Dunmore Homes, a California corporation
By:
Name: Thomas A. Ingram
Its: Secretary

ASSIGNEE:

Dunmore Homes, Inc., a New York corporation

By:
Name: Michael Kane
Its:

SD 000020

Exhibit "C"

## BILL OF SALE AND ASSIGNMENT

Pursuant to Section 3.3.3 of that certain Asset Purchase Agreement of even date herewith (the "**Agreement**"), by and between Dunmore Homes, Inc., a New York corporation ("**Buyer**"), on the one hand, and Dunmore Homes, a California corporation ("**Seller**"), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller hereby sells, transfers, assigns and delivers to Buyer all of his right, title and interest in and to (i) the Personal Property, and (ii) the Assignment Property.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Seller covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other action as Buyer may reasonably request to more effectively transfer and assign to and vest in Buyer each of the Personal Property and Assignment Property; provided that nothing herein shall be deemed to require Seller to execute or deliver any such further document or instrument or take any such action to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon Seller by this Agreement.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Agreement). Seller and, by proceeding with the Closing, Buyer acknowledge and agree that the representations and warranties and, to the extent not performed prior to or at the Closing, the covenants, and agreements contained in the Agreement shall not be superseded hereby but rather the representation and warranties and, to the extent not performed or waived prior the Closing, such other provisions shall remain in full force and effect. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

SD 000021

IN WITNESS WHEREOF, Seller has caused this Bill of Sale and Assignment to be executed as of the _10_ day of September, 2007.

SELLER:

Dunmore Homes, a California corporation

By: _____
Name: Thomas A. Ingram
Its: Secretary

SD 000022

Exhibit "D"

## ASSIGNMENT OF INTANGIBLE PROPERTY

Dunmore Homes, a California corporation (the "**Assignor**") is executing this Assignment of Intangible Property (the "**Assignment**") in favor of Dunmore Homes, Inc., a New York corporation (the "**Assignee**"), with respect to the following facts and circumstances:

(A)    Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement of even date herewith (the "**Agreement**").  Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)    Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Agreement.  Pursuant to Sections 3.3.4 and 3.4.3 of the Agreement, Assignor and Assignee are required to mutually execute and deliver this Assignment at the Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which Assignor hereby expressly acknowledges, Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest, if any, in and to all Intangible Property. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

Assignor and Assignee acknowledge and agree that the representations and warranties and, to the extent not performed prior to or at the Closing, the covenants, and agreements contained in the Agreement shall not be superseded hereby but rather the representation and warranties and, to the extent not performed or waived prior the Closing, such other provisions shall remain in full force and effect.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

In the event that Assignor or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

SD 000023

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of California.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the _____ day of September, 2007.

ASSIGNOR:

Dunmore Homes, a California corporation

By: _____
Name: Thomas A. Ingram
Its: Secretary

ASSIGNEE:

Dunmore Homes, Inc., a New York corporation

By: _____
Name: Michael Kane
Its: _____

DOCS_LA:171449.1
DOCS_LA:172068.3

24

Exhibit "E"
## ASSUMPTION AGREEMENT

This Assumption Agreement (this **"Assumption"**) is entered into as of this _10_ day of September, 2007, by Dunmore Homes, Inc., a New York corporation (the **"Buyer"**) in favor of Dunmore Homes, a California corporation (the **"Seller"**), with respect to the following facts and circumstances:

A.    Seller and Buyer have heretofore entered into that certain Asset Purchase Agreement dated of even date herewith (the **"Purchase Agreement"**). Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the execution and delivery of this Assumption, Buyer and Seller are consummating the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Buyer hereby acknowledges, Buyer hereby agrees as follows:

1.    Assumption. Effective as of the Closing Date, Buyer hereby assumes and agrees fully and faithfully to perform all of the Assumed Liabilities.

2.    Terms of the Purchase Agreement. . Assignor and Assignee acknowledge and agree that the representations and, to the extent not performed or waived prior to or at the Closing, warranties, covenants, and agreements contained in the Purchase Agreement shall not be superseded hereby but rather the representations and, to such extent, such other provisions of the Purchase Agreement, shall remain in full force and effect. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.    Attorneys' Fees. In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assumption, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding. By closing the transaction contemplated by the Purchase Agreement, Seller shall be deemed to have agreed to the terms and provisions of this Paragraph 3 and the second sentence of Paragraph 6 below.

4.    Amendments. This Assumption may only be amended by a writing signed by both Buyer and Seller.

5.    Governing Law. This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of California.

SD 000025

6.     Execution in Counterparts.  This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature promptly thereafter.

IN WITNESS WHEREOF, Buyer and Seller have executed this Assumption as of the day and year first set forth above.

BUYER:

Dunmore Homes, Inc., a New York corporation

By: _____
Name: Michael Kane
Its: _____

SELLER:

Dunmore Homes, a California corporation

By: _____
Name: Thomas A. Ingram
Its: Secretary

DOCS_LA:171449.1
DOCS_LA:172068.3

26

SD 000026

## Schedule 1.1.1

*Limited Liability Company Interests*

### Dunmore Homes Entities

| CURRENT COMPANIES | Federal Tax ID# | Corp# | Type | Home State |
|---|---|---|---|---|
| Dunmore Brown Estates, LLC | 68-0479124 | 200117810001 | LLC | CA |
| Dunmore Canterbury LLC | 20-1130751 | 200412610111 | LLC | CA |
| Dunmore Central Valley, LLC | 20-2240540 | 200502110159 | LLC | CA |
| Dunmore Country Villas, LLC | 30-0046952 | 200205110068 | LLC | CA |
| Dunmore Fullerton Ranch, LLC | 20-1658193 | 200426810092 | LLC | CA |
| Dunmore Highland, LLC | 20-1102518 | 200403610226 | LLC | CA |
| Dunmore Laguna Reserve, LLC | 68-0483351 | 200126710002 | LLC | CA |
| Dunmore Orchard LLC | 20-0120586 | 200319210160 | LLC | CA |
| Dunmore-Providence LLC | 20-1130736 | 200412610108 | LLC | CA |
| Dunmore Reflections II, LLC | 41-2044374 | 200215210049 | LLC | CA |
| Dunmore Stone Creek, LLC | 20-1891045 | 200431810024 | LLC. | |
| Dunmore Wildhawk, LLC | 94-3394377 | 200109510054 | LLC | CA |
| Fahrens Park LP (50%) | 68-0167122 | 198824200051 | LP | CA |
| Fairways, LLC | 68-0421420 | 199827310091 | LLC | CA |
| Dunmore Viscaya LLC | 20-3169170 | 200519910195 | LLC | CA |
| Dunmore Diamond Ridge LLC | 20-2558956 | 200508310090 | LLC | CA |
| Dunmore Croftwood LLC | 20-4652654 | 200527810139 | LLC | CA |
| Dunmore Westport, LLC | 20-3262629 | 200520710174 | LLC | CA |
| Dunmore Sienna LLC | 20-2559065 | 200508310104 | LLC | CA |
| Dunmore Sycamore Ranch LLC | 73-1703713 | 200409910038 | LLC | CA |
| Dunmore Delano LLC | 20-8574324 | 200527810141 | LLC | CA |
| Dunmore Wildhawk North, LP | 20-8026303 | 200632000012 | LP | CA |
| Dunmore Montecito LLC | 20-2559026 | 200508310100 | LLC | CA |

SD 000027

## Schedule 1.1.2(i)

*Leases and Contracts*

### MODEL LEASES

| Address | Owner/Lessor | Lessee | Amt |
|---------|--------------|--------|-----|
| 2053 Bristol Court, Yuba City, CA | Nesham | Dunmore Canterbury LLC | $3,916.58 |
| 2036 Bristol Court, Yuba City, CA | Bains | Dunmore Canterbury LLC | $4,175.83 |

### OFFICE LEASES

| Address | Owner/Lessor | Lessee | Amt |
|---------|--------------|--------|-----|
| 8781 Sierra College, Granite Bay | Don Nausbaum | Dunmore Homes | $65,626.85 + |
| Fresno, CA | TBD | Dunmore Homes | $12,896.78 |

1

SD 000028

# Schedule 1.1.2(ii)

### *Other Leases*

| Printer Name | Model # | Dept | Location | Lease Holder |
|---|---|---|---|---|
| Thumper | 2545p | Accounting | Granite Bay | CIT Tech Fin Services |
| Mickey | C3528 | Sales | Granite Bay | CIT Tech Fin Services |
| Sully | C2824 | Legal | Granite Bay | CIT Tech Fin Services |
| Pluto | 8035SP | Sales | Granite Bay | CIT Tech Fin Services |
| Donald | 8035SP | Sales | Granite Bay | CIT Tech Fin Services |
| Pongo | 8035SP | Fresno | Fresno | CIT Tech Fin Services |
| Perdita | C6045 | Land | Fresno | CitiCapital |
| Jiminy | 4075SP | Mail Room | Granite Bay | Citicorp Vendor Fin |
| Minnie | SLP38C | Design Ctr | Granite Bay | Heartland Leasing |
| DIRI1SAVIN816 | 816MF | Dia Ridge 1 | Bakersfield | Key Equip Fin |
| DIRI2SAVIN816 | 816MF | Dia Ridge 2 | Bakersfield | Key Equip Fin |
| CBSTSAVIN816 | 816MF | Cobblestone | Atwater | Key Equip Fin |
| VISC1SAVIN816 | 816MF | Las Casas | Dinuba | Key Equip Fin |

# Schedule 1.1.2(iii)

*Other Contracts*

## CONTRACTS WITH SUBCONTRACTORS BY PROJECT

### Cobblestone

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 4/17/2007 | 4/17/2008 |
| AC Electric | 7/15/2007 | 7/15/2008 |
| Timberlake Cabinet Company | 4/11/2007 | 4/11/2008 |
| Simas Floor Company Inc. | 7/13/2007 | 7/13/2008 |
| CVC Construction | 4/11/2007 | 4/11/2008 |
| Reach Removal Inc. | 4/11/2007 | 4/11/2008 |
| CVC Construction | 4/11/2007 | 4/11/2008 |
| McBay Tile Inc. | 4/17/2007 | 4/17/2008 |
| Elegant Surfaces, Inc. | 4/11/2007 | 4/11/2008 |
| Dry Wall Works Inc. | 4/17/2007 | 12/31/2007 |
| AC Electric | 4/11/2007 | 4/11/2008 |
| Western Shower Door, Inc. | 4/17/2007 | 4/17/2008 |
| Quality Door and Trim | 4/17/2007 | 4/17/2008 |
| Fence America, Inc. | 4/18/2007 | 4/18/2008 |
| Merced Pacific Landscape, Inc. | 5/15/2007 | 5/15/2008 |
| Sacramento Building Products | 5/2/2007 | 5/2/2008 |
| I and J Builders Inc | 4/11/2007 | 4/11/2008 |
| Cassie Door & Insulation Co. Inc. | 4/17/2007 | 4/17/2008 |
| Simas Floor Company Inc. | 7/13/2007 | 7/13/2008 |
| California Living & Energy | 4/17/2007 | 4/17/2008 |
| Quality Door and Trim | 4/17/2007 | 4/17/2008 |
| Beutler Corporation | 4/11/2007 | 4/11/2008 |
| Sacramento Building Products | 4/17/2007 | 4/17/2008 |
| A-1 Cleaning Services | 4/17/2007 | 4/17/2008 |
| Quality Door and Trim | 4/17/2007 | 4/17/2008 |
| Merced Pacific Landscape, Inc. | 4/17/2007 | 4/17/2008 |
| James & Co., Inc. | 4/17/2007 | 4/17/2008 |
| I and J Builders Inc | 4/11/2007 | 4/11/2008 |
| R & A Painting | 4/11/2007 | 4/11/2008 |
| BEE Pest Control, Inc. | 4/11/2007 | 4/11/2008 |
| Downey Plumbing | 4/11/2007 | 4/11/2008 |
| Executive Cleaning Corporation | 6/13/2007 | 6/13/2008 |
| Old Country Roofing Inc | 4/11/2007 | 4/11/2008 |
| Duracite, Inc. | 5/15/2007 | 5/15/2008 |
| Edwards Plastering Inc. | 4/11/2007 | 4/11/2008 |
| I and J Builders Inc | 4/11/2007 | 4/11/2008 |
| AC Electric | 39189 | 39555 |
| Simas Floor Company Inc. | 39276 | 39642 |
| Far West Windows, Inc. | 39183 | 39549 |
| Creative Touch Interiors-Fresno | 39187 | 39553 |

### CopperCreek

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 3/1/2004 | 3/1/2005 |

SD 000030

| | | |
|---|---|---|
| MH Integrated Services, Inc. | 6/21/2005 | 6/21/2006 |
| GE Appliances | 8/8/2003 | 8/8/2004 |
| Timberlake Cabinet Company | 12/22/2005 | 12/15/2006 |
| Simas Floor Company Inc. | 12/15/2005 | 5/6/2006 |
| Cedar Valley Concrete, Inc. | 4/1/2005 | 6/30/2005 |
| Valley Maintenance Service | 3/18/2003 | 3/18/2004 |
| Cedar Valley Concrete, Inc. | 3/31/2005 | 12/31/2005 |
| Grand Floor Designs Inc.-Lodi | 7/1/2006 | 7/1/2007 |
| Elegant Surfaces, Inc. | 12/17/2004 | 12/17/2005 |
| Arellano Drywall | 12/22/2005 | 6/1/2006 |
| EZ Electric, Sacramento | 10/24/2006 | 10/24/2007 |
| Western Shower Door, Inc. | 7/17/2002 | 7/17/2003 |
| Quality Door and Trim | 8/8/2004 | 8/8/2005 |
| Pacific Landscape | 1/1/1999 | 12/31/2002 |
| Sacramento Building Products | 12/22/2005 | 12/31/2005 |
| I and J Builders Inc | 9/25/2002 | 9/25/2003 |
| I and J Builders Inc | 9/25/2003 | 9/25/2004 |
| Elegant Surfaces, Inc. | 1/3/2007 | |
| Barton Overhead Door, Inc. | 12/22/2005 | 12/31/2005 |
| Simas Floor Company Inc. | 12/15/2005 | 5/6/2006 |
| Quality Door and Trim | 8/8/2004 | 8/8/2005 |
| Beutler Corporation | 6/20/2006 | 7/30/2007 |
| F. Rodgers Specialty Contractor, Inc. | 5/18/2006 | 10/1/2006 |
| A-1 Cleaning Services | 4/5/2004 | 4/5/2005 |
| Quality Door and Trim | 8/8/2004 | 8/8/2005 |
| MH Integrated Services, Inc. | 6/21/2005 | 6/21/2006 |
| Pacific Landscape | 1/1/1999 | 12/31/2002 |
| James & Co., Inc. | 12/10/2002 | 12/10/2003 |
| I and J Builders Inc | 4/21/2004 | 4/21/2005 |
| Norman Masonry, Inc. | 9/30/2004 | 9/30/2005 |
| R & A Painting | 4/15/2005 | 4/15/2006 |
| BEE Pest Control, Inc. | 8/6/2002 | 8/6/2003 |
| Creative Plumbing | 12/22/2005 | 4/5/2006 |
| State Roofing | 1/5/2005 | 6/2/2005 |
| Barbosa Cabinets, Inc. | 1/19/2004 | 1/19/2005 |
| BRS The Stair Company | 8/8/2002 | 8/8/2003 |
| Edwards Plastering Inc. | 4/6/2005 | 3/16/2006 |
| I and J Builders Inc | 4/5/2006 | 4/5/2007 |
| AC Electric | 6/15/2005 | 6/15/2006 |
| Simas Floor Company Inc. | 12/15/2005 | 5/6/2006 |
| Atrium Windows & Doors Inc. | 8/23/2004 | 8/23/2005 |
| Grand Floor Designs Inc.-Lodi | 11/24/2003 | 11/24/2004 |

## Emerald

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 3/21/2007 | 3/21/2008 |
| 180 Digital Interiors Inc. | 3/21/2007 | 3/21/2008 |
| Timberlake Cabinet Company | 10/25/2006 | 10/25/2007 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| CVC Construction | 4/18/2007 | 4/18/2008 |
| Patrick Construction Clean-Up | 12/7/2006 | 12/7/2007 |
| CVC Construction | 10/25/2006 | 10/25/2007 |
| Hudson Tile, Inc. | 1/2/2007 | 1/2/2008 |
| Elegant Surfaces, Inc. | 1/22/2007 | 1/22/2008 |
| *Kings Drywall, Inc.* | 10/25/2006 | 10/25/2007 |
| Norcal Electric | 11/3/2006 | 11/3/2007 |

SD 000031

| | EFF Date | EXP Date |
|---|---|---|
| Western Shower Door, Inc. | 1/15/2007 | 1/15/2008 |
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| Golden State Fence Co. | 10/31/2006 | 10/31/2007 |
| Penney Lawn Service, Inc. | 11/6/2006 | 11/6/2007 |
| Western Insulation, LP | 1/12/2007 | 1/12/2008 |
| Masonry Creations, Inc. | 5/9/2007 | 5/9/2008 |
| Weslar, Inc. | 11/7/2006 | 11/7/2007 |
| King Door Co. Inc. | 2/5/2007 | 2/5/2008 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| California Living & Energy | 3/21/2007 | 3/21/2008 |
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| Beutler Corporation | 10/25/2006 | 10/25/2007 |
| Western Insulation, LP | 11/2/2006 | 11/2/2007 |
| American Maid | 10/25/2006 | 10/25/2007 |
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| 180 Digital Interiors Inc. | 3/13/2007 | 3/13/2008 |
| Penny Lawn Service | 11/6/2006 | 11/6/2007 |
| James & Co., Inc. | 3/23/2007 | 3/23/2008 |
| Weslar, Inc. | 11/7/2006 | 11/7/2007 |
| Penny Lawn Service | 3/16/2007 | 3/16/2008 |
| Walldesign Incorporated | 1/22/2007 | 1/22/2008 |
| RES-COM Pest Control | 10/25/2006 | 10/26/2007 |
| Prime Plumbing Inc. | 10/25/2006 | 10/25/2007 |
| American Maid | 3/6/2007 | 3/6/2008 |
| Old Country Roofing Inc. | 10/25/2006 | 10/25/2007 |
| Duracite, Inc. | 1/26/2007 | 1/26/2008 |
| Precision Industries Solid Surface & Mill Work Inc. | 10/25/2006 | 10/25/2007 |
| Vision Plastering | 10/25/2006 | 10/25/2007 |
| Weslar, Inc. | 11/7/2006 | 11/7/2007 |
| Lowry Trenching Inc. | 1/10/2007 | 1/10/2008 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| Door & Window Company | 11/27/2006 | 11/27/2007 |
| Creative Touch Interiors-Fresno | 5/17/2007 | 5/17/2008 |

## Kensington

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 10/1/2004 | 10/1/2005 |
| Liberty Bell Alarm | 9/9/2004 | 9/9/2005 |
| Timberlake Cabinet Company | 6/4/2007 | 6/4/2008 |
| Citadel Tile & Marble | 6/4/2007 | 6/4/2008 |
| Dennis Blazona Construction, Inc. | 8/20/2007 | 8/20/2008 |
| H&H Brothers Enterprises, Inc. | 8/13/2004 | 8/13/2005 |
| Dennis Blazona Construction, Inc. | 1/1/2005 | 3/31/2005 |
| Citadel Tile & Marble | 7/15/2006 | 7/15/2007 |
| Elegant Surfaces, Inc. | 4/13/2005 | 4/13/2006 |
| Emerald Drywall | 2/5/2007 | 2/5/2008 |
| Power Factor Electric, Inc. | 12/12/2006 | 12/12/2007 |
| Western Shower Door, Inc. | 8/27/2004 | 8/27/2005 |
| Riddio Construction Co., Inc. | 8/27/2004 | 8/27/2005 |
| General Construction Works Inc | 8/17/2004 | 8/17/2005 |
| Sacramento Building Products | 8/30/2004 | 8/30/2005 |
| I M Construction, Inc. | 9/15/2005 | 9/15/2006 |
| Creative Touch Interiors-Roseville | 5/26/2006 | 5/26/2007 |
| Easy Lift Door Company | 1/4/2006 | 1/4/2007 |
| Citadel Tile & Marble | 6/4/2007 | 6/4/2008 |
| California Living & Energy | 10/1/2005 | 10/1/2006 |

