UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TABERNA CAPITAL MANAGEMENT, LLC, | : District Court Case No.: 08 CV 1817 [JSR] |
| | : |
| Plaintiff, | |
| | : |
| - against - | : |
| | : |
| SIDNEY B. DUNMORE, MICHAEL A. KANE, and DHI DEVELOPMENT f/k/a DUNMORE HOMES, LLC, | : |
| | : |
| Defendants. | : |
| | : |
| | : |
| | : |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SIDNEY B. DUNMORE'S MOTION TO: (1) DISMISS THE COMPLAINT DUE TO THE AUTOMATIC STAY OR DUE TO PLAINTIFF'S LACK OF STANDING; (2) DISMISS THE COMPLAINT PURSUANT TO F.R.C.P. 12(b)(6); OR IN THE ALTERNATIVE, (3) FOR A MORE DEFINITE STATEMENT OF FACTS PURSUANT TO F.R.C.P. 12(e)**

Pursuant to Federal Rule of Evidence 201, defendant Sidney B. Dunmore ("Dunmore"), by and through his undersigned attorneys, files this Request for Judicial Notice of the following pleadings of record and other documents set forth below on the grounds that they constitute records capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, in support of Dunmore's Motion To (1) Dismiss the Complaint Due to the Automatic Stay or Due to Plaintiff's Lack of Standing; (2) Dismiss the Complaint Pursuant to FRCP 12(b)(6); Or In The Alternative, (3) For a More Definite Statement of Facts Pursuant to FRCP 12(e):

1.      The Transcript of the Hearing Before the Honorable Martin Glenn United States Bankruptcy Court Judge dated November 16, 2007, a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated herein by this reference and made a part hereof.

Dated: May 1, 2008                    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.


                                       By: _____/s/ Beth Ann R. Young_____

                                            Beth Ann R. Young (CA State Bar No. 143945) (Pro Hac Vice)
                                            Michelle Sharoni Grimberg (CA State Bar No. 217327) (Pro Hac Vice)

                                       10250 Constellation Boulevard, Suite 1700
                                       Los Angeles, California  90067
                                       Telephone:      (310) 229-1234
                                       Facsimile:       (310) 229-1244

                                       Attorneys for Defendant Sidney B. Dunmore

# EXHIBIT A

```
                   UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK


IN RE:                         . Case No. 07-13533
                               .
                               .
  DUNMORE HOMES, INC.,         .
                               . One Bowling Green
                               . New York, NY 10004
                   Debtor.     .
                               . November 16, 2007
. . . . . . . . . . . . . . . . 10:00 a.m.

                      TRANSCRIPT OF HEARING
                 BEFORE HONORABLE MARTIN GLENN
               UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Pachulski, Stang, Ziehl & Jones
                             By:  DEBRA GRASSGREEN, ESQ.
                             150 California Street
                             15th Floor
                             San Francisco, CA 94111

                             Pachulski, Stang, Ziehl & Jones
                             By:  MARIA A. BOVE, ESQ.
                             780 Third Avenue
                             36th Floor
                             New York, NY 10017

                             Palumbo Bergstron, LLP
                             By:  KEVIN MEADE, ESQ.
                             17901 Von Karman Avenue
                             Suite 500
                             Irvine, CA 92614
                             (Telephonic Appearance)

For RBC Contura Bank:        Bryan Cave, LLP
                             By:  MICHELLE McMAHON, ESQ.
                             1290 Avenue of the Americas
                             New York, NY 10104

Audio Operator:              Kevin Su

 Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
```

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

```
APPEARANCES:  (Cont'd)

For the U.S. Trustee:        Office of the U.S. Trustee
                            By:  RICHARD C. MORRISSEY, ESQ.
                            33 Whitehall Street
                            21st Floor
                            New York, NY 10004

For Weyerhaeuser Realty      Lowenstein Sandler, PC
Investors, Inc., et al:      By:  KENNETH A. ROSEN, ESQ.
                                  BRUCE BUECHLER, ESQ.
                                  DAVID M. BANKER, ESQ.
                            1251 Avenue of the Americas
                            New York, NY 10020

For IndyMac Bank:            Orrick, Herrington &
                              Sutcliffe, LLP
                            By:  ALYSSA D. ENGLUND, ESQ.
                            666 Fifth Avenue
                            New York, NY 10103

For Guaranty Bank:           Pillsbury, Winthrop, Shaw &
                              Pittman, LLP
                            By:  RICK B. ANTONOFF, ESQ.
                            1540 Broadway
                            New York, NY 10036

                            Seward & Kissel, LLP
                            By:  JOHN R. ASHMEAD, ESQ.
                            One Battery Park Plaza
                            New York, NY 10004

For The Aleco Corp.:         Klein, DeNatale, Goldner,
                              Cooper, Rosenlieb & Kimball,
                              LLP
                            By:  THOMAS SCOTT BELDEN, ESQ.
                            4550 California Avenue
                            2nd Floor
                            Bakersfield, CA 93309
                            (Telephonic Appearance)

For Newmeyer & Dillion,      Newmeyer & Dillion, LLP
LLP:                         By:  ALAN H. PACKER, ESQ.
                            1333 N. California Boulevard
                            Suite 440
                            Walnut Creek, CA 94596
                            (Telephonic Appearance)
```

**J&J COURT TRANSCRIBERS, INC.**

3

APPEARANCES:   (Cont'd)

For Kay Bank National              Kaye Scholer
                                   By:  MARC COHEN, ESQ.
                                   1999 Avenue of the Stars
                                   Suite 1700
                                   Los Angeles, CA 90067
                                   (Telephonic Appearance)


For Wachovia Bank:                 Rutan & Tucker, LLP
                                   By:  MARTIN TAYLOR, ESQ.
                                   611 Anton Boulevard
                                   Suite 1400
                                   Costa Mesa, CA 92626
                                   (Telephonic Appearance)


For SGN Construction,              Murphy, Austin, Adams &
Inc. & Vaca Valley                   Schoenfeld
Roofing, Inc.:                     By:  LISA D. NICOLLS, ESQ.
                                   304 S Street
                                   Sacramento, CA 95814
                                   (Telephonic Appearance)


For Silar Advisors, LP:            Bryan Cave, LLP
                                   By:  KATHERINE WINDLER, ESQ.
                                   120 Broadway
                                   Suite 300
                                   Santa Monica, CA 90401
                                   (Telephonic Appearance)


For Teichert Construction          Downey Brand
and Cal Sierra                     By:  R. DALE GINTER, ESQ.
Construction:                      555 Capitol Mall
                                   10th Floor
                                   Sacramento, CA 95814
                                   (Telephonic Appearance)


For John W. Busby:                 John W. Busby, II, Esq.
                                   (Telephonic Appearance)


For Hemington Landscape            Hefner, Stark & Marois, LLP
Services:                          By:  HOWARD S. NEVINS, ESQ.
                                   2150 River Plaza Drive
                                   Suite 450
                                   Sacramento, CA 95833
                                   (Telephonic Appearance)


**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES:   (Cont'd)

For SGN Construction,          Parkinson Phinney
Inc.:                          By:  THOMAS PHINNEY, ESQ.
                               400 Capitol Mall
                               11th Floor
                               Sacramento, CA 95814
                               (Telephonic Appearance)


For Mackay & Somps             Lombardi, Loper & Conant, LLP
Civil Engineers:               By:  MATTHEW S. CONANT, ESQ.
                               Lake Merrit Plaza
                               1999 Harrison Street
                               26th Floor
                               Oakland, CA 94612
                               (Telephonic Appearance)


For Affinity Bank:             Frandzel, Robins, Bloom &
                                 Csato, L.C.
                               By:  CRAIG A. WELIN, ESQ.
                               6500 Wilshire Boulevard
                               Seventeenth Floor
                               Los Angeles, CA 90048
                               (Telephonic Appearance)


For Sidney Dunmore:            Levene, Neale, Bender, Rankin,
                                 & Brill, LLP
                               By:  RON BENDER, ESQ.
                                    BETH ANN R. YOUNG, ESQ.
                               10250 Constellation Boulevard
                               Suite 1700
                               Los Angeles, CA 90067
                               (Telephonic Appearance)


For The Silva Gate             Law Office of Michael Willcoxon
Contraction:                   By:  MICHAEL WILLCOXON, ESQ.
                               11555 Dublin Boulevard
                               Suite 201
                               Dublin, CA 94568
                               (Telephonic Appearance)


**J&J COURT TRANSCRIBERS, INC.**

5

1                THE COURT:  Please be seated.

2                All right.  We're here this morning in Case Number

3    07-13533, Dunmore Homes, Inc.

4                Counsel have already made their appearances.  The

5    first two motions were the pro hoc vice motions for Debra

6    Grassgreen and Richard Pachulski.  Both of those motions are

7    granted.

8                MS. GRASSGREEN:  Thank you, Your Honor.

9                THE COURT:  Counsel, do you want to proceed on behalf

10   of the debtors?

11               MS. GRASSGREEN:  Thank you, Your Honor.  Debra

12   Grassgreen of Pachulski, Stang, Ziehl & Jones on behalf of the

13   debtor.

14               Excuse me, Your Honor.  There's quite a --

15               THE COURT:  Sure.

16               MS. GRASSGREEN:  On the podium here.  I'm going to

17   rearrange.

18               Your Honor, maybe just a little bit of housekeeping

19   about how I'd suggest that we proceed today.  This is our first

20   hearing in the case and actually the first time that we've

21   appeared before you, Ms. Bove and I, so it's a pleasure to

22   appear before you.

23               I thought we would start with just a quick

24   introduction and background of what brought Dunmore Homes here

25   and also to spend a few minutes explaining the sale transaction

1  that happened in September of this year because that's been the

2  subject of a lot of questions by various parties and I think a

3  number of parties that are here today will have questions about

4  that.  And then I thought we could run through the agenda.  I'm

5  going to suggest that we put the DIP financing last on the

6  agenda because we had made a proposal to resolve the one

7  objection that has been filed and they're waiting to contact

8  their --

9           THE COURT:  All right, that's fine.

10          MS. GRASSGREEN:  So, Your Honor, the intention is

11 that I'll present the debtor-in-possession financing motion and

12 the retention application and Ms. Bove will handle the rest of

13 the motions --

14          THE COURT:  Okay.

15          MS. GRASSGREEN:  -- if that's okay.  I'll just give a

16 little bit of background.

17          Dunmore Homes is a home-builder, land developer whose

18 headquarters are in Northern California in the Sacramento area.

19 It's the parent of 15 operating subsidiaries that collectively

20 operate 26 communities in various stages of development.

21          We had Exhibit A to the Strauss affidavit.  I don't

22 know if you have that handy, Your Honor --

23          THE COURT:  I do.

24          MS. GRASSGREEN:  -- but I do have copies.  It's

25 actually --

1          THE COURT:  No, I have it.

2          MS. GRASSGREEN:  -- quite a good cheat sheet for

3  reference to how our structure is, but if you have it handy.

4  As set forth on Exhibit A, each of the rectangular boxes is a

5  separate legal entity.

6          THE COURT:  Actually maybe I'm not looking at the

7  same thing you're looking at.

8          MS. GRASSGREEN:  May I approach, Your Honor?

9          THE COURT:  Sure.  Why don't you hand it to one of my

10  law clerks and they'll hand it up.

11          Do you have another copy for yourself?

12          MS. GRASSGREEN:  We do.  And for anyone who's in the

13  courtroom who doesn't.

14          THE COURT:  Actually I do have it now.  I'm sorry.  I

15  flipped one page too far.

16          MS. GRASSGREEN:  Okay.  This makes it a little bit

17  easier to understand what's going on here.

18          So the debtor is the corporate parent of each of the

19  entities.  The entities listed on the left-hand side, each

20  rectangular box is an entity and then inside the box you'll see

21  the name, not the community, a separate housing community.  The

22  initials on the side show whether or not there's homes being

23  built.  They've been finished and selling.  We call it -- we've

24  got vertical construction happening at those properties and

25  some of them are just land and development of our land and on

8

1 some of them we have what we call horizontal construction,

2 things like grading and infrastructure and things like that are

3 going on.  They're all in various stages of development.

4       The entities on the right-hand side are separated out

5 and at the top you'll see a note that these are the

6 Weyerhaeuser projects.  As to these four entities and the

7 projects listed in these entities, the debtor owns an 85

8 percent membership interest, and I know Mr. Rosen will have

9 some comments about that.  But the interest was 85 percent and

10 Weyerhaeuser has a 15 percent equity interest.  So that is why

11 that is there.

12       And then the ovals in the middle and the arrows show

13 you which lenders have lent to each entity and in some cases

14 within an entity a lender has lent to one project or community

15 and lent to a different one.  So but this is all at the

16 subsidiary level and generally speaking Dunmore Homes, the

17 parent, is either a guarantor or a co-borrower.  The obligation

18 is to each of the lenders.  So it's just a quick little summary

19 of how that works.

20       So the primary asset of this estate, because the

21 subsidiaries are not currently in bankruptcy proceedings, is

22 the debtor's interest in the subsidiaries.  There are a couple

23 other assets of this estate, and I'll go through them because

24 they will bear on the cash collateral and the DIP financing

25 when we get to it and just an idea of where we are.

9

1    There's 160 acres of what we call mitigation
2    property.  This is land that is required to be held and not
3    developed to mitigate environ impacts and other developments.
4    And we are working on a sale of that property.  It's in the
5    Sacramento area.

6    There's also an option to purchase 20 acres of land
7    adjacent to our Wild (indiscernible) project.  So that's in the
8    Hyland, LLC is where that option is.  We called that in our
9    papers the Fadano option.  The option is exercisable, I
10   believe, in 2013 but there's a life of state on that property.
11   It could be exercisable earlier if the woman passes.  And I
12   believe she's close to a hundred years old so it's possible
13   that option could be exercisable sooner depending on the state
14   of her health.

15   We have a little bit of unrestricted cash.  We had
16   $120,000 when we filed and we've got $350,000 that are in CD's
17   that are held for the benefit of the City of Fresno in
18   connection with a development bond.  And we're not
19   acknowledging that those are restricted in any way.  We're
20   looking at them.  At the moment we're not authority asking to
21   use them in any way.  They're going to just stay where they
22   are.

23   And in connection with our cash management system,
24   we're communicating with the U.S. Trustee whether they require
25   any kind of motion vis-a-vis those.  That's special

1    information.

2            There's also, Your Honor, an interest in a deferred

3    compensation fund.  There's a Rabbi trust that has about a

4    million seven that provides that upon an insolvency the assets

5    are held for the benefit of the general creditors and that --

6    subject to general creditors -- and we are working out a

7    stipulation with the Trustee of that trust for turnover of

8    those funds to the estate and we expect to file that hopefully

9    in the next week or so.

10           And then there is a note from Mr. Dunmore that was in

11   the approximate amount of $11 million as of the petition date.

12   And a receivable from Dunmore Land in the amount of about

13   $350,000.

14           So if you add all of that up, we've got other assets

15   other than the interest in the communities that we think the

16   value is between five and a half and $6 million.

17           THE COURT:  What was the origin of the $11.1 million

18   receivable from Mr. Dunmore?

19           MS. GRASSGREEN:  Mr. Dunmore had a revolving note

20   agreement with the company that went back many years.  At one

21   point I think the original balance was $25 million and it was

22   paid down over time to 11 million.  But it was in place for a

23   number of years.