SD 000032

| | | |
|---|---|---|
| Riddio Construction Co., Inc. | 11/20/2006 | 11/20/2007 |
| Beutler Corporation | 7/25/2006 | 7/25/2007 |
| Sacramento Building Products | 4/13/2006 | 4/13/2007 |
| Above & Beyond Cleaning Services, Inc. | 8/10/2007 | 8/10/2008 |
| Riddio Construction Co., Inc. | 8/27/2004 | 8/27/2005 |
| Peikus Brothers | 10/13/2004 | 10/13/2005 |
| Liberty Bell Alarm | 9/9/2004 | 9/9/2005 |
| Boyd's Landscaping | 10/1/2004 | 10/1/2005 |
| Power Factor Electric, Inc. | 2/22/2007 | 2/22/2008 |
| Placer Lumber Inc | 4/23/2007 | 4/23/2008 |
| R & C Masonry, Inc. | 8/26/2004 | 8/26/2005 |
| Mark ScanGarella Painting, Inc. | 9/21/2004 | 9/21/2005 |
| The Noble Way Pest Control | 8/30/2004 | 8/30/2005 |
| CVC Construction | 11/16/2006 | 11/16/2007 |
| Executive Cleaning Corporation | 1/20/2007 | 1/20/2008 |
| Old Country Roofing Inc | 1/4/2005 | 12/31/2006 |
| Creative Touch Interiors-Roseville | 5/1/2007 | 5/1/2008 |
| BRS The Stair Company | 8/30/2004 | 8/30/2005 |
| G. Glenn Plastering | 2/2/2007 | 2/2/2008 |
| Placer Lumber Inc | 4/23/2007 | 4/23/2008 |
| Valley Utility Services Inc. | 9/16/2004 | 9/16/2005 |
| Citadel Tile & Marble | 6/4/2007 | 6/4/2008 |
| Y.T. Glass & Windows, Inc. | 3/9/2005 | 3/9/2006 |
| Grand Floor Designs Inc - Roseville | 9/8/2004 | 9/8/2005 |

## Las Casas

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 2/21/2007 | 2/21/2008 |
| 180 Digital Interiors Inc. | 7/13/2007 | 7/13/2008 |
| Timberlake Cabinet Company | 2/21/2007 | 2/21/2008 |
| Creative Touch Interiors-Fresno | 2/21/2007 | 2/21/2008 |
| CVC Construction | 2/21/2007 | 2/21/2008 |
| A & S Grading Services Inc. | 3/27/2007 | 3/27/2008 |
| CVC Construction | 2/21/2007 | 2/21/2008 |
| Creative Touch Interiors-Fresno | 2/21/2007 | 2/21/2008 |
| Hard Surface Technology, Inc. | 3/27/2007 | 3/27/2008 |
| Kings Drywall, Inc. | 3/27/2007 | 3/27/2008 |
| AC Electric | 3/27/2007 | 3/27/2008 |
| Western Shower Door, Inc. | 3/8/2007 | 3/8/2008 |
| Doorway Mfg. Co., Inc. | 3/27/2007 | 6/1/2007 |
| CVC Construction | 3/16/2007 | 3/16/2008 |
| Sacramento Building Products | 2/21/2007 | 2/21/2008 |
| Golden State Custom Framing, Inc. | 3/27/2007 | 3/27/2008 |
| McClure Door Inc. | 2/21/2007 | 2/21/2008 |
| Creative Touch Interiors-Fresno | 3/27/2007 | 3/27/2008 |
| California Living & Energy | 3/8/2007 | 3/8/2008 |
| Doorway Mfg. Co., Inc. | 3/21/2007 | 3/21/2008 |
| Beutler Corporation | 2/21/2007 | 2/21/2008 |
| F. Rodgers Specialty Contractor, Inc. | 3/27/2007 | 3/27/2008 |
| Almark Janitorial Service | 3/8/2007 | 3/8/2008 |
| Doorway Mfg. Co., Inc. | 7/24/2007 | 7/24/2008 |
| 180 Digital Interiors Inc. | 2/21/2007 | 2/21/2008 |
| Parker Landscape Development Inc. | 3/27/2007 | 3/27/2008 |
| James & Co., Inc. | 2/21/2007 | 2/21/2008 |
| Golden State Custom Framing, Inc. | 5/11/2006 | 5/11/2007 |
| Design Masonry | | |

| | | |
|---|---|---|
| R & A Painting | 2/21/2007 | 2/21/2008 |
| RES-COM Pest Control | 2/21/2007 | 2/21/2008 |
| Wilmor and Sons Plumbing | 2/21/2007 | 2/21/2008 |
| Executive Cleaning Corporation | 6/13/2007 | 6/13/2008 |
| Old Country Roofing Inc | 3/8/2007 | 3/8/2008 |
| Duracite, Inc. | 5/11/2007 | 5/11/2008 |
| Precision Industries Solid Surface & Mill Work Inc. | 5/12/2006 | 5/12/2007 |
| Mid-Valley Plastering, Inc. | 3/27/2007 | 3/27/2008 |
| Golden State Custom Framing, Inc. | 2/21/2007 | 2/21/2008 |
| Dalco Inc. | 2/21/2007 | 2/21/2008 |
| Creative Touch Interiors-Fresno | 2/21/2007 | 2/21/2008 |
| Door & Window Company | 2/21/2007 | 2/21/2008 |
| Creative Touch Interiors-Fresno | 2/21/2007 | 2/21/2008 |

## Cypress Cove

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 7/1/2006 | 7/1/2007 |
| Liberty Bell Alarm | 5/2/2006 | 5/2/2007 |
| Timberlake Cabinet Company | 6/11/2007 | 6/11/2008 |
| Simas Floor Company Inc. | 6/11/2007 | 6/11/2008 |
| Blazona Concrete Construction, Inc | 6/12/2007 | 6/12/2008 |
| Quality Construction Clean-up, Inc. | 6/20/2006 | 6/20/2007 |
| Blazona Concrete Construction, Inc | 6/12/2007 | 6/12/2008 |
| Shennan Lochr Custom Tile Works | 6/11/2007 | 6/11/2008 |
| Forsyth Marble Installation | 7/10/2006 | 7/10/2007 |
| Energetic Paint & Drywall, Inc | 5/2/2006 | 5/2/2007 |
| Power Factor Electric, Inc. | 12/27/2006 | 12/27/2007 |
| Western Shower Door, Inc. | 11/17/2006 | 11/17/2007 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Frontier Fence Company | 8/1/2006 | 8/1/2007 |
| Troy Scott's Custom Grading | 5/2/2006 | 5/2/2007 |
| The Garage Door & Fireplace Center | 8/11/2007 | 8/11/2008 |
| California Mantel, Inc. | 6/23/2006 | 6/23/2007 |
| LaVoie & Sons | 3/27/2007 | 3/27/2008 |
| Creative Touch Interiors-Roseville | 6/13/2007 | 6/13/2008 |
| Overhead Door Co/SAC Inc. | 5/22/2006 | 5/22/2007 |
| Simas Floor Company Inc. | 5/22/2006 | 5/22/2007 |
| California Living & Energy | 10/1/2006 | 10/1/2007 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Beutler Corporation | 8/10/2007 | 8/10/2008 |
| Western Insulation LP | 5/2/2006 | 5/2/2007 |
| Contractors Cleaning | 6/20/2006 | 6/20/2007 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Petkus Brothers | 7/1/2006 | 7/1/2007 |
| Pacific Parks Landscaping, Inc. | 6/20/2006 | 6/20/2007 |
| Power Factor Electric, Inc. | 5/22/2006 | 5/22/2007 |
| LaVoie & Sons | 3/27/2007 | 3/27/2008 |
| Design Masonry | 5/2/2006 | 5/2/2007 |
| Sondad Industries | 9/22/2006 | 9/22/2007 |
| HA Painting | 7/12/2007 | 7/12/2008 |
| BEE Pest Control, Inc. | 5/2/2006 | 5/2/2008 |
| CVC Construction | 5/23/2007 | 5/23/2008 |
| Executive Cleaning Corporation | 1/19/2007 | 1/19/2008 |
| H & M Roofing Inc. | 5/2/2006 | 5/2/2007 |
| Creative Touch Interiors-Roseville | 6/14/2007 | 6/14/2008 |

| | | |
|---|---|---|
| BRS The Stair Company | 2/28/2007 | 2/28/2008 |
| G. Glenn Plastering | 2/21/2007 | 2/21/2008 |
| LaVoie & Sons | 3/27/2007 | 3/27/2008 |
| American Underlayment Systems, Inc. | 7/1/2006 | 7/1/2007 |
| Valley Utility Services Inc. | 6/27/2006 | 6/27/2007 |
| Simas Floor Company Inc. | 5/22/2006 | 5/22/2007 |
| KBI NorCal Windows | 6/12/2006 | 6/12/2007 |
| Creative Touch Interiors-Roseville | 5/22/2006 | 5/22/2007 |

## The Villas

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 7/1/2006 | 7/1/2009 |
| Liberty Bell Alarm | 5/22/2006 | 5/22/2007 |
| Timberlake Cabinet Company | 7/5/2007 | 7/5/2008 |
| Simas Floor Company Inc. | 5/22/2006 | 5/22/2007 |
| Blazona Concrete Construction, Inc | 6/12/2007 | 6/12/2008 |
| Quality Construction Clean-up, Inc. | 6/13/2006 | 6/13/2007 |
| Blazona Concrete Construction, Inc | 6/12/2007 | 6/12/2008 |
| Creative Touch Interiors-Roseville | 5/22/2006 | 5/22/2007 |
| Forsyth Marble Installation | 7/10/2006 | 7/10/2007 |
| Energetic Paint & Drywall, Inc | 2/13/2007 | 2/13/2008 |
| Power Factor Electric, Inc. | 12/29/2006 | 12/29/2007 |
| Western Shower Door, Inc. | 6/19/2007 | 6/19/2008 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Fence America, Inc. | 5/31/2007 | 5/31/2008 |
| Troy Scott's Custom Grading | 5/2/2006 | 5/2/2007 |
| International Fire | 6/30/2006 | 6/30/2007 |
| California Mantel, Inc. | 6/23/2006 | 6/23/2007 |
| SGN Construction, Inc | 12/28/2006 | 12/28/2007 |
| Creative Touch Interiors-Roseville | 6/23/2006 | 6/23/2007 |
| Overhead Door Co/SAC Inc. | 5/22/2006 | 5/22/2007 |
| Simas Floor Company Inc. | 5/22/2006 | 5/22/2007 |
| California Living & Energy | 12/1/2006 | 12/1/2007 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Beutler Corporation | 8/1/2007 | 8/1/2008 |
| Western Insulation LP | 5/2/2006 | 5/2/2007 |
| Contractors Cleaning | 6/15/2006 | 6/15/2007 |
| Doorway Mfg. Co., Inc. | 7/7/2006 | 7/7/2007 |
| Liberty Bell Alarm | 5/22/2006 | 5/22/2007 |
| Professional Landscape Solutions Inc. | 3/7/2007 | 3/7/2008 |
| Power Factor Electric, Inc. | 4/18/2007 | 4/18/2008 |
| SGN Construction, Inc | 5/1/2007 | 5/1/2008 |
| Design Masonry | 5/2/2006 | 6/2/2007 |
| Sondsd Industries | 10/3/2006 | 10/3/2007 |
| HA Painting | 7/12/2007 | 7/12/2008 |
| BEE Pest Control, Inc. | 5/2/2006 | 5/2/2007 |
| Wilmor and Sons Plumbing | 3/2/2007 | 3/2/2008 |
| Executive Cleaning Corporation | 1/19/2007 | 1/19/2008 |
| H & M Roofing Inc. | 3/30/2007 | 3/30/2008 |
| Creative Touch Interiors-Roseville | 6/23/2006 | 6/23/2007 |
| BRS The Stair Company | 6/20/2006 | 6/20/2007 |
| G. Glenn Plastering | 6/20/2006 | 6/20/2007 |
| SGN Construction, Inc | 5/1/2007 | 5/1/2008 |
| American Underlayment Systems, Inc. | 7/1/2006 | 7/1/2007 |
| Valley Utility Services Inc. | 6/27/2006 | 6/27/2007 |
| Simas Floor Company Inc. | 5/22/2006 | 5/22/2007 |

SD 000035

| | 6/12/2006 | 6/12/2007 |
|---|---|---|
| KBI NorCal Windows | 6/12/2006 | 6/12/2007 |
| Creative Touch Interiors-Roseville | 5/22/2006 | 5/22/2007 |

## Providence

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 2/12/2004 | 2/12/2005 |
| Liberty Bell Alarm | 2/18/2004 | 2/18/2005 |
| Timberlake Cabinet Company | 1/6/2006 | 1/6/2007 |
| Floorspace, Inc. | 12/1/2005 | 12/1/2006 |
| Dennis Blazona Construction, Inc. | 12/20/2005 | 12/20/2006 |
| H&H Brothers Enterprises, Inc. | 2/11/2004 | 2/11/2005 |
| Dennis Blazona Construction, Inc. | 1/1/2006 | 7/1/2006 |
| Tileco | 7/15/2006 | 7/15/2007 |
| Elegant Surfaces, Inc. | 4/8/2005 | 4/8/2006 |
| Emerald Drywall | 2/26/2007 | 2/26/2008 |
| Power Factor Electric, Inc. | 7/1/2006 | 7/1/2007 |
| Western Shower Door, Inc. | 2/12/2004 | 2/12/2005 |
| Sacramento A-1 Door and Building Solutions | 2/12/2004 | 2/12/2005 |
| Troy Scott's Custom Grading | 1/7/2004 | 1/7/2005 |
| Sacramento Building Products | 9/1/2004 | 4/1/2005 |
| J M Construction, Inc. | 9/1/2005 | 10/15/2005 |
| Easy Lift Door Company | 5/1/2006 | 5/1/2007 |
| Floorspace, Inc. | 12/1/2005 | 12/1/2006 |
| Sacramento A-1 Door and Building Solutions | 2/12/2004 | 2/12/2005 |
| RB Spencer Inc. | 12/7/2006 | 12/7/2007 |
| Sacramento Building Products | 6/10/2006 | 6/10/2007 |
| New Life Construction Cleaning | 2/12/2004 | 2/12/2005 |
| Sacramento A-1 Door and Building Solutions | 2/12/2004 | 2/12/2005 |
| Liberty Bell Alarm | 3/15/2004 | 3/15/2005 |
| Boyd's Landscaping | 5/12/2004 | 5/12/2005 |
| Power Factor Electric, Inc. | 3/15/2004 | 3/15/2005 |
| Placer Lumber Inc | 6/25/2007 | 6/25/2008 |
| R & C Masonry, Inc. | 2/11/2004 | 2/11/2005 |
| Walldesign Incorporated | 2/18/2005 | 12/31/2005 |
| The Noble Way Pest Control | 2/4/2004 | 2/4/2005 |
| CVC Construction | 11/16/2006 | 11/16/2007 |
| Executive Cleaning Corporation | 4/12/2007 | 4/12/2008 |
| Old Country Roofing Inc | 1/1/2006 | 1/1/2007 |
| Yeager Tile Co., Inc. | 4/4/2004 | 4/4/2005 |
| BRS The Stair Company | 2/11/2004 | 2/11/2005 |
| Vision Plastering | 3/1/2007 | 3/1/2008 |
| Placer Lumber Inc | 6/25/2007 | 6/25/2008 |
| Valley Utility Services Inc. | 6/10/2004 | 6/10/2005 |
| Floorspace, Inc. | 12/1/2005 | 12/1/2006 |
| Atrium Windows & Doors Inc. | 12/1/2005 | 12/1/2006 |
| Grand Floor Designs Inc - Roseville | 4/1/2004 | 4/1/2005 |

## StoneCreek

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 8/1/2005 | 8/1/2006 |
| AC Electric | 7/18/2007 | 7/18/2008 |
| Timberlake Cabinet Company | 12/22/2004 | 12/15/2006 |
| Builders Flooring | 12/15/2005 | 5/6/2006 |
| CVC Construction | 5/16/2005 | 12/31/2005 |

SD 000036

| | | |
|---|---|---|
| Reach Removal Inc. | 3/24/2006 | 12/15/2006 |
| CVC Construction | 5/16/2005 | 12/31/2005 |
| MoBay Tile Inc. | 5/26/2005 | 5/26/2006 |
| Elegant Surfaces, Inc. | 5/16/2005 | 5/16/2006 |
| Arellano Drywall | 5/16/2006 | 5/16/2007 |
| AC Electric | 1/5/2007 | 7/5/2007 |
| Western Shower Door, Inc. | 5/16/2005 | 5/16/2006 |
| Quality Door and Trim | 6/19/2006 | 6/19/2007 |
| Fence America, Inc. | 7/1/2005 | 7/1/2006 |
| W. T. Cook Construction, Inc. | 5/16/2005 | 5/16/2006 |
| Sacramento Building Products | 4/15/2006 | 4/16/2006 |
| I and J Builders Inc | 5/16/2005 | 5/16/2006 |
| Cassie Door & Insulation Co. Inc. | 7/7/2005 | 7/7/2006 |
| Builders Flooring | 12/15/2005 | 5/6/2006 |
| California Living & Energy | 12/19/2006 | 12/19/2007 |
| Dan Valentine Construction, Inc. | 6/24/2005 | 6/24/2006 |
| Quality Door and Trim | 6/19/2006 | 6/19/2007 |
| Beutler Corporation | 3/12/2007 | 3/12/2008 |
| F. Rodgers Specialty Contractor, Inc. | 5/22/2006 | 12/1/2006 |
| A-1 Cleaning Services | 5/16/2005 | 5/16/2006 |
| Quality Door and Trim | 6/19/2006 | 6/19/2007 |
| Petkus Brothers | 5/16/2005 | |
| MH Integrated Services, Inc. | 5/16/2005 | 5/16/2006 |
| Merced Pacific Landscape, Inc. | 5/16/2005 | 5/16/2006 |
| Ambiance Lighting & Design | 6/27/2007 | 6/27/2008 |
| I and J Builders Inc | 5/16/2005 | 7/1/2005 |
| Norman Masonry, Inc. | 5/16/2005 | 5/16/2006 |
| R & A Painting | 5/16/2005 | 5/16/2006 |
| BEE Pest Control, Inc. | 7/1/2005 | 7/1/2006 |
| Downey Plumbing | 5/16/2005 | 5/16/2006 |
| Executive Cleaning Corporation | 5/16/2005 | 5/16/2006 |
| Old Country Roofing Inc | 12/31/2005 | 6/30/2006 |
| Barbosa Cabinets, Inc. | 5/16/2005 | 5/16/2006 |
| BRS The Stair Company | 5/16/2005 | 5/16/2006 |
| Edwards Plastering Inc. | 5/16/2005 | 5/16/2006 |
| I and J Builders Inc | 4/1/2006 | 5/6/2006 |
| AC Electric | 5/16/2005 | 5/16/2006 |
| Builders Flooring | 12/15/2005 | 5/6/2006 |
| Far West Windows, Inc. | 5/16/2005 | 5/16/2006 |
| Grand Floor Designs Inc.-Lodi | 6/30/2005 | 6/30/2006 |

## Sundance

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 2/12/2006 | 2/12/2007 |
| AC Electric | 7/15/2007 | 7/15/2008 |
| Timberlake Cabinet Company | 2/15/2006 | 11/30/2006 |
| Builders Flooring | 1/18/2006 | 12/31/2006 |
| Dennis Blazona Construction, Inc. | 1/26/2006 | 7/1/2006 |
| Reach Removal Inc. | 4/2/2007 | 7/2/2008 |
| Blazona Concrete Construction, Inc | 4/9/2007 | 4/9/2008 |
| MoBay Tile Inc. | 2/20/2006 | 2/20/2007 |
| Elegant Surfaces, Inc. | 1/25/2006 | 1/1/2007 |
| Arellano Drywall | 3/3/2006 | 7/1/2006 |
| AC Electric | 1/18/2006 | 1/18/2007 |
| Fresno Shower Door & Mirror | 12/23/2005 | 12/31/2006 |
| Quality Door and Trim | 1/18/2006 | 12/31/2006 |

SD 000037

| Fence America, Inc. | 1/25/2006 | 1/1/2007 |
| Merced Pacific Landscape, Inc. | 6/19/2007 | 6/19/2008 |
| Sacramento Building Products | 2/20/2006 | 2/20/2007 |
| I and J Builders Inc | 3/21/2007 | 3/21/2008 |
| Elegant Surfaces, Inc. | 2/3/2006 | 1/7/2007 |
| Cassie Door & Insulation Co. Inc. | 1/17/2006 | 8/31/2006 |
| Builders Flooring | 1/18/2006 | 12/31/2006 |
| ConSol | 3/20/2006 | 3/20/2007 |
| Dan Valentine Construction, Inc. | 1/25/2006 | 1/1/2007 |
| Quality Door and Trim | 1/18/2006 | 12/31/2006 |
| Beutler Corporation | 1/17/2006 | 1/17/2007 |
| Sacramento Building Products | 2/20/2006 | 12/31/2006 |
| A-1 Cleaning Services | 1/17/2006 | 12/31/2006 |
| Quality Door and Trim | 1/18/2006 | 12/31/2006 |
| Petkus Brothers | 2/15/2006 | |
| MH Integrated Services, Inc. | 2/27/2006 | 2/27/2007 |
| Merced Pacific Landscape, Inc. | 1/23/2006 | 12/31/2006 |
| WBC Lighting | 11/13/2006 | 11/13/2007 |
| I and J Builders Inc | 3/21/2007 | 3/21/2008 |
| Norman Masonry, Inc. | 5/3/2006 | 5/3/2007 |
| American Painting, Inc. | 2/1/2006 | 12/31/2006 |
| BEE Pest Control, Inc. | 1/17/2006 | 12/31/2006 |
| Downey Plumbing | 1/19/2006 | 1/19/2007 |
| Executive Cleaning Corporation | 2/1/2006 | 12/31/2006 |
| State Roofing | 1/18/2006 | 12/31/2006 |
| Duracite, Inc. | 2/21/2007 | 2/21/2008 |
| BRS The Stair Company | 1/18/2006 | 12/31/2006 |
| Mid-Valley Plastering, Inc. | 3/30/2007 | 3/30/2008 |
| I and J Builders Inc | 3/21/2007 | 3/21/2008 |
| AC Electric | 1/17/2006 | 1/17/2007 |
| Builders Flooring | 1/18/2006 | 12/31/2006 |
| Alliance Building Products | 8/1/2007 | 8/1/2008 |
| Creative Touch Interiors-Roseville | 1/30/2006 | 1/1/2007 |