24           THE COURT:  All right.

25           MS. GRASSGREEN:  Collectively the lenders in the

11

center boxes here are owed about $200 million.  And we've set forth in detail in our papers the specific amount just so you can get an idea of where the principal debt is.

I failed to mention, on the mitigation property there is a first lien on that in the amount of a million and a half dollars but we believe the value is -- there's value in excess of that lien of an additional 2.8 based on the offer that we're currently negotiating.

As I mentioned, all of the secured lenders are secured by the property at the subsidiary level.  And again, those entities are not in bankruptcy and they generally have claims against Dunmore Homes which are unsecured claims based on their guarantee because Dunmore Homes was a co-borrower under certain of the agreements.

In addition, a number of these contractors and subcontractors who perform work at the subsidiary level have either direct claims or guarantee claims that they are asserting against Dunmore Homes.  Many of the subcontractor agreements were under master agreements with Dunmore Homes and they performed services for various subsidiaries.  In other cases Dunmore Homes acted as an agent on behalf of the subsidiaries.

So we have listed on our list of 20 largest creditors a number of subcontractors.  Those primarily perform services at the subsidiary level.  And many of them do have mechanics

1 liens and claims against surety bonds.

2       The cause of the bankruptcy, Your Honor, like many

3 other home-builders around the country, particularly

4 home-builders such as Dunmore Homes whose customers were

5 first-time buyers or move-ups was there was a slow-down

6 starting at the end of 2006 but the credit crunch and

7 sub-prime ministry this summer caused a tremendous decrease in

8 sales because first-time home-buyers and first-time move-ups

9 often look to the sub-prime loans for their financing.  And, in

10 fact, many customers that we think would have been buying homes

11 today were able to buy homes a year or two ago and so the

12 customers from yesterday have been taken from today and the

13 sales have completely dropped off.

14       So in August Dunmore Homes stopped building homes.

15 They shut down their home-building operations.  That was before

16 any restructuring advisors came in.  Alvarez & Marsal in our

17 firm came in in the middle of August after the operations had

18 been shut down and the company was in a severe liquidity

19 crisis.  They had enough cash to possibly operate for another

20 60 days and immediately Alvarez & Marsal in our firm put

21 together an analysis on a project-by-project basis and sat down

22 one-on-one over the course of four days with each of our

23 lenders.  And then we followed that up with a global meeting

24 and what came out of those meetings was that an internal

25 restructuring where the lenders continued to contribute funds

1  and perhaps had to modify -- contribute additional funds over

2  what was committed was not something that was terribly

3  attractive to the lenders given the current environment in the

4  home-building industry.  And that they were interested in

5  understanding if there was a third-party investor that might

6  come in after some sort of a transaction.

7          And so at that time we engaged the portion of Alvarez

8  & Marsal that does the transactional work, the M&A side,

9  Alvarez & Marsal Corporate Finance, and they went out and

10  they've been running a process to try find a third-party

11  investor.  We've described that quite a bit in our papers and

12  I'll be happy to answer any questions about it.

13          This is going to be a really quick case, Your Honor.

14  Either that transaction is going to come to fruition and we're

15  going to know that we've really got something in the next 30

16  days, or we're going to just do an orderly wind-down.  There

17  really are no other options than that given the current

18  situation in the home-building market and the decreased sales.

19  So we do not expect to be here this time next year, Your Honor.

20  We think that this is a very quick case.

21          The reason for the filing.  We've been trying very

22  hard to do this as an out-of-court restructuring.  We did not

23  believe necessarily that the bankruptcy was necessary other

24  than for defensive reasons.  As it turned out a writ of

25  attachment was issued.  It was pursuant to a tentative ruling

14

1    going to be issued against Dunmore Homes brought by Calsiera

2    who's one of our largest contractor creditors and that

3    restricted our ability to obtain liquidity and Mr. Dunmore was

4    willing to lend money in a bankruptcy proceeding under a DIP

5    authority.  So that was what necessitated the filing.  We're

6    trying very hard to keep the subsidiaries out, but we really

7    don't know at this time whether or not we'll have to file for

8    the subsidiaries.

9            So I don't know if there's any questions about the

10   background.  I did want to spend just a little bit of time on

11   the sale transaction.

12           THE COURT:  Yes, please.

13           MS. GRASSGREEN:  Your Honor, on September 10th, 2007,

14   Dunmore California that was wholly owned by Sid Dunmore sold

15   all of its assets.  So the California holding company sold its

16   interest in subsidiaries and the other assets that I described

17   to a new company that was formed that's owned by a gentleman

18   named Michael Cane who's a Sacramento businessman for an

19   assumption of all liabilities and $500.

20           When Dunmore sold all of its assets, Mr. Dunmore paid

21   from his personal funds, I'm advised, approximately $280,000 to

22   Michael Cane.  The sale created a taxable event and the taxable

23   event allowed Mr. Dunmore to realize the losses, carry the

24   losses back to the year 2005 when he paid a lot of taxes and

25   things were good in the home-building industry.  And we expect

15

1 it to generate a tax refund that could be as much as $15

2 million.

3            In connection with that, we secured the previously

4 unsecured note from Mr. Dunmore to the, you know, to Dunmore

5 California, now to Dunmore New York, by the tax refund.  So the

6 sale created an asset and then posted that asset as security to

7 increase the assets from the estate.  A number of creditors

8 have argued that this could be a fraudulent conveyance.  We

9 don't believe creditors are harmed in any way.  In fact, we

10 think this benefits everybody because if this transaction

11 didn't happen, if there is no taxable event that would allow

12 Mr. Dunmore to realize a loss, there would be no tax refund.

13 And that tax refund is going to be used either to pay, you

14 know, to go to Dunmore Homes and be distributed, or to pay

15 joint creditors to which he's guaranteed to the extent it

16 exceeds the amount of the note or if he has claims of offset to

17 reimburse him for that.

18            So that really is the history of the sale, Your

19 Honor.  There was a legitimate purpose, business purpose for

20 the sale, because it needed to be done in the year 2007 in

21 order to create a taxable event.  All the advisors who looked

22 at it informed us that there is absolutely nothing wrong with

23 creating a taxable event.  It's the same thing as when I decide

24 to sell my stock at the end of the year to take a loss, offsets

25 and gains, by having another transaction.  And we've been very

1  transparent about the transaction with any creditors who've

2  asked.  We shared it completely with all the lenders and

3  provided them all the documents.  Several of the contractor

4  creditors have asked for copies of the asset purchase agreement

5  and related documents and we've provided it to them and we'll

6  be happy to spend time with whoever has questions about it.

7          We recognize that on its face it appears unusual but

8  we believe there's a legitimate explanation.

9          When we did the transaction we -- as I mentioned, we

10 entered into a note modification agreement that added the tax

11 refund as security for the note.  We also set up an ADR

12 procedure for the assertion of setoff claims and we modified

13 the due date of the note.  The note was due December '08 and it

14 was modified to be due the earlier receipt of the tax refund or

15 December '09.

16         You'll hear later under the DIP that we've modified

17 that again so that it would be earlier, 15 days after the tax

18 refund or December '09.  And we've collapsed some of the time

19 periods within which Mr. Dunmore can assert an offset, and I'll

20 review that later.

21         That really is the end of my introductory remarks,

22 Your Honor, unless you have any questions.

23         THE COURT:  I don't for now.  We'll undoubtedly have

24 questions when we get to some of the specific motions.

25         MS. GRASSGREEN:  Thank you, Your Honor.

17

1          THE COURT:  Thank you very much, Ms. Grassgreen.

2          MS. GRASSGREEN:  I will then defer to my colleague,

3   Ms. Bove, to present the rest of the motions and we'll check in

4   as to where we are.

5          THE COURT:  Okay.

6          MS. BOVE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MS. BOVE:  Maria Bove of Pachulski, Stang, Ziehl &

9   Jones for the debtor.

10          I don't know if Your Honor was able to get a copy of

11   the amended agenda that we filed this morning.

12          THE COURT:  Let me see whether I -- does it say

13   amended agenda?

14          MS. BOVE:  It --

15          THE COURT:  It just says agenda.

16          MS. BOVE:  It just says agenda, right.

17          THE COURT:  Yes, I have it.

18          MS. BOVE:  Okay.  So I propose to skip the DIP motion

19   and then move to B, which is our -- the debtor's motion to

20   establish case management procedures.

21          THE COURT:  Yes.

22          MS. BOVE:  And we have made the modifications

23   requested by Your Honor.  And I submitted a black line of the

24   order reflecting those changes to Your Honor's law clerk this

25   morning.

                    **J&J COURT TRANSCRIBERS, INC.**

18

1          THE COURT:  Yes.  And I have that.

2          Let's just talk briefly about -- and in general I

3  like the case management order -- depending on how many

4  hearings you're going to need, you're going to find out that

5  one difficulty we have is I don't have my own courtroom, it's

6  under construction.

7          MS. BOVE:  Right.

8          THE COURT:  And I'm somewhat at the mercy of my

9  colleagues for obtaining a courtroom.

10          MS. BOVE:  I understand.

11          THE COURT:  And so I haven't -- I tried to fill in

12  all of the dates that you have on Page 11 of the order.

13          MS. BOVE:  Okay.

14          THE COURT:  So far unsuccessfully.  The other

15  objective I would like to accomplish.  I know there are a lot

16  of lawyers on the telephone.  I think many from California.

17  And I'm mindful that 10:00 a.m. hearings are 7:00 a.m. in

18  California.  And so depending on the length of the agenda, I

19  would propose, if possible, either to start at 11:00 a.m. on

20  days when there is a full agenda for omnibus motions and where

21  it's anticipated that there will be fewer motions even starting

22  it at two o'clock during the afternoon to accommodate people

23  participating by telephone.

24          I guess also I know, Ms. Bove, you're from New York.

25  Ms. Grassgreen, you're from California.

19

1              MS. BOVE:  Correct.

2              MS. GRASSGREEN:  But I'm often in all of our offices.

3              THE COURT:  All right.  You know, all things being

4   equal, I would prefer not to schedule Friday hearings because

5   for those people who have to fly back to California it's a real

6   pain to have to fly back on a Friday afternoon.  I never have

7   problems getting a courtroom on a Friday.  Thursdays can be a

8   problem, at least until my courtroom is done.

9              So, you know, that's a little bit of a dilemma.  And

10  working through the time sequence and the, you know, I

11  appreciate the longer time sequence for motions than what our

12  rules provide.  It's really inadequate.

13             So, you know, assuming the 17 days rather than the 14

14  days -- assuming some things you have to get served by mail,

15  you know, in an ideal world the schedule that I looked at would

16  have essentially, you know, motions would be filed on a Monday.

17  The objections would be due on a Thursday.  The reply on a

18  Tuesday and the hearings on Thursday.  But right now I'm

19  having, still having challenged in getting courtrooms.

20             So, we can talk about -- well, I'll raise it right

21  now.  And I also, given the number of counsel involved and

22  they're being spread out, I'd like to minimize the number of

23  hearings.  So I agree with setting up omnibus days.  Subject to

24  your thoughts on this, I would propose that the next hearing be

25  on Friday, December 14th.

20

1          MS. BOVE:  That's what we, I think, intended to ask

2  for.

3          THE COURT:  Okay.  And that I have.  I think it's

4  this courtroom on Friday, December 14th.  And soon we'll see

5  what happens with the DIP motion.  But assuming the interim

6  order is approved, a final hearing would -- on the DIP -- and a

7  final hearing on retention assuming the initial applications

8  are granted.  All of that would be on Friday, December 14th.

9          MS. BOVE:  That would be great, Your Honor.

10          THE COURT:  And, you know, I would -- I don't know

11  whether you anticipate a lot of additional motion practice for

12  that day.

13          MS. BOVE:  Not right now, Your Honor.  I think just

14  the motion to approve the stipulation with respect to the

15  deferred compensation fund.  I think that's something we have

16  on our agenda that we'd like, too.

17          THE COURT:  All right.  And I know on the agenda for

18  today is the issue of the retention of Alvarez.  And just

19  before coming on the bench -- I gather we have it on for a

20  status today and the proposal is to have a hearing next week

21  and I think that we have a courtroom for Tuesday afternoon at

22  two o'clock assuming you're able to work out issues with

23  respect to it.  And I do have some issues I'm going to raise

24  with you about it.

25          So in any event -- but what I would like to do is

1   despite the fact that I've scheduled the next hearing for

2   Friday -- or we will schedule Friday, December 14th at 11

3   o'clock, I'd like to run the clock for filing of motions,

4   objections and replies instead with -- actually it's going to

5   add a day because as if it were being done on Thursday.  So in

6   other words, the last day for filing motions assuming the

7   17-day period would apply would be Monday, November 26th.  The

8   deadline for objections would be Thursday, December 6th.  The

9   deadline for reply would be Tuesday, December 11th.  Right now

10  the hearing probably will have to go forward on Friday,

11  December 14th.  So I probably have -- and I'll enter an order

12  that sets these dates because it will differ from your

13  calculation of 17 days or 14 days before the hearing and --

14          MS. BOVE:  Okay.  That will be helpful.

15          THE COURT:  Okay.  And as to the other dates, my

16  courtroom deputy is still working on trying to get them.  It

17  may be that the December, January and February hearings have to

18  occur on Friday.  We'll see, but my courtroom is actually

19  supposed to be ready in early March.  So we'll see.  After that

20  I have more control over it.  But I think that was -- you made

21  the change and for those who haven't seen it I have some

22  specifics on the lengths of briefs and courtesy copies and

23  that's been added in the black line order which I reviewed

24  shortly before taking the bench.

25          So the case management and administrative procedures

22

1  motion is granted.  But as I say, I will enter a separate order
2  setting this hearing -- at least the first hearing -- for
3  December 14th with the dates slightly adjusted on filing
4  motions.

5          MS. BOVE:  Okay.  Thank you, Your Honor.
6          THE COURT:  I take it there were no objections filed.
7  Does anybody in the courtroom have any objections to the case
8  management procedures order?

9          All right.  So that motion is granted.
10         MS. BOVE:  Thank you, Your Honor.
11         Moving on to letter C which is Tab 5 in our binder.
12 The debtor's motion for an extension of time to file schedules
13 and statements.  We had originally asked for 45 days beyond the
14 15-day period.  But after consultation with the U.S. Trustee we
15 agreed to reduce the extension by about 27 days beyond the
16 15-day period.  And that will bring us to December 20th, 2007.
17 And I have modified the order to reflect that and I put it in
18 the black line.

19         THE COURT:  And I've seen that.
20         Mr. Morrissey, is that date acceptable?
21         MR. MORRISSEY:  Your Honor, it is.
22         Just for the record, Richard Morrissey for the U.S.
23 Trustee.
24         As Ms. Bove has stated, we did go a little bit back
25 and forth with this and finally settled on December 20th

1  because we didn't believe that it was either necessary or in my

2  view appropriate to keep the creditors waiting for four times

3  the statutory number of days for the filing of schedules.

4          THE COURT:  All right.  So with the change to

5  December 20th, that motion is granted.

6          MS. BOVE:  Thank you, Your Honor.

7          Moving on to the next motion which is letter D in the

8  agenda and Tab 6 in our binder.  It's the debtor's motion to

9  approve payment of pre-petition wages and related amounts and

10  to continue its benefits programs post-petition.

11          Your Honor, by this motion the debtor requests that

12  it be permitted to pay certain wages that accrued

13  pre-petition but remained unpaid as of the petition date and to

14  continue its benefit program.