## Tiffany

| Subcontractor | EFF Date | EXP Date |
| --- | --- | --- |
| Signet Testing Labs, Inc. | 3/21/2007 | 3/21/2008 |
| 180 Digital Interiors Inc. | 3/21/2007 | 3/21/2008 |
| Timberlake Cabinet Company | 10/25/2006 | 10/25/2007 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| CVC Construction | 4/18/2007 | 4/17/2008 |
| Patrick Construction Clean-Up | 12/7/2006 | 12/7/2007 |
| CVC Construction | 10/24/2006 | 10/24/2007 |
| Hudson Tile, Inc. | 1/2/2007 | 1/2/2008 |
| Elegant Surfaces, Inc. | 1/21/2007 | 1/21/2008 |
| Kings Drywall, Inc. | 10/25/2006 | 10/25/2007 |
| Norcal Electric | 11/3/2006 | 11/3/2007 |
| Western Shower Door, Inc. | 1/15/2007 | 1/15/2008 |
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| Golden State Fence Co. | 10/31/2006 | 10/31/2007 |
| Penney Lawn Service, Inc. | 11/6/2006 | 11/6/2007 |
| Western Insulation, LP | 1/12/2007 | 1/12/2008 |
| Masonry Creations, Inc. | 5/9/2007 | 6/30/2007 |
| Westar, Inc. | 11/7/2006 | 11/7/2007 |
| King Door Co. Inc. | 2/5/2007 | 2/5/2008 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| California Living & Energy | 3/21/2007 | 3/21/2008 |

| | | |
|---|---|---|
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| Beutler Corporation | 10/24/2006 | 10/24/2007 |
| Western Insulation, LP | 11/2/2006 | 11/2/2007 |
| American Maid | 10/25/2006 | 10/25/2007 |
| Doorway Mfg. Co., Inc. | 11/2/2006 | 11/2/2007 |
| 180 Digital Interiors Inc. | 3/21/2007 | 3/21/2008 |
| Penny Lawn Service | 11/6/2006 | 11/6/2007 |
| James & Co., Inc. | 3/23/2007 | 3/23/2008 |
| Weslar, Inc. | 5/9/2007 | 7/1/2007 |
| Penny Lawn Service | 3/16/2007 | 3/16/2008 |
| Walldesign Incorporated | 1/22/2007 | 1/22/2008 |
| RES-COM Pest Control | 10/24/2006 | 10/24/2007 |
| Prime Plumbing Inc. | 10/24/2006 | 10/24/2007 |
| American Maid | 3/6/2007 | 3/6/2008 |
| Old Country Roofing Inc | 10/25/2006 | 10/25/2007 |
| Durasite, Inc. | 1/23/2007 | 1/23/2008 |
| Precision Industries Solid Surface & Mill Work Inc. | 10/24/2006 | 10/25/2007 |
| Vision Plastering | 10/25/2006 | 10/25/2007 |
| Weslar, Inc. | 11/7/2006 | 11/7/2007 |
| Lowry Trenching Inc. | 1/10/2007 | 1/10/2008 |
| Simas Floor Company Inc. | 1/10/2007 | 1/10/2008 |
| Door & Window Company | 11/27/2006 | 11/27/2007 |
| Creative Touch Interiors-Fresno | 5/17/2007 | 5/17/2008 |

## Vinedo

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 5/1/2006 | 5/1/2007 |
| 180 Digital Interiors Inc. | 6/13/2007 | 6/13/2008 |
| Timberlake Cabinet Company | 5/1/2006 | 5/1/2007 |
| Creative Touch Interiors-Fresno | 5/15/2006 | 5/15/2007 |
| CVC Construction | 6/10/2006 | 6/10/2007 |
| A & S Grading Services Inc. | 11/6/2006 | 11/6/2007 |
| CVC Construction | 6/10/2006 | 6/10/2007 |
| Creative Touch Interiors-Fresno | 5/15/2006 | 5/15/2007 |
| Hard Surface Technology, Inc. | 6/1/2006 | 6/1/2007 |
| Kings Drywall, Inc. | 7/19/2007 | 7/19/2008 |
| AC Electric | 11/29/2006 | 11/29/2007 |
| Western Shower Door, Inc. | 5/10/2006 | 5/10/2007 |
| Doorway Mfg. Co., Inc. | 5/7/2007 | 5/7/2008 |
| A & S Grading Services Inc. | 7/19/2007 | 7/19/2008 |
| Design Masonry | 5/11/2006 | 5/11/2007 |
| Golden State Custom Framing, Inc. | 5/4/2006 | 5/4/2007 |
| McClure Door Inc. | 5/1/2006 | 5/1/2007 |
| Creative Touch Interiors-Fresno | 5/15/2006 | 5/15/2007 |
| California Living & Energy | 3/5/2007 | 3/5/2008 |
| Doorway Mfg. Co., Inc. | 5/7/2007 | 5/7/2008 |
| Beutler Corporation | 5/8/2006 | 5/8/2007 |
| F. Rodgers Specialty Contractor, Inc. | 5/10/2006 | 5/10/2007 |
| Almark Janitorial Service | 10/25/2006 | 10/25/2007 |
| Doorway Mfg. Co., Inc. | 5/7/2007 | 8/7/2008 |
| Berman Communications, Inc. | 5/1/2006 | 5/1/2007 |
| Parker Landscape Development Inc. | 5/11/2006 | 5/11/2007 |
| WBC Lighting | 5/4/2006 | 5/4/2007 |
| Golden State Custom Framing, Inc. | 5/11/2006 | 5/11/2007 |
| Design Masonry | | |

| | | |
|---|---|---|
| American Painting, Inc. | 5/10/2006 | 5/10/2007 |
| RES-COM Pest Control | 5/4/2006 | 5/4/2007 |
| Wilmor and Sons Plumbing | 5/4/2006 | 5/4/2007 |
| Executive Cleaning Corporation | 5/10/2006 | 5/10/2007 |
| Old Country Roofing Inc | 5/3/2006 | 12/31/2006 |
| Duracite, Inc. | 2/21/2007 | 2/21/2008 |
| Precision Industries Solid Surface & Mill Work Inc. | 5/12/2006 | 5/12/2007 |
| Mid-Valley Plastering, Inc. | 5/16/2006 | 5/16/2007 |
| Golden State Custom Framing, Inc. | 5/4/2006 | 5/4/2007 |
| Dalco Inc. | 6/27/2006 | 6/27/2007 |
| Creative Touch Interiors-Fresno | 5/15/2006 | 5/15/2007 |
| Door & Window Company | 5/9/2006 | 5/9/2007 |
| Creative Touch Interiors-Fresno | 5/12/2006 | 5/12/2007 |

## Windsor

| Subcontractor | EFF Date | EXP Date |
|---|---|---|
| Signet Testing Labs, Inc. | 11/1/2004 | 11/1/2005 |
| Liberty Bell Alarm | 1/28/2005 | 1/28/2006 |
| Timberlake Cabinet Company | 5/2/2006 | 5/2/2007 |
| Creative Touch Interiors-Roseville | 12/1/2005 | 12/1/2006 |
| Dennis Blazona Construction, Inc. | 3/25/2004 | 3/25/2005 |
| H&H Brothers Enterprises, Inc. | 11/1/2004 | 11/1/2005 |
| Dennis Blazona Construction, Inc. | 3/25/2005 | 3/25/2006 |
| Tileco | 7/15/2006 | 7/15/2007 |
| Elegant Surfaces, Inc. | 4/13/2005 | 4/13/2006 |
| Emerald Drywall | 4/18/2006 | 4/18/2007 |
| Marticus Electric, Inc. | 7/15/2005 | 12/31/2005 |
| Western Shower Door, Inc. | 9/1/2006 | 9/1/2007 |
| Riddio Construction Co., Inc. | 1/18/2007 | 1/18/2008 |
| General Construction Works Inc | 11/1/2004 | 11/1/2005 |
| Sacramento Building Products | 1/1/2005 | 6/30/2005 |
| LaVoie & Sons | 3/5/2007 | 3/5/2008 |
| Elegant Surfaces, Inc. | 8/24/2005 | 8/24/2006 |
| Easy Lift Door Company | 1/1/2006 | 1/1/2007 |
| Creative Touch Interiors-Roseville | 12/1/2005 | 12/1/2006 |
| California Living & Energy | 11/2/2005 | 11/2/2006 |
| Riddio Construction Co., Inc. | 1/18/2007 | 1/18/2008 |
| RB Spencer Inc. | 4/10/2007 | 4/10/2008 |
| Sacramento Building Products | 4/25/2007 | 4/25/2008 |
| New Life Construction Cleaning | 11/1/2004 | 11/1/2005 |
| Riddio Construction Co., Inc. | 1/18/2007 | 1/18/2008 |
| Petkus Brothers | 11/1/2004 | 11/1/2005 |
| Liberty Bell Alarm | 2/16/2005 | 2/16/2006 |
| Boyd's Landscaping | 6/26/2006 | 6/26/2007 |
| Marticus Electric, Inc. | 7/15/2005 | 12/31/2005 |
| LaVoie & Sons | 3/5/2007 | 3/5/2008 |
| R & C Masonry, Inc. | 1/4/2006 | 1/4/2007 |
| Sondad Industries | 2/11/2005 | 2/11/2006 |
| Walldesign Incorporated | 11/1/2004 | 11/1/2005 |
| The Noble Way Pest Control | 11/1/2004 | 11/1/2005 |
| CVC Construction | 11/16/2006 | 11/16/2007 |
| Executive Cleaning Corporation | 1/20/2007 | 1/20/2008 |
| Old Country Roofing Inc | 7/16/2007 | 7/16/2008 |
| Creative Touch Interiors-Roseville | 9/22/2006 | 9/22/2007 |
| G. Glenn Plastering | 1/19/2007 | 1/19/2008 |

| | | |
|---|---|---|
| LaVoie & Sons | 3/5/2007 | 3/5/2008 |
| American Underlayment Systems, Inc. | 11/1/2004 | 11/1/2005 |
| Valley Utility Services Inc. | 11/1/2004 | 11/1/2005 |
| Creative Touch Interiors-Roseville | 12/1/2005 | 12/1/2006 |
| Y.T. Glass & Windows, Inc. | 11/1/2004 | 11/1/2005 |
| Grand Floor Designs Inc - Roseville | 11/1/2004 | 11/1/2005 |

SD 000041

# Schedule 1.1.3

### *Real Property*

The Stone Mitigation Property – described as :

> *Lots 259, 260 and 261 of Natomas Central Subdivision, according to the official plat thereof, filed in the office of the recorder of Sacramento County, California on August 18, 1920, in Book 16 Maps, Map No. 3.*

APN: 201-0120-031

Deed attached

**SD 000042**



Sacramento County Recording
Mark Norris, Clerk/Recorder
BOOK **20040702** PAGE **1073**
Friday, JUL 02, 2004 11:50:59 AM
Ttl Pd    $7.00      Nbr-0002906708
001-Unincorp. DTT PAID    DML/38/1-1

RECORDING REQUESTED BY:
Stewart Title of Sacramento

AND WHEN RECORDED MAIL TO
AND UNLESS OTHERWISE SHOWN BELOW,
MAIL TAX STATEMENTS TO:

Dunmore Homes, LLC
2150 Professional Drive #150
Roseville, CA 95661

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: -005907 | Escrow No.: CM-15005907-SW |
|---|---|

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
        DOCUMENTARY TRANSFER TAX is $ by separate declaration
[] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[X] Unincorporated area   [ ] City of  AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

JOHN FREDERICK STONE, a Single Man and KRISTINE A. TURNER, a Married Woman, as her sole and separate property

hereby GRANT(s) to:  Dunmore Homes, LLC, a Delaware Limited Liability Company

the real property in the  County of Sacramento, State of California, described as:

Lots 259, 260 and 261 of Natomas Central Subdivision, according to the official plat thereof, filed in the office of the recorder of Sacramento County, California on August 18, 1920, in Book 16 of Maps, Map No. 3.

AP#: 201-0120-031

DATED June 24, 2004
STATE OF CALIFORNIA
COUNTY OF SACRAMENTO
On 6/28/04
Before me, CYNTHIA F. WALKER
A Notary Public in and for said State, personally appeared
JOHN FREDERICK STONE and
KRISTINE A. TURNER

_John Frederick Stone_
John Frederick Stone

_Kristine A. Turner_
Kristine A. Turner

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

CYNTHIA A. WALKER
COMM. #1379428
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
My Comm. Expires Nov. 5, 2005

Signature _Cynthia A. Walker_

(This area for official notarial seal)

SD 000043

RECORDING REQUESTED BY AND
WHEN RECORDED PLEASE MAIL TO:

Dunmore Homes, Inc.
8781 Sierra College Blvd.
Granite Bay, CA  95746

ATTN: Mike Kane

PLEASE MAIL TAX STATEMENTS TO:

Dunmore Homes, Inc.
8781 Sierra College Blvd.
Granite Bay, CA  95746

ATTN: Mike Kane

_____
SPACE ABOVE THIS LINE FOR RECORDER'S USE

### GRANT DEED

By this instrument dated  September _10_ , 2007, for valuable consideration, Dunmore
Homes, a California corporation (the "Grantor") grants to Dunmore Homes, Inc., a New York
corporation (the "Grantee"), the real property situated in the State of California, County of
Sacramento and more particularly described in Exhibit "A" attached hereto and incorporated
herein by this reference, together with all improvements thereon and rights and appurtenances
pertaining thereto (collectively, the "Property"), but the conveyance herein is made subject to all
liens; rights; rights of way; claims; easements; interests; covenants, conditions, and restrictions;
encumbrances and other matters affecting the Property, in each case, whether monetary or non-
monetary in nature and whether or not of record.

Executed on September _10_ , 2007, at Granite Bay, California.

Dunmore Homes,
a California corporation

By: _____
Name: Thomas A. Ingram
Title:  Secretary

68700-001\DOCS_LA:25109.1

**SD 000044**

THE STATE OF CALIFORNIA )
)
COUNTY OF _Placer_ )

On September _10_, 2007, before me _Cathryn Dawn Evtchison_, Notary Public in
and for said State, personally appeared Thomas A. Ingram, personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his authorized capacity, and that
by his signature on the instrument the person, or the entity upon behalf of which the person acted,
executed the instrument.

WITNESS my hand and official seal.

Notary Public Signature
My Commission Expires:

CATHRYN DAWN EVTCHISON
Commission # 1542846
Notary Public - California
Placer County
My Comm. Expires Jan 9, 2009

68700-001\DOCS_LA:25109.1

**SD 000045**

**Legal Description**

Lots 259, 260 and 261 of Natomas Central Subdivision, according to the official plat thereof, filed in the Office of the Recorder of Sacramento County, California on August 18, 1920, in Book 16 Maps, Map No. 3.

SD 000046

# Schedule 1.1.4

### *Personal Property*

**CENTRAL VALLEY**

**Building**

Leasehold Improvement (Railings)
Network Wiring (Brownstone)
Dunmore Signs
Fresno Design Center
WBC Lighting, Track Lighting Shares
Design Center Painting/Showroom Tile
Architectural Wood Design/Doorway
Vintage Electric, Inc.  Electrical

**Office Furnishings**

File 4 Drawer Lateral
3 drawer File
Furnishings from California Business
Five drawer C - File
4 Drawer Lateral
Ranger Steel Four
Tambour Door Storage
Executive Chairs
(16) Conference Chairs and (5) Rec.
Conference Table (President's Office)
Office Furniture
Cubicles
Conference Table Restoration
3 Craftsman Tapered Leg Tables

**Office Equipment**

Nortel BCM 400 Phones Fresno Office
GE Space maker XL 1800 Microwave Oven
Savin C6045GW Buscolor/ Multi Tray
HP LaserJet 4101 MFP Printer
Telephone System Hardware and Software
Appliances (Break room Brownstone)
Audio/Visual Conference Room

1

SD 000047

HP 4345X Laserjet Printer

**Computer Hardware**

8 Wyse Winterm
IBM Exp TP T42 60GB CRW XPP Laptop
(2) ThinkPad T42 Laptops
(4) Dell GX 620 Computers
Dell GX620 Computer
LVO T43 Laptop
LVO T43 Laptop
LVO T43 Laptop
Network Switches
HP DL380 Server
2 Wireless Bridge Kits (Sund II, VI)
LVO T43 Laptop
(2) LVO T43 Laptops
HP DC 5100 Desktop

**GRANITE BAY**

**Vehicles**

2001 Chevy Van
2001 Chevy 1500 Pickup
2003 GMC Envoy
2005 Chevrolet Silverado

**Office Furnishings**

Design Center range
Paoli Chambers Credenza
High Back Swivel arm chair
48" Round Table
Paoli Chambers U shape Desk
Paili 48" Round Table light cherry
Paoli 77" Bookcase light cherry
Leslies' desk & overhead credenza
Desk/chair/overhead
K&K MFG Office furniture systems
K&K MFG Office furniture systems
Sales & Marketing Furniture
K&K Desk, credenza
HR Office Furniture
Bill West Office Furniture

2

Craig's Office Desk
9 Lazy Boy Arm Chairs
Central Valley Furniture
4 drawer lateral/cabinets
CA Office Furniture
Faustinos Desk, Overhead, Round Table
Furniture for conference room 2, HR
Cubicle demo for new office
Benning Design - Executive Office
Workstations
Executive Suite custom secretary desk
1 India Wool Rug @ Executive Suite Entry
2 Casablanca Venezia Rugs
Design Center - Tile Display
Design Center Cabinets
Benning Design - Break Room
Benning Design - Conference Room Main
Benning Design - Lobby
Benning Design - Rest Room
Main Conference Table - Natural Stone
Maxwell Down Chair Bourbon
Executive Office - Inter Flora
Inter Flora Plants – Design Center & Main entrance
Glen Eden Wool Carpet - Lobby Rug
CEO Bathroom Mirror 17th Century

**Office Equipment**

HP Printer/Fax machine
HP Jet Direct Printer server
HP Scanjet 6250
Laserjet printer
Lincoln 2 copiers (per Todd s/b)
Color laser Jet, scram Dimm
GFE copier/Fax Machine
GFE copier/Fax Machine
Sony Projector XGA
Copier/Fax
SAVIN Copier/Printer Combo
SAVIN Copier/printer combo
Design Center Copier/Fax/printer
Top-Freezer Refrigerator
Xerox Printer 6200/N
GE Gas Range, Microwave, Refrigerator
Stars & Strips Telecom - New Phone
Wide Format Printer

3

SD 000049

**Construction Equipment**

Generator
Generator
Generator - portable
Power Washer
Upgrades to Dunmore Trailer
Upgrades to Sales Trailer

**Computer Hardware**

Cisco Network Router-New acc NT Ser
3 Dell computers - Bill, Sid & new
Office computers - - 2 Comp ?????
Dell Dimension 8100 computer
Server
Back up Power up equipment
Dimension 8200 Pentium 4 Processor
Exchange server, back-up, email
One Optiplex GX240 Pentium 4 computer
Two Optiplex GX240 Pentium 4 computer
Three Optiplex GX240 Pentium 4 computer
HP Tape Drive for Backups – D.C CV
Three IBM Thinkpad notebook computer
2 Servers - Citrix & SQL
HP Laserjet Printer 1200
Twenty MS- SQL Server CAL licenses
HP Battery Backup Power Supply
Three Slimline Compaq computer system
Citrix MetaFrame XPA 1.0 Starter
HP Procurve Switch 4000M
HP Laserjet Printer 2200DN
Compaq SQL Server
Fifteen Flatpanel Monitors
Twelve Slimline Compaq systems w/ monitor
Sixteen Slimline Compaq systems w/o monitor
Cisco PIX Firewall
Fifteen View Sonic 19" Monitors
Five Flat Panel Monitors
Compaq Server Rack
APC Symmentra Power Array Rack
APC Symmentra 4U Rack Mount
Seven (7) Dell computer systems
Six (6) Dell computer systems