15          In compliance with Your Honor's request, on Wednesday

16  we submitted to chambers a list of pre-petition wages the

17  debtor seeks authority to pay.  We also provided a copy of that

18  schedule to the U.S. Trustee.

19          As Your Honor will see on that schedule, no

20  individual will be paid more than the maximum 10,950 amount

21  permitted under Section 507(a)(4) of the Code with respect to

22  priority.  And the maximum aggregate amount the debtor seeks to

23  pay for pre-petition wages and expense reimbursements is

24  $63,421.

25          THE COURT:  Let me ask you.  One question I had was

24

1  whether there were any amounts you proposed to pay for

2  pre-petition workers compensation premiums?

3      MS. BOVE:  Well, Your Honor, that was one

4  clarification that I wanted to make.  When we filed the motion,

5  the debtor's management had not been able to reconcile what

6  happened in the couple days before the petition date and the

7  time when the pre-petition accounts were closed in order to

8  open the post-petition DIP accounts.

9      It turns out yesterday, I believe, upon

10 reconciliation the debtor discovered that workers comp premiums

11 in the amount of $1,044 remained unpaid as of the petition

12 date.  A check had been cut but it had not cleared before the

13 pre-petition accounts were closed.

14     Candidly, Your Honor, I was not going to request

15 authority to pay that amount due to the Supreme Court

16 precedent.

17     THE COURT:  It's Howard Delivery Services.

18     MS. BOVE:  Um-hmm.  So unfortunately we didn't -- we

19 hadn't discovered it and it was intended to be paid but

20 unfortunately with the intervening bankruptcy and the closing

21 of the accounts the amount did not clear.

22     THE COURT:  Mr. Morrissey, do you want to be heard on

23 that $1,000 amount?

24     MR. MORRISSEY:  Your Honor, we did discuss this order

25 generally and the $1,000 specifically in a telephone

1 conversation yesterday and my general concern about this kind

2 of order is allowing the Committee to get a crack at it, but

3 there were a couple of other small issues, too, involving

4 things like gym memberships which --

5           THE COURT:  I noticed the gym memberships.

6           MR. MORRISSEY:  Yes.  But due to the de minimus

7 amount, I did not wish to lodge an objection.

8           THE COURT:  All right.  Thank you, Mr. Morrissey.

9           Given the U.S. Trustee's position, the motion will be

10 granted.

11          MS. BOVE:  Thank you, Your Honor.

12          Moving to our next motion which is letter E on the

13 agenda and Tab 9 of our binder.  It's the motion of the debtor

14 to prohibit utilities from discontinuing services providing

15 deposits as adequate assurance of future payment and setting up

16 a procedure pursuant to which utilities can request additional

17 adequate assurance.  By this motion simply the debtor requests

18 this relief to avoid any disruption in utility services

19 provided to the debtor.

20          THE COURT:  Ms. Bove, the question I had on this

21 motion is that unlike Judge Bernstein in Music Land or Judge

22 Lifland in Dana, they had provided an opt-out procedure.  My

23 concern is that under I guess 366 the utility has a statutory

24 right to cut off utilities after the 30-day period and because

25 you didn't provide for the opt-out, you extend your rights

1  beyond the 30 days.  That was my one concern.

2          MS. BOVE:  Perhaps we can address that by shortening

3  the time frames in the procedures.

4          THE COURT:  Either that or adopt the opt-out

5  provisions that Judges Bernstein and Lifland -- I know Judge

6  Lifland put it in <u>Dana</u> I believe.

7          MS. BOVE:  Correct.  Well, Your Honor, let me suggest

8  this.  I believe it probably would be more appropriate to

9  follow Your Honor's suggestion and add the opt-out procedure.

10 So I will do that and then --

11         THE COURT:  I'm going to conditionally grant the

12 motion --

13         MS. BOVE:  Okay.

14         THE COURT:  -- on the understanding that you'll

15 resubmit the order essentially conforming it to what Judge

16 Lifland did in <u>Dana</u> with the opt-out provision.

17         MS. BOVE:  Okay.

18         THE COURT:  And when we get that -- because there

19 were no objections.

20         Mr. Morrissey, do you have a problem with that?

21         MR. MORRISSEY:  Your Honor, again, on the

22 understanding, as I discussed with counsel on numerous of these

23 pleadings, that would be an interim order.  The Committee may

24 or may not wish to weigh in on this.  And my suggestion, and

25 Ms. Bove thought she would come in, was that this was not

27

1  really necessarily a first-day pleading, but we have no

2  objection on the merits.

3           THE COURT:  Okay.  Assuming that the opt-out

4  procedure is added, it doesn't seem to me to be controversial

5  at all.  I'm not sure what the Committee would -- how the

6  Committee would weigh in on this, Mr. Morrissey.

7           MR. MORRISSEY:  Your Honor, they very well may not.

8  I'm just saying that just to give them the opportunity.

9           THE COURT:  All right.  So let's resubmit it as an

10 interim order.  We'll take it up on December 14th and I don't

11 -- I'd be surprised if we -- unless the utilities come in and

12 say they don't think two weeks is enough, which they can do

13 anyway.  I mean whether it was interim or final, they could do

14 that.

15          So with that understanding, it will be conditionally

16 granted and we'll receive your revised order.  Please share it

17 with Mr. Morrissey --

18          MS. BOVE:  I will, Your Honor.

19          THE COURT:  -- as well.  All right?

20          MS. BOVE:  Thank you.

21          Moving on to our next application which is letter F

22 in the agenda, Tab 7 in the binder.  This is the application of

23 the debtor to retain Kurtzman Carson Consultants, LLC.  The

24 debtor submitted a copy of the application to the Clerk's

25 Office under its procedures.  The Clerk's Office reviewed it

1  and asked the debtor to make two clarifications, which we did.

2  We filed an amended application yesterday and submitted it to

3  chambers.  And I would request that Your Honor enter the order

4  originally submitted which was not changed in connection with

5  the amended application.

6          THE COURT:  All right.

7          Mr. Morrissey.

8          MR. MORRISSEY:  Your Honor, the U.S. Trustee has no

9  objection.  The concern the Clerk has is just to make sure that

10  the business gets shopped around.  And as long as that

11  representation is made, the U.S. Trustee certainly has no

12  objection.

13          MS. BOVE:  And that's the clarification that we -- we

14  had made a general statement about that and we clarified it by

15  saying that we had reviewed the --

16          THE COURT:  And I saw that yesterday.  The motion is

17  granted.

18          MS. BOVE:  Thank you, Your Honor.

19          I will turn over the podium now again to Ms.

20  Grassgreen who will present my firm's retention application.

21          THE COURT:  All right.  Thank you, Ms. Bove.

22          MS. BOVE:  Thank you, Your Honor.

23          Oh, and one more thing, Your Honor.

24          THE COURT:  Yes.

25          MS. BOVE:  If we may just hand up all the orders and

1 the disks at the end of the presentation?

2          THE COURT:  Yes, you can.  That's fine.

3          MS. BOVE:  Okay.  Thank you.

4          THE COURT:  Thank you very much.

5          MS. GRASSGREEN:  Your Honor, with respect to our

6 firm's employment application, the U.S. Trustee asked -- had

7 some questions and clarifications.  A couple other parties had

8 some questions.  So if I could just make a few statements on

9 the record that I think would address that.

10          The first was the U.S. Trustee asked us for some

11 disclosures regarding the percentage of income earned by our

12 firm for worked performed for IndyMac.  It's less than 1

13 percent.  Significantly less than 1 percent.  And also asked if

14 we were continuing to represent Dunmore California.  We were

15 originally engaged, Your Honor, to represent Dunmore California

16 and its subsidiaries and the transaction was already

17 contemplated before we got involved.  So our engagement letter

18 specifically provided that following the transaction, we would

19 represent only the Newco that was formed.  We didn't know what

20 state that would take, you know, what form it would take at

21 that point.

22          We also contemplated at that time because the

23 identify of the owner of Newco and the type of entity that

24 would be formed was unknown.  It was originally anticipated

25 that in the transaction we would do the restructuring work for

30

1 Dunmore California and the subsidiaries.  Following the sale we

2 would continue that restructuring work but that in terms of

3 negotiating the transaction, our engagement letter provided

4 specifically that we would represent the successor.  As it

5 turned out, Mr. Cane had his own counsel, wanted to use his own

6 counsel, so we did not represent the successor in that

7 transaction.  We represented Dunmore California and all our

8 work just followed the assets.

9          And so we've explained that to the Office of the

10 United States Trustee where I'm not sure if we have yet

11 provided them our engagement letter but we've made that

12 disclosure and we are -- our employment for Dunmore California

13 was terminated upon a closing sale to this debtor.

14          We have agreed with the Office of the United States

15 Trustee if any issues arise regarding claims between the parent

16 and the subsidiaries that will engage conflict counsel and that

17 if there's a challenge to the sale that would make it given our

18 transactional work on behalf of the sale that would make it

19 inappropriate for us to represent in that capacity, we would

20 also get conflict counsel.

21          We also agreed with the Office of the United States

22 Trustee that we would apply any post-petition retainer if there

23 is anything left -- which there may not be -- to our first

24 sale.  There won't be an evergreen retainer that carries out.

25 Given the de minimus amount, in this case we're willing to

**J&J COURT TRANSCRIBERS, INC.**

31

1   agree to that.  On behalf of our firm I'm not agreeing to that

2   in all cases because there are obviously bigger issues there.

3   I'm sure a number of the professionals in the courtroom are

4   well aware of the need to be protected there.

5          We've also, of course, agreed to abide by all the

6   expense guidelines.  The Office of the United States Trustee

7   had some questions about that.  And we also confirmed for the

8   U.S. Trustee and other parties and the lenders that we have not

9   ever and do not presently and do not intend to represent either

10  Mr. Dunmore or Dunmore Land Company which is not part of --

11         THE COURT:  I know what that is.  Right.

12         MS. GRASSGREEN:  That's a separate entity.

13         So those were the clarifications on our retention.

14  We are only being engaged on behalf of the parent company in

15  the case but we are performing services for both the parent and

16  the subsidiary.  The parent -- all the administrative overhead,

17  all of the employees, everything is at the parent level so we

18  intend to only charge the parent and to seek approval from Your

19  Honor for all of our fees and expenses incurred in connection

20  with the entire restructuring effort in and out of court.

21         I don't know if there were any other questions.

22                       (Pause)

23         MR. ROSEN:  Good morning, Your Honor.  Kenneth A.

24  Rosen, R-o-s-e-n, from Lowenstein Sandler appearing for

25  Weyerhaeuser.

32

1        Your Honor recalls on Exhibit A that Ms. Grassgreen

2   referred to, the Weyerhaeuser project listed in the

3   right-hand column.  I only stand with regard to at this time

4   the two -- actually it's three -- retention applications,

5   Kurtzman Carson, the Pachulski Stang firm and I guess next

6   would be Alvarez & Marsal.

7        There is an operating agreement between Dunmore and

8   Weyerhaeuser that governs the nature of that relationship.

9        As an aside, we believe that the conveyance of the

10  interest, the JV interest in the four Weyerhaeuser entities,

11  was in violation of the operating agreement and is null and

12  void.  But we will deal with that in the California court

13  system inasmuch as the automatic stay doesn't apply to any

14  potential or likely litigation between my -- at least as of now

15  -- and if the debtor sought some kind of injunctive relief

16  before this Court, of course we'll deal with it in due course.

17       We just want to make sure with regard to these

18  professional retention motions that there is not an intent to

19  charge at least our four debtors with any of the fees earned or

20  that may be earned by these professionals.  And we don't want

21  anything that happens here today to be deemed consent thereto.

22  In fact, inasmuch as our four entities are not Chapter 11

23  debtors and are not before this Court, we don't believe that

24  the Court would have the authority at this time to, you know,

25  to permit the what I'll call surcharge to the non-debtors --

1          THE COURT:  Mr. Rosen, the only thing before me is an

2   application for the debtor to retain counsel and I don't see

3   anything anywhere that would affect the issue of whether the

4   debtor can or cannot allocate amounts to its subsidiaries or

5   affiliates.  So I mean there's nothing in the motion, or in the

6   interim order, or the proposed final order that deals with that

7   issue, is there?

8          MR. ROSEN:  That's what I was hoping I would hear,

9   Your Honor.

10          Thank you very much.

11          THE COURT:  Thank you.

12          Mr. Morrissey, is there anything you want to add?

13          MS. GRASSGREEN:  Your Honor, I just want to respond

14   to one thing.  Mr. Rosen raised this issue with me prior to the

15   hearing and I -- just before you very timely took the bench and

16   we hadn't really completed our conversation.  But we did

17   provide in our retention papers that if there is an affiliate

18   filing that our retention would automatically be approved in

19   those cases and I did agree with him that we would file a

20   separate employment application so that we could raise those

21   issues at the time.  Because as you stated, it was our position

22   that nothing we were doing here today either prohibited or

23   allowed charging anything down to the subsidiaries.

24          I don't frankly believe that's been the historical

25   practice of these debtors.

34

1          THE COURT:  Mr. Morrissey, on billing, what is the

2 practice of your office with respect to charging of secretarial

3 overtime?  Do you have guidelines on that?

4          MR. MORRISSEY:  Your Honor, we will generally

5 consider secretarial overtime to be part of a firm's overhead.

6 I actually discussed --

7          THE COURT:  I saw that in the application among their

8 charges were for secretarial overtime.

9          MR. MORRISSEY:  Yeah.  I mean generally we would

10 oppose that at the time of the fee application -- I'm sorry,

11 Your Honor --

12          THE COURT:  No, no.  I was just going to say you

13 shouldn't presume, Ms. Grassgreen, that my approval of the

14 interim or final order when that comes on for a hearing will

15 approve anything in any fee application you submit.  I'm not

16 taking a position one way or the other on it only to say --

17 because I know you're -- in describing your firm's charges, you

18 had indicated that you charge for secretarial overtime and

19 we'll deal with that when fee applications come before the

20 Court.  So you shouldn't assume from the fact that it was in

21 your application and that the Court is granting the order on an

22 interim basis today that I'm deciding what is or is not a

23 proper charge.  That's all I want to say.

24          MS. GRASSGREEN:  We understand that, Your Honor, and

25 actually my personal practice is to always write off

35

1  secretarial overtime in debtor cases so that would be our

2  intention even though it's listed as one of our firm charges,

3  again, not binding on any of my other partners or in any other

4  cases.

5         THE COURT:  I understand.

6         MS. GRASSGREEN:  I'm certainly willing to write off

7  the secretarial overtime in this case.

8         THE COURT:  Okay.  I'm not saying whether it would be

9  or not approved.  I only want to make clear that --

10        MS. GRASSGREEN:  That's my personal practice in any

11 event.

12        THE COURT:  -- by approving the interim application,

13 don't take comfort --

14        MS. GRASSGREEN:  Yes, Your Honor.

15        THE COURT:  -- that it would be approved.

16        MS. GRASSGREEN:  We understand that.

17        THE COURT:  All right.  On that basis the interim --

18 go ahead, Mr. Morrissey.

19        MR. MORRISSEY:  Your Honor, just so that counsel

20 isn't alarmed, I'm not here to object to the interim retention.