4

SD 000050

Two Compaq Slimline systems w/o monitor
IBM ThinkPad laptop computer
Server - computer
IBM server for computer room
1 Firewall Network Procter
Dell Desk top Optiplex computer - 1
Cisco Firewalls
8 IBM Lap Tops
3 Dell 2 HGH 256 MB Computer
Hewlett Packard Network Server
Internet - Website 03
5 Dell Optiplex 2.4 OG 266 MH Computer
Newstar
CPQ Proliant 256 MB Computer
3 - IBM Computers
6 GBIT serv PCI Adapter
DBX Analyzer
IBM 256 MP XPP Computer
20 NBD exchange SVC Printer
IBM 20GB Computer
8 Canon Powershot
2 - IMP 40GB CRW XPP Computer
Dell 256 MB Computer
Xerox Phaser 6200N 16PPM 2400 DPI
2 Kingston 2GB CPQ Computer
QTM ATL M150 Backup System
HP Proliant NewStar server
QTM ATL M1500/M2500 2nd Drive
Cisco 2621XM Modular Access Router
New Server E-Mail HP DL380 G4 7.3.6
New Server HP DL380 G4 7/3 6.2MB 2
2 Lap Tops
Lap Top - Think Pad
Network Upgrade
Battery Back up unit - APS Symetra
APC 17" RM/Mouse/Monitor
4 PC for Sid's main conf room
LVO Exp TP T 43 C9/1.8 40G 512 Computer
2 Printers HP 4345X Kaser Jet MFP -
APC SYBT2 Battery Module
HP SB DC5100 Computer - Steve Roberts
HP Computer - J. Jellison
HP XW440 Workstation Computer

**Computer Software**
FaxServer software including installation

5

**SD 000051**

Quick Books Pro 99 5 users version
Sixty-five MS-Outlook Upgrades
MS-Windows Professional Software
MS-Office Professional Software
MS-Windows Professional Software
MS-Office Professional Software
Multiple Microsoft Licenses for Software
Three MS-Office XP Professional software
Blue Ocean Track-It software
MS Windows - Server software license
6 Microsoft Office XP Professional
Intranet
1 MS MBL Win Software License
Intranet (DAN)
Data Warehouse - Lot
Web Site Project
Dan - DBx Analyzer
8 MS MBL Office Pro License
Newstar User Sales Profiler
Data Warehouse - Lot Classification
Internet - Phase II
Microsoft Wind Server License
Dan Infrastructure
Data Warehouse - Lot Classification
Newstar Software installed
Spript Logic
50 MS - MBL Exchange licenses
Auto Desk Auto Cad Lt
2 Auto desk AutoCad
100 SYM Ent. 8.6 Licenses
Job Cost Data Mart
Convert Lot number
SP to print on PO
13 MS MBL project std license
Fax Press
Newstar Add 10 Users
DBX Analyer - Software
HP Proliant DL360 Backup Server Mob
20 Sales Profiler License
Outlook Software
5 Perpetual Licenses Outlook
Microsoft Business License MS Windows
MS Office license 2 year license
MS MBL Sequel Server License
MS AOV E-Mail exchange Server License
New Website

6

SD 000052

MS Office License 1 year

7

SD 000053

# STATE OF CALIFORNIA

## CERTIFICATE OF TITLE

517010808A5

COMMERCIAL

VEHICLE ID NUMBER
1GCHG35R711149220

BODY TYPE MODEL
VN

YR MODEL   MAKE
2001 CHEV

PLATE NUMBER
6SOD500

REGISTRATION
EXPIRATION DATE
07/31/2002

AX  UNLADEN WEIGHT  FUEL  TRANSFER DATE   FEES PAID
2  05295 G                                $339

DATE ISSUED
08/18/01

YR 1ST SOLD   CLASS   *YR   MO   EQUIPMT/TRUST NUMBER
2001 FD         GV

MOTORCYCLE ENGINE NUMBER

ODOMETER DATE
07/23/2001
ACTUAL MILEAGE

ODOMETER READING
145 MI

REGISTERED OWNER(S)
DUNMORE HOMES LLC
2150 PROFESSIONAL DR
ROSEVILLE CA 95661

I certify under penalty of perjury under the laws of the State of California, that THE SIGNATURE(S) BELOW RELEASES INTEREST IN THE VEHICLE.

1a. _____ X _____
    DATE              SIGNATURE OF REGISTERED OWNER

1b. _____ X _____
    DATE              SIGNATURE OF REGISTERED OWNER

Federal and State law requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

The odometer now reads |___|___|___|,|___|___|___| (no tenths), miles and to the best of my knowledge reflects the actual mileage unless one of the following statements is checked.

WARNING    ☐ Odometer reading is not the actual mileage.   ☐ Mileage exceeds the odometer mechanical limits.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATE              TRANSFEROR/SELLER SIGNATURE(S)       DATE         TRANSFEREE/BUYER SIGNATURE(S)
                  X                                                 X

PRINTED NAME OF AGENT SIGNING FOR A COMPANY          PRINTED NAME OF AGENT SIGNING FOR A COMPANY

## IMPORTANT READ CAREFULLY

Any change of Lienholder (holder of security interest) must be reported to the Department of Motor Vehicles within 10 days.

LIENHOLDER(S)

GMAC
PO BX 8128
COCKEYSVILLE
MD 21030

**GMAC**

018586

2. _____
Signature releases interest in vehicle. (Company names must be countersigned)
Release Date    JUL 27 2004

CA56589149

REG. 17.30 (REV 2-00)

**KEEP IN A SAFE PLACE — VOID IF ALTERED**

SD 000054



# STATE OF CALIFORNIA
## CERTIFICATE OF TITLE

517010808A5

COMMERCIAL

VEHICLE ID NUMBER
1GCEC19V11Z329661

YR MODEL  MAKE
2001  CHEV

BODY TYPE MODEL
PK

AX  UNLADEN WEIGHT  FUEL  TRANSFER DATE
2  04509 G

YR 1ST SOLD  CLASS  YR  MO
2001  FK  GV

TITLE NUMBER
4500439

REGISTRATION EXPIRATION DATE
07/31/2002

FEES PAID
$272

EQUIPMT/TRUST NUMBER

ISSUE DATE
08/18/01

MOTORCYCLE ENGINE NUMBER

ODOMETER DATE
07/23/2001
ACTUAL MILEAGE

ODOMETER READING
11 MI

REGISTERED OWNER(S)
DUNMORE HOMES LLC
2150 PROFESSIONAL DR
ROSEVILLE CA 95661

I certify under penalty of perjury under the laws of the State of California, that THE SIGNATURE(S) BELOW RELEASES INTEREST IN THE VEHICLE.

1a. _____  X _____
    DATE        SIGNATURE OF REGISTERED OWNER

1b. _____  X _____
    DATE        SIGNATURE OF REGISTERED OWNER

Federal and State law requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

The odometer now reads | | | | | | | (no tenths), miles and to the best of my knowledge reflects the actual mileage unless one of the following statements is checked.

WARNING  ☐ Odometer reading is not the actual mileage.  ☐ Mileage exceeds the odometer mechanical limits.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATE _____  TRANSFEROR/SELLER SIGNATURE  X
DATE _____  TRANSFEREE/BUYER SIGNATURE  X

PRINTED NAME OF AGENT SIGNING FOR A COMPANY  X

### IMPORTANT READ CAREFULLY

Any change of Lienholder (holder of security interest) must be reported to the Department of Motor Vehicles within 10 days.

LIENHOLDER(S)

GMAC
PO BX 8128
COCKEYSVILLE
MD 21030

2.  X _____  GMAC
Signature releases interest by company, names must be countersigned
Release Date _____  JUL 28 2001

CA56689148

01A585

KEEP IN A SAFE PLACE — VOID IF ALTERED

SD 000056

## 2003 GMC Envoy

Note paid off September 5, 2007.  Awaiting title.

SD 000057

# Schedule 1.1.5

*Intangible Property*

Dunmore Homes name and logo
Intranet (DAN)
Kent's Analyzers (Tools)
Kent's SB800 Document Archiving/Retrieval Tool
Dunmore Home's Premier Warranty
Dunmore Home's One Year Fit and Finish Warranty
Dunmore Home's Wrap Administration Program and Documents
Internal manuals such as the Employees' manual, etc.
Proformas

# Schedule 1.1.6

### *Permits and Licenses*

## Building Permits – Central Valley

### Copper Creek:

| Lot # | Permit # | Address |
|-------|----------|---------|
| 195 | BP052897 | 1446 El Redondo Drive |
| 201 | BP052667 | 1440 El Redondo Drive |
| 200 | BP052662 | 3502 Sarasota Avenue |
| 398 | BP051855 | 1520 Esplanade Drive |
| 122 | BP052655 | 3505 San Isidro Avenue |
| 123 | BP052651 | 3509 San Isidro Avenue |
| 157 | BP052658 | 3510 San Isidro Avenue |
| 158 | BP052659 | 3506 San Isidro Avenue |
| 161 | BP052663 | 3507 Sarasota Avenue |
| 162 | BP052664 | 3513 Sarasota Avenue |
| 163 | BP052665 | 3517 Sarasota Avenue |
| 164 | BP052666 | 3519 Sarasota Avenue |
| 196 | BP031561 | 3516 Sarasota Avenue (model) |
| 198 | BP021559 | 3508 Sarasota Avenue (model) |
| 199 | BP021557 | 3504 Sarasota Avenue (model) |

### Sundance II:

| Lot # | Permit # | Address |
|-------|----------|---------|
| 35 | BP06111399 | 425 Aldrich Avenue |
| 34 | BP06111401 | 449 Aldrich Avenue |
| 87 | BP06111396 | 448 Aldrich Avenue |
| 86 | BP06111397 | 436 Aldrich Avenue |
| 85 | BP06111398 | 424 Aldrich Avenue |
| 80 | BP06071135 | 2952 Trigger Lane |
| 81 | BP06071137 | 2946 Trigger Lane |
| 41 | BP06071127 | 2949 Trigger Lane |
| 14 | BP06031938 | 461 Evans Lane (model) |
| 13 | BP06031939 | 449 Evans Lane (model) |
| 12 | BP06031937 | 437 Evans Lane (model) |

### Stonecreek:

| Lot # | Permit # | Address |
|-------|----------|---------|
| 73 | B050863 | 840 Sandstone Way |
| 76 | B050866 | 870 Sandstone Way |
| 92 | B060324 | 2531 Boulder Drive |
| 114 | B060327 | 2510 Boulder Drive |
| 113 | B070075 | 2500 Boulder Drive |

1

SD 000059

| 112 | B070074 | 2490 Boulder Drive |
| 111 | B070254 | 2480 Boulder Drive |
| 110 | B070253 | 870 Boulder Drive |
| 96 | B070252 | 2491 Boulder Drive |
| 95 | B060646 | 2501 Boulder Drive |
| 26 | B050417 | 2671 Stone Creek Drive (model) |
| 27 | B050418 | 2661 Stone Creek Drive (model) |
| 28 | B050419 | 2651 Stone Creek Drive (model) |

Las Casas:

| Lot # | Permit # | Address |
| --- | --- | --- |
| 1.002 | 19022 | 874 Bellis Avenue (model) |
| 1.003 | 19023 | 844 Bellis Avenue (model) |
| 1.004 | 19024 | 800 Bellis Avenue (model) |
| 2.003 | 19114 | 773 Rosemary Avenue |
| 2.004 | 19115 | 753 Rosemary Avenue |
| 2.005 | 19116 | 733 Rosemary Avenue |
| 2.006 | 19118 | 701 Rosemary Avenue |
| 2.007 | 19119 | 697 Rosemary Avenue |
| 2.008 | 19121 | 663 Rosemary Avenue |
| 2.014 | 18632 | 1266 Viscaya Court |

Vinedo:

| Lot # | Permit # | Address |
| --- | --- | --- |
| 3.075 | 18633 | 936 Bellis Avenue (model) |
| 3.076 | 18634 | 966 Bellis Avenue (model) |
| 3.077 | 18635 | 976 Bellis Avenue (model) |
| 3.013 | 18873 | 1077 Aster Court |
| 3.014 | 18874 | 1087 Aster Court |
| 3.016 | 18959 | 1101 Aster Court |
| 3.017 | 18960 | 1135 Aster Court |
| 3.018 | 18961 | 1145 Aster Court |
| 3.019 | 18962 | 1165 Aster Court |
| 3.020 | 18963 | 1175 Aster Court |
| 3.021 | 19074 | 1146 Aster Court |
| 3.022 | 18965 | 1136 Aster Court |

## Building Permits – Northern California

Cypress Cove:

| Lot # | Permit # | Address |
| --- | --- | --- |
| 54 | 07-00000337 | 9975 Asilomar Lane |
| 55 | 07-00000338 | 9979 Asilomar Lane |
| 56 | 07-00000339 | 9983 Asilomar Lane |
| 57 | 07-00000340 | 9987 Asilomar Lane |

2

SD 000060

| | | |
|---|---|---|
| 64 | 06-00004068 | 5105 Ocean Lane (house finaled, but is an inventory house) |
| 66 | 06-00004070 | 5113 Ocean Lane (house finaled, but is an inventory house) |
| 72 | 06-00004924 | 5205 Ocean Lane |
| 73 | 06-00004928 | 5209 Ocean Lane |
| 102 | 06-00004920 | 5208 Ocean Lane |
| 104 | 06-00004922 | 5200 Ocean Lane (house finaled, but is an inventory house) |
| 4 | 06-00002412 | 9987 Macabee Lane (model home) |
| 5 | 06-00002416 | 9991 Macabee Lane (model home) |
| 6 | 06-00002417 | 9995 Macabee Lane (model home) |

**The Villas:**

| Lot # | Permit # | Address |
|---|---|---|
| 117 | 06-00005007 | 5024 Ocean Lane (2nd walk 8/31/07) |
| 119 | 06-00005011 | 5020 Ocean Lane (1st & 2nd walks done, waiting to close) |
| 121 | 06-00005013 | 5016 Ocean Lane (house finaled, but is an inventory house) |
| 243 | 07-00000403 | 9924 Macabee Lane |
| 244 | 07-00000404 | 9926 Macabee Lane |
| 245 | 07-00000405 | 9928 Macabee Lane |
| 246 | 07-00000406 | 9930 Macabee Lane |
| 247 | 07-00000407 | 9932 Macabee Lane |
| 248 | 07-00000408 | 9934 Macabee Lane |
| 249 | 07-00000409 | 9936 Macabee Lane |
| 250 | 07-00000410 | 9938 Macabee Lane |
| 251 | 07-00000411 | 9940 Macabee Lane |
| 252 | 07-00000412 | 9942 Macabee Lane |
| 253 | 07-00000413 | 9944 Macabee Lane |
| 254 | 07-00000319 | 9946 Macabee Lane |
| 255 | 07-00000414 | 9948 Macabee Lane |
| 256 | 07-00000321 | 9950 Macabee Lane |
| 257 | 07-00000332 | 9952 Macabee Lane |
| 258 | 07-00000333 | 9954 Macabee Lane |
| 259 | 07-00000415 | 9956 Macabee Lane |
| 260 | 07-00000334 | 9958 Macabee Lane |
| 261 | 07-00000335 | 9960 Macabee Lane |
| 262 | 07-00000336 | 9962 Macabee Lane |
| 263 | 07-00000316 | 9964 Macabee Lane |
| 264 | 07-00000318 | 9966 Macabee Lane |
| 147 | 06-00002429 | 4826 Ocean Lane (model home) |
| 148 | 06-00002428 | 4822 Ocean Lane (model home) |
| 149 | 06-00002431 | 4820 Ocean Lane (model home) |

3

SD 000061

| 150 | 06-00002424 | 4818 Ocean Lane (model home) |
| 151 | 06-00002430 | 4816 Ocean Lane (model home) |

**Kensington:**

| Lot # | Permit # | Address |
|-------|----------|---------|
| 3.18 | 07060069 | 2108 York Drive |
| 3.49 | 06080093 | 2119 Newcastle Drive |
| 3.50 | 06080091 | 2109 Newcastle Drive |
| 3.51 | 06080086 | 1127 Manchester Way |
| 3.54 | 06080087 | 1157 Manchester Way |
| 3.55 | 07020086 | 1165 Manchester Way |
| 3.56 | 07020083 | 1175 Manchester Way |
| 3.57 | 07020079 | 1181 Manchester Way |
| 3.58 | 07020085 | 1189 Manchester Way |

**Providence:**

| Lot # | Permit # | Address |
|-------|----------|---------|
| 1.1 | 05090296 | 119 Nantucket Way |
| 1.2 | 05090295 | 127 Nantucket Way |
| 1.3 | 05090294 | 135 Nantucket Way |
| 1.67 | 05090303 | 1703 Newport Drive |
| 1.47 | 06010014 | 135 Bryton Loop (COE 8/31/07) |
| 1.68 | 05090289 | 138 Nantucket Way (completed & finaled) |

**Windsor:**

| Lot # | Permit # | Address |
|-------|----------|---------|
| 2.47 | 06110107 | 1004 Norwich Way |
| 2.48 | 06110108 | 1012 Norwich Way |
| 2.50 | 06110106 | 1028 Norwich Way |
| 1.63 | 07020069 | 993 Norwich Way |
| 1.64 | 07020066 | 985 Norwich Way |
| 1.65 | 07020076 | 977 Norwich Way |
| 1.66 | 07020068 | 969 Norwich Way |

**Business Licenses**

Business License – Dunmore Stone Creek, LLC
Business License – Dunmore Brown Estates, LLC
Business License – Dunmore Montecito, LLC
Business License – Dunmore Fullerton Ranch, LLC
Business License – Dunmore Country Villas, LLC
Business License – Dunmore Homes, a California Corporation

4

SD 000062

Business License – Dunmore Reflections II, LLC
Business License – Dunmore Providence, LLC
Business License – Dunmore Canterbury, LLC
Business License – Dunmore Viscaya, LLC
Business License – Dunmore Laguna Reserve, LLC
Business License – Dunmore Wildhawk, LLC
Business License – Dunmore Croftwood, LLC
Business License – Dunmore Orchard, LLC

5

SD 000063

## Schedule 1.1.15

### Insurance for Dunmore Homes

1.  Specialty Home Builders Insurance – Commercial General Liability: Premier Indemnity, No. SHB 0002-04 (01/01/07 – 01/01/08) – Broker: Beecher Carlson

2.  Excess CGL (1st Layer): Lexington (AIG), No. 5577514 (10/01/06 – 01/01/08) – Broker: Beecher Carlson

3.  Excess CGL (2nd Layer): AWAC, No. C006347/001, (10/01/06 - 01/01/08) – Broker: Beecher Carlson

4.  E&O: National Union Fire Ins. Co. of Pittsburgh, PA, No. 9666110 (03/17/07 – 03/16/08) – Broker: Black Ink Insurance Services

5.  Workers Comp: State Fund, No. 719-0000102-06 (renewal policy) (04/01/07 – 04/01/08) – Broker: John O. Bronson

6.  Commercial/Property/Auto – EFF: Golden Eagle, No. CBP8123145 (04/01/07 – 04/01/08) - Broker: John O. Bronson

7.  Excess Auto – Golden Eagle, No. CU8121049 (04/01/07 – 04/01/08) - Broker: John O. Bronson

8.  Crime – Hartford Fire Ins. Co., No. 57BDDAC9780 (04/01/07 – 04/01/08) - Broker: John O. Bronson

9.  Crime Excess – Travelers, No. 103810340 (04/01/07 – 04/01/08) - Broker: John O. Bronson

10. Builder's Risk – ACE, No. I21112756 (07/21/07 – 07/21/08) – Broker: Beecher Carlson

11. Employment Practices Liability – Continental Casualty, No. 268046108 (11/01/06 – 11/01/07) - Broker: John O. Bronson

12. D&O – National Union Insurance Company, No. N/A (08/29/07 – 08/29/08) – Black Ink Insurance Services

**SD 000064**

## Schedule 1.1.16

### Benefit Plan Assets

| Plan | Asset |
|------|-------|
| The Dunmore Home Executive Nonqualified Excess Benefit Plan | $1,700,483* |

*Plan assets are held in a rabbi trust and thus the amount due to participants is a liability to the Company while the plan assets are an asset of the Company. Such plan assets approximate plan liabilities as of the closing date. The assets of the plan are currently being held in trust for the benefit of the Company's general creditors.*

| Plan | Asset |
|------|-------|
| Dunmore Homes 401 (K) Profit Sharing plan | $14,143* |

*Such funds represent employee contributions to the Plan for payroll paid 8/31/07 and will be forwarded to the Plan manager (ING) by 9/15/07.*

SD 000065

# Schedule 1.2

*Excluded Assets*

2 ea CEO Guest Chairs
Ottoman/Coffee Table in CEO area
2 lounge arm chairs
1 lounge sofa & leather
2 executive suite entry guest chairs
CEO Suite entry side tables
Custom Conference table bases
Sid's personal desk chair
Sid's personal desk and matching credenza
Sid's personal floor mat

SD 000066

## Schedule 2.2

*Seller's Loans and Loan Facilities*

| Lender | Current Balance |
|--------|-----------------|
| Affinity Bank | 10,448,113.00 |
|  | 10,448,113.00 |
|  |  |
| Cencal Holdings | 518,587.00 |
|  | 518,587.00 |
|  |  |
| Comerica Bank | 1,992,895.00 |
| Comerica Bank | 5,292,935.00 |
| Comerica Bank | 24,498,170.00 |
| Comerica Bank | 57,970.00 |
|  | 31,841,970.00 |
|  |  |
| TPS (JP Morgan Chase) | 20,000,000.00 |
|  | 20,000,000.00 |
|  |  |
| GMAC (pay off before close)? | 5,521.00 |
|  | 5,521.00 |
|  |  |
| Guaranty Bank | 4,487,199.00 |
| Guaranty Bank | 8,444,310.00 |
| Guaranty Bank | 233,189.00 |
| Guaranty Bank | 8,683,034.00 |
| Guaranty Bank | 2,016,084.00 |
| Guaranty Bank | 663,463.00 |
| Guaranty Bank | 9,258,409.00 |
| Guaranty Bank | 4,178,004.00 |
|  | 37,963,692.00 |
|  |  |
| IndyMac Bank | 4,528,000.00 |
| IndyMac Bank | 3,790,235.00 |
|  | 8,318,235.00 |
|  |  |
| JMP Securities | 2,000,000.00 |
|  | 2,000,000.00 |
|  |  |
| KeyBank | 13,365,922.00 |
| KeyBank | 5,513,155.00 |
| KeyBank | 7,087,923.00 |