21 Just to make a few points.

22        One of them is actually related to what Your Honor

23 was talking about in terms of secretarial overtime.  There was

24 another item there which was about working meals and we

25 clarified, I hope, with counsel that that doesn't mean that if

36

1  you're sitting at your desk eating lunch that the estate pays

2  for your lunch.  It has to do with work meetings and things

3  like that and it can be limited.  So I kind of fired a shot

4  across about in a similar vein.

5          THE COURT:  All right.  The only thing I'm making

6  clear is today nothing is being decided about fee applications.

7          MR. MORRISSEY:  Yes.  Yes, that's fine, Your Honor.

8          Your Honor, back to the IndyMac issue.

9          THE COURT:  Yes.

10          MR. MORRISSEY:  That is a client of the Pachulski

11  firm.  Ms. Grassgreen just indicated that they account for less

12  than 1 percent of the firm's revenues.  I believe she said it

13  was far less than 1 percent, which is fine, but in the event

14  that the debtor should become adverse to IndyMac in terms of

15  challenging the validity of a lien or a claim, either there

16  would have to be a waiver or there would have to be conflict

17  counsel retained for that purpose as well.

18          As far as the subsidiaries, it's always foreseeable

19  in the case where a parent files that the subsidiaries could

20  follow even if they have to follow from 3,000 miles away.  But

21  I'm certainly satisfied by counsel's representation that there

22  will be a renewal of the firm's retention.

23          As to the sale transaction.  That's something that

24  particularly concerns me and my office in general.  We want to

25  make sure that counsel begins on one side of a transaction and

**J&J COURT TRANSCRIBERS, INC.**

37

1  stays on that side.  And as counsel put it, she's kind of

2  following the --

3            THE COURT:  Followed the assets.

4            MR. MORRISSEY:  -- money.  Following the assets.  But

5  again, you know, it's something we'll continue to discuss.  I

6  understand there's an agreement, a copy of which I'm to be

7  getting, but I'm going to hold any bullets that I have until

8  the final.  But as for this interim application, the U.S.

9  Trustee has no objection.

10            THE COURT:  Thank you, Mr. Morrissey.

11            Anyone else wish to be heard on the interim

12  application?

13            All right.  Therefore the interim application to

14  retain the Pachulski firm is granted.

15            MS. GRASSGREEN:  Thank you, Your Honor.  And for the

16  record, we do have a written waiver from IndyMac.  I'm also

17  happy to provide that to Mr. Morrissey.

18            THE COURT:  Thank you.

19            Are we coming back to the DIP or are we going to talk

20  about the Alvarez -- the status conference on Alvarez.

21            MS. GRASSGREEN:  If we could just briefly talk about

22  Alvarez, Your Honor.

23            THE COURT:  Yes.

24            MS. GRASSGREEN:  We have requested a status

25  conference on the Alvarez & Marsal application.  That's because

38

1  the U.S. Trustee has raised some questions and requires

2  involvement of others in addition to Mr. Morrissey at the

3  Office of the U.S. Trustee and we're not quite sure whether it

4  might also require involvement of the executive office at the

5  Office of the United States Trustee.  And in light of the

6  Thanksgiving holiday, we're trying to set up a meeting for

7  early next week.  I appreciate that Your Honor is potentially

8  available on Tuesday afternoon at two o'clock.  I think if Your

9  Honor wouldn't mind terribly because we need to have confirmed

10 when the meeting is going to be and figure out if there will be

11 enough time then to have the hearing then.  If we could also

12 get a backup date for the very beginning of the week after

13 Thanksgiving.  We would very much appreciate it because there's

14 a possibility that we may be meeting with the Office of the

15 United States Trustee on Tuesday.  It appears that everyone is

16 only available by phone on Monday and we thought an in-person

17 meeting might be more beneficial to discuss various issues.

18 We've also agreed to provide an additional supplemental writing

19 to the Office of the United States Trustee to address some of

20 their concerns which relate primarily to Alvarez & Marsal being

21 involved as both financial advisor and performing investment

22 banking services.

23        What's slightly unusual about this retention from the

24 way we often see folks perform both of those roles is that

25 there are actually two separate legal entities and that's how

1  the application was presented as it was.  But we are making

2  every effort to work that out with the Office of the United

3  States Trustee and we would appreciate any accommodation in

4  terms of a holding date.  Perhaps we could hold it Tuesday at

5  2:00 p.m. and if we can get it done then we would like to, but

6  if not it may end up having to be just after the Thanksgiving

7  holiday.

8           THE COURT:  I have a preliminary injunction hearing

9  scheduled for the Monday after Thanksgiving.  It's been pushed

10 several times and it may get pushed again.  But it also may be

11 -- if it goes forward it may be multiple days.  I'm just

12 unsure.  So we'll communicate with my courtroom deputy and I'm

13 sure we'll find the time to hear you the week after

14 Thanksgiving, early in the week after Thanksgiving.  It may

15 have to be late in the day.

16          MS. GRASSGREEN:  Your Honor, we'll willing to be

17 flexible.  We appreciate your accommodation.  The concern

18 obviously with the timing as you saw it in our papers and as I

19 said in the opening remarks is that Alvarez & Marsal is very

20 deep into this process with the transactions and was hoping to

21 meet and start discussing the potential offers with our lenders

22 as early as the beginning of next week.  I think having them

23 not officially employed is going to inevitably delay that

24 process.  It would be a little unfair of them to have to go

25 through that without knowing that they've been engaged in a

40

1  case.  So we would like to get it resolved just given the very

2  compressed time period and cash that we have available.

3          THE COURT:  Sure.

4          MS. GRASSGREEN:  So we do appreciate your

5  accommodation and we are going to make every effort to come to

6  an agreement with the Office of the United States Trustee that

7  resolves their objection.  There were some other matters that

8  they raised as well that we believe are not going to be an

9  issue.  We think we can accommodate all their other concerns.

10 And we hope to accommodate the overriding concern as well.

11         I know that you had mentioned that you have some

12 questions.

13         THE COURT:  I do.  And I guess I'd like to get them

14 out on the table now because when we --

15         MS. GRASSGREEN:  Yeah, I appreciate that.

16         THE COURT:  -- do come for a hearing on it -- and

17 again, you know, I only had a limited amount of time to review

18 the motion and the agreements.  But let me tell you what's on

19 my mind as of now.

20         I understand the U.S. -- you've indicated the U.S.

21 Trustee has raised a question about the representation -- the

22 retention in two capacities, the two separate but related

23 entities and I really won't address that for now, I'll leave

24 that to Mr. Morrissey and his colleagues.

25         On its face at least I had fewer problems about the

41

financial advisory agreement.  You know, the Committee when
it's in place may have its own issues it wants to raise on, you
know, what the cost of this is.  But assuming for present
purposes that the amounts are not unreasonable in light of the
work they're being asked to do in these circumstances, I didn't
have the concerns that I'm going to raise about the Alvarez &
Marsal Securities, LLC agreement.  And I guess with respect to
Alvarez & Marsal Securities, LLC they signed a pre-petition
engagement letter, retention letter, with the debtor and all of
the subsidiaries.  And I guess with respect -- my concerns are
about the compensation in particular.

          The monthly fees, which I gather there are no
pre-petition amounts due with respect to the monthly fees?

          MS. GRASSGREEN:  That's correct.

          THE COURT:  Okay.  So that's not my focus.  My focus
-- the questions I have really relates to the transaction fees
portion of the agreement.  And I understand that the deal
people have been out there shopping the debtor and under what I
refer to as the tail provision.  Even if they weren't engaged
today, or tomorrow, or whenever, they would have -- they could
have a pre-petition, unsecured, contingent, unliquidated claim
if and when a transaction was accomplished with any of the
entities with whom they've been dealing.

          So question one is does that pre-petition, unsecured,
contingent, unliquidated claim give rise to an adverse interest

42

1 under Section 327?  Unless they wish to waive their

2 pre-petition claim.  That's question one.

3          Question two or point two.  It seems to me that the

4 effect of the Court approval certainly with the order that you

5 presented would be essentially to convert this pre-petition,

6 unsecured, contingent, unliquidated claim into an

7 administrative claim.  And I'm wondering about that.  Certainly

8 in any interim order.

9          Next.  The interim order seeks approval of the

10 retention pursuant to the terms of this October 3 engagement

11 letter which contains the compensation provisions.  Not only

12 under 327 but under 328.  The effect of which, if I understand

13 the law, would be that this would be a determination by the

14 Court before any Committee is appointed and has a chance to

15 speak up about this retention.  That the fees contained in the

16 engagement letter would be approved.  328, which certainly

17 authorizes the percentage fee basis, you know, in 328(a),

18 "Notwithstanding such terms and conditions, the Court may allow

19 compensation different from the compensation provided under

20 such terms and conditions after the conclusion of such

21 employment if such terms and conditions prove to have been

22 improvident in light of developments not capable of being

23 anticipated at the time of the fixing of such terms and

24 conditions."  And Judge Gonzalez in the XR Communications case

25 really addresses this issue.  And it's such a narrow exception

43

that you've got an uphill battle to convince me on any interim

order to approve under 328.  Perhaps I could be persuaded to

approve under 327 which makes fees subject to 330 and

reasonable.

And I understand Alvarez & Marsal is out there

actively and you want to get this case over with and I'm not

trying to limit what they can recover but I also before there's

a Committee in place, I don't want to foreclose the Committee's

ability to review something potentially so significant as the

transaction fees that Alvarez & Marsal might be entitled to

under the engagement letter.

So those are -- there may be other things that when I

study it further come to mind, but those were things that

raised questions in my mind that you ought to address whenever

it is that you come back to deal with the motion.

MS. GRASSGREEN:  Thank you, Your Honor.  That's

actually very helpful and we absolutely will address each of

them when we return either on Tuesday or just after

Thanksgiving.  It looks like I'll be able to do lots of holiday

shopping in New York.

(Laughter)

So we will continue the Alvarez & Marsal application

until -- I guess we should continue it till Tuesday at 2:00 for

now with a potential after further discussions after the

hearing with Mr. Morrissey and his office for a further

44

1 continuance.

2          THE COURT:  All right.  And that hearing, if it's

3 Tuesday at 2:00, will be in Judge Gonzalez' courtroom.  I think

4 it's 523.

5          Mr. Rosen.

6          MR. ROSEN:  I only stand to address a similar issue

7 that I raised before with regard to the retention of Pachulski

8 Stang.  Our understanding on behalf of the Weyerhaeuser

9 entities is that Alvarez is only being retained by the debtor

10 to sell the assets of the debtor.  To the extent that someone

11 seeks to retain the Alvarez firm to sell assets of a non-

12 debtor, my client has not been asked to provide such consent,

13 it has not given such consent.  And the Weyerhaeuser entities

14 are not before this Court.

15          Are the Weyerhaeuser entities signatories to the

16 engagement letter?

17          MS. GRASSGREEN:  The entities?

18          THE COURT:  Yes.

19          MS. GRASSGREEN:  I believe they are actually.  Are

20 the individual entities -- Your Honor, excuse me.

21          THE COURT:  Nothing has to get resolved today.  But,

22 you know, the --

23          MS. GRASSGREEN:  The answer is yes, they are.

24          THE COURT:  Yes.  I mean the Alvarez & Marsal

25 Securities, LLC engagement letter -- October 3 engagement

45

1   letter -- is signed by somebody -- Thomas Ingram -- I guess

2   what is it, general counsel? on behalf of I guess he's the

3   managing member -- secretary managing member of a large number

4   of entities.  I didn't check off to see whether every one of

5   the entities, including the ones in which Weyerhaeuser has a 15

6   percent interest are on there or not.  But we'll deal with it

7   when the time comes, Mr. Rosen.  It doesn't seem to me to be

8   ripe for today.

9              MR. ROSEN:  Yeah.  I don't know --

10             THE COURT:  So let's deal with it when the issue

11  comes up.

12             MR. ROSEN:  Okay.  I just didn't want --

13             THE COURT:  Mr. Rosen, we'll deal with it when the

14  issue comes up.

15             MR. ROSEN:  Thank you.

16             THE COURT:  Thank you.

17             MS. GRASSGREEN:  And, Your Honor, I've indicated to

18  Mr. Rosen we're happy to meet and discuss their issues.

19             THE COURT:  Okay.

20             MS. GRASSGREEN:  We weren't aware of them before

21  today.

22             So that brings us to our debtor-in-possession

23  financing motion and the cash collateral.  And if I could just

24  turn for a second to --

25             THE COURT:  Mr. Morrissey?

1          MS. GRASSGREEN:  I'm sorry.

2          MR. MORRISSEY:  Your Honor, again Richard Morrissey

3   for the U.S. Trustee.

4          I don't know if the Court wanted address any concerns

5   or anything else about the Alvarez & Marsal --

6          THE COURT:  I would certainly like to hear what

7   concerns you have, Mr. Morrissey.  It would probably focus my

8   thinking before we bring this up again.

9          MR. MORRISSEY:  And again, I don't want to sandbag

10  counsel here.  I certainly don't intend to argue a motion at

11  this point.

12         As far as the interim versus final, the way I look at

13  that, Your Honor, everything is open between the interim and

14  the final and --

15         THE COURT:  Not the way they have the order drafted.

16         MR. MORRISSEY:  Yeah.  But that's what I mean.

17  That's the way it should be, in other words.  That everything

18  should be open for the Committee to get a second look at

19  anyone's retention.

20         THE COURT:  So tell me when you think we're going to

21  have a Committee.

22         MR. MORRISSEY:  Your Honor, I can tell you this.  The

23  deadlines for submitting response forms is November the 20th.

24  We did not have an organizational meeting in this case.  One of

25  the issues that we're going to have to deal with, Your Honor,

1  on the Committee is something that counsel alluded to before

2  and that is the fact that a lot of the trade creditors are

3  contractors and subcontractors.  And those entities have a

4  habit of asserting mechanics liens.  As I understand it, those

5  liens are being asserted against the non-debtor subsidiaries,

6  not against the debtors themselves.  The debtors are, as

7  Counsel stated, I believe either co-borrowers or guarantors on

8  some of those subsidiary obligations.  The tricky part is when

9  -- if a subsidiary does, in fact, come into the Chapter 11

10 after the fact, as I phrased it to counsel yesterday, what we

11 are trying to avoid is having some kind of a kaleidoscopic

12 Committee where its membership changes every time you look at

13 it because it turns out that somebody has a secured claim in

14 the end.  So that's going to be a little tricky.  But I'm

15 certainly hoping that we'll have a Committee before

16 Thanksgiving.  It's hard to guarantee that only because of the

17 -- I guess turmoil is a good word -- that always hits before a

18 holiday like that.  But as soon as possible, Your Honor, we're

19 going to try to form a Committee.

20       As far as the A&M retention, as Ms. Grassgreen has

21 said, we have an issue with a dual retention and to put it very

22 briefly, Your Honor, the problem is you have a financial

23 advisor that does one function and an investment banker that

24 performs quite a different function.  There's a decision to be

25 made by the financial advisor.  Actually, I know counsel will

48

1    correct me on this.  The debtor does retain control, or the

2    company, the debtor's officers and directors are the

3    decision-makers.  There's no key for structuring officer in

4    this case and Alvarez & Marsal is not playing that role.