SD 000067

| | |
|---|---|
| KeyBank | 13,025,373.00 |
| KeyBank | <u>18,452,869.00</u> |
| | 57,445,242.00 |
| | |
| RBCBuilder Finance | 1,652,811.00 |
| RBCBuilder Finance | 8,486,025.00 |
| RBCBuilder Finance | 5,008,630.00 |
| RBCBuilder Finance | 6,086,943.00 |
| RBCBuilder Finance | 14,954,457.00 |
| RBCBuilder Finance | <u>3,037,006.00</u> |
| | 39,225,872.00 |
| | |
| Sac Valley Farm Credit | <u>1,531,940.00</u> |
| | 1,531,940.00 |
| | |
| Wachovia Bank | <u>9,689,410.00</u> |
| | 9,689,410.00 |
| | |
| Total | 218,988,582.00 |

SD 000068

## Schedule 2.2 (vi)

### Liabilities Under Benefit Plans

| Plan | Liability |
|---|---|
| The Dunmore Home Executive Nonqualified Excess Benefit Plan | $1,700,483* |

*Plan assets are held in a rabbi trust and thus the amount due to participants is a liability to the Company while the plan assets are an asset of the Company. Such plan assets approximate plan liabilities as of the closing date. The assets of the plan are currently being held in trust for the benefit of the Company's general creditors.*

| Plan | Liability |
|---|---|
| Dunmore Homes 401 (K) Profit Sharing plan | $14,143* |

*Such funds represent employee contributions to the Plan for payroll paid 8/31/07 and will be forwarded to the Plan manager (ING) by 9/15/07.*

SD 000069

# Schedule 7

Notwithstanding the AS IS nature of the transaction, Seller discloses the following:

<u>Pending Lawsuits Against Dunmore Homes</u>

1)  *Swan, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court Case No. 05AS01766 - Construction Defect lawsuit involving app. 30 homes in Elk Grove, CA

2)  *Barksdale, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court Case No. 04AS03485 - Construction Defect lawsuit involving app. 11 homes in Elk Grove, CA

3)  *Pitts v. Dunmore Development, et al.* – San Francisco County Superior Court Case No. CGC-06-453679 – Asbestos case involving ex employee of Teichert Construction

4)  *Barnes v. Dunmore Homes, et al.* – Sacramento County Superior Court Case No. 07AS03301- Breach of Contract case involving repairs to a 10yr+ old home

5)  *East Linda of Edgewater v. Dunmore Homes, et al.* – Yuba County Superior Court Case No. 070000164 - Breach of Contract case involving 11 acres of commercial property in Linda, CA.

6)  *Navarro, et al. v. Dunmore Homes, et al.* – Sacramento County Superior Court Case No. 07AS03217 - Construction Defect lawsuit with class action allegations involving 1 home in Elk Grove, CA.

<u>Currently existing insurance policies</u>

See Schedule 1.1.15 for currently existing insurance policies.  Transferability of any policy must be determined on a case by case basis and it is probable that Buyer will have to apply for new policies of insurance in any instance.

<u>Consents to Transfer</u>

Seller has not obtained any consents to this transfer which consents may be required under certain contracts, including but not limited to, loan agreements and joint venture agreements with Weyerhaeuser and said lack of consents may be a default under material contracts.

SD 000070

# Schedule 9(d)

## Employee Disclosure

*Larry Schuppan v. Dunmore Homes* - Case No. 01-33294 CT – Wage and Hour claim totaling $3,028.80 plus penalties.  Hearing currently set for September 24, 2007.

*Larry Schuppan v. Dunmore Homes* – Case No. TBD – Age discrimination claim.

SD 000071

# EXHIBIT D

Sent: Tuesday, August 21, 2007 11:33 AM
To: Sid Dunmore
Subject: RE: LOI

Sid,

Is Dunmore Inc. a current Delaware Corp or Cal corp?


Michael A. Kane
Senior Loan Officer

Direct Line (916) 977-1231    24/7

-----Original Message-----
From: Sid Dunmore [mailto:sdunmore@dunmorehomes.com]
Sent: Monday, August 20, 2007 3:07 PM
To: Mike Kane
Subject: RE: LOI

Mike;
Its Richard Pachulski and Debra Greengrass of
Pachulski,Stang,Ziehl,Young, Jones and Weintraub LLP

Sid

-----Original Message-----
From: Mike Kane [mailto:mkane@comstockmortgage.com]
Sent: Monday, August 20, 2007 2:33 PM
To: Sid Dunmore
Subject: RE: LOI

Sid,

Who's your Corp Attorney in LA?

-----Original Message-----
From: "Sid Dunmore" <sdunmore@dunmorehomes.com>
To: "Mike Kane" <mkane@comstockmortgage.com>
Sent: 8/20/07 9:22 AM
Subject: RE: LOI

Mike thanks and our Southern Cal. Attorneys are putting together a New
York C corp. to use instead of Delaware they seem to like that venue
better.

-----Original Message-----
From: Mike Kane [mailto:mkane@comstockmortgage.com]
Sent: Friday, August 17, 2007 3:33 PM
To: Sid Dunmore

**SD 000078**

3/20/2008

# EXHIBIT E

## AGREEMENT

This Agreement is entered into _____, 2007, by and among DUNMORE INVESTMENTS, LLC, a California limited liability company ("Dunmore"), DUNMORE HOMES, INC., a New York corporation ("New York Co."), and MICHAEL A. KANE ("Kane").

### Recitals

A.      Kane is a real estate broker and sole shareholder of New York Co. that desires to acquire all of the assets and assume the liabilities of Dunmore Homes, a California corporation ("Dunmore Homes").

B.      Sid is sole member of Dunmore and Sid is sole shareholder of Dunmore Homes.

C.      Dunmore Homes' liabilities exceed its assets due to the current economic difficulties in the residential housing market. Dunmore Homes is in default of its obligations to many of its creditors. New York Co. is willing to acquire the assets and assume the liabilities of Dunmore Homes and to work with the creditors of Dunmore Homes in order to resolve the defaults of Dunmore Homes.

D.      Dunmore desires to protect the creditors of Dunmore Homes and Kane desires to work with the creditors of Dunmore Homes in order to maximize the return to the creditors as well as provide Kane an opportunity to increase value to Dunmore Homes' business in the future.

E.      Dunmore desires to make available Sid Dunmore to assist Kane by providing continuity of service to New York Co. and to work with Kane and/or New York Co. in making sure that the concerns of the creditors of Dunmore Homes are allayed by the sale of Dunmore Homes to New York Co.

F.      Dunmore is willing to induce Kane to cause New York Co.'s purchase of all of the assets and assume all of the liabilities of Dunmore Homes pursuant to an Asset Purchase Agreement between Dunmore Homes and New York Co (the "Purchase Agreement").

### Agreements

1.      As an inducement for Kane to enter into and cause New York Co. to enter into the Purchase Agreement with Dunmore Homes, Dunmore shall pay to Kane at the closing of such Purchase Agreement the amount of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00).

2.      Dunmore shall provide on-going consulting services to Kane and New York Co. in order to assist Kane and/or New York Co. to develop a plan to repay creditors and to rehabilitate the business. Dunmore shall make Sid Dunmore available at reasonable times and upon reasonable notice from Kane and/or New York Co. to attend meetings and provide advice

MK 000411

regarding the historical operations and relationships of Dunmore Homes, as well as provide assistance, at no cost to Dunmore, in the transition of the activities of Dunmore Homes to New York Co.

3.    Dunmore shall provide such consulting services to Kane for only the reimbursement of Dunmore's expenses. Dunmore shall not charge a fee for the consulting with Kane and/or New York Co. The term of the consulting services shall be one (1) year. However, Kane may extend such consulting services on behalf of New York Co. for an additional year. Dunmore would provide New York Co. with documentation relating to the expenses. Once the documentation is received, New York Co. shall pay Dunmore within thirty (30) days of receipt of the documentation.

4.    Kane shall cause New York Co. to indemnify, defend and hold Dunmore and its members and managers harmless from any claim, cost (including reasonable attorneys' fees and costs of investigations, settlement or appeal), liability or loss arising from or connected with Dunmore's consulting for and on behalf of New York Co. and in connection with the operations of New York Co. or any liability assumed by New York Co. in the purchase of the assets and assumption of liabilities of Dunmore Homes.

5.    All notices, requests, demands and other communications required to or permitted to be given under this Agreement shall be in writing and shall be conclusively deemed to have been duly given: (i) when hand-delivered to the other party; or (ii) when received when sent by facsimile at the address and number set forth below next to their respective names below their respective signatures of this Agreement (provided, however, that notices given by facsimile shall not be effective unless either (a) a duplicate copy of such facsimile notice is promptly given by depositing same in a United States post office with first-class postage prepaid and addressed to the parties as set forth below, or (b) the receiving party delivers a written confirmation of receipt for such notice either by facsimile or any other method permitted under this paragraph; additionally, any notice given by telex or facsimile shall be deemed received on the next business day if such notice is received after 5:00 p.m. (recipient's time) or on a nonbusiness day; or (iii) three (3) business days after the same have been deposited in a United States post office with first class or certified mail, return receipt requested, postage prepaid and addressed to the parties as set forth below next to their respective names; or (iv) the next business day after same have been deposited with a national overnight delivery service reasonably approved by the parties (Federal Express being deemed approved by the parties), postage prepaid, addressed to the parties as set forth below next to their respective names with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery service provider. Each party shall make an ordinary, good faith effort to ensure that it will accept or receive notices that are given in accordance with this Agreement, and that any person to be given notice actually receives such notice. A party may change or supplement the addresses, or designate additional addresses, for purposes of this Section 5 by giving the other parties written notice of the new address in the manner set forth above.

6.    In the event that any dispute between or among the parties should result in litigation, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

MK 000412

7.    The covenants, agreements and provisions contained herein shall not be construed in favor of or against any of the parties, but shall be construed as if each of the parties prepared this Agreement.  In the event any claim is made by any party relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular party or the party's counsel.

8.    All amendments to this Agreement will be in writing, approved and signed by both of the parties.

9.    If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

10.    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of California without regard to principles of conflict of laws, and all rights and remedies shall be governed by such laws.


Dated:_____        _____
                                                              MICHAEL A. KANE

                                        Address:    3626 Fair Oaks Boulevard, Suite 100
                                                        Sacramento, CA 95864


                                        DUNMORE HOMES, INC.,
                                        a New York corporation

Dated:_____        By:_____
                                              Michael Kane, President

                                        Address:    3626 Fair Oaks Boulevard, Suite 100
                                                        Sacramento, CA 95864


                                        DUNMORE INVESTMENTS, LLC,
                                        a California limited liability company

Dated:_____        By:_____
                                              Sidney B. Dunmore, trustee of the Sid
                                              Dunmore Trust,  sole member

                                        Address:    8781 Sierra College Blvd., Suite 100
                                                        Granite Bay, CA  95746

MK 000413

# EXHIBIT F

CONFIDENTIALITY AGREEMENT

August 28, 2007

Michael Kane
_3626 Fair Oaks Blvd. # 208_
_Sacramento, CA 95764_

      Re:    Dunmore Homes, a California corporation (the "Company")

Dear Michael:

      In connection with the proposed acquisition of certain assets of the Company by an entity to be formed by you (the "Transaction") (your review and evaluation of information solely with respect to such possible Transaction is referred to herein as the "Purpose"), we have heretofore provided and will hereafter provide certain proprietary and/or confidential information concerning the Company and its business and assets and liabilities.

      For the purpose of this Agreement: "you," "your" and similar words shall mean Michael Kane and "Information" shall mean any and all information and data, whether oral, written or otherwise, heretofore or hereafter furnished to you and/or your partners, affiliates, employees, attorneys, agents, consultants, advisors or representatives (collectively, your "Purchaser Representatives") regarding the Company, its business, its assets and/or its liabilities by the Company or its directors, officers, employees, affiliates, representatives (including, without limitation, financial advisors, consultants, attorneys and accountants) or agents (collectively, its "Company Representatives"), as well as all notes, memoranda, summaries, reports, analyses, compilations, forecasts, studies and other materials prepared by either you or any Purchaser Representative or the Company or any Company Representative relating to, containing or based upon, in each case, in whole or in part, such Information.

      In consideration of the Company providing you with or granting you access to the Information (it being understood and agreed that nothing in this Agreement shall obligate the Company to at any time provide or continue to provide any Information to you), you agree that (i) the Information, (ii) the existence of this Agreement, (iii) the fact that the Information has been made available, and (iv) any opinion or view with respect to the Information or the Company based upon or in any way derived from the Information, are confidential and, except only as expressly provided in Paragraph (3) below, shall not be disclosed by you or any Purchaser Representative, in any manner whatsoever, in whole or in part, to any person without the prior written consent of the Company. The term "person" as used in this Agreement shall be broadly interpreted to include, without limitation, any corporation, company, group, partnership or individual. You further agree that:

      (1)    The Information will be used by you solely for the Purpose and for no other purpose (including, without limitation, any such other purposes as investing in, engaging in or encouraging businesses in competition with the Company or in any way influencing or attempting to influence the actions or conduct of any other person involved or having a relationship with the Company). Without limiting the foregoing or anything else in this Agreement, you shall not solicit, accept, negotiate for, or have

any discussions with any party other than the Company and the Company Representatives concerning the Transaction or the Company's business, operations, assets and/or liabilities, except as may hereafter be expressly permitted in connection with the Transaction pursuant to any definitive purchase and sale agreement entered into by you or any of your affiliates, on the one hand, and the Company, on the other (a "Definitive Agreement").

(2)    Except as expressly provided in Paragraph (3) below, you will not disseminate the Information to any person whatsoever, other than such of the Purchaser Representatives as need to know in order to enable you to accomplish the Purpose and who expressly agree to be bound by the terms of this Agreement. You will, in any event, be responsible for the actions of the Purchaser Representatives.

(3)    You will not and will not permit any Purchaser Representative to disclose any Information, except upon receipt of a written opinion from outside counsel that such disclosure is required by applicable law. In such event, you agree (i) to promptly notify the Company of the existence, terms and circumstances surrounding such requirement, (ii) to consult with the Company on the advisability of taking legally available steps to resist or narrow such requirement, and (iii) if disclosure of such information is required, (a) to furnish only that portion of the Information which, in the written opinion of your counsel, you are legally compelled to disclose, and (b) to cooperate with any action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Information.

(4)    Except as otherwise provided in any Definitive Agreement, you agree that without the prior written consent of the Company, you will not and will instruct each Purchaser Representative not to, directly or indirectly, solicit to hire (or cause or seek to cause to leave the employ of the Company) any employee of the Company; provided that neither you nor any Purchaser Representative shall be precluded or otherwise restricted from hiring or employing any such person who (a) is not then employed by the Company (other than by reason of your or any Purchaser Representative's actions in violation of this Agreement), (b) contacts you without any solicitation by you or any Purchaser Representative acting on your behalf, or (c) responds to a general solicitation for employment placed by you or any Purchaser Representative in newspapers, trade journals, or the Internet or similar means of general advertisement or solicitation.

(5)    You acknowledge and agree that in the event of any breach of this Agreement, the Company would be irreparably and immediately harmed and could not be made whole by monetary damages. It is accordingly agreed that the Company, in addition to any other remedy to which it may be entitled in law or equity, shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to compel specific performance of this Agreement, without the need for proof of actual damages. You hereby waive, and agree to cause all Purchaser Representatives to waive, any requirement for the securing or posting of any bond in connection with such remedy. In the event of any litigation or proceeding relating to this Agreement, if a court of competent jurisdiction determines that this Agreement has been breached by you and/or by any Purchaser Representative, then you will reimburse the Company for its costs and expenses (including, without limitation, legal fees and expenses) incurred in connection with such litigation or proceeding.

(6)    This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof. The agreements set forth in this Agreement may be modified or waived only by a separate writing by the Company and that expressly modifies or waives such agreements. It is understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right or privilege hereunder.

(7)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without regard to any principles of conflict of laws. This Agreement shall inure to the

SD 000074

- *Page - 3 -*

benefit of any successor in interest to the Company, as well as of any person that may acquire, after the date hereof, any subsidiary or division of the Company with respect to Information concerning the business or affairs of such subsidiary or division.

(8)     If the Company at any time requests, you shall promptly redeliver to the Company or destroy all tangible Information and any other tangible material (including, without limitation, Information contained in printed, magnetic or other tangible media) containing, prepared on the basis of, or reflecting any information contained in, in each case, in whole or in part, the Information (whether prepared by the Company, its advisors or otherwise), including all notes, memoranda, summaries, reports, analyses, compilations, forecasts, studies and other materials prepared by either you or any Purchaser Representative or the Company or the Company Representatives relating to, containing or based upon, in each case, in whole or in part, the Information and neither you nor any Purchaser Representative will retain any copies, extracts or other reproductions of any tangible material containing, reflecting or based upon the Information.

(9)     You acknowledge and agree that no Information disclosed pursuant to this Agreement and no other action taken by the Company or any Company Representatives in connection herewith shall be deemed to be a waiver of any rights against you or any Purchaser Representative whether existing as of the date of this Agreement or hereafter.

(10)     Reference is made to that certain Confidentiality Agreement of similar date hereto, between you and Sidney Dunmore (the "Individual Agreement"). You hereby agree that to the extent that any Information disclosed to or obtained by you is or would be covered both by the terms and provisions of this Agreement and those of the Individual Agreement, your rights and obligations with respect to such Information shall be governed and controlled by this Agreement.

Paragraphs 1 and 2 above shall not apply to Information in your possession which: (i) part of the public domain and is generally available to the public (except by virtue of a breach of this Agreement); (ii) disclosed to you by a third party in circumstances where you have no reason to believe that such information is confidential Information or that such third party was bound by a fiduciary, contractual or other legal obligation not to disclose such information to you; (iii) you have obtained independently of the Company without obligation on your part or on the part of the source supplying such Information to treat such Information as confidential or limiting the purposes for which it could be used; or (iv) you or your employees or agents have developed independently without use of Information.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

DOCS_LA:162613.1

**SD 000075**

*Page - 4 –*

You acknowledge that neither the Company nor any Company Representative shall be deemed to make any express or implied representation or warranty as to the accuracy or completeness of the Information. You agree that no such person shall have any liability to you or any Purchaser Representative resulting from the use of the Information or for any errors therein or omissions therefrom.

Very truly yours,

Dunmore Homes,
a California corporation

By:: _____
Sidney Dunmore, President

The foregoing is agreed to and accepted:

_____                    9/5/07
Michael Kane

The undersigned hereby joins in this Agreement
in his individual capacity for the purpose of agreeing to the
provisions of Paragraph (10) above:

_____
Sidney Dunmore

DOCS_LA:162613.1

**SD 000076**

# EXHIBIT G

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement (the "Agreement") is entered into on _____, 2007, between MICHAEL A. KANE ("Kane") and SIDNEY B. DUNMORE ("Dunmore").

### Recital

Kane is interested through his wholly owned corporation to acquire all of the assets and liabilities of Dunmore Homes, a California corporation (the "Company"). Dunmore presently owns 100% of the Company. Dunmore is willing to share information with Kane with respect to the Company, but wishes to protect and preserve the confidential information of the Company for the benefit of the creditors of the Company.

### Agreement

NOW, THEREFORE, the parties, intending to be legally bound, agree as follows:

1.    Confidential Information. For purposes of this Agreement, "Confidential Information" means all information furnished by Dunmore to Kane constituting, referring, or relating to the Company that is not otherwise information currently available to the general public. Confidential Information also includes information that Dunmore has furnished and is furnishing to Kane, whether furnished before or after the date of this Agreement, whether tangible or intangible, and in whatever form or medium provided. Confidential Information further includes information generated by Kane that contains, reflects, or is derived from the Confidential Information provided by Dunmore. Confidential information excludes attorney work product generated by Kane's outside counsel; provided that any attorney work product disclosed to Kane's Consultants shall be returned to counsel for Kane at the end of the review process.