5          But Alvarez & Marsal, the financial advice side, is

6    going to be giving advice to the debtors as to what to do;

7    whether there should be a sale, whether there should be

8    restructuring, whether there should be a refinancing.  And the

9    entity that's going to be actually performing that function of

10   sale, if that comes to pass, is the other side of Alvarez &

11   Marsal.

12         And Your Honor mentioned the transaction fees, and I

13   don't want to go into all the transaction fees right now, but

14   it's a complicated setup and I'm still not totally clear on it,

15   although Counsel certainly enlightened me on certain aspects of

16   it.  But Alvarez & Marsal, the investment banking side, could

17   certainly benefit more or less depending on what Alvarez &

18   Marsal, the financial side, decides is best for the company.

19   And again, I will acknowledge that --

20         THE COURT:  I'm not sure I agree with that.  But go

21   ahead.

22         MR. MORRISSEY:  Okay.  Now, another thing we

23   discussed, Your Honor, is that there could be different deals

24   with respect to different assets also.  In other words, there

25   could be a hybrid set of transactions.  In other words, they

1 could sell some properties and not others, to be very succinct

2 about that.

3          There were issues that we discussed about the

4 expenses, that expenses, in general have to be documented.

5 They don't just automatically get paid by the debtor, and also,

6 about Alvarez & Marsal paying its own legal bills.  Under the

7 engagement letter or letters that I saw, it's not entirely

8 clear, but certainly it provides that certain of the financial

9 advisor/investment bankers' legal bills are to be paid by the

10 estate.  Our view is that the professionals have to pay some of

11 their own expenses, and legal bills should be among them,

12 unless, of course, they can convince us why not.  There was an

13 indemnification provision which contemplates legal bills, but

14 for certain things.  The U.S. Trustee takes the position that

15 A&M should be paying their own legal fees, and not the estate.

16 And also, to the extent that such legal fees are allowed, we

17 need to see the time records for the attorney in question.  And

18 the danger there with that attorney is that that attorney is

19 not retained by this Court.  For all we know the attorney could

20 have a conflict.  And again, it could lead to some messy issues

21 coming to light, and we'd rather avoid that.

22          There's an issue, Your Honor, about A&M's own time

23 records that we believe that A&M should do their time record.

24 We've been negotiating about the increments.  In other words,

25 should they be half hour --

1          THE COURT:  Half hour versus tenths.

2          MR. MORRISSEY:  -- one hour, tenths of an hour.

3  Right.  So, we've been talking about that.  As I understand it,

4  A&M is not to be paid by the hour.

5          THE COURT:  Well, that's not true.  One of the

6  people, there's a flat monthly -- you know, on the financial

7  advisors' side, one person is the flat $100,000 a month figure,

8  but for others they're being charged on an hourly basis.  Am I

9  right, Ms. Grassgreen?

10         MS. GRASSGREEN:  That's correct.

11         MR. MORRISSEY:  I'm sorry, Your Honor.  Again, we

12  would need the schedule of hourly rates, then, you know, for

13  that aspect of it.  The conflicts check hadn't been complete as

14  of the time of the drafting of the pleading.  I understand that

15  the conflicts check now is complete on Alvarez & Marsel's part,

16  so we're going to need some kind of supplemental language there

17  to clarify that not only are we looking, but we have found

18  whether there are conflicts.

19         The other issue, Your Honor concerns what we call the

20  Blackstone protocol, which comes from the <u>Global Crossing</u> case.

21  In terms of indemnification, and in terms of the 328 retention,

22  I don't know if Your Honor is familiar with that, but what that

23  originated from was a meeting that the former U.S. Trustee had

24  with representatives with the financial advice community.  And

25  they came to what they call a protocol, and under that

51

protocol, yes, there can be indemnification, yes, there can be

328 retention under certain conditions, but there's a quid pro

quo for that, and that is that there should be a 45-day notice

period before there is a final order.  And the other part of

that is that all creditors should be paid -- I'm sorry -- all

creditors should be noticed.

THE COURT:  From your lips.  I mean --

MR. MORRISSEY:  We had discussions, Your Honor, about

what all creditors means in this case, because there are some

who may -- some homeowners, as I understand it, who --

THE COURT:  Warranty claims, and --

MR. MORRISSEY:  Right.  Who may or may not have

claims.  And we're still discussing that, because as I

understand it, the question is whether hundreds of creditors

are going to be served versus thousands.  So, we still --

THE COURT:  I mean, I would assume that the rules

that permit me to say who has to receive notice, you say that

those shouldn't apply on this?

MR. MORRISSEY:  Again, Your Honor, I mean, the Court

is the Court, and we're not trying to take anything away, but

it's a general agreement that's been followed in this district

for quite some time.  And I provided counsel with a copy of the

so-called Blackstone order.  It's an interim order and a final

order.  And certainly once we get to the hearing, hopefully

Your Honor will see the Dunmore version of those orders.

52

1           THE COURT:  Okay.

2           MR. MORRISSEY:  And that's all I have for now, Your

3    Honor.

4           THE COURT:  Thank you.

5           MR. MORRISSEY:  Hopefully we'll be able to work it

6    out.  If I may conclude simply by saying there's one of a

7    number of possible outcomes.  One is we could just object.  We

8    could not come to a resolution.  Another is that we could be

9    persuaded by legal counsel.  A third possibility, Your Honor,

10   is that we could try to convince counsel to modify the pleading

11   so that it becomes acceptable to the U.S. Trustee.  And I

12   mention that last possibility only because that's the sort of

13   thing that may require a hearing a week later than otherwise.

14          THE COURT:  Yes.  No, and -- that's what usually

15   happens.  Not that it gets pushed off for a week, but that you

16   work it out.

17          MR. MORRISSEY:  Yes.  That's what we were trying to

18   do.

19          THE COURT:  At least some of the issues you've raised

20   I would feel confident you'll work out.  Others I'm not --

21          MR. MORRISSEY:  Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Morrissey.

23          MS. GRASSGREEN:  Your Honor, since this is not the

24   hearing on Alvarez & Marsal, I am not going to respond to each

25   and every issue that Mr. Morrissey has raised.  We discussed

53

1  all of them, and I do want to state for the record, however,

2  that by not saying anything we're not conceding any points.

3  We're reserving all of our rights, Alvarez & Marsal is

4  reserving all of our rights, particularly on the statements

5  about conflict, because we have a very different view of

6  whether or not there is either a potential or an actual

7  conflict here, and we actually do not believe that there are

8  either.  And we'll be prepared to either convince the U.S.

9  Trustee or convince Your Honor at the appropriate time.  I

10  don't know if there are any more questions or issue on the

11  Alvarez & Marsal continuance.

12          THE COURT:  Does anybody else wish to be heard on

13  this?  It doesn't sound like it.

14          MS. GRASSGREEN:  So, Your Honor, that brings us to

15  our debtor-in-possession and cash collateral motion, and if I

16  could just take a second to confer with counsel for RBC, who

17  did file an objection, and see if he has --

18          THE COURT:  Yes.

19          MS. GRASSGREEN:  -- worked things out, or what their

20  position is, we'd appreciate it.

21          THE COURT:  It's quarter after 11.  We'll just --

22  we'll take a ten-minute recess.  We'll resume at 11:25.  Okay?

23          MS. GRASSGREEN:  Thank you, Your Honor.

24                          (Recess)

25          THE COURT:  Please be seated.  Ms. Grassgreen?

1          MS. GRASSGREEN:  Your Honor, unfortunately we have

2     not been able to work out the objection filed by RBC, so I'll

3     just go through our presentation on the debtor-in-possession

4     financing and cash collateral motion.

5          As I mentioned in our introductory remarks, this

6     debtor filed with $119,000 in fee cash.  That would be

7     insufficient to pay the payroll through today.  The payroll,

8     through today, would be $140,000.  So, if we do not have

9     additional funds coming in, and use the cash collateral, this

10    truly is game over -- we close the doors, everyone goes home,

11    there is no one to work with any of the other lenders.  There's

12    no one to provide maps and information.  We're done.

13          THE COURT:  So, show me where, within the Code,

14    there's the exception for the doors closing?  Go ahead.

15          MS. GRASSGREEN:  Well, I'm just -- so, in terms of

16    the need for use of cash collateral, and the import of it, and

17    for financing, there is certainly a critical and an emergent

18    need for it today, and the impact on the debtor is quite

19    significant.

20          There's two parts to our motion.  One part is a

21    million dollar DIP loan, and the other is use of cash

22    collateral, and I'll walk through each of them separately, if

23    you don't mind.

24          The DIP loan is a $1 million is the amount of the

25    loan, $500,000 on an interim basis and $500,000 on a final

55

1  basis.  The $500,000 on an interim basis would actually take us

2  right through the hearing on the 14th if we end up with having

3  a final DIP hearing on that day, and we were expecting that

4  that would be the time period, and that was why that number was

5  selected.

6         The lender is Mr. Dunmore, who, as I mentioned

7  earlier, is the former sole owner of the entity that had all of

8  these assets before.  He's sole owner of Dunmore California,

9  which is a Subchapter S corporation.  He has no equity interest

10  in this debtor.  He is not an employee of this debtor.  And he

11  has no control over this debtor.  He is performing consulting

12  services for no charge.  He is working about 50 hours a week

13  assisting with the wind down activities, and it is assisting

14  the debtor, and frankly, it's also in his personal interest to

15  do so because to the extent we have a successful restructuring

16  it is going to limit his exposure on his personal guarantees,

17  which is something that, as you can expect, is of significance

18  to him.

19         THE COURT:  Am I right, it's $149 million on his

20  personal guarantees?

21         MS. GRASSGREEN:  No, Your Honor.  I don't believe

22  that they are that much.  He has only guaranteed -- that may be

23  the number that Dunmore Homes has guaranteed of the subsidiary

24  debt, and then the rest is Cobar's (phonetic), but Mr. Dunmore

25  has guaranteed a very limited number of obligations.  He's

56

1  guaranteed one of the debts to Affinity, one of the obligations

2  to Indymac Bank, certain surety obligations, and I believe a

3  title policy.  So, I mean, the number is significantly less

4  than --

5          THE COURT:  Can you put a dollar value on it?

6          MS. GRASSGREEN:  I believe the total asserted number

7  -- so, I'm going to look over to the Vice President of Finance,

8  is less than $30 million.

9          THE COURT:  So, he's either a co-signer or a

10  guarantor on approximately $30 million?

11          MS. GRASSGREEN:  That's correct, Your Honor.  And

12  that's the face amount of the debt.  We don't know that that

13  will be the amount of the claim, ultimately.  And I did refer

14  to Mr. Strauch, who is in the courtroom, who I neglected to

15  introduce to you earlier, bu Doug Strauch, the Vice President

16  of Finance, and the -- who put in an affidavit here in support

17  of the first day motions, and next to him is Scott Brubaker,

18  our financial advisor from Alvarez & Marsal.

19          Your Honor, the DIP agreement has a nine week budget.

20  The reason why there's a nine week budget for the DIP

21  agreement, and we'll talk about a 12-week budget for the cash

22  collateral is that the $1 million is used up for operating

23  expenses, and no payments to professionals are accrued at that

24  point.  So, at the end of week nine, without any payments to

25  professionals we've gone through a $1 million, and that was why

1  that budget period was chosen, because that was the amount that

2  Mr. Dunmore was prepared to lend.

3         The DIP provides for a senior lien on any

4  unencumbered property.  The only item that we think is

5  completely unencumbered is the Fadano option, with the life

6  estate, which we discussed earlier.  But there's a junior lien

7  on everything else, and there are a number of other items, like

8  the equity interest in the Stone mitigation that we don't

9  believe any creditor has even an asserted, let alone

10  unperfected, security interest in.  We have explained in our

11  papers why we believe that some of the secured lenders may

12  assert an interest in the $119,000, because there was a

13  consolidated cash management system --

14         THE COURT:  Is RBC one of the lenders asserting a

15  lien on the $119,000?

16         MS. GRASSGREEN:  You know, Your Honor -- they may say

17  yes, although their papers, frankly, do not say that.  Their

18  papers indicate that they are concerned about proceeds from

19  Monteceda (phonetic) --

20         THE COURT:  Rents.

21         MS. GRASSGREEN:  -- Diamond, Ridgestone, Creek, and

22  Providence.  And I'll get to that, but we are not seeking to

23  use those in any manner today, and hopefully that will address

24  that portion of their objection.

25         But we will bring whatever appropriate papers we need

58

1  to avoid any unperfected security interest.  But we did confer

2  with substantially all of the lenders, on their own, got

3  together yesterday and had a conference call, and had some

4  comments, and we have taken their comments into account, and

5  I'll go through that.  So, I really believe only RBC has an

6  objection.  I regret that they were not part of that group, and

7  I didn't speak to them before this was filed, because I would

8  have hoped that we would have been able to work it out.  That

9  certainly is our intention, to work with our creditors here.

10 This is, again, a case that has a very short life, and limited

11 liquidity, and so, resolution, I think, is going to be much

12 better than litigation to the extent we can do it.  If not,

13 we'll move forward.

14         In connection, there's some provisions in the DIP

15 agreement that I want to comment on, because they're not --

16 we've highlighted them as extraordinary provisions, and I want

17 to make one correction, a confusion between the motion and the

18 order that was just brought to my attention by one of the

19 lenders.

20         One of the items in connection with the DIP agreement

21 is we agreed to a slight modification of the note, the due date

22 on the note, and I mentioned that earlier.  The modification

23 is, as I mentioned, the note was due -- when we modified the

24 note on September 10th, it was modified to provide that the due

25 date was the earlier of the day the tax refund comes in or

59

1  December '09, unless further extended.

2            THE COURT:  I thought you had said December '08.

3            MS. GRASSGREEN:  It was originally due December '08.

4            THE COURT:  Okay.  And that was changed to '09?

5            MS. GRASSGREEN:  Right.

6            THE COURT:  Okay.  Go ahead.

7            MS. GRASSGREEN:  The theory being that there could be

8  an audit, we don't know, in the tax refund.

9            THE COURT:  Right.

10            MS. GRASSGREEN:  But if that due date hits December

11  '09, and the note is due, it's due, whether the tax refund

12  comes in or not.  The modification is only to make the earlier

13  of 15 days after the tax refund or December '09.  We're not

14  limiting the recovery on the note to the tax refund in any way,

15  and the lenders ask that I make that very clear on the record.

16  And we do intend to document that in a separate agreement, and

17  we'll share that with the interested parties so everyone's

18  comfortable with it.

19            There was some language in the motion regarding the

20  offsets that Mr. Dunmore asserted.  It is a cause for

21  confusion, and I apologize for that, Your Honor.  There was

22  originally discussion with Mr. Dunmore about acknowledgment of

23  certain offsets, and that came out at the last minute, and it

24  didn't make it out of the motion, but it made it out of the

25  order and the agreement, and we have discussed with the U.S.

60

1  Trustee and the other lenders, and we've added proposed

2  language to our order an express reservation of rights.

3  There's a provision in the order that no offsets are going to

4  be acknowledged without approval from Your Honor, presentation

5  to the Court, and we have a revised form of proposed order that

6  in addition to that some language for an express reservation of

7  rights for the estate and all parties, and for Mr. Dunmore, of

8  course, whatever claims of offset he has.

9          THE COURT:  I have a question.  In your motion, on

10  Page 10, Paragraph 16, the second sentence in Paragraph 16,

11  where it says -- I'll wait until you find it.  It's behind Tab

12  8 of your binder.