2.    Restrictions on Use and Disclosure. The Confidential Information can be used by Kane, Kane's consultants or Kane's legal counsel for the sole purpose of allowing Kane to conduct its due diligence review of the Company. Kane expressly agrees that the terms of this Agreement shall be binding on any and all agents of Kane, including its brokers. Except as may otherwise be required by law, Kane agrees that it shall not use, copy, transfer, disclose, or permit any other person to obtain any such Confidential Information for as long as the pertinent information or data remains Confidential Information (whether or not the Confidential Information is in written, tangible or intangible form), without the prior written consent of Dunmore. Kane also agrees that that it shall not make any use of any Confidential Information except for the sole and limited purpose, as stated above, of allowing Kane to conduct its due diligence review of the Project. All copies of materials containing Confidential Information provided to Kane shall remain the Property of the Company and all such copies shall remain subject to the restrictions on use and disclosure stated herein. If so requested by Dunmore in writing, all copies of the Confidential Information shall be returned to Dunmore or destroyed promptly upon completion of Kane's due diligence review of the Company. In the event that Kane receives a request to disclose all or any part of the Information under legal compulsion

MK 000401

(e.g., under the terms of a subpoena or order issued by a court or by a governmental body), Kane agrees:

      A.    To notify Dunmore immediately of the existence, terms, and circumstances surrounding such request;

      B.    To consult with Dunmore on the advisability of taking legally available steps to resist or narrow such request; and

      C.    To allow Dunmore (at its expense) to take any legal steps Dunmore deems reasonable to prevent the disclosure of any Information which Dunmore desires to keep confidential.

    3.    <u>Security Measures</u>.  Kane shall use commercially reasonable business efforts to protect the Confidential Information and shall require all of its agents, including Kane's Consultants, to do the same.

    4.    <u>Term and Return of Information</u>.  This Agreement shall remain in effect until the earlier of the date Dunmore notifies Kane in writing that the Agreement is terminated or the second anniversary date of this Agreement.  Upon termination of the Agreement, at Dunmore's written request, Kane shall immediately destroy or return to Dunmore all materials in its possession or within its control that contain or reflect the Confidential Information, and, upon request, Kane shall certify that no copies of such Confidential Information have been retained and that all summaries thereof have been destroyed.  Notices shall be considered sent when posted in the U.S. Mail, return receipt requested, Federal Express, or by any other national carrier that provides evidence of delivery, and shall be deemed to be received on the date indicated on the delivery receipt, when addressed to the last known address provided by Kane.

    5.    <u>Injunction</u>.  The unauthorized disclosure or use of any Confidential Information by Kane could cause irreparable harm and significant injury to Dunmore or the Company, which may be difficult to measure with certainty or compensate through damages.  Accordingly, Dunmore shall have the right to seek and obtain an immediate injunction enjoining any breach upon application to a court of competent jurisdiction, and Kane shall not plead as a defense to any such action that Dunmore has an adequate remedy at law.  Notwithstanding the foregoing language regarding injunctive relief, Dunmore shall retain the right to pursue any other legal or equitable relief to the extent permitted by law in the event of any breach of this Agreement by Kane or its agents.  In the event either party pursues any right to enforce the provisions of this Agreement, the prevailing party shall have the right to collect all costs and expenses, including attorneys' fees, incurred by the prevailing party in enforcing the obligations of the other party under this Agreement, as fixed by the court.

    6.    <u>Waiver</u>.  No failure or delay by Dunmore in exercising any rights, powers, or privileges hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or privilege preclude any other or further exercise thereof.

    7.    <u>Assignment</u>.  Kane shall not assign or transfer this Agreement or delegate any of its rights (except the right of Kane's Consultants or Kane's legal counsel to review the

MK 000402

Confidential Information), or obligations hereunder without the prior written consent of Dunmore hereto in each instance.

8.      Severability.  If any term, covenant, or condition of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable, the remainder of this Agreement and the application of any such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and all other terms shall be valid and enforceable to the fullest extent permitted by law.  The waiver by Dunmore of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a continuing waiver or a waiver of any subsequent breach of either the same or any other provision of this Agreement.

9.      Modification.  This Agreement may be modified or waived only by a separate writing by Dunmore and by Kane expressly so modifying or waiving such agreement.

10.     Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. TO THE EXTENT PERMITTED BY LAW, KANE AGREES THAT ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED IN ANY WAY TO THIS AGREEMENT SHALL BE BROUGHT SOLELY IN A COURT OF A COMPETENT JURISDICTION SITTING IN SACRAMENTO, CALIFORNIA. KANE HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF ANY SUCH COURT AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING IN ANY SUCH COURT, ANY OBJECTION TO VENUE WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF THE PLACE OF RESIDENCE OR DOMICILE OF ANY PARTY THERETO. KANE AND DUNMORE EACH HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE INFORMATION OR THE TRANSACTION TO THE EXTENT PERMITTED BY LAW.

11.     Counterparts.  This Agreement may be signed by the parties hereto in counterparts.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first written above.

_____
MICHAEL A. KANE


_____
SIDNEY B. DUNMORE

MK 000403

# EXHIBIT H

shall be deemed to be a sufficient giving of such notice. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders. Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 1.7.  *Effect of Headings and Table of Contents.*

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

SECTION 1.8.  *Successors and Assigns.*

This Indenture shall be binding upon and shall inure to the benefit of any successor to the Company and the Trustee, including any successor by operation of law.  Except in connection with a transaction involving the Company that is permitted under <u>Article VIII</u> and pursuant to which the assignee agrees in writing to perform the Company's obligations hereunder, the Company shall not assign its obligations hereunder.

SECTION 1.9.  *Separability Clause.*

If any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

SECTION 1.10.  *Benefits of Indenture.*

Nothing in this Indenture or in the Securities, express or implied, shall give to any Person, other than the parties hereto and their successors and assigns, the holders of Senior Debt, the Holders of the Securities and, to the extent expressly provided in <u>Sections 5.2</u>, <u>5.8</u>, <u>5.9</u>, <u>5.11</u>, <u>5.13</u>, <u>9.2</u> and <u>10.7</u>, the holders of Preferred Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 1.11.  *Governing Law.*

**This Indenture and the rights and obligations of each of the Holders, the Company and the Trustee shall be construed and enforced in accordance with and governed by the laws of the State of New York without reference to its conflict of laws provisions (other than Section 5-1401 of the General Obligations Law).**

SECTION 1.12.  Submission to Jurisdiction.

ANY LEGAL ACTION OR PROCEEDING BY OR AGAINST ANY PARTY HERETO OR WITH RESPECT TO OR ARISING OUT OF THIS INDENTURE MAY BE BROUGHT IN OR REMOVED TO THE COURTS OF THE STATE OF NEW YORK, IN AND FOR THE

COUNTY OF NEW YORK, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK (IN EACH CASE SITTING IN THE BOROUGH OF MANHATTAN). BY EXECUTION AND DELIVERY OF THIS INDENTURE, EACH PARTY ACCEPTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS (AND COURTS OF APPEALS THEREFROM) FOR LEGAL PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE.

SECTION 1.13. *Non-Business Days*.

If any Interest Payment Date, Redemption Date or Stated Maturity of any Security shall not be a Business Day, then (notwithstanding any other provision of this Indenture or the Securities) payment of interest, premium, if any, or principal or other amounts in respect of such Security shall not be made on such date, but shall be made on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity, as the case may be, until such next succeeding Business Day) except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case with the same force and effect as if made on the Interest Payment Date or Redemption Date or at the Stated Maturity.

ARTICLE II

SECURITY FORMS

SECTION 2.1. *Form of Security*.

Any Security issued hereunder shall be in substantially the following form:

**Dunmore Homes, LLC**

**Junior Subordinated Note due 2035**

No. _____                                          $20,619,000

Dunmore Homes, LLC, a corporation organized and existing under the laws of Delaware (hereinafter called the "*Company*," which term includes any successor Person under the Indenture hereinafter referred to), for value received, hereby promises to pay to Sigler & Co., or registered assigns, the principal sum of $20,619,000 on July 30, 2035. The Company further promises to pay interest on said principal sum from June 28, 2005, or from the most recent Interest Payment Date to which interest has been paid or duly provided for, quarterly in arrears on January 30, April 30, July 30 and October 30, of each year, commencing October 30, 2005, or if any such day is not a Business Day, on the next succeeding Business Day (and no interest shall accrue in respect of the amounts whose payment is so delayed for the period from and after such Interest Payment Date until such next succeeding Business Day), except that, if such Business Day falls in the next succeeding calendar year, such payment shall be made on the immediately preceding Business Day, in each case, with the same force and effect as if made on the Interest Payment Date, at a fixed rate equal to 8.60% per annum through the interest payment date in July 30, 2010 and thereafter at a variable rate equal to LIBOR plus 4.5% per annum, together

# EXHIBIT I

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

     I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on March 13, 2008.

*Paul LaPointe*

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07



## CT-07

CERTIFICATE OF INCORPORATION
OF
DUNMORE HOMES, INC.

Under Section 402 of the Business Corporation Law

FIRST:  The name of the corporation (hereinafter, this "Corporation") is Dunmore Homes, Inc.

SECOND:  This Corporation is formed to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law of the State of New York, provided that it is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

THIRD:  The county, within this state, in which the office of this Corporation is to be located is the County of New York.

FOURTH:  The aggregate number of shares which this Corporation shall have authority to issue is 100,000 shares of common stock with a par value of $0.001 per share.

FIFTH:  The Secretary of State is designated as agent of this Corporation upon whom process against this Corporation may be served.  The address to which the Secretary of State shall mail a copy of any process accepted on behalf of this Corporation is:

CT Corporation System
111 Eighth Avenue
New York, NY 10011

IN WITNESS WHEREOF, the undersigned, being the incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the Business Corporations Law of the State of New York makes this Certificate of Incorporation, hereby declaring and certifying that this is his act and deed and the facts herein stated are true and, accordingly, has hereunto executed this Certificate of Incorporation on this 29th day of August, 2007.

Keith W. McBride
400 Capitol Mall, Ste. 1800
Sacramento, CA 95814

070830000502

# EXHIBIT J

PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Richard M. Pachulski (CA Bar No. 90073)
Robert B. Orgel (CA Bar No. 101875)
Debra Grassgreen (CA Bar No. 169978)
Maria A. Bove (MB-8687)

Counsel for the Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| DUNMORE HOMES, INC.,[1] | Case No. 07-13533 (MG) |
| Debtor. | |

## DEBTOR'S OPPOSITION TO MOTION OF CAL SIERRA CONSTRUCTION, INC., PACIFIC PAVING CO., INC., AND VALLEY UTILITY SERVICES, INC. TO TRANSFER VENUE TO THE EASTERN DISTRICT OF CALIFORNIA, <u>SACRAMENTO DIVISION</u>

---

[1] The last four digits of the Debtor's Federal Tax I.D. Number are 8267.

# **TABLE OF CONTENTS**

**Page No.**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 4

    A.    Nature of Debt and Location of Creditors ............................................. 5

    B.    Assets ................................................................................................. 10

    C.    Restructuring Efforts .......................................................................... 11

ARGUMENT .......................................................................................................... 11

    A.    Venue in New York is Proper .............................................................. 11

    B.    There are No Sufficient Grounds for Transferring the Debtor's Case  to the
        Eastern District of California .............................................................. 12

        1.    Transfer is Not in the Interest of Justice .................................. 14

        2.    Transfer is Not Warranted For The Convenience of The Parties ............ 21

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*,
   596 F.2d 1239 (5th Cir. 1979) .................................................................... passim

*Eagle Pointe Ltd. Dividend Housing Ass'n Ltd. Partnership*,
   350 B.R. 84 (Bankr. N.D. Ind. 2006) ..................................................................... 21

*In re Abacus Broadcasting Corp.*,
   154 B.R. 682 (Bankr. W.D. Tex. 1993) .................................................................. 18

*In re Del. & Hudson Ry. Co.*,
   96 B.R. 467 (Bankr. D. Del. 1988) ........................................................................ 22

*In re Éclair Bankruptcy Ltd.*,
   255 B.R. 121 (Bankr. S.D.N.Y. 2000) ................................................................... 19

*In re Enron Corp.*,
   274 B.R. 327 (Bankr. S.D.N.Y. 2002) .............................................................. passim

*In re Enron Corp.*,
   284 B.R. 376 (Bankr. S.D.N.Y. 2002) ................................................................... 24

*In re FRG, Inc.*,
   107 B.R. 461 (Bankr. S.D.N.Y. 1989) ................................................................... 12

*In re Garden Manor Associates, L.P.*,
   99 B.R. 551 (Bankr. S.D.N.Y. 1988) ..................................................................... 16

*In re Grumman Olson Industries, Inc.*,
   329 B.R. 411 (Bankr. S.D.N.Y. 2005) ................................................................... 14

*In re International Filter Corp.*,
   33 B.R. 952 (Bankr. S.D.N.Y. 1983) ..................................................................... 15

*In re LaGuardia Associates, L.P.*,
   316 B.R. 832 (Bankr. E.D. Pa. 2004) .................................................................... 14

*In re MacDonald*,
   356 B.R. 416 (W.D. Tenn. 2006) ........................................................................... 23

*In re Manville Forest Prods. Corp.*,
   896 F.2d 1384 (2d Cir. 1990) ........................................................................... 13, 14

*In re Maruki USA Co., Inc.*,
   97 B.R. 166 (Bankr. S.D.N.Y. 1988) ................................................................ 18, 19

*In re Ross*,
   312 B.R. 879 (Bankr. W.D. Tenn. 2004) ............................................................... 23

*In re Scotia Development, LLC*,
   2007 WL 1192137 (Bankr. S.D. Tex. 2007) .......................................................... 19

*In re Segno Communications, Inc.*,
   264 B.R. 501 (Bankr. N.D. Ill. 2001) .................................................................... 12

ii

*In re Suzanne de Lyon, Inc.*,
   125 B.R. 863 (Bankr. S.D.N.Y. 1991) ................................................................................ 21

*In re Uslar*,
   131 B.R. 22 (Bankr. E.D. Pa. 1991) ................................................................................. 21

**STATUTES**

28 U.S.C. § 1408 .......................................................................................................... 11, 12, 13

28 U.S.C. § 1412 ................................................................................................................ 12

The above-captioned debtor and debtor in possession (the "Debtor") hereby opposes the

motion of Cal Sierra Construction, Inc. ("Cal Sierra"), Pacific Paving Co., Inc. ("Pacific

Paving")[2] and Valley Utility Services, Inc. ("Valley Utility") (collectively, "Movants") to

transfer venue of this case to the Eastern District of California (the "Motion").[3]

## PRELIMINARY STATEMENT

1.      In seeking to transfer this case to the Eastern District of California, the Movants:

(i) greatly mischaracterize the composition of the creditor body and geographic center of gravity

in the case; (ii) presuppose without legal basis that venue must be where the assets are located;

(iii) disregard that the subsidiaries that own such assets and are the primary obligors (often the

only obligors) are not in bankruptcy; and (iv) cast aspersions of forum shopping against the

Debtor that are more appropriately directed toward the Movants themselves.

2.      The Debtor is a New York corporation entitled to select New York as the venue

for its pending chapter 11 case.  Congress afforded corporate debtors the right to select their state

of domicile, not just where their assets are located.  New York and Delaware corporations

exercise that right regularly, and that decision is entitled to "great weight."  Nothing in the

Motion is sufficient to outweigh that deference.

3.      The center of gravity in this case is not Sacramento.  The Debtor has

approximately $195.9 million in bank debt.  Very little of this institutional debt is held by

creditors in Northern California ($9.7 million), or even in Southern California ($25 million).

The Debtor has an estimated $43.8 million in other unsecured obligations (including $20 million

---

[2]  As set forth herein, Pacific Paving is not a creditor of the Debtor, but of a non-debtor subsidiary.
[3]  A joinder has been filed by The Aleco Corporation, Granite Construction Company, and DeSilva Gates
Construction, L.P.  These three parties are also not creditors of the Debtor, but of non-debtor subsidiaries.

in bond debt to a New York indenture trustee), of which only $11.2 million is held by creditors

in Northern California, and $2.9 million by creditors in Southern California. The Debtor's three

largest creditors are not in California. At most, under the most optimistic assumptions

concerning the banks' deficiency claims, Northern California creditors will hold no more than

12% of the total debt in this case. That is less than the debt held by creditors in Texas (35%),

New York (16%), and Ohio (12%). It is not Northern California trade creditors that will be most

active in this case, or whose convenience should dictate the choice of venue.[4]

    4.    Institutional debt predominates in this case, and for those creditors, their

professionals, and most potential investors, New York is a far more convenient and efficient

venue. Reported decisions emphasize repeatedly that it is the economic and efficient

administration of the case that is the single most important consideration and, significantly, that

it is the convenience of the parties, professionals and financiers that are likely to be most

instrumental in a debtor's reorganization that factor most heavily. Such considerations strongly

favor retention of venue in New York. The focus of this case is not operations, but financial

restructuring. The Debtor has ceased operating and is soliciting investment and discussing

workout terms with its lenders. It has already indicated that this case will proceed quickly: it

will either obtain an investor or strategic partner or the banks will foreclose. The largest

contingent of potential investors is from New York. Only one investor that submitted a term

sheet is from Northern California. Counsel for the largest creditors, for the Debtor and for the

---

[4] Even for some trade creditors, Sacramento is inconvenient. For example, Subsidiaries (as defined below) are located in Fresno and Bakersfield, which are nearly a 3 hour and 4 ½ hour drive, respectively, from Sacramento. It is far more likely that such "local" creditors will take advantage of electronic filing and telephonic appearances. In the last several years alone, modern technology has greatly increased the ease with which remote creditors can participate in proceedings, and ameliorated many of the concerns voiced in older opinions on venue.

Official Committee of Unsecured Creditors have offices in New York. They do not have offices in Sacramento. The largest unsecured creditor is the indenture trustee for the trust preferred securities, Bank of New York. The securities were issued pursuant to a Delaware statutory trust and the note purchase agreement is governed by New York law. Subordination under the indenture may become an issue in the case. One of other the other key assets – the funds in the deferred compensation plan that is the subject of a contested motion for turnover – is in a trust governed by Delaware law. The Debtor believes that its single largest creditor: Key Bank, the only creditor whose claim is <u>solely</u> against the Debtor without recourse to subsidiary assets: Bank of New York, and at least one other significant lender, Wachovia, all support venue in New York. All of these facts favor the retention of venue in New York.

5.      Another premise of the Motion is that this case involves litigation against California assets by California creditors that should be decided by a California judge. The Subsidiaries, however, have not filed. Thus the lawsuits to which the Motion refers, which largely seek recovery from property owned by nondebtor subsidiaries, are <u>not stayed</u>, except as to the Debtor. In fact, one of the Movants and all three joining parties do not have claims against the Debtor at all, but only the Subsidiaries. Trade creditors whose claims are not satisfied from bonds or by liens *may* have claims against the Debtor, but only if the corporate parent was an obligor on the contract. The Debtor is reviewing its records and has ascertained that it is not party to any contract with Pacific Paving or any of the three joining parties.

6.      Finally, the Movant's accusations of forum shopping are baseless. The Debtor is a New York corporation established for what the Movants concede was a legitimate economic purpose. Companies with foreign assets routinely incorporate in Delaware or New York for,

3

among other legitimate reasons, the relative commercial sophistication of their judiciaries. The

Movants' assertion that venue in California is more economical rings hollow when it was Cal

Sierra that precipitated the bankruptcy needlessly, when its most important rights – surety bonds

and mechanic's liens – are unimpaired. The Motion represents a continuation of these

aggressive and counterproductive tactics.

## BACKGROUND[5]

7.      The Debtor is a corporation organized under the laws of New York. With its

subsidiaries (collectively, the Dunmore Companies"), it formerly built residential developments

in communities throughout Northern and Central California. The Dunmore Companies have 26

communities which are organized into fourteen limited liability companies and one limited

partnership (collectively, the "Subsidiaries"), which are all owned (in whole or in substantial

part) by the Debtor.[6] The Dunmore Companies have financed fifteen of these Subsidiary

entities, representing twenty-five communities, with secured debt at the Subsidiary level. Such

financing has been provided by nine different lenders (or lending groups) and is generally

guaranteed by the Debtor (or the Debtor is a co-borrower). The Subsidiaries are not currently

debtors but are engaged in an out-of-court restructuring process.

---

[5] The facts set forth herein are described in the Affidavit of Doug Strauch (the "Strauch Affidavit") filed herewith.

[6] The Subsidiaries are: Dunmore Canterbury LLC ("Canterbury"); Dunmore Country Villas, LLC ("Country Villas"); Dunmore Fullerton Ranch, LLC (Fullerton Ranch"); Dunmore Highlands, LLC ("Highlands"); Dunmore Laguna Reserve, LLC ("Laguna Reserve"); Dunmore Orchard LLC ("Orchard"); Dunmore-Providence LLC ("Providence"); Dunmore Stone Creek, LLC ("Stone Creek"); Fahrens Park LP ("Fahrens Park"); Dunmore Viscaya LLC ("Viscaya"); Dunmore Diamond Ridge LLC ("Diamond Ridge"); Dunmore Croftwood LLC ("Croftwood"); Dunmore Westport, LLC ("Westport"); Dunmore Sycamore Ranch LLC ("Sycamore Ranch"); and Dunmore Montecito LLC ("Montecito"). The Debtor wholly owns all of the Subsidiaries except Croftwood, Diamond Ridge, Highlands and Viscaya, all of which are operated as joint ventures with Weyerhauser Realty Investors. The Debtor also has an interest in the following inactive subsidiaries: Dunmore Brown Estates, LLC; Dunmore Reflections II, LLC; Dunmore Wildhawk, LLC; Fairways, LLC; Dunmore Sierra, LLC; Dunmore Delano, LLC; Dunmore Wildhawk North LP; and the Dunmore Homes Statutory Trust 1.