13          MS. GRASSGREEN:  Right.  This is probably that

14  statement that was left over that I think perhaps --

15          THE COURT:  Okay.  Maybe that will clarify it,

16  because we --

17          MS. GRASSGREEN:  Yes, Your Honor.  That is --

18          THE COURT:  My clerks and I searched the loan

19  agreement, and we couldn't find --

20          MS. GRASSGREEN:  That is exactly why -- that is a

21  product of middle of the night negotiations --

22          THE COURT:  Okay.  That's fine.

23          MS. GRASSGREEN:  -- and that was what was just

24  brought to my attention by counsel for Guaranty Bank.  So,

25  notwithstanding Paragraph 16, there is no provision in the

1  order or the loan agreement to acknowledge any offset of any

2  sort, and it does specifically provide for Court approval and a

3  reservation of rights.  And I apologize for that oversight.

4          THE COURT:  You've clarified -- it's fine.

5          MS. GRASSGREEN:  At the request of the U.S. Trustee,

6  the DIP lender has agreed to provide five days' written notice

7  prior to exercising certain rights under the agreement, and

8  we've included that language in a proposed order.  And as this

9  is an interim order, there was originally $100,000 carve out

10 for post-default expenses.  That could be used for debtor's

11 professionals and also for what I'll call burial expenses if

12 the case were to be converted.  In our proposed form of order

13 that we have today, which is interim, we were proposing to

14 actually have a very specific carve out for the burial expenses

15 of 20,000, and 80,000 for the rest.  I've discussed it with Mr.

16 Morrissey, and we've -- since this is interim the committee may

17 want to revisit that.  But for the interim we don't -- we don't

18 expect we're going to be needing to look to that at --

19         THE COURT:  I hope not.

20         MS. GRASSGREEN:  -- during this interim period.  On

21 cash collateral we did attach a 12-week budget, and it's the

22 same budget through nine weeks, and it carries it out another

23 three weeks.  And the reason why we didn't just stop at nine

24 weeks and come back in is that it ends on January 11th, which

25 would mean filing the papers and responses between Christmas

62

1   and New Year's, and for the benefit of everybody involved, we

2   thought if we could carry it out.  In order for us to have the

3   cash to go out that far, one of two things has to happen.  We

4   either have to sell the Stone mitigation property, and recover

5   the 2.8 million in equity there, which would then partially be

6   repaid to Mr. Dunmore and give us another million eight in

7   cash, or get turnover of the deferred compensation fund, which,

8   as we mentioned, we intend to bring --

9           THE COURT:  That's a million seven?

10          MS. GRASSGREEN:  -- before Your Honor on December

11  14th.  So, one or the other of those has to happen, or we're

12  not going to go 12 weeks, because we will not have additional

13  cash to continue operating if one of those things do not

14  happen.

15          As I mentioned, various parties have unperfected

16  security interests, and various items of personal property.  We

17  think, you know, perhaps it's just the 119,000 that was in the

18  bank, and was co-mingled from the consolidated cash management

19  system.  It's impossible to identify the source of those funds

20  because everything was consolidated and co-mingled.  So, we

21  have proposed to provide a replacement lien on things like the

22  Stone mitigation property and the Fadano option that nobody

23  else had liens on, and we believe that there is sufficient

24  asset --

25          THE COURT:  The mitigation property has a first --

J&J COURT TRANSCRIBERS, INC.

1          MS. GRASSGREEN:  It has a first of a million five.

2  We believe there's 2.8 million above.  And the other assets in

3  the asset.  I would also note that in the DIP collateral

4  package carved out from the collateral is any interest in the

5  deferred compensation fund, and any interest in Mr. Dunmore's

6  note, although he, of course, retains a right of offset against

7  the note, and he could elect, rather than being repaid his

8  million dollars, to just reduce the money.

9          So, that is a summary of the papers.  RBC has filed

10  an objection, and they -- I boiled it down, really, I think, to

11  four points, and I'll take them one by one.

12          Their first point, with absolutely no evidence

13  whatsoever, is the sale was a fraudulent conveyance because

14  they say so, and because it is you can't authorize any use of

15  these assets because they don't truly belong to this estate.

16  Certainly, Your Honor, at the appropriate time we will take up

17  those issues.  There is a State Court proceeding pending in

18  Fresno where similar allegations, although I believe in that

19  proceeding they've alleged actual fraud rather than

20  constructive fraud, is pending.  And, you know, that may or may

21  not come before Your Honor, rather than in Fresno.  We haven't

22  made a final decision yet.  But we do not believe that that was

23  -- is a basis to deny use of cash collateral here, having --

24  that those allegations aren't proven, and frankly, we don't

25  think they ever will be proven, because as I described earlier,

1  the sale was beneficial.  It created an asset, the tax

2  attribute that didn't exist before, and it's completely

3  transparent, and all of the assets and all of the liabilities

4  have gone.  All that happened is that the ownership has changed

5  And as to the projects that RBC has an interest in, those are

6  still in the project LC's, always where they resided.  It's

7  just the ownership interest that's changed.  So, we believe

8  that if and when that issue ever comes up, we will succeed on

9  it, and that it is not a basis to deny the DIP financing

10  request or use of cash collateral today.  As we stand before

11  you today, these assets have been transferred, and they have

12  not -- that transfer has not been avoided.

13          The next argument is in Paragraph 12 of their

14  opposition, and it pertains to the definition of permitted

15  priority liens, and we are in agreement with making that

16  change, and we have proposed some language that we've shown to

17  RBC's counsel, and I think on that point --

18          THE COURT:  Just -- which paragraph again?

19          MS. GRASSGREEN:  It was Paragraph 12 of their

20  opposition.

21          THE COURT:  All right.  I have that.

22          MS. GRASSGREEN:  And it dealt with the avoidability.

23  And it comes up a couple of places in the order, but whether or

24  not the replacement lien attaches to liens that are unavoidable

25  or unavoided.  And so, we're going to correct that, use the

1  words unavoided rather than unavoidable, and we have a number

2  of places in the order where that shows up, and we've shared

3  that with RBC.  And I believe that as to that point I know

4  they're retaining their argument that the whole thing should be

5  denied --

6        THE COURT:  Right.

7        MS. GRASSGREEN:  -- but, you know, if we get past the

8  overriding argument as to that point, I think we're conceding

9  that point and we're willing to make that change.  Their next

10 argument relates to the carve out provision, and the carve out

11 --

12       THE COURT:  Save yourself.

13       MS. GRASSGREEN:  Okay.

14       THE COURT:  You know, I haven't been on the bench

15 that long, but I have not seen a carve out that agrees to pay

16 for actions against the DIP lender, so let's just move on from

17 there.

18       MS. GRASSGREEN:  Okay.  Thank you, Your Honor.  And

19 then, the final argument I believe that they made, and

20 obviously I reserve my right to respond after we hear from RBC,

21 but from my reading of their papers, at least, is that they do

22 request clarification that we're not using any cash collateral

23 from the four projects that they have identified, and we are

24 not using any cash collateral from their four projects.  None

25 of the items that we are projecting to use, the cash on hand,

66

1  the cash from the deferred compensation fund, the proceeds of

2  the Stone mitigation property, none of the things in this

3  budget period are coming from those projects, and we would love

4  nothing more to restart and have some sales from those

5  projects, but everything is shut down at the moment, Your

6  Honor, so we don't expect that to be an issue --

7          THE COURT:  Is anything selling?  I mean, is there

8  any revenue coming in?

9          MS. GRASSGREEN:  No.  None.

10         THE COURT:  I didn't look at the budget carefully

11  enough to see whether --

12         MS. GRASSGREEN:  Well, the only revenue -- there's a

13  very small revenue item, and that reflects that Dunmore Land

14  Company is still sharing space with Dunmore Homes, and they're

15  making a payment for services that Dunmore Homes provides, and

16  that is the only incoming number in the deferred comp fund.

17  But, no.  What happened in this industry, Your Honor, was

18  really -- you know, the way that it generally worked in home

19  building is that you would have a certain number of homes that

20  you would sell every month, and you'd have a release price, and

21  you'd pay off the debt, and then there would be something above

22  that, and that would pay things like taxes, and interest, and

23  operating expenses.  And when the -- what they call in the home

24  building industry, the absorption rates went from six a month

25  to one, and then the prices had to drop because as the

1  absorption rates went down everyone dropped prices to try to

2  get the absorption rates up, you know, there is nothing above

3  the release prices, and it's not just with this debtor, you

4  know, this is a crisis with many, many home builders around the

5  country.

6          THE COURT:  Are these mixed-use developments?  Or are

7  these single-family homes, townhouses, condos?

8          MS. GRASSGREEN:  They are single-family homes.

9          THE COURT:  Is there a strip mall?  I mean, where is

10  the rent coming from?  Are there strip malls in them, or

11  something?

12          MS. GRASSGREEN:  There are not rents to my knowledge,

13  Your Honor.  I'm looking to Mr. Strauch.  They're just proceeds

14  of the sales of the homes.

15          THE COURT:  Okay.  I saw a reference to rents, and --

16          UNIDENTIFIED ATTORNEY:  I think the rent you're

17  referring to is either the Dunmore Homes -- Dunmore Land rent

18  arrangement, or we have sold and leased back two model homes

19  that we continue to have rent --

20          THE COURT:  I think actually it was in RBC's

21  objection, where they -- they wanted to be sure that their

22  rents aren't being used -- it's just maybe the term of art in a

23  string of terms in a document, but there really isn't any.

24  Okay.

25          MS. GRASSGREEN:  Right.  So, as of now there's no

J&J COURT TRANSCRIBERS, INC.

68

1  sales.  You know, and really, the debtor's operation there's

2  about 37 employees, Your Honor, and the primary -- you know,

3  they're working on the restructuring piece of this, and putting

4  together all of the information, and dealing with the liens,

5  and the sureties, and the set aside letters, but they're also

6  going out to the properties and making sure that they're

7  secure.  And we described in our papers they're working on

8  winterization --

9          THE COURT:  What's the winterizing?  You're in

10 California?

11         MS. GRASSGREEN:  Well, it's rain, Your Honor.  It's

12 rain.  You know, in California we are dry all summer, and then

13 when it rains --

14         THE COURT:  I used to live there.

15         MS. GRASSGREEN:  Oh.  Okay.  And what we refer to as

16 the SWPP, which I'm sure I'll get this wrong, Storm Water

17 Pollution Protection and Prevention Program?

18         THE COURT:  Very good.

19         MS. GRASSGREEN:  The SWPP program, which relates

20 primarily to land that's been disturbed, and reducing runoff

21 from that land and the rain.  So, I learned a new word in

22 connection with this case, Your Honor, called waddle, which is

23 the straw piece that gets put around the edge that we all see

24 that looks like it's in chicken wire, to keep the runoff.  So,

25 the winterization is to make sure we get our waddles in place,

1  and other related activities.  So, that is primarily what the

2  employees are doing.  And there's quite a bit of work to be

3  done, whether or not we are able to come up with a transaction

4  or to do an orderly wind down, we have, you know, advised the

5  lenders that, you know, we will work with them.  We don't

6  intend to just, you know, leave everything in disarray.  And

7  there's a lot of engineering drawings, and documents that have

8  to be compiled in the event that we were to just do an orderly

9  wind down if we can't accomplish a transaction, which we hope

10 that we can.

11         So, Your Honor, with that I -- I believe that our

12 comments should address all the objections of RBC, and we would

13 ask that you overrule their objection in light of the changes

14 that we're proposing to make, and authorize the use of finance

15 -- the use of cash collateral and the financing as set forth in

16 the motion as modified by our comments today.

17         THE COURT:  Thank you.

18         MS. McMAHON:  Michelle McMahon from Bryan Cave for

19 RBC.  As addressed, some of the points that we'll get to a

20 little bit later on related to the terms have been resolved.

21 But going to the bulk of our objection, it relates to the sale

22 that's been described by the debtor that occurred two months

23 pre-petition.  RBC is a significant secured lender to both the

24 debtor and its non-debtor subsidiaries, the four projects

25 referenced by the debtor.  On those financings the debtor is

70

1 either a guarantor or a co-borrower, depending on the financing

2 in question.

3          On November 7th, RBC filed a series of complaints in

4 the State Court alleging that each of the financings which are

5 in default, and have been in default, are a breach of contract,

6 breach of note, conspiracy claims, and fraudulent transfer

7 claims, in addition to seeking foreclosure of the four

8 properties related to those defaults.  The basis of their

9 fraudulent transfer claims is that in exchange for

10 substantially all of the assets of Mr. Dunmore's companies, the

11 debtor paid $500 in an assumption of liability, and in exchange

12 received a $280,000 cash payment.

13          THE COURT:  And collateral for the $11.1 million

14 loan.

15          MS. McMAHON:  So we've just learned.  But the concern

16 there is that --

17          THE COURT:  Was that the substantial value?

18          MS. McMAHON:  Well, that depends, since the note was

19 also pushed out for an additional two years, and there's

20 apparently no income whatsoever to pay the obligations which

21 have been in default --

22          THE COURT:  The note is not pushed out if he receives

23 the refund in that time, correct?

24          MS. McMAHON:  I understand it was pushed out even

25 before, that there was an additional modification to push it

1  out farther.

2          MS. GRASSGREEN:  That's not correct, Your Honor.

3          MS. McMAHON:  Okay.

4          THE COURT:  Well, let me just --

5          MS. McMAHON:  Well, could you clarify that?

6          THE COURT:  Ms. McMahon --

7          MS. GRASSGREEN:  It's due the earlier of receipt of

8  -- 15 days after receipt of the tax refund, or December '09.

9          THE COURT:  15 days -- if he receives his refund, 15

10 days after that he's got to pay the note.

11         MS. McMAHON:  When is the refund anticipated?

12         THE COURT:  Ms. McMahon, talk to me, not to --

13         MS. McMAHON:  Oh.  When is the refund anticipated?

14         THE COURT:  We'd all like to see it.

15         MS. GRASSGREEN:  Your Honor, we fully expect, and Mr.

16 Dunmore's counsel is on the phone, and she may want to respond

17 to this, but we expect that he will file his tax return as soon

18 as possible after January 1st, and, you know, if all goes well

19 it could come in as early as next summer, but we're dealing

20 with the IRS and I certainly can't commit them --

21         MS. McMAHON:  No, I understand.  I was only asking

22 the former question, not the later question.

23         MS. GRASSGREEN:  Certainly.

24         THE COURT:  Ms. McMahon, talk to me, not to Ms.

25 Grassgreen.  Okay?  What was transferred away?  What value was

72

1  transferred away that your client has a claim in?  I mean, I

2  understand there was the sale, the terms of which have been

3  described.  What assets -- they assumed -- the debtor has

4  assumed the liability to your client, and so, what assets, if

5  any, have been moved away or made unavailable to your client's

6  claim?

7          MS. McMAHON:  RBC's concern is that the individual to

8  whom all of the assets were transferred doesn't have the

9  financing or the experience to run the company with any

10 success, and that there's insufficient liquidity for the

11 company to continue, which seems to be --

12         THE COURT:  I know, but I want to focus on the

13 separate set of issues that you're raising.  But, what assets

14 have been transferred away and made unavailable to your client?

15 Your client had a claim against the debtor's predecessor --

16         MS. McMAHON:  Correct.

17         THE COURT:  -- and now it has a claim against the

18 debtor, as well as the non-debtor subsidiary.  Correct?

19         MS. McMAHON:  I did not draft the State Court

20 complaint, but it's my understanding that the concern goes to

21 who --

22         THE COURT:  I didn't ask about the State Court --

23         MS. McMAHON:  -- the principal is --

24         THE COURT:  I didn't ask about the State Court

25 complaint.