8.      Prior to September 10, 2007, the Subsidiaries and the other assets of the Debtor were owned by Dunmore Homes, Inc., a California corporation ("Dunmore California"). Dunmore California is the successor by merger to Dunmore Homes, LLC.  On September 10, 2007, Dunmore California sold all of its assets to the Debtor, a New York corporation wholly owned by Michael Kane, which assumed all of its liabilities (the "Sale").

A.      **Nature of Debt and Location of Creditors**

9.      **Trust Preferred Securities**:  The Debtor is party to a Junior Subordinated Indenture Agreement (as amended, the "Indenture Agreement") between Dunmore California and JP Morgan Chase Bank, National Association, as indenture trustee, dated June 28, 2005. The indenture trustee is now Bank of New York, based in New York.  Pursuant to a Delaware statutory trust, Dunmore California issued a series of junior subordinated notes (collectively, the "Trust Preferred Securities"), which mature on July 30, 2035.  The note purchase agreement is governed by New York law.  The outstanding debt is approximately $20 million.[7]

10.     **Surety Obligations**:  Travelers Casualty and Surety Company of America ("Travelers"), based in St. Paul, Minnesota, issued payment and performance bonds ("Bonds") in favor of certain of the Subsidiaries.  Travelers claims that it is owed approximately $9,147,000.[8]

11.     **Secured Subsidiary Debt**:  Approximately $196 million of secured debt is owed to nine lenders or lending groups (the "Secured Lenders")[9] at the Subsidiary level, all of which

---

[7] Subordination issues may arise between the noteholders and other unsecured creditors pursuant to the Indenture Agreement.  Any such dispute arises under New York law and should be decided by this Court.

[8] Travelers has a security interest in Dunmore California's property, but its UCC-1 financing statement was filed only one week before the bankruptcy.

[9] The Secured Lenders are:  JMP Securities ("JMP"); Sacramento Valley Farm Credit ("Sacramento"); RBC Builder Finance ("RBC"); Indymac Bank ("Indymac"); Guaranty Bank ("Guaranty"); Key Bank ("Key Bank"); Wachovia Bank, N.A. ("Wachovia"); Affinity Bank ("Affinity"); Comerica Bank ("Comerica"); Franklin Bank ("Franklin"); and United Commercial Bank ("United").

represents potential deficiency claims against the Debtor. Dunmore California is the guarantor

or co-borrower on the project debt, and the Debtor assumed such obligation in the Sale.

12.    The Secured Lenders are primarily national financial institutions. Only one

(Sacramento Valley) is based anywhere near Sacramento (45 minutes away in Yuba City), and

not only is it the smallest ($1.5 million), its claim will be satisfied by the sale of the Stone

Mitigation Property, set for hearing on December 14, 2007.

(a)    Key Bank: Key Bank is based in Ohio. As the agent for a bank group
(which includes Franklin and Wachovia), it was owed $31.5 million as of August 31, 2007. As
the lender on two other projects, Key Bank was owed approximately $26.0 million, as of August
31, 2007. It is the Debtor's largest creditor, and has advised that it opposes the Motion. It is
represented by Kaye Scholer, which has offices in New York but not Sacramento.

(b)    Wachovia: In addition to being a participant in the syndicated Key Bank
$31.5 million loan, Wachovia is owed directly approximately $9.7 million, as of August 31,
2007, on a project loan that is guaranteed by the Debtor. Wachovia is based in North Carolina
and both the Wachovia participation in the KeyBank loan and the Wachovia $9.7 million loan
are being administered by Wachovia's Philadelphia office. Wachovia is represented by Rutan &
Tucker in Orange County, California. Rutan & Tucker does not have an office in Sacramento,
California. Wachovia has advised the Debtor that that it does not object to the New York venue.
Wachovia's counsel has stated that he will be present telephonically at the hearing and that he
will be willing, at the request of either the Debtor or the Court, to confirm the foregoing on the
record.

(c)    RBC: RBC is a Texas-based subsidiary of the Royal Bank of Canada.
The Debtor is a co-borrower on the RBC debt, which was approximately $39.0 million as of
August 31, 2007. The RBC loan agreement is governed by Texas law. It is represented by
Bryan Cave, which has offices in New York but not Sacramento.

(d)    Guaranty Bank: Guaranty Bank is based in Texas. The Debtor is a co-
obligor on the debt to Guaranty, which was owed approximately $37.7 million, as of August 31,
2007. It is represented by Pillsbury Winthrop Shaw Lipton, which has offices in New York and
Sacramento.

(e)    Comerica: Comerica is now headquartered in Texas. It is the agent for
Affinity and United on a loan to Croftwood for the Lake Pointe development (the "Croftwood
Loan"), guaranteed by the Debtor. The amount due on account of the Croftwood loan was
approximately $24.5 million as of August 31, 2007. Comerica is also the lender on a separate
project loan, on which approximately $7.2 million was owed, as of August 31, 2007. Its loan
officer is in San Jose, California. It is represented by Shephard Mullin Richter & Hampton,
which has offices in New York but not Sacramento.

6

(f)    IndyMac: Indymac is based in Pasadena (Southern California). The Debtor guaranteed the obligation to Indymac obligation, which was owed approximately $8.4 million, as of August 31, 2007. It is represented by Orrick Herrington & Sutcliffe, which has offices in New York and Sacramento.

(g)    Affinity: Affinity is based in Ventura (Southern California). In addition to being a participant in the Croftwood Loan, Affinity is the lender on a separate project loan, guaranteed by the Debtor, on account of which Affinity was owed approximately $10.5 million, as of August 31, 2007. Its loan officer is in Southern California. It is represented by Frandzel Robins Bloom & Csato, a Los Angeles based firm with no office in New York or Sacramento.

(h)    United Commercial Bank: United Commercial Bank is a participant in the Comerica Croftwood Loan. It is based in San Francisco, and has four branch offices in Manhattan.

(i)    JPM Securities: The Debtor is also the primary obligor on a $2 million from JPM Securities, based in San Francisco.

13.    While the eventual amount of the deficiency claims against the Debtor arising from the approximately $196 million of Secured Subsidiary Debt is unliquidated, it can be conservatively estimated at no less than approximately $78 million. This figure is based on an estimated purchase value of 60% of the debt. Based on the Debtor's marketing efforts to date, the results of which have been shared with the Secured Lenders, that estimate (which is made solely for illustrative purposes in connection with the Motion) is very conservative.[10]

14.    **Trade Debt**: The trade debt is held primarily by contractors and subcontractors for goods and services provided to Subsidiaries. These creditors are typically located in proximity to the Dunmore Companies' residential projects, and assert claims directly against the Subsidiaries. In many instances, Dunmore California is a co-obligor on such obligations. The

---

[10] To lend a general perspective, as reported in numerous mass media sources on December 3, 2007, homebuilder Lennar Corp. has sold a "diversified portfolio" of 11,000 lots for $525 million, a sale price that represents 40% of Lennar's cost basis of $1.3 billion.

Debtor assumed such obligations pursuant to the Sale. In other instances, Dunmore California was not a contract party, and thus the Debtor did not assume such liabilities.

15.     A significant amount of trade claims will be satisfied from surety bonds and/or mechanic's liens on assets of the Subsidiaries. The bankruptcy does not prevent contractors from making claims against those bonds. As the Motion emphasizes, Cal Sierra and numerous other trade creditors have also commenced lawsuits to, *inter alia*, foreclose on mechanic's liens. Trade creditors are not stayed from pursuing such recoveries.[11]

16.     The list of the Debtor's largest unsecured creditors that accompanied the petition was prepared based on consolidated liabilities. The Debtor is reviewing its records to determine (a) which claims are not obligations of the Debtor because Dunmore California is not a contracting party, and (b) which claims are projected to be paid in full or in part from surety bonds or from liens senior in priority to those of the Secured Lenders. After making such deductions, the Debtor estimates that unsatisfied trade obligations will be $14.7 million.

17.     Of particular pertinence to the Motion, Movant Pacific Paving does not have a claim against the Debtor, because Dunmore California was not an obligor on its contract. The same is true of the three creditors that filed a Joinder in the Motion: The Aleco Corporation, Granite Construction Company, and DeSilva Gates Construction, L.P. In addition, the Debtor estimates that all but approximately $1 million of Cal Sierra's asserted claim of approximately $4.1 million may be recovered from bonds and writs of attachment against Subsidiaries.

---

[11] Among other pending actions, on September 25, 2007, Cal Sierra filed a complaint against Dunmore and Laguna Reserve, alleging causes of action for breach of contract, foreclosure of mechanic's lien, unjust enrichment and accounts stated. Cal Sierra also sought prejudgment writs of attachment (the "Writs") against the Debtor and Laguna Reserve for $1,977,121.40. The action was stayed only as to the Debtor by the bankruptcy filing. Cal Sierra received a writ of attachment against unencumbered assets of Laguna Reserve.

18.    **Summary and Geographic Distribution of Debt**: A summary of the Debtor's projected liabilities, and an illustrative map showing the geographic distribution of such debt, is set forth in Exhibit 1 hereto.  It reflects $43.8 million in unsecured debt, exclusive of deficiency claims of the Secured Lenders.  Of that subtotal, $20 million is attributable to Trust Preferred Securities, and $9.1 million consists of surety claims based on estimated payments to bonded contractors and subcontractors.  After payment on surety bonds, and projected recoveries on senior mechanic's liens, the remaining $14.7 million consists of projected unsatisfied trade liabilities assumed by the Debtor.  Exhibit 1 reflects that, of the $43.8 million in non-Secured Lender unsecured debt, $11.2 million is held by creditors in Northern California.  $2.9 million is held by creditors in Southern California.  The remaining $29.7 million is held by creditors in other states, the largest being New York ($20 million held by Bank of New York as indenture trustee on the Trust Preferred Securities).

19.    Exhibit 1 also lists the amount and distribution of bank debt secured at the Subsidiary level.  Of the total of $195.9 million, $9.7 million is based in Northern California.  $105.9 million is Texas-based.  For purposes of estimating overall unsecured debt, Exhibit 1 incorporates the conservative estimate, discussed above, that deficiency claims on such bank debt will total $78.4 million.

20.    The total of (a) estimated non-bank debt and (b) estimated bank deficiency claims is $122.2 million.  The geographic distribution of that total debt reflects that 12% of such amount is held by creditors in Northern California.  By comparison, creditors in Texas (35%), New York (16%) and Ohio (12%) all carry more of the debt in this case.  Others are Southern California (11%), Minnesota (7%) and North Carolina (7%).

**B.**    <u>Assets</u>

21.    As of September 30, 2007, the book value of the Debtor's consolidated assets was approximately $280,592.251. Debtor's principal assets included: (a) its interests in the Subsidiaries; (b) cash on hand of approximately $119,000, (c) an option to purchase 19.8 acres of property in Northern California with an estimated value in excess of the option exercise price of $815,000 (the "Cordano Option"),[12] (d) the Debtor's interest in the Executive Non Qualified Excess Plan (the "Deferred Compensation Plan") valued at approximately $1,700,000, (e) a note from Mr. Dunmore (the "Lender Receivable"), in the amount of approximately $11.1 million, secured by the tax refund to Mr. Dunmore generated by the Sale,[13] (f) 161 acres of mitigation property in Northern California, with estimated equity of $2.8 million,[14] (g) a receivable due from Dunmore Land Company in the amount of approximately $351,000; and (h) $350,000 in certificates of deposit, which may be subject to restrictions.

22.    The Funds in the Deferred Compensation Plan are held in a rabbi trust pursuant to The Executive Nonqualified Excess Plan Trust Agreement ("Trust Agreement"), dated March 25, 2005, between Dunmore California and Delaware Charter Guarantee & Trust Company, conducting business as Principal Trust Company (the "Trustee"). The trust is governed by Delaware law, and the Trustee is located in Minnesota.[15]

---

[12] The Cordano Option is more fully described in the Affidavit of Doug Strauch filed pursuant to Rule 1007-2.

[13] The Sale was made in part to enhance the security for the Lender Receivable. The Sale derivatively eliminated Mr. Dunmore's economic interest in the assets through his stock in Dunmore California. This will allow Mr. Dunmore to realize net tax losses in 2007 that should entitle him to a substantial Federal tax refund. In connection with the Sale, the Debtor and Mr. Dunmore entered into a note modification agreement pursuant to which, among other things, the Lender Receivable was collateralized by the anticipated Federal tax refund. RBC has challenged the Sale as a fraudulent transfer, an issue that if litigated will present issues with no greater nexus to California than to New York.

[14] A hearing on the sale of this property is set for December 14, 2007. The sale will satisfy the secured claim of Sacramento Valley Farm Credit.

[15] A hearing on a stipulation for the turnover of such funds is set for hearing on December 14, 2007.

## C.    Restructuring Efforts

23.    As the Debtor has already indicated, this case should move rapidly. The Debtor's goal is to find a strategic partner or source of capital so that it can restructure and position itself to compete successfully when the housing market recovers. The heart of this case is the formulation and negotiation of a plan or transaction implementing this goal. If no buyer or strategic partner is obtained, the likely outcome is foreclosure. The Debtor does not seek to shift local litigation into this forum.

24.    The Debtor is marketing the projects. Sixty nine potential buyers or investors across the country have been contacted, and numerous parties have conducted diligence calls, financial reviews, and market studies. Twenty-six are located in New York. Twelve are in Southern California, eleven are in Northern California, five are in Colorado, and three each are in Connecticut and Texas. Six have submitted term sheets: two are from New York, two from Southern California, one from Northern California and one from Connecticut. Information from this process has been shared with the Secured Lenders. It was also shared with Cal Sierra in an effort to avoid litigation, but Cal Sierra decided to take a litigious approach.

## ARGUMENT

## A.    Venue in New York is Proper

25.    Section 1408 of title 28 of the United States Code governs venue in Chapter 11 cases. 28 U.S.C. § 1408 provides that a case under title 11 may be commenced in the district court for the district-

> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such

commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408.

26.     The Debtor is a corporation organized under New York law, and is therefore domiciled in New York. *In re FRG, Inc.*, 107 B.R. 461, 471 (Bankr. S.D.N.Y. 1989) ("[A] corporation's domicile is generally held to be its state of incorporation..."); *In re Segno Communications, Inc.*, 264 B.R. 501 (Bankr. N.D. Ill. 2001) (same). The Debtor has never been domiciled in any other state. Accordingly, and as the moving parties appear to concede, venue is proper.[16]

**B.     There are No Sufficient Grounds for Transferring the Debtor's Case
to the Eastern District of California**

27.     When venue is proper in the district where the bankruptcy case was filed, the case may nevertheless be transferred, on motion by a party, pursuant to 28 U.S.C. § 1412, which provides that: "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."

28.     A debtor's choice of forum is entitled to "great weight." *In re Enron Corp.*, 274 B.R. 327, 342-43 (Bankr. S.D.N.Y. 2002). Consequently, "[w]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *Id.* Transferring venue of a bankruptcy case is not to be taken lightly. *Id.* It is a

---

[16] The Motion's unfounded suggestion that the Sale to the Debtor was made for purposes of forum shopping is raised not as a challenge to the propriety of venue, but as a consideration in favor of transfer.

movant's burden to show by a preponderance of the evidence that a transfer of venue is warranted. *Id.*; *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390 (2d Cir. 1990).

29.     The deference accorded a debtor's choice of venue cannot be dissipated by the moving parties' mantra that the Debtor's assets and employees are located elsewhere. Section 1408(1) is very clear in providing that venue is proper where a debtor is domiciled, *i.e.*, its state of incorporation (domicile). If Congress intended proper venue to be only where the debtor's assets, employees, creditors or books and records are located, it would have said so. It clearly intended to allow a debtor to choose its venue from a number of options.[17] That conclusion is reinforced by the recent sweeping changes to the Bankruptcy Code, in which Congress left the venue provisions intact.

30.     In addition to placing "great weight" on a debtor's choice of venue, in determining whether to transfer a bankruptcy case courts consider: (i) the proximity of creditors to the court; (ii) the proximity of the debtor to the court; (iii) the proximity of witnesses necessary to the administration of the estate; (iv) the location of the debtor's assets; (v) the economic administration of the estate; and (vi) the necessity for ancillary administration if liquidation should result. *See Enron Corp.*, 274 B.R. at 343 (*citing Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979), *reh'g denied, In re Commonwealth Oil Refining Co.*, 601 F.2d 1195 (5th Cir. 1979) ("Commonwealth")). The factor given the most weight is the promotion of the economic and efficient administration of the estate. *Id.* The factor typically given the least

---

[17] Likewise, in section 1408(2), Congress expressly allows a debtor to select the same venue of an affiliate's case even if none of the debtor's employees, books, records, or assets are located in the district where such affiliate case was filed. *See* 28 U.S.C. § 1408(2).

weight is the necessity for ancillary administration if liquidation should result. *Id.* As set forth below, these factors weigh heavily toward retention of venue in New York.

1.    **Transfer is Not in the Interest of Justice**

31.    When considering the "interest of justice," the court applies a broad and flexible standard. *In re Grumman Olson Industries, Inc.*, 329 B.R. 411, 437 (Bankr. S.D.N.Y. 2005). A court "considers whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Enron Corp.*, 274 B.R. at 343 (*citing Manville Forest Prods. Corp.*, 896 F.2d at 1391). "[T]he facts and circumstances which inform one evaluation will almost always bear on the other as well." *In re LaGuardia Associates, L.P.*, 316 B.R. 832, 839 (Bankr. E.D. Pa. 2004).

32.    Transfer of the pending chapter 11 case to the Eastern District of California, located in Sacramento, California, would be inefficient, and would be adverse to the interests of bondholders, investors, Secured Lenders, and other institutional creditors that hold the largest claims in the case. It also burdens the professionals for the parties that will be principally responsible for obtaining the investment capital needed to restructure the Debtor and for negotiating and formulating the plan of reorganization to implement it. Such reorganization efforts are best accomplished by maintaining venue in the Southern District of New York.

(a)    Efficient administration of the bankruptcy estate

33.    In determining whether transfer of venue is in the interests of justice, "[t]he factor given the most weight is the promotion of the economic and efficient administration of the estate." *Enron Corp.*, 274 B.R. at 343 (*citing Commonwealth*, 596 F.2d at 1247 ("[T]he most important consideration is whether the requested transfer would promote the economic and

efficient administration of justice.")).  This factor has been examined in terms of "the need to

obtain post-petition financing, the need to obtain financing to fund reorganization, and the

location of the sources of such financing and the management personnel in charge of obtaining

it." *Enron Corp.*, 274 B.R. at 348 (*citing Commonwealth*, 596 F.2d at 1247, and *In re*

*International Filter Corp.*, 33 B.R. 952, 956 (Bankr. S.D.N.Y. 1983)).

34.    The application of this test by the Fifth Circuit in its oft-cited decision in

*Commonwealth* is illustrative.  In determining that transfer of the bankruptcy case to Puerto Rico

was not in the interest of justice, the Fifth Circuit stated as follows:

> The main concern that this implicates is the importance of CORCO to the welfare and
> economic stability of Puerto Rico and its people. Because CORCO is a major supplier of
> petroleum products to Puerto Rico, both the economy and the people of Puerto Rico are
> vitally concerned with the outcome of the Chapter XI proceeding.  The government
> contends that the overwhelming concern of Puerto Rico with the continued operations of
> CORCO require a transfer of this case to Puerto Rico. We disagree. Without belittling in
> the least the extent of Puerto Rico's interest in CORCO, that interest is served by
> maintaining CORCO as a functioning refinery.  This can best be accomplished in San
> Antonio. <u>The troubles of CORCO are financial. The people who can solve those</u>
> <u>problems are in San Antonio.</u>

*Commonwealth*, 596 F.3d at 1248 (emphasis added).

35.    As in this case, *Commonwealth* addressed a motion to transfer venue where the

principal assets are located elsewhere.  Venue in San Antonio, Texas, was challenged on the

basis that Commonwealth's most substantial asset (an oil refinery) was located in Puerto Rico,

was subject to substantial regulation in Puerto Rico, most of Commonwealth's products were

sold to Puerto Rican customers, and Commonwealth was important to the people and economy

of Puerto Rico.  Notwithstanding all of those factors, the Fifth Circuit held that the interest of

justice required retention of venue in San Antonio where Commonwealth's financial

restructuring would actually take place. *Id*. at 1248.

36.    Similarly, in *In re Garden Manor Associates, L.P.*, 99 B.R. 551 (Bankr. S.D.N.Y. 1988), the court retained venue of a single asset real estate debtor, whose sole asset was located in another jurisdiction, after taking into consideration the fact that New York was the location where the debtor could most successfully reorganize. *Id.* at 554-55. The court found that the case turned on the debtor's ability to raise capital, renegotiate loan terms, locate a potential purchaser, or execute a potential cram down of its major secured creditor. *Id.* The court noted that the parties most likely to be a source of capital were located in New York, and found that efforts to reorganize could best be conducted in New York. As Judge Gonzalez recognized, citing the decision positively: "This is the ultimate purpose of a Chapter 11 bankruptcy case." *Enron Corp.*, 274 B.R. at 348.