73

1          MS. McMAHON:  Well, that's the genesis of our

2   fraudulent transfer claim.

3          THE COURT:  But my question specifically is, I don't

4   want to know what's in your State Court complaint.  I want you

5   to tell me, you're objecting to the DIP financing motion.

6          MS. McMAHON:  Um-hmm.

7          THE COURT:  And you raise an issue that there's been

8   a fraudulent conveyance.  There's been no adjudication by a

9   California State Court.  There's been no attachment or other

10  pre-judgment remedy granted by a California State Court.  And

11  so, my question to you is not what you've alleged in

12  California.  My question to you is what, if any, assets as to

13  which you may have had some claim before, are no longer

14  available to you?

15         MS. McMAHON:  The concern is that --

16         THE COURT:  You keep talking about concern, and I

17  keep asking about transfer of assets.  You're asserting that

18  somehow there's a fraudulent transfer claim that should lead me

19  to deny the interim debtor-in-possession financing order, and I

20  don't want to know about concerns.  I want to know about

21  transfer of assets.  Was there a transfer of assets that made

22  unavailable -- your client had a claim -- has a claim against

23  the debtor for the same amount that it had a claim before the

24  September sale, and I have my own questions about the September

25  transaction, but I don't see how where that had the effect of

74

1  transferring away anything of value from your -- as to which

2  your client may have had a claim.  If anything, it brings

3  perhaps somewhat greater security to your client because the

4  transaction resulted in the security -- the collateral being

5  the refund claim, whatever it turns out to be worth.  They

6  didn't have it before.  They have it now.  Before they had a

7  naked note for $11.1 million.  Now they've got a note plus

8  security of uncertain value that they didn't have before, but

9  nothing transferred away.  If I'm wrong, tell me.  But don't

10 tell me about your concern.  Tell me about what got transferred

11 away.

12        MS. McMAHON:  The change in the sole shareholder of

13 the company owning the assets changed from an individual with

14 significant assets to an individual with less significant

15 assets.

16        THE COURT:  Did Mr. Dunmore personally guarantee

17 RBC's debt?

18        MS. McMAHON:  I don't believe he did personally

19 guarantee those liabilities, although I would have to check the

20 documents to confirm.

21        THE COURT:  If he --

22        UNIDENTIFIED ATTORNEY:  Your Honor, this is

23 (indiscernible).  I'm (indiscernible) RBC's debt --

24        THE COURT:  I'm sorry.  Your voice was breaking up.

25 If you're on a speaker, pick up the phone.

1          MS. YOUNG:  I'm sorry, Your Honor.  This is Beth

2    Young.  I represent Sidney Dunmore, and Mr. Dunmore did not

3    execute any guarantees in favor of RBC.

4          THE COURT:  Okay.  Thank you.  Go ahead, Ms. McMahon.

5          MS. McMAHON:  But to the extent that it's an entity

6    owned and controlled by a single person, there are clearly

7    potential veil piercing issues there that would open up

8    whomever the shareholder is to liabilities for those actions.

9          THE COURT:  And assuming that's true --

10         MS. McMAHON:  Correct.

11         THE COURT:  -- what effect does granting the interim

12   debtor-in-possession financing order have on whatever claims

13   you might have against Mr. Dunmore personally, or against Mr.

14   Cane personally?

15         MS. McMAHON:  Our concern is that the debtor is

16   seeking to place liens on assets which we've alleged it

17   actually doesn't have anything more than a possessory interest

18   in.

19         THE COURT:  Which assets --

20         MS. McMAHON:  All of its assets were, as we've

21   alleged in the State Court, fraudulently transferred to it,

22   giving it nothing more than a possessory interest.

23         THE COURT:  You don't have any -- you didn't get an

24   attachment, or prejudgment remedy.  You haven't asked this

25   Court for one.  You say you filed a lawsuit in California.

1   Fine.  But how does that entitle -- I don't understand what

2   rights or interests of yours are being effected.

3           MS. McMAHON:  To the extent that we would be

4   successful in the fraudulent transfer claims and it were later

5   determined that these were not assets of the debtor, then any

6   failure on our part to assert that now when there were being

7   liens placed on -- in a relatively senior position could be --

8           THE COURT:  Okay.  Any other points?

9           MS. McMAHON:  Excuse me?

10          THE COURT:  Any other points you wish to make?

11          MS. McMAHON:  The rest of our objections have largely

12  been resolved.  I did want to address one single issue on Your

13  Honor's comment about the limitations on the use of the DIP

14  funds.  And I hear what you're saying with respect to the

15  assertion of claims, but this limitation is broader and goes to

16  even a challenge to claims asserted by Mr. Dunmore himself,

17  including, I would have to assume, the setoff.  And tying the

18  hands of the committee before it's even formed with respect to

19  any funding for defending claims against the estate seems over

20  broad.

21          THE COURT:  I don't want to be thick, but I didn't

22  follow this point in your brief, and I don't follow it right

23  now, so just tell me one more time.  Okay?

24          MS. McMAHON:  Okay.  According to the language that's

25  in there, not only can they not have any funds from the DIP

1 financing, the debtor, or the committee professionals, to

2 assert claims against Mr. Dunmore --

3          THE COURT:  That's standard.

4          MS. McMAHON:  -- they also can't use it to defend

5 against claims by Mr. Dunmore, or to challenge any claims by

6 him, as is the language of the document.  And taking away this

7 defensive right is, in our position, over broad.

8          THE COURT:  Do you have any authority for that

9 position?  I mean, I don't claim to have reviewed that many DIP

10 motions so far, but for better or worse, it seems to be the

11 standard that a DIP lender doesn't permit its funds to be used

12 with respect to any claims against it, or -- I mean, the carve

13 out doesn't apply.  I mean, do you have some authority for your

14 position?

15          MS. McMAHON:  We do not yet, and it's obviously a

16 first day motion.

17          THE COURT:  Yes, it is.  It is.

18          MS. McMAHON:  We will certainly have some by the

19 final.  But I think in this situation, as opposed to

20 potentially other situations, it's a little unique in the sense

21 that the DIP financer is also, for all intents and purposes,

22 the former principal and sole shareholder of the debtor

23 principal and predecessor in interest.  And that makes it that

24 unique.

25          THE COURT:  Well, I mean, it -- the immediate

1 question I had is, and I know that the debtor asserts this as

2 an arm's length transaction, but given Mr. Dunmore's connection

3 to the debtor, the fact that he's a co-obligor, guarantor in a

4 substantial amount of debt, you know, I think there are

5 questions about that.  But, I mean, I think that would, if

6 anything, go to questions -- are the -- I mean, you don't claim

7 that the financial terms of the DIP are unfair, do you?  I

8 mean, there's no fees, the interest rate, no one's raised a

9 question so far about that the interest rate is too high, or

10 that the duration or term is too short, or that there's

11 anything else coercive about it, because that was something I

12 looked for carefully because of this historic relationship of

13 Mr. Dunmore.  But I didn't see anything about the -- I know

14 you're raising the question of the use of proceeds to prosecute

15 or defend claims against Mr. Dunmore.  You know, if and when

16 the committee comes into existence, and it believes there are

17 good claims, if there are really good claims they will find a

18 way to finance them, even without Mr. Dunmore's money.  I mean,

19 that's the reality of it.  I bet you there are a lot of lawyers

20 who would line up for that opportunity if they thought there

21 was a good claim there.

22          MS. McMAHON:  And what about a good defense?  I mean,

23 there are setoff claims alleged to exist in the motions

24 themselves --

25          THE COURT:  Well, that's -- I thought that's been

79

1  taken out.

2          MS. McMAHON:  -- yet the committee won't have the

3  ability to --

4          THE COURT:  I thought that was taken out.  What

5  remains is --

6          MS. McMAHON:  Baking them in has been taken out, but

7  they still --

8          THE COURT:  I'm sorry?

9          MS. McMAHON:  Baking them in, or baking approval of

10  them in had been taken out for a greater reservation of rights

11  to object to them, but there's still no financing in place for

12  the committee to actually object.

13          THE COURT:  Okay.  Anything else?

14          MS. McMAHON:  Those are all our objections.

15          THE COURT:  Thank you very much, Ms. McMahon.  Mr.

16  Rosen?

17          MR. ROSEN:  Very briefly, Your Honor.  I should have

18  mentioned before, Weyerhauser's claims in this case are --

19  investment with Mr. Dunmore are approximately $30 million.  I

20  neglected to mention that before.  By way of housekeeping, I

21  assume that the loan agreement will be modified from what was

22  submitted to the Court because Section 4.1 of the loan

23  agreement, if I'm reading it correctly, grants a much broader

24  security interest than what's being requested today.  I assume

25  that will be made consistent.  The only other --

1          THE COURT:  Show me what you're talking about.

2          MR. ROSEN:  The language of 4.1 on Page 10 --

3          THE COURT:  I'm there, but which subparagraph?

4          MR. ROSEN:  Page 4.1A.

5          THE COURT:  Yes.

6          MR. ROSEN:  Look on Line 3, it says, "on all of the

7   property, assets, interests, and property or assets of a

8   borrower."  For example, the third line from the bottom of 4A,

9   just by way of example, says it includes -- I assume what

10  they're referring to is Chapter 5 claims.  But in the interim

11  order, I believe, on Page 7 of the application, it says the

12  collateral was the Fadano option, unencumbered assets, and a

13  junior lien on a Stone mitigation property.  I assume that will

14  just be reconciled.  And it says there will be no --

15         THE COURT:  I thought it was if everything else other

16  than --

17         MS. GRASSGREEN:  Yes.  Are you reading from the

18  motion or the order?

19         MR. ROSEN:  I'm reading from Paragraph 4.1 of your --

20  what I think is the loan agreement, and comparing it to the

21  description of the collateral on Page 7 of your motion for

22  interim financing.

23         MS. GRASSGREEN:  Your Honor, it's a junior lien on

24  everything.

25         THE COURT:  That's what I thought.

81

```
 1          MS. GRASSGREEN:  And with the exception of the

 2  deferred compensation fund, and the notes --

 3          THE COURT:  And the avoidance actions.

 4          MS. GRASSGREEN:  -- and the avoidance actions --

 5          THE COURT:  Right.

 6          MS. GRASSGREEN:  -- which is 4.1B, the specific

 7  exclusion.  Notwithstanding the foregoing, collateral shall not

 8  include avoidance assets lender receivable.  The description in

 9  the motion was in all events qualified by the agreement.  It

10  was just a description.

11          MR. ROSEN:  So --

12          THE COURT:  That's what I understood, Mr. Rosen.

13          MR. ROSEN:  In 4.1 it says and all causes of action

14  arising under the Bankruptcy Code.

15          MS. GRASSGREEN:  Right, but look to B.

16          MR. ROSEN:  I understand that.  So -- B is

17  inconsistent with A.  This says shall not include avoidance

18  assets, but A says that it includes actions arising under the

19  Bankruptcy Code.

20          MS. GRASSGREEN:  B says notwithstanding the

21  foregoing.

22          THE COURT:  Yes.  It's a carve out.  It's --

23          MR. ROSEN:  All right.

24          THE COURT:  A gives you everything, and B takes some

25  of it back.
```

82

1          MR. ROSEN:  Your Honor, just in the nature of a

2    reservation of rights, the operating agreement between Dunmore

3    and Weyerhauser prohibited -- it prohibits the transfer of the

4    85 percent interest.  It's our position that the debtor in this

5    case doesn't have an interest in the four Weyerhauser entities

6    to use as collateral for this DIP loan, so that we reserve all

7    of our rights in that regard.

8          THE COURT:  If they don't have anything to give, they

9    haven't given anything.

10         MR. ROSEN:  Thank you very much.

11         THE COURT:  Mr. Morrissey?

12         MR. MORRISSEY:  Thank you, Your Honor.  Once again,

13   Richard Morrissey, for the U.S. Trustee, and once again, I have

14   not come to object.  But perhaps to clarify Your Honor's

15   colloquy with Ms. McMahon on the challenge to the lien of the

16   DIP lender, what we customarily do is, as Your Honor has said,

17   is that we don't necessarily force the lender to pay for

18   opposition to its own claim, but we do generally have a carve

19   out for a committee, or perhaps someone else to investigate the

20   validity of a lien.  And perhaps that would be appropriate

21   here, although with the caveat that very often in other cases,

22   unlike this one, there is also a pre-petition lien to

23   investigate, as well as the debtor-in-possession lien.

24         Other than that, Your Honor, as Your Honor suggested,

25   there are certain provisions in here that make this DIP loan

**J&J COURT TRANSCRIBERS, INC.**

1  actually less onerous than most of the ones that we see,

2  because the lender is only getting junior lien, or perhaps --

3           THE COURT:  It's not priming anybody.

4           MR. MORRISSEY:  Right.  It's not displacing anyone.

5  And as far as the carve out for burial expenses, it's not just

6  the committee that may want to revisit --

7           THE COURT:  It shows that I'm new to this.  This is

8  the first day that I've heard about the burial expenses, but --

9           MR. MORRISSEY:  Okay.  It's -- in the event a Chapter

10 7 Trustee is appointed --

11          THE COURT:  Right.

12          MR. MORRISSEY:  -- or perhaps even an 11 Trustee,

13 Your Honor, the idea is we don't want the Court's hands to be

14 tied in case that's the way it wants to go.  But the amount in

15 the case of this size, perhaps that can be revisited.  But as

16 --

17          THE COURT:  You know, the problem I see, Mr.

18 Morrissey, is that it would be nice if somebody were standing

19 in line to commit more than the million dollars, but when you

20 look at the budget and the realities of the case, they are

21 barely scraping through to January, and it would be nice to

22 increase the carve out, to increase the use of the carve out,

23 and then where does that leave the case?  And, that's fine.

24 That doesn't mean that the Court should be steam-rolled into

25 approving something that isn't proper, but there is so little

84

1  room in the budget that if it doesn't put those bales of straw

2  out to winterize the property --

3          MS. GRASSGREEN:  The waddles.

4          THE COURT:  -- and California gets more rain than

5  they've gotten in the last year, you know, the problems are

6  bigger.  So, I'm -- what would the U.S. Trustee ask the Court

7  to do?

8          MR. MORRISSEY:  Well, again, at this time, Your

9  Honor, I don't want to give the Court a number.  I gave counsel

10 a number before.  But what I think we can do is we can --

11         THE COURT:  You can wait for a committee, and --

12         MR. MORRISSEY:  Yes.  We can work on this, and among

13 the committee and the debtors, and the U.S. Trustee, and we can

14 work something out.  The U.S. Trustee is satisfied with the

15 changes made so that notice and cure provisions, or actually

16 the insertion of notice and cure provisions, because what we

17 try to avoid is having events of default and termination of

18 financing automatic.  And we want people to realize what's

19 going on, and perhaps if there's a problem it can be fixed, and

20 perhaps Court intervention is necessary, or at the very least

21 desirable.  And, Your Honor, apart from that, the U.S. Trustee

22 has no comments, unless the Court has any questions?

23         THE COURT:  No, Mr. Morrissey.  Thank you very much.

24         MS. GRASSGREEN:  Your Honor, just a point of

25 clarification on the carve out.  And I'm prepared to respond to

**J&J COURT TRANSCRIBERS, INC.**

1 the comments by RBC on that point if you would like, but I know

2 that earlier you said it wasn't necessary.  It does allow for

3 the investigation of claims.  It's specific in Paragraph 6 of

4 the order.  It -- you know, it's --

5        THE COURT:  All right.  Let me look at that.  Hold

6 on.