37.    Here, as in *Commonwealth*, *Garden Manor Associates*, and *Enron*, the Court is faced with a motion to transfer venue of a pending chapter 11 case to the state and the district in which the debtor's principal assets are located. In support of such motion, the Movants invoke the history of the Dunmore Companies as a premier California developer, and the breadth of their creditor and customer relationships in California. In order to continue as a going concern, however, the Debtor must resolve its financial troubles as embodied by its multiple loan defaults and cessation of operations. Even if the Debtor's $196 million in obligations to Secured Lenders is reduced to (conservatively estimated) deficiency claims of $78 million, fully *88% of total estimated debt* is held by creditors that are not in Northern California. These include all of the Debtor's largest creditors, which are institutional lenders. For these creditors, potential investors and strategic partners, and for all of their professionals, New York is a trusted and convenient

16

venue for negotiating and consummating sophisticated financial transactions under the auspices

of a judicial proceeding. As Judge Gonzalez put it:

> New York is a world financial center and, as such, has the resources that will be required
> to address the Debtors' financial issues. Most of the entities and individuals expected to
> be responsible for the financial restructuring and development of a plan of reorganization
> in this case are located in New York or have ready access to New York, including most
> of the Debtors' legal and financial advisors as well as the legal and financial advisors to
> the Committee and the lenders. Those members of the financial community that provide
> access to capital necessary to the Debtors' financial restructuring are located in New
> York. Furthermore, while the Debtors' management and operations are predominantly in
> Houston, New York is a more convenient location for those responsible for negotiating
> and formulating a plan of reorganization. The Court finds that New York is the more
> economic and convenient forum for those whose participation will be required to
> administer these cases. Accordingly, New York is the location which would best serve
> the Debtors' reorganization efforts-the creation and preservation of value.

*Enron Corp.*, 274 B.R. at 349.

> (b)     Forum Shopping

38.     The Movants contend that transfer is in the interest of justice because the Debtor's

choice of venue constitutes forum shopping. This argument continues the theme – both factually

and legally erroneous – that the creditors and legal issues are California-centric and that these

factors drive the decision on venue. Movants argue:

> Debtor's decision to file in New York despite the incontrovertible economies,
> convenience, and vast preponderance of legal factors indicating a California filing must
> raise the inference that Debtor, and its predecessor who "sold" all of its assets merely two
> months ago, has come to New York merely out of forum shopping.

Motion at 11.

39.     Where are the "incontrovertible economies, convenience, and vast preponderance

of legal factors" that dictate venue in Sacramento? The debt in this case is overwhelmingly <u>not</u>

in Sacramento or elsewhere in Northern California or, for that matter, anywhere in California.

Venue in Sacramento is decidedly <u>not</u> convenient for the creditors, investors and professionals

17

who will be most active in the reorganization of the Debtor. And the "vast preponderance of legal factors" is apparently a reference to the contractor litigation against Subsidiaries and their assets that are <u>not</u> in bankruptcy, which litigation is <u>not</u> stayed except as to the Debtor and will not be decided by this Court. The facts simply do not support the allegations.

40.    The cases cited by the Movants offer scant support for their position. *In re Abacus Broadcasting Corp.*, 154 B.R. 682 (Bankr. W.D. Tex. 1993) involved a transfer of venue of an operating case of a radio station to the district in which the station broadcasts. "The court specifically noted that, for an operation such as a radio station, it made much more sense to locate the bankruptcy in a venue where the judge presiding would more likely have active familiarity with the community and the milieu in which the station operated, for such a judge would be in a much better position to gauge the likelihood of an effective reorganization." *Id.* at 683. Moreover, *Abacus* was a localized case on an entirely different scale. The largest creditor resided in the district to which the case was transferred, along with the debtor's management and its radio station. It was not a case with institutional creditors scattered throughout the country, none of which are in the district to which transfer is proposed. Such facts are distinct and inapplicable.

41.    *In re Maruki USA Co., Inc.*, 97 B.R. 166 (Bankr. S.D.N.Y. 1988) was an obvious bad faith case in which a debtor moved in New York to transfer the Florida case of an affiliate in which the stay had just been lifted. In the context of such obvious forum-shopping, Judge Brozman held that the Florida court (*i.e.*, the transferor court) was the proper court in which to bring a motion to transfer, not the proposed transferee court. "To entertain the venue motion

because of Maruki Florida's eleventh-hour filing after the stay was lifted in the HL Associates case by the Florida court would be to encourage flagrant forum shopping." *Id.* at 170.

42.    *In re Éclair Bankruptcy Ltd.*, 255 B.R. 121 (Bankr. S.D.N.Y. 2000) could hardly be more factually distinct.  It was another patently bad faith filing on the eve of eviction after a sister case had been dismissed with a bar on refilling.  The court made an express finding "that this case was filed in the Southern District for 'forum shopping'- to try out the Southern District, after repeated unfavorable rulings, and a restrictive order, in the Eastern District.  The interests of justice require that this Court not reward such an effort." *Id.* at 142.[18]

43.    Corporations are entitled to incorporate in states other than their principal place of business, and do so routinely.  They frequently do so in states such as Delaware and New York where, truth be told, the commercial and corporate sophistication of the judiciary is perceived to be more uniform than elsewhere.  That is not forum-shopping and Congress permits it to be a basis for venue.  As the court stated in *In re Scotia Development, LLC*, 2007 WL 1192137, at *7 (Bankr. S.D. Tex. 2007):

> Venue selection is an appropriate decision made by a debtor with the assistance of counsel. As Judge Drain said in *Winn-Dixie*, it is not "improper to file within a district that Congress has expressly created for one. In fact it may well be a duty to do so based on one's analysis of all the facts at hand." *In re Winn-Dixie Stores, Inc.*, Case No. 05-11063-rdd, April 12, 2005, p. 170, ll.6-11.  Here, Movants who asserted that venue is improper in the Southern District of Texas disregarded the law and the facts, such that this Court has seriously considered but now declines to impose Rule 11 sanctions. There is no evidence of forum shopping and the facts presented demonstrate that venue is entirely proper in the Southern District of Texas.

---

[18] The court also invoked comity, since "virtually all of the events leading up to the case took place in proceedings before a judge in another district; where files and exhibits are likely to be more readily available in the other district; and where a judge in the other district considered matters relevant to this case as recently as four weeks prior to the filing here." *Id.*

(c)    Fairness

44.    The interests of fairness favor retention of this case in the Southern District of New York.  Notably absent from the Motion is any reference to the noteholders, who are owed $20 million, the surety, which is owed over $9 million, or the Secured Lenders, who are owed $196 million, and whose unsecured deficiency claims will swamp those of the trade creditors that the Movants purport to champion.

45.    In fact, the Motion is motivated by self-serving agendas without regard to the other constituencies in the case.  The Movants' invocation of the supposed "economies" of transfer is disingenuous.  Besides the fact that it is untrue that economies would result from transfer, it is Cal Sierra that needlessly precipitated this bankruptcy in the first place, after the Debtor had ceased operating and apprised Cal Sierra of its financial information and workout strategy.  It was vindictive and pointless: the Debtor is now pursuing the same strategy in bankruptcy as it would have continued to pursue out of court.  The Motion can be viewed as a continuation of Cal Sierra's strategy to litigate aggressively and be a "fly in the ointment."

46.    Traditional notions of fairness dictate that the interest of justice will be best served by retaining venue of this case in the Southern District of New York.

(d)    Judicial Economy

47.    Consideration of the efficient administration of the estate and judicial economy factors should take into account the "learning curve" of the court, including "consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue." *Enron Corp.*, 274 B.R. at 349 (citation omitted).  The Court has gained some familiarity with this case by virtue of the initial round of motions filed by the Debtor, and

through the motions relating to the sale of the Stone Mitigation Property and the Deferred

Compensation Plan that are set for hearing on December 14, 2007. The knowledge imparted

from this contested matter is also relevant. *See Eagle Pointe Ltd. Dividend Housing Ass'n Ltd.*

*Partnership*, 350 B.R. 84, 92 (Bankr. N.D. Ind. 2006) (stating that venue transfer depends on

facts that exist at the time of such consideration). The information conveyed therewith is

meaningful in the context of what is anticipated to be a relatively quick chapter 11 case. It is a

learning curve and procedural history that would have to be processed *ab initio* by a new court.

> (e)     Timeliness

48.     The Debtor does not dispute the timeliness of the Motion.

**2.     Transfer is Not Warranted For The Convenience of The Parties**

> (a)     Proximity of Creditors to the Court

49.     This factor decisively favors the retention of venue in the Southern District of

New York. When determining the proximity of creditors, courts must consider the actual

number of creditors and the dollar value of their respective claims. *Enron Corp.*, 274 B.R. at

345; *Commonwealth Oil Refining Co., Inc.*, 596 F.2d at 1248. The views of secured creditors are

of particular significance on this issue. *See In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 868

(Bankr. S.D.N.Y. 1991); *In re Uslar*, 131 B.R. 22, n. 3 (Bankr. E.D. Pa. 1991) (secured versus

unsecured status irrelevant – all claims are considered).

50.     Taking into account both secured claims and the relative amounts of creditor

claims, the overwhelming amount of debt in this case is <u>not</u> proximate to the Eastern District of

California. As set forth above and in Exhibit 1, fully 88% of the Debtor's total projected

liabilities are held by creditors outside Northern California. If the face amount of the Secured

21

Lenders' $196 million in debt were utilized in this calculation, rather than very conservatively

estimated deficiency claims, even the 12% figure would shrink significantly.

51.     The court in *Enron* declined to transfer the case to Houston even where the debt

was more weighted to the proposed transferee district than it is here:

> The Movants emphasize that an overwhelming percentage of trade and vendor creditors
> are located in Texas. However, the Movants' numbers take into consideration inter-
> company debt. If the debts owed to inter-company Debtors are removed, the percentage
> of debt owed to Texas entities drops from approximately 90% to 34%, with the balance
> (66%) being held by non-Texas entities. Of the 66% representing trade and vendor debt
> not in Texas, 20% is owed to creditors in New York and 46% is owed to creditors outside
> of both New York and Texas. If the same analysis is applied with respect to the creditors
> in terms of number versus amount, the percentage in number located in Texas is 33%,
> and the percentage of creditors located outside of Texas is 67%.

*Enron Corp.* 274 B.R. at 346.

52.     Courts also consider the convenience in reaching the court, as well as its physical

location.  *See In re Del. & Hudson Ry. Co.*, 96 B.R. 467 (Bankr. D. Del. 1988), *aff'd*, 884 F.2d

1383 (3d Cir. 1989).  Sacramento is not particularly convenient even for many trade creditors; as

noted, Fresno is nearly a 3 hour drive one way, while Bakersfield is nearly 4 ½ hours.  Creditors

are much more likely to rely on telephonic appearances to participate than to spend a full day

traveling to and from a hearing.

53.     Indeed, older decisions on the "convenience of the parties" should be viewed

through the lens of modern technology.  The last several years have seen rapid development in

the digital transfer of documents; email; convenient, inexpensive and reliable in-court conference

calling; efficient teleconferencing; digital video depositions; and digital transfer of video

depositions and massive instant document transfers.  Particularly in a court such as the Southern

District of New York, previously articulated concerns are rapidly being minimized.  Smaller

creditors may file pleadings electronically and are far more likely to attend and participate in a

conference call or pay for "court call" access) than to take a full day to attend a hearing.

54.     Courts recognize that the proximity of creditors is of less importance in cases of

national scope because no one location is convenient for all parties. *See In re Ross*, 312 B.R. 879,

n. 6 (Bankr. W.D. Tenn. 2004), *aff'd, In re MacDonald*, 356 B.R. 416 (W.D. Tenn. 2006) ("the

reality in today's bankruptcy world is that most creditors are national ones, relying upon

electronic filings of pleadings in more bankruptcy courts. Outside of the need in some instances

for creditors to have an attorney appear in the bankruptcy court, it may be of little concern to

creditors where the individual debtor's case is filed ... ."). *See also Enron Corp.*, 274 B.R. at

347 (noting that the dockets of all cases pending before the court were available on Pacer, and

that the burden of travel could be reduced by permitting telephonic and video conferencing).

While this is not a "national case" in terms of operations, it involves substantial debt that is

distributed throughout the country.  This is a more convenient venue than any other.

> (b)     Proximity to the Court of the Debtor and Witnesses Administration
> of the Estate.

55.     With respect to these factors, the "concern is with the corporation's employees

who must appear in court..." *Commonwealth*, 596 F.2d at 1248.  The Debtor's remaining 37

employees are located in California.  While the Debtor appreciates that the Movants are

solicitous of their interests, there is little reason on the facts of this non-operating case that any

significant numbers of employees will be required to travel to New York with any significant

frequency.

> [Most of the Debtors' officers] will not be required to attend
> hearings before this Court. Rather, the certain participants in the
> proceedings before this Court will be the professionals retained in
> these cases. Subject to court approval, appearances required by the
> officers (or other management) can be addressed by telephonic and
> video conferencing capabilities. The limited appearances that may
> be required of the principals will nevertheless allow them to
> continue with the management of the businesses.

*Enron Corp.*, 274 B.R at 347. (footnotes omitted). Such analysis is equally applicable here,

where the Court permits attendance by telephone by parties in interest and has indicated its

willingness to accommodate logistical issues faced by California parties in interest.

56.     Moreover, it will be the professionals that attend the majority of the hearings, and

most of the players in the bankruptcy case have New York counsel.  Again, Judge Gonzalez'

observations are apt:

> [The debtor] is dependent on a group of professionals and business people that have
> determined that this is the proper venue for the case. Were the venue to change, it would
> not result in a change in the key individuals that are making the decisions in [the
> debtor's] case. Rather, a change in venue … would simply make it that much less
> convenient for [the debtor's] decision-makers to efficiently and economically administer
> [the debtor's] estate.

*In re Enron Corp.*, 284 B.R. 376, 394 (Bankr. S.D.N.Y. 2002), *abrogated on other grounds, In*

*re Enron Corp.*, 317 B.R. 629 (Bankr. S.D.N.Y. 2004).  This factor should receive little weight.

(c)     Location of Assets

57.     *Commonwealth* and other cases recognize that the location of assets in a chapter

11 case is not particularly important for determining proper venue. *See Enron Corp.*, 274 B.R. at

347-48 ("The location of the assets is not as important where the ultimate goal is rehabilitation

rather than liquidation.").  While the Movants characterize this as a real property case, best

24

handled in the area where the real property is located, the characterization is inaccurate. The

Subsidiaries own the real property, and they are not in bankruptcy.

## **CONCLUSION**

Fairly presented, the facts do not support the transfer of venue to the Eastern District of

California. The Motion focuses myopically on the interests of local trade creditors that hold 12%

of the total debt, that may have surety bonds and liens on assets of nondebtor Subsidiaries, that

would not typically be active participants in the case and that, given geographical reality, are

most likely to participate telephonically in either forum. It disregards the interests of most of the

largest holders of debt in this case, investors, and most of their professionals – in short, most of

the parties and persons likely to be most active in the case. The economic and efficient

administration of this case strongly favors retention of venue in New York. Transfer is not in the

interest of justice or for the convenience of the parties, and the Motion should be denied.

Dated:  New York, New York          PACHULSKI STANG ZIEHL & JONES LLP
        December 6, 2007

                                    */s/ Maria A. Bove*
                                    Debra I. Grassgreen (CA Bar No. 169978)
                                    Maria A. Bove (MB-8687)
                                    780 Third Avenue, 36th Floor
                                    New York, NY 10017-2024
                                    212-561-7700 Telephone
                                    212-561-7777 Fax
                                    dgrassgreen@pszjlaw.com
                                    mbove@pszjlaw.com

                                    Counsel for the Debtor and Debtor in Possession

# EXHIBIT 1

**Dunmore Homes**
**Creditor Summary**
($millions)

| | Bank Debt | Less 60% Secured Portion [A] | Unsecured "Deficiency" Portion [A] | Non-Bank Unsecured Debt [B] | Total Unsecured | Percent of Total |
|---|---|---|---|---|---|---|
| **Summary** | | | | | | |
| Non-California | 161.2 | (96.7) | 64.5 | 29.8 | 94.2 | 77% |
| California | 34.7 | (20.8) | 13.9 | 14.1 | 28.0 | 23% |
| Total | 195.9 | (117.5) | 78.4 | 43.8 | 122.2 | 100% |
| | | | | | | |
| **By State** | | | | | | |
| Texas | 105.9 | (63.5) | 42.4 | 0.1 | 42.5 | 35% |
| New York | - | | | 20.0 | 20.0 | 16% |
| Ohio | 35.3 | (21.2) | 14.1 | 0.0 | 14.1 | 12% |
| N. California | 9.7 | (5.8) | 3.9 | 11.2 | 15.0 | 12% |
| S. California | 25.0 | (15.0) | 10.0 | 2.9 | 12.9 | 11% |
| Minnesota | - | | | 9.1 | 9.1 | 7% |
| North Carolina | 20.0 | (12.0) | 8.0 | - | 8.0 | 7% |
| Other [C] | - | | | 0.5 | 0.5 | 0% |
| Total | 195.9 | (117.5) | 78.4 | 43.8 | 122.2 | 100% |

Notes:
[A] Deficiency portion of bank debt has not been determined and is included for illustrative purposes.
[B] Assumes bonded subcontractors file surety claims.  Includes trust preferred securities.
[C] Includes Colorado, Hawaii, Illinois, Arizona, New Jersey, Nevada, Washington, Georgia, Louisiana and Maryland

Estimated Dollar Value of Unsecured Claims by State[A]
($millions)



ₒ   = States with claims that collectively total $0.5 million.

[A]  Estimated unsecured claims amounts assume a conservative 60% secured recovery on bank debt.

# EXHIBIT K

Hearing Date:    December 14, 2007
Hearing Time:    11:00 A.M. (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re                                                    :

DUNMORE HOMES, INC.,                                     :

                                  Debtor.                :

---------------------------------------------------------x

Chapter 11

Case No. 07-13533 (MG)

**OBJECTION OF BANK OF NEW YORK TRUST COMPANY, N.A.,**
**AS TRUSTEE, TO MOTION TO TRANSFER VENUE TO THE**
**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

Bank of New York Trust Company, N.A., as Indenture Trustee and Property Trustee (the "Trustee") for the Junior Subordinated Notes[1] issued by the Debtor's predecessor, Dunmore Homes, LLC, by its undersigned counsel, submits this objection to the Motion of Cal Sierra Construction, Inc., Pacific Paving Co., Inc., and Valley Utility Services, Inc., to Transfer Venue to the Eastern District of California, Sacramento Division, dated November 26, 2007 (the "Motion"), and in support therof respectfully represents as follows:

## ARGUMENTS

1.      The Debtor is a New York corporation.  A New York corporation is entitled under 28 U.S.C. § 1408 to select New York as the venue for its chapter 11 case.

2.      Based on information received to date, the Trustee is the single largest direct unsecured creditor of the Debtor.

---

[1]  Bank of New York Trust Company, N.A. is successor to JPMorgan Chase Bank, N.A., as Trustee, pursuant to the Indenture dated as of June 28, 2005, between itself and Dunmore Homes, Inc. as successor to Dunmore Homes, LLC, as Issuer of Junior Subordinated Notes, due 2035.  Bank of New York Trust Company, N.A. also acts as successor to JPMorgan Chase Bank, N.A., as Property Trustee, and as successor to Chase Bank USA, N.A., as Delaware Trustee, pursuant to the Amended and Restated Trust Agreement dated as of June 28, 2005 between itself, Dunmore Homes, Inc. as successor to Dunmore Homes, LLC., as Depositor of Dunmore Homes Statutory Trust I (the "Trust"), and the Administrative Trustees named therein.

3.      The Trustee is based in New York, and the beneficial holder of the Junior Subordinated Notes, Taberna Preferred Funding II Ltd., prefers that the Debtor's case remains in this Court.

4.      The transaction documents governing the issuance of the Junior Subordinated Notes are governed by New York law.

5.      Based on information received to date, the Trustee is the only creditor with claims solely against the Debtor.  In other words, based on information received to date, other creditors of the Debtor have or claim recourse on their claims against subsidiaries of the Debtor, too, and, in certain instances, enjoy liens or other collateral benefits.[2]  Thus, the true extent of the other creditors' claims against the Debtor is not known and may not be known until claims are recovered against other entities or collateral.

6.      Furthermore, it is not clear whatsoever that all other claims, or the largest claims, against the Debtor are held by claimants based in California.

7.      Based on the foregoing, venue is proper in this Court.

---

[2] The Trustee does not waive any potential claims that it may have against any other entity or person.

## <u>CONCLUSION</u>

WHEREFORE, for all the reasons stated above, the Trustee requests that the Court deny the Motion.

Dated:    December 6, 2007

SEWARD & KISSEL LLP

By:    /s/ John R. Ashmead
John R. Ashmead, Esq. (JA-4756)
One Battery Park Plaza
New York, New York 10004
(212) 574-1222

*Counsel for Bank of New York Trust Company, N.A., as Trustee*