7        MS. GRASSGREEN:  The language says, "fees and

8 expenses occurred in any connection with any challenge to," and

9 then there's a paren, "as opposed to the investigation of."

10        THE COURT:  Okay.  Let me just -- did you submit a

11 revised order?  You're going to have to submit another revised

12 order.

13        MS. GRASSGREEN:  We are -- we do.  And we do have --

14 well, we have two forms of proposed revised order, neither of

15 which I think addresses everything we've agreed to today, so I

16 think we'll have to submit one this afternoon --

17        THE COURT:  All right.

18        MS. GRASSGREEN:  -- Your Honor, if that's acceptable,

19 if Your Honor is inclined to grant the motion, that is.

20        THE COURT:  Any other points you want to raise?

21        MS. GRASSGREEN:  That was the only point I wanted to

22 make.

23        THE COURT:  All right.  With the changes that have

24 been discussed, subject to the Court's review of the revised

25 order, the Court will grant the interim motion, approval of the

1  interim motion.  The Court overrules the objections of RBC,

2  first with respect to its argument regarding fraudulent

3  conveyance, without any -- the filing of a complaint in

4  California establishes nothing, other than the filing of the

5  complaint itself.  There has been no attachment or other liens

6  imposed by a Court in California or elsewhere.  It does not

7  appear to the Court, based on the papers or the colloquy in

8  Court today that the September transaction had the effect of

9  transferring any assets away from the debtor, which remains, or

10  has assumed the liability to RBC.

11          I understand that the debtor has agreed to make the

12  change that arises in Paragraph 12 of the opposition, and Ms.

13  McMahon, I gather that that objection you're withdrawing, that

14  specific one?

15          MS. McMAHON:  That's been resolved.

16          THE COURT:  All right.  Thank you.  And, with respect

17  to the third -- with respect to the carve out issue, Ms.

18  Grassgreen has pointed out that the carve out can be used to

19  investigate claims, although not to prosecute or defend, so

20  that objection is overruled.  With respect to the fourth point

21  about not using cash collateral for the four projects, Ms.

22  Grassgreen represented that it will not be so used.  And any

23  remaining points raised in the RBC objection are overruled.

24          So, we will go forward -- I think you still have

25  considerable work to do before the final approval hearing on

87

1 the cash collateral, and I'm sure you can work with Mr.

2 Morrissey and perhaps resolve any remaining issues with Ms.

3 McMahon's client, as well.  The final approval hearing will be

4 on December 14th.  And I think I indicated that hearing would

5 be at 11 o'clock.

6            MS. GRASSGREEN:  Thank you, Your Honor.

7            THE COURT:  Is there --

8            MS. GRASSGREEN:  Your Honor, one housekeeping matter.

9 I know we were discussing earlier about the scheduling, and I

10 believe that the U.S. Trustee has tentatively set January 11th

11 for the 341(a).  Is that correct, Mr. Morrissey?

12            MR. MORRISSEY:  Yes, Your Honor.  That's the date

13 that we're aiming for.

14            MS. GRASSGREEN:  So, if Your Honor could just keep

15 that in mind with respect to scheduling of the hearing, we

16 certainly wouldn't want to conflict with that date, and also,

17 perhaps we could have a hearing, you know, somewhere around

18 that date so that the parties who want to travel --

19            THE COURT:  What day of the week is the 11th?

20            MR. MORRISSEY:  That's a Friday, Your Honor.

21            MS. GRASSGREEN:  So, perhaps a hearing on the 10th,

22 or -- what time --

23            THE COURT:  What time is the 341?

24            MR. MORRISSEY:  Well, it's not set, Your Honor, and

25 the reason that it can't be set in stone, we need to receive

1   the creditor matrix, so that they can be noticed.

2            THE COURT:  All right.

3            MR. MORRISSEY:  So -- but my plan is to have it

4   November 11th -- January 11th, 2008, and the time that I've

5   been given, I don't have as much control over these things as I

6   might like, is 2:30 p.m.

7            MS. GRASSGREEN:  So, assuming we had a short hearing,

8   perhaps the morning would work on that Friday, but we may -- if

9   you were considering that week for a January date --

10            THE COURT:  Actually, what I was considering, I'll go

11  back and look at Friday, the 11th.  I was looking at Friday,

12  the 18th, and then Friday, February 29th.

13            MS. GRASSGREEN:  Okay.

14            THE COURT:  And then, Thursday, March 27th, Thursday,

15  April 24th, and Thursday, May 22nd.  So, December, January and

16  February, unless I'm able to work something out, I'm having

17  trouble getting Thursday courtrooms --

18            MS. GRASSGREEN:  All right.  Well, I --

19            THE COURT:  It's possible -- so, you would prefer to

20  do January 11th, Friday, January 11th?

21            MS. GRASSGREEN:  I guess I'm slightly concerned that

22  we may need some time on a number of other matters.  That will

23  be the first time the committee would be appearing, and that

24  might not be enough time, if we start at 11, to then be at the

25  341 at 2:30.

1          THE COURT:  Well, we can -- you know, the only reason

2    for not starting earlier is the people on the phone.

3          MS. GRASSGREEN:  Right.  Were the phone calls.  I

4    mean, I certainly would -- for convenience of creditors who

5    might want to appear at that 341, it would be, I think,

6    convenient if we did the January hearings at least contiguous,

7    so if Thursday isn't available, perhaps we start a little

8    earlier, and if we don't finish we'll have to --

9          THE COURT:  Thursday -- I don't have my calendar, but

10   I -- two Thursday a month, starting in January, I'm inheriting

11   the Chapter 13 calendar.  I have not had that.  And those

12   hearings are already scheduled for all of next year, and it's

13   two Thursdays a month.  And I know that Thursday, January -- it

14   -- it has to be a Chapter 13, Thursday, the 10th, is a Chapter

15   13th day.  That's why I picked Thursday, January -- I had

16   originally hoped for Thursday, January 17th.  So, I know that

17   Thursday, January 10th is not available.

18         MS. GRASSGREEN:  Well, Your Honor, perhaps what we

19   can do is, you know, either use the 11th, or the 18th, and, you

20   know, maybe we're back here on the 14th, once the committee is

21   appointed, and we'll have a better idea --

22         THE COURT:  I'd like to minimize --

23         MS. GRASSGREEN:  -- to know -- oh, actually, I --

24   January, it's the December hearing I was concerned about going

25   on.  I would think that the morning would be fine on the 11th,

90

1  and that would, I would think, be convenient for most parties

2  who would be traveling for the 341, and --

3        THE COURT:  Let's see if we could start at ten

4  o'clock.  Most people are going to be here, or otherwise --

5        MS. GRASSGREEN:  I think so, Your Honor.

6        THE COURT:  -- people can get up earlier -- still

7  earlier in California.

8        MS. GRASSGREEN:  I think the key constituents, and by

9  that time we'll have a committee, will likely be here in person

10  for the 341 if they have an interest --

11        UNIDENTIFIED ATTORNEY:  January 11th at?

12        THE COURT:  Well, I'm going to have to -- I'm going

13  to enter a pre-trial order that sets the dates for the December

14  14th and assuming, when I get back to chambers, that January

15  11th works, for January 11th.  I'll enter an order that will

16  cover both of those dates, and I'm going to include in the

17  order the deadline for filing motions to be heard on those

18  days.  And it's going to be -- I'm going to use the 17 days,

19  rather than the 14 days that's in the case management order.

20  But it will have the specific days for filing motions, filing

21  objections, and replies to be heard on Friday, January 11th.

22  I'm probably going to put that extra day so that motions will

23  get filed on Monday, and --

24        MS. GRASSGREEN:  Thank you, Your Honor.  And we will

25  abide by that.  And the only matter that I could see that might

1  require a separately set hearing before year end is if we do

2  have a sale of the Stone mitigation property, and it needs to

3  close, but we will adjust that with your chambers if and when

4  it comes up.

5         The other housekeeping matter, I just wanted to go

6  back a bit to the employee benefits motion, because there was a

7  bit of discussion about the workers' comp, and I was not clear

8  on what --

9         THE COURT:  And Mr. Morrissey said it was de minimus,

10  and I --

11         MS. GRASSGREEN:  -- and I wasn't clear on what the

12  Court's ruling was with respect to that, so I did want to

13  clarify so that we make sure that we're acting appropriately.

14         THE COURT:  I'm going to sign the order you

15  submitted.  I'm not trying to be vague about it, but I think

16  Mr. Morrissey made the point it was quite a de minimus amount,

17  and so, if for no other reason than I think I deem it to be

18  necessary to do it, given the de minimus amount, you have the

19  authority to go ahead and pay that.

20         MS. GRASSGREEN:  Thank you, Your Honor.

21         THE COURT:  Mr. Morrissey?

22         MR. MORRISSEY:  Your Honor, just to clarify a little

23  further, and I have no problem with what the Court just said,

24  as counsel and I discussed yesterday, if the committee has

25  problems with certain aspects of that order in terms of the

92

1  practices of the debtor, in terms of the famous gym

2  memberships, for example, those can always be revisited later

3  on.

4            THE COURT:  They can.

5            MS. GRASSGREEN:  Yes, Your Honor.  We'll be happy to

6  address that.  I will say I think we suffered a little bit from

7  over disclosure because I think it's pretty common for

8  corporate employers to offer gym memberships, because it

9  generally reduces the healthcare costs.  But they are not often

10 highlighted, as we did in our motion, but we will accept

11 whatever is appropriate with the gym memberships.  Thank you

12 for your time today.

13           THE COURT:  Thank you very much.  Anything else

14 anybody wishes to raise today?  All right.  So, we're

15 adjourned.  We do have a hearing scheduled for Tuesday at 2:00.

16 If you advise my chambers that we don't need that hearing date,

17 we can go ahead and adjourn that.  I'll enter an --

18                     (C.D. Off)

19           THE COURT:  -- the larger cases without out of town

20 counsel.  That's been what I have been doing.  I actually

21 shortened the usual time that you have to call -- to advise

22 Court Call of participation because there was so little time to

23 do that.  When I go back to chambers we'll look at what the

24 usual is.  We'll advise you about it.  And just as a standing

25 -- it's not in that case management order you submitted, but

1  you ought to consider as a standard practice all of our

2  courtrooms have telephone capability.  I know you had, I think,

3  had a footnote in your submission about it.  So, we'll go ahead

4  and do that.  You should just, as a matter of course, post the

5  notice about when -- and maybe you can talk with one of my law

6  clerks this afternoon, we usually require a little more notice

7  to Court Call before, and I think have you post the information

8  about the call in and all that a day earlier or so than you had

9  to do for this hearing because the time was so compressed.  Ms.

10 Bove, you can talk with my law clerks and work that out.

11            MS. BOVE:  Okay.  I will, Your Honor.

12            THE COURT:  Okay.  Anything else anybody wishes to --

13            MS. GRASSGREEN:  Perhaps we could include in our

14 notices of motions that anyone may appear telephonically on a

15 day's notice in our standard form.

16            THE COURT:  Yes.  But in the order I entered, and it

17 said anyone who is not, I think, the principal spokesperson,

18 that's not the precise language, either in support of or in

19 opposition, if someone is the moving party, if there are some

20 extraordinary reasons that can't be here, they should call my

21 chambers and request the ability to participate by phone.  The

22 sound system -- because they just are not perfect, and it's

23 difficult listening to any sort of lengthy argument in support

24 of or in opposition to a motion.  So, if somebody is -- I think

25 I put some language in the order that was entered.  It's the

1  usual language I use.  If someone in California, because of

2  conflicting Court hearings, can't be here for a hearing, and

3  they're the moving party, they should call my chambers and

4  explain why, and I'll consider permitting them to do it.  But

5  it just -- it's a problem if the principal, if the lawyers

6  making the principal arguments in support of or in opposition

7  to a motion are not in the courtroom.

8          MS. GRASSGREEN:  Thank you, Your Honor.

9          MR. WITTER:  Your Honor?

10          THE COURT:  Yes?

11          MR. WITTER:  This is Art Witter (phonetic).  I'm one

12  of the California counsel on the line.  I'm sure there's many

13  of us that are on the line this morning, and we appreciate the

14  Court's indulgence to allow us to appear by telephone.  There's

15  been quite a bit of discussion among the California entities as

16  to the propriety of the venue, and I'm asking the Court if the

17  Court would like to set a special hearing, or how the Court

18  would like to handle motions brought by the California

19  contractors, the creditors, for a change in venue or a

20  challenge to the filing on the basis it's a new debtor

21  syndrome, bad faith filing, and venue shopping.  We may want to

22  bring that motion before a creditors' committee is formally

23  established, and I know the Court's got a tight schedule, and

24  so, I haven't -- we're before this Court, and I apologize if

25  I've offended you by asking these questions, but if there's a

1  procedure that we could announce for the motion, or if you'd

2  like to specially set it, I'd appreciate the Court's

3  instruction on that.

4        THE COURT:  Set it for Friday, December 14th -- if

5  you're going to file the motion, file it no later than Monday,

6  November 26th, and objections to the motion will be due

7  Thursday, December 6th.  The replies Tuesday, December 11th,

8  and you will put it on for the omnibus motion day on Friday,

9  December 14th, at 11 o'clock.

10        MR. WITTER:  Thank you very much, Your Honor.

11        MS. GRASSGREEN:  Your Honor, is there an expectation

12  that that would be an evidentiary hearing?  Or, I guess I'll

13  ask the proposed proponent?

14        THE COURT:  Hard for me to know without seeing the

15  motion.

16        MR. COHEN:  I'm sorry, Your Honor.  This is Marc

17  Cohen.  And you're right about -- Kaye Scholer in Los Angeles

18  -- you're right, it's hard to hear.  The de bene motion that

19  Mr. Witter indicated was to be filed by November 26th, and the

20  hearing on December 14th?  When would the debtor or other

21  responses due on that?

22        THE COURT:  This is basically the schedule you'll see

23  in an order I'll enter for the December 14th hearing, that the

24  deadline for filing motions, Monday, November 26th.  The

25  deadline for objections, Thursday, December 6th.  Deadline for

96

1  replies, December 11th.  And I think it's under their order

2  it's noon on December -- it would be noon on December 11th for

3  the replies.

4          MR. COHEN:  Thank you very much, Your Honor.  Mr.

5  Morrissey, did you --

6          MR. MORRISSEY:  The smallest of points, Your Honor.

7  When Your Honor said noon on December 7th, is that Eastern

8  Time, or Pacific Time?

9          THE COURT:  I'm operating on Eastern Time, Mr.

10 Morrissey.

11         MR. MORRISSEY:  Very well.

12         THE COURT:  And everybody should take note, I did --

13 the case management order has basically been modified with

14 language I added that courtesy copies get filed as soon as

15 practicable after the paper is filed.  So --

16         MS. GRASSGREEN:  Thank you, Your Honor.

17         THE COURT:  Okay.  We're adjourned.  Thank you very

18 much, counsel.

19         MS. GRASSGREEN:  Thank you.

20                        *  *  *  *  *

21

22

23

24

25

# C E R T I F I C A T I O N

       We, PATRICIA KONTURA and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Patricia Kontura*

PATRICIA KONTURA

*Tammy DeRisi*           Date:  December 5, 2007

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.